Docusign Envelope ID: 98F4900F-9130-8726-8036-5029ADA51F2E

Case No. 1:25-cv-25894-RKA

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 1:25-cv-25894-RKA

**PRESIDENT DONALD J. TRUMP,**

an individual,

Plaintiff,

vs.

**BRITISH BROADCASTING CORPORATION a/k/a BBC, BBC STUDIOS DISTRIBUTION LIMITED, and BBC STUDIOS PRODUCTIONS LIMITED,**

Defendants.

---

### DECLARATION OF TAL LAVIAN, Ph.D.

*Independent Technical Analysis of Geographic-Restriction Technology*

*and of the Sworn Statements Concerning It*

# TABLE OF CONTENTS

I. Scope and Role: What This Declaration Does and Does Not Do

II. Qualifications

III. Materials Considered

IV. Summary of Opinions

V. Methodology

VI. What the BBC's Own Vendor and the BBC Itself Publicly Acknowledge

VII. The Cooper Declaration Against the Cooper Deposition Testimony

VIII. The Continued Deposition of May 29, 2026

IX. iPlayer Scale and the Absolute Magnitude of the Residual

X. Summary of Testing

XI. Evolution of the Technical Record Since 2018

XII. Independent Technical Findings

XIII. Attestation

List of Exhibits

Appendix A. Glossary of Essential Technical Terms

Appendix B. Technical Background

Appendix C. The Peer-Reviewed Empirical Record

Appendix D. Materials Considered (Itemized)

Appendix E. Conflict Matrix (Landscape)

# I. SCOPE AND ROLE

1.      My name is Tal Lavian, Ph.D. I make this declaration to address the technical content of the sworn statements that Defendants British Broadcasting Corporation, BBC Studios Distribution Limited, and BBC Studios Productions Limited have placed before the Court in connection with their pending motion (D.E. 36) regarding the Court's authority over the Defendants for the alleged conduct. I have personal knowledge of the matters stated in this declaration, and if called as a witness, I could and would testify competently to them.

2.      I have been engaged by Brito PLLC, counsel for Plaintiff, to provide an independent technical analysis of the network-engineering questions raised by the materials Defendants have submitted. I have been asked to analyze the operation, capabilities, and limits of the systems Defendants describe in the Cooper Declaration as constituting the BBC's *"geo-blocking technology,"* and to evaluate the extent to which those systems in fact prevented access to the Panorama programme[1] entitled *"Trump: A Second Chance?"* (the "Documentary") from the United States, specifically Florida, during the period the Documentary was available on BBC iPlayer. I have been asked separately to review the three other declarations Defendants filed in support of their motion, the Telling, Burgess, and Freeman declarations, and to identify the technical content of those declarations and any technical implications of the deposition testimony of those three witnesses. The Defendants have placed the capability of that technology directly in issue by representing, in the Cooper Declaration, that it "prevents access" to iPlayer content from outside the United Kingdom. My analysis addresses that technical representation on its own terms, as a network-engineering matter. It does not depend on, and I do not offer, any opinion on the number of persons who, in fact, viewed the Documentary from any location. That empirical question is reserved for the operational records sought in discovery.

## A. What this declaration does not do, and on what I do not opine

3.      This declaration does not opine on any question of law. I do not opine on whether the technical facts I describe satisfy any particular legal test governing the Court's authority to exercise jurisdiction over the Defendants for the conduct described, nor on any other legal standard. The legal significance of the technical record lies with the Court and counsel.

---

[1] Use of the UK spelling and not the US spelling

4. This declaration does not opine on the merits of the underlying defamation claim. I do not analyze, and I express no view on, the truth or falsity of the Documentary's contents, on the editing decisions the BBC made or did not make, on the Documentary's compliance with journalistic standards, on actual malice, or on any other element of the underlying claim. My scope is narrowly the technical-network questions raised by the technical representations the Defendants have placed before the Court.

5. This declaration does not opine on the specific number of Florida-located endpoints that, in fact, accessed the Documentary. That number can be established only from the operational logs, the existence and retention of which Mr. Cooper testified he could not confirm. This declaration does not opine on the specific commercial VPN or residential proxy service used by any specific Florida-located user. Such opinions would require operational records not in the present record.

6. **Limits of my opinions.** My opinions are subject to stated limits. I do not opine on the specific number of Florida-located endpoints that, in fact, accessed the Documentary, or on the specific circumvention service any specific user used; those are empirical questions for the BBC's operational records, which remain the subject of discovery. In connection with this declaration, I conducted direct technical testing of the BBC iPlayer geo-blocking control from a computer physically located in Florida, in June 2026, summarized in Section X and reflected in Opinion 19; contemporaneous artifacts of that testing are retained and available. I do not opine on any question of law, on the merits of the underlying claim, or on the truthfulness of any witness.

My opinions are testable and refinable against identifiable evidence: the global-traffic-manager logs for the full availability window; the two GeoComply contracts and the GeoGuard configuration as applied to iPlayer; any Documentary-specific request or incident records; the native audience-analytics data underlying deposition Exhibit 31; and the results of direct access testing under protocol. I have identified throughout this declaration which of my opinions each category would confirm, refine, or change.

## B. Compensation and independence

7. I am being compensated at hourly rates for the analysis and reporting in this matter and for any deposition or trial testimony. My compensation is not contingent on the outcome of this matter or on the content of my testimony.

8. I have no prior personal or professional relationship with President Trump, with any party to this matter, or with any of the Defendants. I have no financial interest in the outcome of this matter other than my hourly compensation.

## II. QUALIFICATIONS

9. I hold a Ph.D. in Computer Science, specializing in network communications, from the University of California, Berkeley. I previously earned a Master of Science (M.Sc.) in Electrical Engineering and a Bachelor of Science (B.Sc.) in Mathematics and Computer Science.

10. My professional career in computer networking and Internet protocols spans over thirty-five years across both industrial and academic roles. I served as a Principal Architect at Nortel Networks, where I led research, development, and architecture work on network communications, carrier-grade switching, and routing systems. I am the founder of TelecommNet, a technology consultancy focused on network engineering and content distribution.

11. My specific areas of professional expertise relevant to this matter include the Internet protocol suite (TCP/IP), with particular attention to IPv4 and IPv6 addressing, network switching, routing, and the operational practices governing IP address allocation and assignment; Network protocols, routing protocols, the Border Gateway Protocol (BGP) and the Internet's interdomain routing architecture; Virtual Private Network protocols and architectures, covering IPsec, SSL/TLS-based tunneling, and Layer 2 Tunneling Protocol (L2TP); IP-based geographic location systems and the data sources from which they are constructed; content delivery networks, streaming media, and HTTP-based streaming protocols.

12. I am the named inventor of more than one hundred patents, mostly in the fields of networking and communications. I have authored or co-authored numerous peer-reviewed publications in those fields.

13. I have served as an expert witness in numerous arbitrations, state and federal court matters, USPTO PTAB courts, international courts, and in proceedings before the United States

International Trade Commission (ITC). I have provided sworn testimony at depositions on many occasions and have testified at trial before these courts. My testimony has predominantly addressed questions about network communications, network protocols, TCP/IP protocol suite, communications systems and architectures, routing and switching, content tunneling, IP technologies, streaming media, content switching, and related technical subjects.

14.     A full curriculum vitae is attached to this declaration as Exhibit A. A list of the matters in which I have testified as an expert at trial or by deposition during the preceding four years is attached as Exhibit B. The technical questions in this matter, the behavior of VPN tunneling protocols, the architecture of CDN-based content distribution, and the accuracy limits of IP geolocation, fall squarely within the areas in which I have practiced, taught, published, and previously testified.

## III.  MATERIALS CONSIDERED

15.     In preparing this declaration, I have reviewed and considered six categories of materials: the case record, including the Defendants' pending motion (D.E. 36), its supporting declarations and exhibits (with the principal technical focus on the Declaration of Richard Cooper, D.E. 36-12), the deposition transcripts, the Court's discovery orders, the Plaintiff's discovery requests, and the BBC's document productions; the peer-reviewed academic literature on IP geolocation and on the commercial VPN and residential-proxy ecosystems (2011 through 2024, ten published studies); the published statements of the BBC's contracted geographic-restriction vendor, GeoComply Solutions Inc.; the BBC's own public materials, including the Annual Report 2024/25 and the Terms of Use exhibits the BBC itself filed; the technical documentation of the seven major consumer VPN providers; and the relevant Internet Engineering Task Force standards. The specific items in each category are itemized in Appendix D. The publicly available materials in these categories, the peer-reviewed publications, the published vendor and consumer-VPN materials, the BBC public materials, and the Internet Engineering Task Force standards, are identified in Appendix D by type and citation and are not attached as exhibits to this declaration.

16.     These materials are the kinds of materials reasonably relied upon by experts in network engineering and content distribution in forming opinions about the operation of geographic-restriction systems.

## IV. SUMMARY OF OPINIONS

17.     I have reached the following nineteen technical opinions, each supported by the analysis in the body of this declaration. For each opinion I have identified, in the body, the input materials and the methodology by which I reached it. A consolidated conclusion of opinions appears at the end of this Section.

18.     **Opinion 1.** The Cooper Declaration's representation that the BBC's geo-blocking technology "prevents access" to iPlayer content outside the United Kingdom (Cooper Decl. ¶ 9) is materially qualified by Mr. Cooper's own deposition testimony. He testified that the system operates at *"high nines"* reliability, not at one hundred percent (Cooper Dep. at pp. 79-80); that the BBC has no guarantee from its geo-blocking vendor that the data is accurate one hundred percent of the time, and that the field is *"a cat and mouse game"* (Cooper Dep. at pp. 82-83); and that he does not know whether the BBC retains the failed-request logs that would document any specific blocking failure for the Documentary's availability window (Cooper Dep. at pp. 77-78). In such a *"cat and mouse game"*, the "mouse" has a greater chance of winning without being detected by the "cat". The "cat" does not know what "mice" he did not detect. The pattern of conflict is documented across fifteen discrete points, addressed in Section VII and tabulated as Exhibit G.

19.     **Opinion 2.** Mr. Cooper is not a network engineer, not a security architect, and not a subject-matter expert on virtual private networks, geo-blocking software, or the data product his Declaration repeatedly references. He testified that his formal post-graduation training consisted of a BBC-internal *"ten week course to learn every single aspect associated with how broadcasting works, how video works, how audio works"* (Cooper Dep. at pp. 37-38), with subsequent training on the job. He has received no formal training in virtual private networks, in geo-blocking software, or in GeoComply data (Cooper Dep. at p. 43). Mr. Cooper himself identified Andrew Hudson as the architect and Mark Gledhill as the engineering manager of the iPlayer geo-blocking system (Cooper Dep. at p. 59); neither has been deposed.

20.     **Opinion 3.** The BBC undertook no Documentary-specific technical action. The GeoGuard data set used during the Documentary's window was the same data set used for all iPlayer content (Cooper Dep. at p. 29); *"nobody at the BBC communicated with GeoComply to my knowledge related specifically to this program"* (pp. 28-29); and no Documentary-specific

Docusign Envelope ID: 98F4900F-9130-8726-8036-5029ADA51F2E

verification was undertaken after the fact. The Declaration's representation that the technology *"was engaged for the Documentary"* rests on the BBC's review of its own routing decisions and of the rights-metadata records showing the Documentary's rights coded UK-only, together with distribution data, not on any audit of whether those decisions in fact prevented circumvention from any specific forum (Cooper Dep. at p. 62; the rights system is identified by name, PIPS, in the May 29, 2026 corporate-capacity testimony).

21.    **Opinion 4.** Mr. Cooper does not know whether the operational records that would resolve the empirical question of who, in fact, accessed the Documentary from where still exist. Asked whether the BBC logs failed iPlayer access requests, and whether any such logs from October 2024 through October 2025 are retained, he answered: *"I do not know if we logged failed requests number one. I do not know if our retention period for failed requests is the duration you just said. ... It is something new. ... I think it is very likely that we will be logging failed requests. I do not know the second part of your question which is whether or not those request logs are retained for the duration that we're talking about again going back to October 2024"* (Cooper Dep. at pp. 77-78). On the related question of incident-management records, he testified: *"every single thing that goes wrong is an incident and retention period for incidents extends before the period available to this record"* (Cooper Dep. at p. 81). The operational records are within the BBC's custody; their production is sought by Plaintiff's Fourth Request for Production requests 10, 11, 19, 25, 26, and 28.

22.    **Opinion 5.** The *"active steps"* framing in Cooper Declaration paragraph 9, on technical examination, is less than the framing suggests. Of the five "steps" Mr. Cooper enumerated in his deposition (Cooper Dep. at pp. 67-71), two, the Terms of Use prohibition and the TV-licence[2] pop-up, are forms of consumer-facing notice and not access-control mechanisms. The remaining three are the initial regional check, the request-time geo-and-VPN evaluation, and the CDN-edge re-check. The two BBC-side checks apply the same GeoComply country-and-VPN classification, so they are not independent failure modes. Mr. Cooper testified that the CDN performs "the same calculation" (Cooper Dep. at p. 68), and separately that the CDN provider, Akamai, independently licenses the GeoGuard data (Cooper Dep. at p. 86). Whether the CDN-layer check

---

[2] Use of UK spelling and not the US spelling

draws on the same GeoComply inputs as the BBC-side checks or on the provider's own independent license is not resolved on the present record.

23. **Opinion 6.** The geo-blocking vendor on which the BBC relies, GeoComply Solutions Inc., has publicly characterized the field as an unresolved, adversarial contest. GeoComply's published materials describe the field as a "cat-and-mouse race." GeoComply's published VPN-detection accuracy figure, from vendor-commissioned testing, is 99.1 percent (per its September 3, 2025, press release reporting Kingsmead Security testing). This report does not meet the peer-review standards of a major academic publication. GeoComply has separately and repeatedly identified hijacked residential IP addresses as a specific evasion vector against which detection is, in the vendor's own published acknowledgment, "difficult" because such addresses "may be indistinguishable from genuine user traffic," and which "may seem like a can't-win situation." GeoComply estimates approximately 200 million residential Internet endpoints have been compromised into residential-proxy pools, and has identified 17 separate commercial providers selling residential-proxy IP capacity.

24. **Opinion 7.** Virtual private network and residential-proxy circumvention of geographic restrictions on BBC iPlayer is a commercially-marketed, widely-available consumer activity. Each of the seven major commercial VPN providers, ExpressVPN, NordVPN, Surfshark, Private Internet Access, ProtonVPN, CyberGhost, and IPVanish, operates egress servers in the United Kingdom and openly markets the ability to access BBC iPlayer from outside the United Kingdom. ExpressVPN, in particular, maintains a dedicated landing page titled "Best BBC iPlayer VPN: Secure & Fast UK Streaming" at expressvpn.com/vpn-service/bbc-iplayer-vpn, which contains the verbatim line: "Whether you're catching Panorama at home or on the go, your VPN connection stays reliable with ExpressVPN." Appendix B, subsection G provides verbatim quotations from each of the seven providers' BBC iPlayer marketing and support pages.

25. **Opinion 8.** The BBC's representations regarding the inaccessibility of the Documentary from the United States are framed at the level of the BBC's own routing decisions rather than at the level of audience reception. There is no evidence in the record before me that the BBC undertook any after-the-fact technical audit to determine whether the Documentary was actually viewed from United States Internet endpoints during its availability period. The question of who,

in fact, viewed the Documentary, and from where, can be determined only from operational logs of the kind whose existence and retention Mr. Cooper testified he could not confirm.

26.     **Opinion 9.**  At BBC iPlayer's operational scale, the residual rate that Mr. Cooper and the BBC's vendor jointly acknowledge produces an absolute number of un-blocked or mis-classified requests that is not trivial. The BBC Annual Report 2024/25 reports 4.5 billion hours of viewing on 8.9 billion iPlayer requests with 15.2 million weekly active accounts during the fiscal year, which includes the Documentary's iPlayer availability window. I do not multiply the vendor's residual rate by the total request count, because the total volume is overwhelmingly ordinary in-UK traffic rather than circumvention attempts, and the product of the two would not represent a real quantity. The actual residual depends on the volume of circumvention attempts, which is not in the present record.

27.     **Opinion 10.**  The peer-reviewed empirical literature on IP geolocation accuracy and on the commercial VPN and residential-proxy ecosystems, spanning 2011 through 2024, establishes the general technical principle that IP-based geographic restriction is <u>inherently probabilistic</u> and that <u>VPN and proxy circumvention</u> of such restriction is technically feasible and has been empirically documented. These studies address general technical mechanisms; they do not measure BBC iPlayer specifically, the BBC's particular configuration, or access from any particular location, and I do not rely on them for any such measurement. I rely on them for that general technical principle, anchored in ten peer-reviewed studies: Poese (CCR 2011), Shavitt and Zilberman (JSAC 2011), Gharaibeh (ACM IMC 2017), Khan (ACM IMC 2018), Mi (IEEE S&P 2019), Livadariu (ANRW 2020), Ramesh (NDSS 2022), Komosny (PeerJ 2023), Ramesh (USENIX Security 2023), and Du (ACM IMC 2024).

28.     **Opinion 11.**  The BBC's own contracted vendor has publicly stated, in materials addressed to its own customers and to the media-and-entertainment industry generally, that geographic restriction is an ongoing adversarial contest, not a solved problem. The vendor estimates approximately 200 million home Internet endpoints have been compromised into residential-proxy pools; identifies 17 separate companies selling residential-proxy IP capacity commercially; states that one of its own streaming customers estimates up to 10 percent of its streaming traffic comes from circumventing users; characterizes the field as a "cat-and-mouse

race"; and concedes that residential-IP circumvention "may seem like a can't-win situation." The BBC's Declaration does not disclose these vendor positions to the Court.

29.    **Opinion 12.**   The technical means to present an iPlayer request as originating in the United Kingdom is commercially available to consumers. Each of the seven major commercial VPN providers I reviewed operates egress servers in the United Kingdom, and the BBC's own Terms of Use prohibit precisely that use of a VPN to reach iPlayer from outside the UK. I offer this as a technical-availability observation grounded in the providers' own technical documentation (collected in Appendix B, subsection G), not as a marketing or business opinion, and not as evidence that any person in fact accessed the Documentary.

30.    **Opinion 13.**   The BBC's own filed Exhibits 1, 2, and 3 to the Cooper Declaration explicitly acknowledge VPN circumvention of iPlayer geo-restriction as the conduct the BBC's Terms of Use and help page set out to address. Exhibit 1 (the BBC Terms of Use) prohibits users from "using a VPN service so you can watch BBC iPlayer when you're outside the UK." Exhibit 3 (the BBC.com Terms of Use) contains materially identical language. The BBC iPlayer help page at Exhibit 2 instructs users on the operational scenario in which a user is in fact using a VPN. A contractual prohibition does not exist to address a non-occurring behavior; the BBC's own filed exhibits name, anticipate, and write contractual prohibitions against the very behavior the Declaration represents the BBC's technology prevents.

31.    **Opinion 14.**  Mr. Burgess, the BBC's Director of News Content, attested at paragraph 13 of his Declaration that the BBC's geo-blocking measures are "in line with the industry standard." At deposition he testified that the technical basis of that representation lies outside his role: "I am not responsible obviously for the geo blocking of the iPlayer service so I can't give you a technical explanation but I can tell you is that the BBC rigorously enforces this" (Burgess Dep. at p. 60); and: "I'm familiar with the BBC's policies and responsibilities in this area. ... I'm not familiar with the technology or how it's done." (Burgess Dep. at p. 61.) Asked whether he had reviewed any logs that would have blocked or restricted access, he answered: "I'm not aware. I didn't review any such --" (p. 60), citing the iPlayer Terms of Use for the basis of his review. The industry-standard attestation accordingly stands on the record without technical foundation from its own declarant, and the comparator evidence in the record is Mr. Cooper's: the only comparator he could name is ITV, a United Kingdom Public Service Broadcaster, and he himself

would not describe the BBC's measures as an "established industry guideline" (Cooper Dep. at pp. 85-86, 90-91).

32.      **Opinion 15.** In the BBC's binding corporate capacity, the BBC's own audience-analytics records for the Documentary, produced as deposition Exhibit 31 (data pull dated May 21, 2026), identify approximately 570,000 successful play starts; approximately 0.05 percent identified by the analytics geolocation as originating from the United States (a figure Mr. Cooper gave from memory and said he would need to validate); and 34 successful play starts, comprising 12 visits among 10 distinct users, attributed to the State of Florida. The analytics system records only successful play starts, so each is a completed delivery from the start of playback. Mr. Cooper confirmed that *"the 34 attempts definitely happened"* while *"questioning the extent that they happened in Florida"*; he *"would not testify that they did not occur"* and "will not testify that they did occur." These records and his testimony are addressed in Section VIII.

33.      **Opinion 16.** In corporate capacity the BBC testified that it cannot quantify the geo-blocking failure rate; that it has no mechanism to measure GeoGuard's accuracy on its own iPlayer traffic; that any accuracy percentage is the vendor's own published figure, which the BBC has "no way to be able to authenticate"; that it learns of geolocation errors only when a user complains, and a non-UK user who obtains access is unlikely to complain; and that it has not audited GeoGuard since procurement. The BBC's only error sensor detects the false-positive class (UK users wrongly blocked) and is structurally blind to the false-negative class (non-UK users wrongly served) at issue in this matter.

34.      **Opinion 17.** The same geo-blocking stack that the BBC contends protected the Documentary was, during the Documentary's availability window, the subject of contemporaneous rights-holder reports that named consumer VPN services were reaching iPlayer-protected content and that the iPlayer registration wall could be passed with a random name and a fake UK postcode; a BBC employee internally reproduced cross-border access using a VPN set to a UK location. Mr. Cooper confirmed these facts in corporate capacity and testified that the BBC never determined the cause and never told the rights-holder its concerns were unfounded. His rebuttal, that the named services are data-center VPNs whose reported exit address tested as blocked, is tense with his own contemporaneous email explaining that such

services route an address-check request through data-center exits while routing protected content through residential exits.

35. **Opinion 18.** The continued deposition partially resolved the question, open at the April deposition, of whether records of failed access exist. In its corporate capacity, the BBC testified that blocked requests are recorded as HTTP 403 responses and that the relevant global traffic manager (GTM) logs were retained and produced in aggregate. The architecture limits what can be reconstructed: only the subset of Media Selector endpoints routed through GTM carries a request-time record of the country and VPN determination; the CDN logs record the IP address and outcome without the country, or the reason; the annotation and GeoIP service logs are retained for only seven days. For requests outside the GTM subset, the request-time geographic decision is not recoverable except by post-hoc enrichment, the witness testified, which is not necessarily consistent with the decision taken at the time.

36. **Opinion 19.** Direct technical testing confirms that the BBC's iPlayer geo-blocking control, in its present configuration, can be <u>defeated from a computer physically located in Florida</u>. In **testing I conducted** and observed on June, 2026, a server physically located in Florida was refused service by iPlayer when it connected directly, its Non-UK  IP address detected; and the same server reached and played iPlayer, **undetected, through each of five commercial VPN providers** presenting a United Kingdom exit, <u>ExpressVPN, NordVPN, Private Internet Access, Proton VPN, and Surfshark</u>, the five providers identified in the BBC's own produced correspondence and addressed at the May 29, 2026 deposition. The measurement is iPlayer's own serve-or-refuse decision, corroborated by independent geolocation of the exit address. This <u>confirms, through direct testing and observation,</u> what the documentary record establishes by inference: the control reduces but does not eliminate access from outside the United Kingdom. It does not quantify actual viewing from Florida, which depends on data not analyzed here. The testing is detailed in Section X.

37. **Conclusion of opinions.** Taken together, my opinions reduce to this: on the technical record before the Court, the Cooper Declaration's representation that the BBC's geo-blocking technology *"prevents access"* is materially overstated as an unqualified description of the system's capability. The accurate technical characterization, supported by the BBC's own vendor's published statements, the peer-reviewed empirical record, the BBC's own filed exhibits

and produced internal records, and Mr. Cooper's own testimony in both individual and corporate capacity, is that the technology reduces but does not eliminate access from outside the United Kingdom; that the absolute residual at iPlayer's operational scale is non-trivial; and that the BBC's own records can neither confirm nor exclude Florida-located viewing, including the 34 Florida-attributed successful play starts in its own analytics. The legal significance of this technical record is for the Court; I note only that the inferential core of this conclusion has now been confirmed by direct testing, summarized in Section X, in which a Testbed computer located in Florida reached and played iPlayer, undetected, through each of five commercial VPN providers.

## V. METHODOLOGY

38.     My analysis rests on seven bodies of input, each identified by source: the four BBC declarations, with the principal technical focus on the Cooper Declaration; the certified April 24, 2026 deposition transcript of Mr. Cooper and the rough draft transcript of his continued May 29, 2026 deposition, in which he testified in the BBC's corporate capacity (quotations from the May 29 deposition are conformed to the rough draft and will be confirmed against the certified transcript when available); the peer-reviewed academic literature of 2011 through 2024, consisting of ten published studies; the published statements of the BBC's contracted vendor, GeoComply Solutions Inc.; the BBC's own filed exhibits and produced internal records; and the technical documentation of the major consumer VPN providers, considered as evidence of the technical availability of United Kingdom egress infrastructure. Each deposition quotation is tied to a specific transcript page; each academic citation includes the author, title, venue, publication date, and DOI or institutional URL; each vendor citation includes its source URL and date.

39.     My method is comparative and is documented. I cross-referenced the Cooper Declaration's specific technical representations against Mr. Cooper's subsequent sworn testimony and identified the points of material conflict (Section VII; the full fifteen-point tabulation accompanies this declaration as Exhibit G). I evaluated the BBC's geographic-restriction architecture against the established peer-reviewed empirical record, which provides published, replicated measurements of geolocation-database accuracy and of circumvention under ordinary commercial conditions. And I cross-referenced the BBC's representations against the published statements of the BBC's own contracted vendor and against the BBC's own produced internal

records. Each opinion identifies its inputs, the comparison performed, and the inferential limits of the result. The methods I apply, protocol-level analysis, architecture-level analysis of where classification decisions are taken and what each system records, and the evaluation of system behavior against published, replicated measurements, are standard and generally accepted within network engineering, and they are the same methods I have applied in my industrial and academic work outside litigation.

40.     Where the empirical record permits, my opinions rest on testing identified by source, both direct testing I conducted and testing performed by others: the direct testing of the geo-blocking control that I performed and observed from a Florida-located server on June, 2026; the vendor-commissioned audits of the GeoGuard product; the peer-reviewed studies' direct measurements; and the BBC's own internal reproduction documented in its produced records, each summarized in Section X. I apply to that record the standard analytical methods of network engineering: protocol-level analysis of the IP, routing, and tunneling mechanisms involved, and architecture-level analysis of where classification decisions are taken and what each system records. Every non-trivial inferential claim in this declaration is grounded in the sworn record, the peer-reviewed literature, the vendor's own public statements, or the BBC's own filings and produced records; I have not stated any conclusion that rests only on my own assertion. A further function of this declaration is translational: the record before the Court speaks in the technical vocabulary of geolocation data sets, VPN egress, residential proxies, global traffic managers, and CDN edge rechecks, and specialized network engineering knowledge is required to explain what that record does and does not establish.

Docusign Envelope ID: 88F4909E-8130-8726-8036-5029ADA51E2E
Case 1:25-cv-25894-RKA   Document 94-11   Entered on FLSD Docket 07/14/2026   Page 16 of 62

Case No. 1:25-cv-25894-RKA

## VI. WHAT THE BBC'S OWN VENDOR AND THE BBC ITSELF PUBLICLY ACKNOWLEDGE

41. This Section compiles the public statements of GeoComply Solutions Inc., the BBC's contracted vendor for VPN and proxy detection, of the BBC itself (including pre-litigation statements by Mr. Cooper), and of the BBC's own filed Terms of Use. The statements are admissions inconsistent with the Cooper Declaration's representation that the BBC's geo-blocking technology "prevents access."

### A. The vendor-commissioned 99.1 percent advertised detection rate



all circumvention attempts

detected and blocked

residual
gets through

Bar is schematic, not to scale. No detection layer blocks every attempt;
the residual is a continuous flow, not a rounding error.

Vendor-commissioned testing (Kingsmead, Sept 2025) reports about 99.1% VPN detection.

*Figure 15. No detector is perfect: the probabilistic residual*

42. GeoComply's most recent public press release, dated September 3, 2025, announces the results of testing by Kingsmead Security, Ltd. on the GeoGuard product family: 99.1 percent VPN-detection accuracy, a 0 percent false-positive rate, and 99.8 percent overall accuracy across streaming use cases; it identifies the BBC as a GeoComply customer. The 0.9 percent residual is, on the vendor's own published characterization, the rate at which VPN-originated requests escape detection. Kingsmead was retained by GeoComply, so the figure is a vendor-commissioned result rather than a peer-reviewed or independently-replicated measurement, and I treat it as such throughout this declaration. I do not adopt the vendor's figure as a measured truth about iPlayer traffic; I use it only as the vendor's own most favorable published characterization of the product's performance, an upper bound on claimed detection, and my opinions hold on that upper bound: even at 99.1 percent, the residual is non-zero by the vendor's own statement.

### B. The earlier Kingsmead audit and its single confessed failure

43. GeoComply published an earlier Kingsmead Security audit covering the 2020-2021 testing period: a 99.6 percent VPN-detection rate across approximately 22,500 test transactions, with one confessed failure, a commercial VPN service identified in the audit report as "UltraVPN" that GeoGuard failed to detect on the day of the test. Even within testing conditions the vendor itself chose, a specific commercial VPN service successfully circumvented GeoGuard's detection.

### C. The "cat-and-mouse race" admission

44. The January 23, 2023 Amazon Web Services Partner Network blog post co-authored by GeoComply, titled "Winning the Cat-and-Mouse Race: Staying One Step Ahead of Streaming Geopiracy with GeoGuard and AWS," frames the field as a continuing adversarial contest. Mr. Cooper adopted the same framing at deposition: the BBC has no guarantee from GeoComply that the data is "accurate 100 percent of the time and we recognize that it's a cat and mouse game, right, between us and VPNs because they are continuously trying to get around the protection and GeoComply is continuously updating the protection" (Cooper Dep. at pp. 82-83).

### D. The "can't-win situation" admission

45. GeoComply's published materials on the residential-proxy problem use the phrase "can't-win situation" to describe the operational reality of distinguishing residential-proxy traffic from genuine residential subscriber traffic. The quote in context: residential-proxy detection "may seem like a can't-win situation" because residential-proxy IPs "may be indistinguishable from genuine user traffic."

### E. Demand-side data on the global VPN-using population

46. Three publicly-available data sources on the demand side of the VPN ecosystem are relevant. First, GlobalWebIndex's Q4 2018 data wave reported that approximately 25 percent of global Internet users had used a VPN in the prior month. Second, the Khan et al. ACM IMC 2018 paper's introduction characterizes the demand: "Global Internet users increasingly rely on virtual private network (VPN) services to preserve their privacy, circumvent censorship, and access geo-filtered content." Third, the Ramesh et al. USENIX Security 2023 paper's 1,252-respondent U.S. quantitative survey documents that approximately 42 percent of Americans have used a VPN.

### F. The 84 percent residential-IP figure

47.    GeoComply's blog post "Geofencing, VPN Detection, and the Revenue Security Prism" reports that 84 percent of fraudulent or circumventing access attempts GeoComply tracks originate from residential IP addresses, not from commercial-hosting or known VPN egress points: the vendor's own measurement that the residual-circumvention vector is concentrated in the difficult-to-detect category.

### G. Six circumvention vectors on the vendor's own product page

48.    The GeoComply public product page for GeoGuard enumerates six circumvention categories against which the product is positioned: VPNs; Proxy; Smart DNS Proxy; Tor Exit Nodes; Proxy over VPN; and Residential Proxy. The vendor's own enumeration is a structured admission that six distinct vectors of geographic-restriction circumvention exist in commercial reality. The technical operation of each vector is set out in Appendix B.

### I. The BBC's own Terms of Use acknowledge VPN circumvention

49.    The BBC Terms of Use filed at Exhibit 1 to the Cooper Declaration prohibit "using a VPN service so you can watch BBC iPlayer when you're outside the UK"; the BBC.com Terms of Use filed at Exhibit 3, governing the BBC's international-facing domain, contain materially identical language; and the iPlayer help page filed at Exhibit 2, titled "Why Does BBC iPlayer Think I'm Outside the UK?," lists VPN or proxy use among the categorized reasons ("Using a VPN (Virtual Private Network) or proxy? Try disabling it."). A contractual prohibition does not exist to address a behavior that cannot occur. Taken together, Exhibits 1, 2, and 3 are the BBC's own filed evidentiary acknowledgment that VPN-based iPlayer circumvention from outside the United Kingdom is the conduct its Terms of Use and user-facing help materials exist to address.

50.    **Exhibit 1 to the Cooper Declaration.** The BBC Terms of Use governing bbc.co.uk, filed at Exhibit 1 to the Cooper Declaration, prohibit users from "using a VPN service so you can watch BBC iPlayer when you're outside the UK." A contractual prohibition does not exist to address a behavior that cannot occur. The BBC drafted, posted, and filed in this litigation a Terms of Use that anticipates, names, and contractually prohibits the very behavior that the Cooper Declaration represents the BBC's technology prevents.

51.     **Exhibit 3 to the Cooper Declaration.** The BBC.com Terms of Use governing the BBC's international-facing domain, filed at Exhibit 3 to the Cooper Declaration, contain materially identical language: "using a VPN service to watch BBC iPlayer (which is only legally available in the UK) when you're outside the UK." The BBC's own internationally-facing terms explicitly anticipate that members of that international audience may attempt to use a VPN to access iPlayer.

52.     **Exhibit 2 to the Cooper Declaration.** The BBC iPlayer help page titled "Why Does BBC iPlayer Think I'm Outside the UK?," filed at Exhibit 2 to the Cooper Declaration, lists VPN/proxy use among the categorized reasons iPlayer might think a user is outside the UK: "Using a VPN (Virtual Private Network) or proxy? Try disabling it." The BBC's own user-facing materials address users who use VPNs to access iPlayer.

53.     Taken together, Exhibits 1, 2, and 3 to the Cooper Declaration constitute the BBC's own filed evidentiary acknowledgment that VPN-based iPlayer circumvention from outside the United Kingdom is the conduct the BBC's Terms of Use and user-facing help materials exist to address.

### J. The BBC's own contemporaneous internal records

54.     In this matter the BBC produced its own contemporaneous internal records, Bates BBC00039863 through BBC00040124: an internal email thread titled "BBC iPlayer + Website/App Territorial Protection" and several browser screenshots from September and October 2025. In an email of 24 September 2025 (BBC00040043), Mr. Cooper explained to a colleague that when a user requests VPN-protected content, "some VPNs route the traffic through residential IPs," a path he attributed to faster home broadband and to free VPN browser tools downloaded by "something like 9m people in the UK"; that such traffic "will then look to us that it is coming from this unwitting user and so looks legitimate"; and that it "is very difficult to counteract this method with IP address blocking alone," for four reasons: many users run such tools unwittingly; blocking those addresses also blocks the same users' legitimate BBC access; most residential addresses are dynamic and move between users over time; and some Internet service providers place multiple users behind a single shared address. A 25 September 2025 email in the same thread (BBC00039894) reports a colleague's informal check: a VPN session presenting a German location was geo-blocked, while a session presenting a UK location reached

UK broadcast content including the BBC's, documented in produced browser screenshots (BBC00039863 through BBC00039865); the email states the BBC did "not believe that there is a simple solution." A later email of 17 October 2025 (BBC00040124) relays that, after further matches, nothing had materially changed.

55.     These records concern the BBC's territorial protection generally, not the Panorama programme at issue, and I do not read them as doing so. Their technical significance is narrower: the residential-IP VPN mechanism the BBC describes in its own words is the same mechanism documented in the peer-reviewed residential-proxy literature summarized in Appendix C, and the BBC's own contemporaneous account is consistent with the probabilistic, rather than absolute, characterization of geographic restriction that is the subject of this declaration. I express no opinion on the volume of any such access or on access from any particular location.

### K. Synthesis

56.     The admissions and acknowledgements catalogued in subsections A through J above, taken together, establish that the BBC's representation that its geo-blocking technology "prevents access" is not consistent with: the BBC's own contracted vendor's most recent published detection figures; the BBC's own contracted vendor's published characterization of the field as a continuing adversarial contest; the BBC's own contracted vendor's published characterization of residential-proxy detection as a "can't-win situation"; the BBC's own iPlayer scale figures published in the BBC's own Annual Report 2024/25; the BBC's own pre-litigation public statements regarding iPlayer's operational scale; the BBC's own filed Terms of Use exhibits to the Cooper Declaration; and the BBC's own contemporaneous internal records describing residential-IP VPN traffic as appearing legitimate to the BBC's systems.

## VII.  THE COOPER DECLARATION AGAINST THE COOPER DEPOSITION TESTIMONY

57.     This Section consolidates my analysis of the Cooper Declaration against Mr. Cooper's sworn deposition testimony of April 24, 2026. For orientation, the request path the record describes runs from the viewer's player through an initial regional check at login, then a request-time country-and-VPN evaluation against the GeoComply data sets (at the global traffic manager for the endpoints routed through it), then delivery through a content delivery network that performs an edge re-check; this architecture is detailed in Appendix B. The conflicts identified

below are textual and substantive, not character-credibility conflicts: they are conflicts between the unqualified language of the Declaration and the more measured language the witness used under oath. The full fifteen-point tabulation, with verbatim quotations and transcript citations for each conflict, accompanies this declaration as Exhibit G; the principal points follow.

58.     **The Declaration's framings against the witness's testimony.**   Paragraph 9 of the Declaration culminates in the unqualified representation that the technology "prevents access to video content via the iPlayer service." At deposition Mr. Cooper testified: "They're reliable 100 percent of time if not 100 percent of the time. Talking high nines here." (Cooper Dep. at pp. 79-80.) He added, expressly conditioned on records he had not reviewed, that he thought it was 100 percent reliable throughout the availability period and that any failure would be "highly visible" (pp. 80-81); a stated belief conditioned on operational logs the witness had not consulted is an estimate, not a measurement. The Declaration's own paragraph 11 describes "reasonable, concerted attempts to prevent unauthorised[3] access," a formulation that is itself qualified and that stops well short of paragraph 9; the technical analysis supports the more qualified framing. Paragraph 10's phrase "intended to restrict" states a design objective, not an operational result.

59.     **Cooper Dep. at pp. 8, 14, 20, 26 (structure and scale).**   Mr. Cooper testified that iPlayer logs 30 to 50 billion rows per day at peak (p. 14). He confirmed two distinct GeoComply contracts, one for IP-location data and a separate one for GeoGuard VPN-detection data (p. 8), neither produced; clarified that GeoGuard is not vendor software running at the BBC, "It's a set of data. Imagine it's like a database." (p. 20); and testified "We do not know how GeoComply creates the data. We just buy the data from them." (p. 26.) The BBC, not GeoComply, controls the application logic, and the BBC operates without visibility into the construction of the data set on which its geo-restriction depends.

60.     **Cooper Dep. at pp. 28-29, 31-33 (no Documentary-specific action; no verification).** Mr. Cooper testified that "nobody at the BBC communicated with GeoComply to my knowledge related specifically to this program" (pp. 28-29) and that the GeoGuard data set used during the Documentary's window was the same data set used for all iPlayer content (p. 29), so the system as it now operates is materially the system that operated during the window. The BBC ingests that data set hourly and applies it through software the BBC has written itself; "We do not verify,

---

[3] Use of the original UK spelling and not the US spelling

Docusign Envelope ID: 88E4909F-8130-8726-8036-5029ADA51E2E

we do not duplicate the functionality that GeoComply provides to us," and the BBC validates the data set only "on a technical basis," to ensure it is "safe to load on our system," for example that it is not corrupt (pp. 31-33). The accuracy of the geo-block is therefore entirely dependent on a vendor data product the BBC does not independently verify, refreshed hourly against a continuously changing universe of VPN egress points and residential-proxy addresses.

61.     **Cooper Dep. at pp. 59, 62 (rights-metadata check; the operational technical witnesses).** Mr. Cooper testified that the records he reviewed for the Declaration's paragraph 12 representation, that the technology "was engaged for the Documentary," were the metadata records describing what the geo-blocking should be, the rights associated with the program being UK-only, together with the distribution data, and that no other data formed part of that answer (p. 62). A request from a Florida viewer using a VPN with a UK egress would not appear in a rights-metadata record, which records rights, not access; in corporate capacity on May 29, 2026, Mr. Cooper identified the rights system by name, PIPS, and confirmed that the Documentary's PIPS rights were set to UK only. He also identified Andrew Hudson as the architect of the iPlayer geo-blocking system and Mark Gledhill as the engineering manager (p. 59); Cooper is neither, and neither has been deposed.

62.     **Cooper Dep. at pp. 37-38, 43-44 (training; authorship).** Mr. Cooper described his formal post-graduation training as a BBC-internal "ten week course to learn every single aspect associated with how broadcasting works, how video works, how audio works," with subsequent training on the job and no formal training in VPNs, geo-blocking software, or GeoComply data (p. 43). The Declaration was drafted by counsel and reviewed by him: "Counsel drafted it on the basis of input from me." (p. 44.)

63.     **Cooper Dep. at pp. 67-71 (five active steps).** Mr. Cooper enumerated five "active steps": the Terms of Use prohibition; the TV-licence pop-up at registration; the initial regional check at login; the request-time geo-and-VPN evaluation; and the CDN-edge re-check. The first two are forms of notice to the consumer, not access-control mechanisms. The two BBC-side checks depend on the same GeoComply data inputs and so are not independent failure modes; Mr. Cooper testified that the CDN performs "the same calculation" (p. 68), and separately that the CDN provider, Akamai, independently licenses GeoGuard (p. 86), so the independence of the CDN layer is an open question for discovery.

64.    **Cooper Dep. at pp. 75, 77-78, 81 (documentation; failed-request logs; incidents).** Mr. Cooper testified that the iPlayer Geo IP architecture documentation resides on Confluence but could not identify the specific documents (p. 75). On the operational logs: "I do not know if we logged failed requests number one. I do not know if our retention period for failed requests is the duration you just said. ... I think it is very likely that we will be logging failed requests. I do not know ... whether or not those request logs are retained for the duration that we're talking about again going back to October 2024." (pp. 77-78.) On incident records: "every single thing that goes wrong is an incident and retention period for incidents extends before the period available to this record" (p. 81). These records are within the BBC's custody and are the subject of the Plaintiff's document requests.

65.    **Cooper Dep. at pp. 82-83, 85-86, 89-91 (no guarantee; comparators).** Mr. Cooper testified: "[W]e do not have a guarantee from GeoComply it's accurate 100 percent of the time and we recognize that it's a cat and mouse game. ... so we don't have what you just described as a guarantee." When the BBC encounters indications of a problem it can "complain" to GeoComply, with "service credits associated with it" (pp. 82-83), a commercial remedy that flows after a problem is identified, not a real-time technical assurance. On industry practice: "I wouldn't describe it as established industry guideline" (pp. 85-86), and the only comparator he could name is ITV, a United Kingdom Public Service Broadcaster (pp. 90-91). He characterized GeoComply as the "gold standard" in VPN detection (pp. 89-90); the same vendor's own materials characterize the field as a "cat-and-mouse race" and residential-proxy detection as a "can't-win situation," so the framing does not, in the vendor's own materials, mean a solved problem.

## VIII.  THE CONTINUED DEPOSITION OF MAY 29, 2026

66.    On May 29, 2026 Mr. Cooper testified again, as the designated corporate representative of the Defendants on the noticed geo-blocking and territorial-restriction topics, and he confirmed that this testimony binds the BBC. Where his individual-capacity April testimony and his corporate-capacity May testimony address the same subject, I treat the May testimony as the BBC's institutional position. The quotations in this Section are conformed to the rough draft transcript and will be confirmed against the certified transcript.

67.     **Two location-data systems; what is recorded and retained.**  The BBC operates two separate families of systems that associate viewers with locations. The enforcement side consumes GeoComply IP-geolocation data (updated daily) and GeoGuard VPN-classification data (updated hourly) and drives the serve-or-block decision; the audience-analytics side uses a different supplier, which Mr. Cooper understood to be Digital Element, updated at most weekly and not selected for geolocation accuracy. He testified the two data sets "give different answers in edge cases." Most systems in the request path do not record geolocation; the exception is the global traffic manager (GTM), which records the request-time country and VPN determination, with blocked requests appearing as HTTP 403 codes, and the GTM logs covering the Documentary were retained and produced in aggregate. But not all Media Selector endpoints route through GTM; the annotation and GeoIP service logs are retained seven days; the Media Selector's own logs have expired; and the CDN logs record the IP address and outcome without the country or the reason, so attributing a country to a CDN log line requires after-the-fact enrichment that Mr. Cooper conceded will not necessarily match the decision taken at the time. For requests outside the GTM subset, the request-time geographic decision is not recoverable.

68.     **The United States and Florida records.**  The audience-analytics record for the Documentary, produced as Exhibit 31 (data pull May 21, 2026), contains approximately 570,000 successful play starts and records successful play starts only. Mr. Cooper recalled, from memory and subject to validation, that approximately 0.05 percent were identified as originating from the United States. A query for the State of Florida returned 34 play requests across the availability window, which he refined to 12 visits among 10 distinct users; because the data set holds successful plays only, all were completed deliveries. He confirmed that "the 34 attempts definitely happened" while "questioning the extent that they happened in Florida"; his sworn bottom line: he "would not testify that they did not occur" and "will not testify that they did occur." The BBC's contrary distribution-side figure, that one hundred percent of distribution was to the UK, rests on post-hoc enrichment of CDN logs and cannot, by construction, exclude VPN-mediated United States viewing: circumventing users select VPN exit nodes located inside the UK, so a successful circumvention arrives from a UK address and is recorded as a UK delivery. A UK-only distribution record is consistent both with zero circumvention and with substantial circumvention.

69. **The BBC's post-hoc analysis and its limits.** Mr. Cooper described a personal investigation of the Florida-identified rows: most are attributed to an ISP identified as Carnival Corporation; he located those addresses in the CDN logs, ran them through GeoComply (UK for successful requests, Germany for unsuccessful ones), checked free public geolocation sites (UK), and ran a traceroute on one address that terminated at a data center he identified as LV4 in Slough. As network-engineering method, four observations follow: the lookups and traceroute were performed around May 2026 against assignments from October 2024 through November 2025, while address assignment and routing are dynamic (the BBC's own premise for daily and hourly refresh); the traceroute was run on a single address and generalized; Carnival operates cruise ships, and as a matter of general maritime network architecture, an observation I offer from network-engineering knowledge rather than from this record, shipboard passenger Internet is commonly backhauled via satellite to shore-side gateways, so a UK termination point is not inconsistent with a passenger located elsewhere; and the analysis was performed personally by a witness who testified he has no training in data forensics. The limitation is symmetric: Mr. Cooper testified the BBC does not use IP addresses for state- or city-level determinations "because it's not reliable," so the BBC's records can no more establish that the 34 plays did not occur in Florida than that they did.

70. **Quantification, audit, and error visibility.** In corporate capacity Mr. Cooper testified: "We believe that BBC cannot quantify it. We cannot quantify that." The BBC has no mechanism to measure GeoGuard's accuracy on its own traffic; any percentage is the vendor's published figure, which the BBC has "no way to be able to authenticate." Error detection is complaint-driven: "We only have data on that where somebody complains to us, otherwise we are unaware of the error," and he acknowledged a non-UK user who finds a window of access is unlikely to complain. He conceded the error model is symmetric, citing the UK ISP Hyperoptic's acquired address blocks, and the BBC has not audited GeoGuard since procurement; "gold standard" is his own term derived from the procurement process.

71. **The rights-holder records and the Documentary-specific instructions.** The BBC's produced internal records (Bates BBC00039863 through BBC00040124, addressed in Section VI) were put to Mr. Cooper as deposition exhibits, and he confirmed in corporate capacity: the technology at issue is the same technology the BBC contends protected the Documentary; the rights-holder's reports arrived while the Documentary remained on iPlayer; the registration wall

Docusign Envelope ID: 88E4909F-8130-8726-8036-5029ADA51E2E

could be passed with a random name and a fake UK postcode; a BBC colleague reproduced cross-border access using a UK-set VPN; and the BBC never determined the cause and never told the rights-holder its concerns were unfounded. Separately, published step-by-step instructions for watching the Documentary from anywhere via a UK-set VPN were marked as exhibits; Mr. Cooper agreed the steps require no technical sophistication, and the BBC never tested whether they succeed against its stack. He further testified that the account-registration country plays no role in enforcement; that he knows of no user ever banned for VPN use; and that the categories of authorized access from outside the UK he identified confirm that the infrastructure delivers outside the UK when configured to do so: geographic restriction is a policy applied to data, not a physical property of the network.

## IX. iPLAYER SCALE AND THE ABSOLUTE MAGNITUDE OF THE RESIDUAL

72.     The BBC Annual Report 2024/25, covering the fiscal year that includes the Documentary's availability window of October 28, 2024 through October 28, 2025, reports 4.5 billion hours of iPlayer viewing, 8.9 billion iPlayer requests, and 15.2 million weekly active iPlayer accounts; Mr. Cooper independently testified that iPlayer logs 30 to 50 billion rows per day at peak (Cooper Dep. at p. 14). Because the vendor-acknowledged residual rate on circumvention traffic is non-zero, the absolute number of un-detected requests at this operational scale is non-trivial. I do not multiply that residual rate against the BBC's total request volume: the total volume is overwhelmingly ordinary in-UK traffic rather than circumvention attempts, so the product would not describe a real quantity. The actual residual is an empirical question that depends on the volume of attempted circumvention, which the present record does not contain. The percentage framing (a vendor-commissioned 99.1 percent detection, 0.9 percent residual) understates the operational consequence: at iPlayer's scale a non-zero residual rate is a continuous flow of un-detected access.

73.     I express no opinion on what fraction of the worldwide residual originates in Florida specifically. The deposition has supplied the BBC's own analytics figures bearing on this component, addressed in Section VIII: approximately 570,000 successful play starts of the Documentary, of which roughly 0.05 percent were identified as United States-originating and 34

were attributed to the State of Florida, figures the BBC testified it can neither confirm nor exclude as reflecting actual Florida location.

## X. SUMMARY OF TESTING

74. This Section summarizes the testing on which my opinions rely, including direct technical testing I conducted in this matter and testing performed by others that I have reviewed and identified by source.

75. **Vendor-commissioned testing.** GeoComply has published two rounds of third-party testing of the GeoGuard product by Kingsmead Security, Ltd., a firm GeoComply retained. The 2020-2021 audit reported a **99.6% VPN-detection** rate across approximately 22,500 test transactions, with one confessed failure, a commercial VPN service identified in the audit report as "UltraVPN" that GeoGuard failed to detect on the day of the test. September 3, 2025, press release reports **99.1% VPN-detection** accuracy and a **0% false-positive** rate across streaming use cases. Because the tester was retained by the vendor, I treat these as vendor-commissioned results rather than peer-reviewed or independently replicated measurements; even so, they are the vendor's own published acknowledgment of a non-zero miss rate, roughly nine in every thousand VPN-originated requests in the most recent round.

76. **Peer-reviewed measurement.** The ten peer-reviewed studies identified in Appendix C are the published product of academic researchers' direct measurement of IP-geolocation database accuracy and of the commercial VPN and residential-proxy ecosystems, in venues including ACM IMC, IEEE S&P, NDSS, and USENIX Security, spanning 2011 through 2024. They establish, as a general principle replicated across studies, that IP-based geographic restriction is probabilistic and subject to VPN and proxy circumvention; they do not measure BBC iPlayer specifically, and I do not rely on them for any BBC-specific measurement. Their fit to this matter is at the mechanism level: the studies measure the accuracy and circumvention of the same classes of mechanism, commercial IP-geolocation databases, VPN egress infrastructure, and residential proxies, that Mr. Cooper testified the BBC's stack consumes.

77. **The BBC's own testing and its limits.** The BBC produced internal records document an informal internal reproduction in September 2025: a BBC colleague, using a VPN, found that a session presenting a German location was geo-blocked while a session presenting a UK location reached UK broadcast content, an outcome documented in produced screenshots (BBC00039863

through BBC00039865). In corporate capacity, the BBC testified that it has no mechanism to measure GeoGuard's accuracy on its own traffic, has not audited GeoGuard since procurement, and never tested whether the published step-by-step instructions for viewing the Documentary from abroad succeed against its stack. Mr. Cooper's May 2026 post-hoc lookups and single traceroute, addressed in Section VIII, were performed long after the relevant address assignments and by a witness without data-forensics training, and carry the methodological limits identified there.

78.    **Direct empirical testing performed.** In June 2026, I conducted controlled testing of the BBC iPlayer geo-blocking control using **a server physically located in Florida**, observing sessions in real time; the test machine remained physically in Florida throughout, operated remotely by an information-technology contractor residing physically in London, UK, and observed by me. The test held the test machine's location in Florida constant and varied only whether a commercial VPN was engaged. With no VPN engaged, the server's Florida public IP address (45.32.175.173) was independently geolocated to the United States, and iPlayer refused service, returning the message that BBC iPlayer is not available in the viewer's region: the control detected the out-of-United-Kingdom origin and blocked it, exactly as the BBC describes.

With each of five commercial VPN providers engaged separately, ExpressVPN, NordVPN, Private Internet Access, Proton VPN, and Surfshark, each presenting a United Kingdom exit, the same Florida server was reached and played iPlayer, and the VPN was not detected. These are the five VPN providers the BBC's own produced correspondence identified as defeating the block, and that were addressed in the May 29, 2026 deposition. As a documented example, with ExpressVPN connected through a London exit, the server's public IP became 194.32.120.78, independently geolocated to London, United Kingdom, and identified as a hosting address (AS42831, UK Dedicated Servers Limited); iPlayer nonetheless loaded and streamed a currently available programme.[4] The documentary at issue has since been removed from iPlayer. At the time of this report, the BBC did not detect these five VPNs and allowed the iPlayer streaming.

79.    **What the testing does and does not establish.** The operative measurement is iPlayer's own serve-or-refuse decision, not any third-party geolocation lookup; the lookups corroborate where each VPN exit was located, but the dispositive fact is that the BBC's own control served

---

[4] UK spelling

protected content to a request that, on the BBC's account, it should have refused. Three features of the design foreclose the predictable objections. First, the exemplar United Kingdom exit was a data-center, hosting-flagged address, the category that is easiest to detect; that it was served is a direct empirical test of the BBC's corporate-capacity position that the listed providers "are data centers VPNs" as to which "those same challenges don't apply" (Cooper May 29 Dep.), and on this test the data-center exit was not detected. Second, the test account used the operator's genuine United Kingdom registration details and TV Licence, which does not affect the result, because the BBC testified in corporate capacity that "the account registration location is not used at all within our IP geolocation enforcement." Third, because the BBC's produced correspondence describes the geo-block as platform-wide, and Mr. Cooper testified that the same GeoGuard data set governs all iPlayer content (Cooper Dep. at p. 29), testing a currently available title exercises the same control that governed the Documentary. The testing establishes present-day technical feasibility of undetected iPlayer access from a Florida-located computer; it does not, by itself, quantify how many people in Florida in fact viewed any programme[5]. The result is reproducible: the documented method and the retained artifacts permit independent repetition, and as of June 2026, the same five providers reach iPlayer from a Florida origin undetected.

## XI. EVOLUTION OF THE TECHNICAL RECORD SINCE 2018

80.     The technical record bearing on consumer-grade VPN circumvention of streaming geographic restriction has expanded materially since 2018; the observation is offered as technical context, and any legal significance is for the Court and counsel. Four developments mark the expansion. First, the BBC's principal technical witness has now been deposed under oath, in April 2026, individually and on May 29, 2026, in the BBC's corporate capacity, producing the qualifications and admissions catalogued[6] in Sections VIII and IX. Second, seven of the ten peer-reviewed studies on which my opinions rest postdate 2018, as identified in Appendix C. Third, the BBC's contracted vendor's principal public admissions postdate 2018, including the _"cat-and-mouse race"_ framing (January 2023), the 99.1 percent Kingsmead figure (September 2025), the _"can't-win situation"_ characterization, the 84 percent residential-IP figure, and the six-vector

---

[5] UK spelling
[6] UK spelling

Docusign Envelope ID: 88E4909E-8130-8726-8036-5029ADA51E2E

product page. Fourth, the BBC's own Terms of Use are now in the record as filed exhibits. The technical record before this Court is materially more developed than it was in 2018.

## XII.  INDEPENDENT TECHNICAL FINDINGS

81.     My independent technical findings follow; the supporting analysis is in the Sections above. First, on the technical record before this Court, the BBC's iPlayer geo-restriction architecture is a probabilistic system with vendor-admitted residual rates; the Declaration's framing of the system as one that *"prevents access"* overstates the architectural capability. Second, because the vendor-acknowledged residual rate is non-zero, the absolute number of un-detected requests at iPlayer's operational scale is non-trivial; I state no specific figure, because the volume of circumvention attempts, as distinct from total requests, is not in the present record.

82.     Third, the Florida-specific share of the worldwide residual cannot be quantified from the present record: it depends on operational logs, log-retention documentation, or direct empirical testing from Florida-located endpoints under protocol. The corporate-capacity record of May 29, 2026, including the 34 Florida-attributed successful play starts discussed in Section VIII, is the first record evidence bearing directly on this component; it does not quantify the component, and the BBC's own binding testimony is that its records cannot determine whether those plays did or did not occur in Florida. Fourth, the ten peer-reviewed studies catalogued in Appendix C establish, as a general technical principle, that IP-based geographic restriction is probabilistic and subject to VPN and proxy circumvention; they do not measure BBC iPlayer specifically. Direct testing I conducted in June 2026, summarized in Section X, confirms the present-day technical feasibility of undetected iPlayer access from a Florida-located computer through each of five commercial VPN providers; feasibility is not frequency, and I state no figure for actual Florida viewing.

83.     Fifth, the technical means to present an iPlayer request as originating in the United Kingdom is commercially available to consumers: the major consumer VPN providers operate United Kingdom egress infrastructure, and the BBC's own filed Terms of Use prohibit precisely that use. I offer this as a finding about technical availability, not as a marketing or business observation, and not as evidence that any person in fact accessed the Documentary. Sixth, the Cooper Declaration's unqualified "prevents access" framing is qualified by the witness's own deposition record in both capacities, as set out in Sections VIII and IX.

# XIII.  ATTESTATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____June 5_____, 2026.

DocuSigned by:

*Tal Lavian*
—86EA69B7A94C472...    6/5/2026 | 6:58:21 PM PDT

**Tal Lavian, Ph.D.**

*List of Exhibits*

Exhibit A, Curriculum Vitae of Tal Lavian, Ph.D.

Exhibit B, List of Prior Testimony (Last Four Years)

## APPENDIX A:  GLOSSARY OF ESSENTIAL TECHNICAL TERMS

A-1.   This Section defines technical terms used in this declaration in the senses in which I use them. The definitions are provided for the convenience of the Court.

A-2.   **IP address.**   A numerical label assigned to each device participating in a computer network that uses the Internet Protocol. IPv4 addresses are 32-bit values commonly written in dotted-decimal form. IPv6 addresses are 128-bit values written in colon-hexadecimal form. The source IP address attached to an inbound request is the principal signal a server uses to attempt to identify the request's geographic origin.

A-3.   **Border Gateway Protocol (BGP).**   The Internet's interdomain routing protocol. Each network operator (an "Autonomous System," identified by an AS Number) uses BGP to announce to other operators which blocks of IP addresses it carries. The BGP routing table is the global source of truth for which network operator currently routes any given IP address.

A-4.   **Content Delivery Network (CDN).**   A geographically distributed network of edge servers that cache content close to end users to reduce latency and bandwidth costs. Major CDN providers include Akamai, Amazon CloudFront, and Fastly. Mr. Cooper confirmed at deposition that the BBC uses all three for iPlayer content delivery.

A-5.   **IP geolocation.**   The class of technologies and data products that map an IP address to an approximate geographic location. IP geolocation is inherently probabilistic. The IP address itself contains no geographic information; the mapping is built from external sources including registry records, BGP routing data, network-operator self-reports, latency measurements, and observed user behavior.

A-6.   **Geographic restriction (geo-blocking).**   The practice of restricting access to digital content based on the perceived geographic location of the requesting Internet endpoint. Geo-blocking is implemented using IP geolocation data to classify incoming requests by country (and sometimes by region), then accepting or rejecting the request based on the classification.

A-7.   **Virtual Private Network (VPN).**   A technology class that creates an encrypted tunnel between an end-user device and a remote endpoint operated by a VPN service. When a user connects to a VPN, that user's outbound Internet traffic appears, from the perspective of remote servers, to originate from the VPN egress IP address rather than from the user's own IP address.

**A-8. VPN detection.** A class of technologies that attempts to identify whether an incoming Internet request originated from a VPN egress point rather than from a residential or business endpoint. GeoComply's GeoGuard product family is a VPN-detection data product.

**A-9. Residential proxy (RESIP).** A class of proxy and VPN-like services that routes a paying user's outbound Internet traffic through an IP address associated with a real residential broadband subscriber. The peer-reviewed empirical study of the residential-proxy ecosystem (Mi et al., IEEE S&P 2019) documented six million distinct residential-proxy egress IPs across more than 230 countries and 52,000 Internet service providers.

**A-10. GeoComply and GeoGuard.** GeoComply Solutions Inc. is a Vancouver-based provider of geographic-location and identity-verification data products. GeoGuard is the company's principal VPN and proxy detection product line. GeoGuard is delivered to the BBC as a data set, not as software the BBC deploys at its edge. The BBC ingests the GeoGuard data set on an approximately hourly cadence and applies it through software the BBC has written itself (Cooper Dep. at pp. 26, 31).

**A-11. PIPS.** The BBC's internal Programme Information Pages (later, Programme Information Platform) database, the master metadata system the BBC uses for content cataloguing[7] and distribution-rights coding. Mr. Cooper testified that he relied on PIPS records to confirm the dates and rights coding for the Documentary.

**A-12. MediaSelector.** The BBC's internal service that selects the appropriate media manifest or stream for a given request, based on device, network, and authorization. MediaSelector is part of the BBC's iPlayer application stack and is identified in the Plaintiff's Fourth RFP as a named system whose logs and configuration are sought.

**A-13. ECHO Analytics.** The BBC's internal audience-measurement and analytics platform. ECHO Analytics is identified in the Plaintiff's Fourth RFP as a named system whose logs and reports are sought to determine actual U.S. and Florida-originating access to iPlayer during the Documentary's availability window.

---

[7] Use of UK spelling and not US spelling

**A-14. BBC iPlayer.** The BBC's domestic United Kingdom online video service. The BBC Annual Report 2024/25 reports that iPlayer delivered 4.5 billion hours of viewing on 8.9 billion iPlayer requests with 15.2 million weekly active accounts.

**A-15. BBC.com and BritBox.** BBC.com is the BBC's international online presence, operated by BBC Studios Distribution. It is the international-facing analogue of the UK-domestic BBC iPlayer; the BBC.com Terms of Use, filed by the BBC at Exhibit 3 to the Cooper Declaration, explicitly contemplate non-UK users and contain the same prohibition on accessing iPlayer via VPN as the bbc.co.uk Terms of Use.

**A-16. False positive and false negative.** In any classification system, a false positive is a case in which the system classifies an input as belonging to a category when in fact it does not (here, classifying a legitimate UK user as a VPN user and blocking them); a false negative is a case in which the system fails to classify an input as belonging to a category when in fact it does (here, failing to identify a circumventing user and serving them content).

**A-17. Request log, rejection log, and operational log.** Operational records produced by a streaming service or its CDN provider, recording each incoming request, the geographic and VPN classifications applied, and the action taken (deliver, redirect, reject). Such logs are the only direct technical record of whether a geo-restriction system in fact accepted or rejected a given request.

**A-18. Confluence.** Atlassian's enterprise wiki product, used by the BBC for internal architecture documentation. Mr. Cooper testified that the BBC's iPlayer Geo IP architecture documentation resides on Confluence (Cooper Dep. at p. 75), but he was unable to confirm the specific documents that document the system's configuration.

## APPENDIX B:  TECHNICAL BACKGROUND



*Figure 1. Reaching a remote device across the Internet*

### A.  How IP geolocation works



*Figure 2. IP geolocation is an inference, not a measurement*

**B-1.**   An IP address, considered as a number, contains no geographic information. The geolocation of an IP address is a derived inference, built from external data sources and maintained as a continuously updated database. Principal data sources used to construct an IP geolocation database include regional Internet registry records (recording which network operator was assigned a given block of addresses); BGP routing data (recording which network operators currently announce reachability for which blocks); network-operator self-reports through the geofeed mechanism standardized in IETF RFC 8805 (August 2020); latency-based measurement; and observed user behavior (used by some vendors with appropriate consent and legal authority).

**B-2.**   Every IP geolocation database is therefore an approximation. Accuracy is reported by vendors at the country level (typically 95 to 99 percent for commercial vendors in well-

instrumented markets) and at finer levels of granularity (substantially lower, especially for mobile networks, large CGNAT deployments, and corporate networks). The accuracy decays over time as IP-address assignments shift, network operators are reassigned, and addresses are repurposed. These propositions are not novel; they are the consistent findings of the peer-reviewed empirical literature discussed in Section VIII.

## B. How virtual private networks operate



Figure 3. How a VPN reroutes the connection



Figure 4. The same viewer, with and without a VPN

**B-3.** A virtual private network creates an encrypted tunnel between the end user's device and a remote server operated by the VPN service. Once the tunnel is established, the user's outbound Internet traffic is encapsulated inside the tunnel and emerges from the VPN service's egress server, which has its own IP address. To any remote server the user contacts after that point, the user appears to be located wherever the VPN's egress server is. The protocols used to construct VPN tunnels are documented in published standards: IPsec (RFC 4301, December 2005), SSL/TLS-based tunneling such as OpenVPN, and the more recent WireGuard protocol (integrated into the Linux kernel in 2020). The commercial VPN industry operates worldwide

and maintains egress servers in dozens or hundreds of countries, including specifically in the United Kingdom.

**B-4.** A consumer user located in Florida who wishes to access BBC iPlayer does the following. She subscribes to a commercial VPN service that maintains egress servers in the United Kingdom; she installs the VPN client on her device; she connects the client to a UK egress server; she then opens her web browser and navigates to bbc.co.uk/iplayer. The iPlayer service sees the connection arriving from the VPN service's UK egress IP address. Unless the iPlayer service can identify that IP address as belonging to a VPN service, it has no IP-based reason to refuse the connection. The mechanics are described in the peer-reviewed literature, including Khan et al. (ACM IMC 2018), Ramesh et al. (NDSS 2022), and Ramesh et al. (USENIX Security 2023).

## C. How VPN detection operates



*Figure 7. Two different questions: country database vs GeoGuard*

**B-5.** VPN detection is a separate technical problem from country-level geolocation. Vendors in this space construct databases of IP addresses associated with known commercial hosting providers, known VPN services, and known proxy services. The categories typically tracked include commercial-hosting AS ranges; known consumer VPN egress points; Tor exit nodes; known proxy services; and residential-proxy networks.

**B-6.** Each category requires different data sources and different methods of identification. Hosting AS ranges are relatively straightforward because the AS-number registration data is public and the classification is stable. Consumer VPN egress points are more difficult because VPN providers can stand up new egress IPs at any time, and the resulting IP addresses do not announce themselves as VPN egress points; they must be discovered. Residential proxies are the

most difficult of all because, by design, the egress IP address looks like a real residential subscriber's address.

**B-7.** The approximately hourly update cadence Mr. Cooper described at deposition is itself a technical concession of this difficulty. If VPN detection were a solved problem, no hourly update would be necessary. The hourly cadence is the operational expression of the vendor's effort to keep up with a continuously-changing universe of VPN egress points. The cadence implies that, in any given hour, some subset of currently-active VPN egress points has not yet been added to the GeoGuard data set.

### D. How geo-blocking is implemented in modern streaming



*Figure 5. iPlayer's geo-block is layered*



*Figure 6. The DRM key is separate from the content*

**B-8.** Modern streaming services implement geo-restriction at multiple points in the request lifecycle. The principal enforcement points are at the application's initial landing screen, at the time of a specific playback request, and at the CDN edge that delivers the content bytes. These enforcement points are referred to in the streaming industry as a layered defense. The layering provides operational robustness against misconfiguration at any single point. But the layering

does not provide independent failure-mode protection unless the layers use independent data inputs. Where, as Mr. Cooper described, all three layers use the same GeoComply data sets, a request whose IP address is misclassified by GeoComply will be misclassified consistently at all three layers.

### E. The adversarial environment and the residential-proxy threat

**B-9.** The vendor on whose data the BBC relies, GeoComply, has itself publicly characterized the geo-restriction enforcement field as a continuing adversarial contest. The January 23, 2023 Amazon Web Services Partner Network blog post co-authored by GeoComply, titled "Winning the Cat-and-Mouse Race: Staying One Step Ahead of Streaming Geopiracy with GeoGuard and AWS," describes the field in those terms. The same vendor's product pages identify the categories of evasion GeoGuard is designed to detect, of which the most operationally significant in the present moment is the residential-proxy category.

**B-10.** A residential proxy routes a paying user's traffic through the home Internet connection of a separate person, sometimes with the home subscriber's knowing consent, sometimes through compromised devices on home networks. The egress IP address that a streaming service sees is, in either case, the home subscriber's residential IP. From the data the streaming service has, it is indistinguishable from any other residential Internet user. GeoComply's own marketing acknowledges this problem in candid terms: residential-proxy detection "may seem like a can't-win situation" because such addresses "may be indistinguishable from genuine user traffic."

### F. The two-decade history of VPN circumvention as a known operational reality

**B-11.** Geographic restriction of streaming media and consumer-grade circumvention of that restriction have co-existed as commercial realities for approximately two decades. The IETF standards underlying the principal VPN protocols predate iPlayer itself. RFC 4301, the IPsec security architecture, was published in December 2005, eighteen months before the BBC launched the iPlayer service in December 2007. OpenVPN, the principal SSL/TLS-based consumer VPN protocol, was first publicly released in 2001. The technical means by which a consumer-grade VPN can make a non-UK user appear to a UK streaming service to be in the United Kingdom have therefore been available since before the streaming service existed.

**B-12.** The use of consumer VPNs to access streaming content across geographic borders has been continuously documented in the trade and consumer press over substantially the entire operational life of BBC iPlayer. Major commercial VPN providers have, since at least 2010, openly marketed BBC iPlayer access from outside the United Kingdom as a primary feature. The BBC has been a sophisticated participant in this environment for the entire operational life of the iPlayer service. The BBC has, by Mr. Cooper's own testimony, contracted with a specialized commercial vendor (GeoComply) to attempt to detect and block VPN-originated requests.

## G. The commercial VPN industry's open marketing of BBC iPlayer access

**B-13.** This subsection compiles the publicly-accessible marketing and support documentation of the seven major commercial VPN providers regarding BBC iPlayer access from outside the United Kingdom. The compilation is provided as direct, verifiable evidence that the commercial VPN industry, in its own marketing, openly represents BBC iPlayer access from outside the UK as a supported use case.

**B-14.** ExpressVPN maintains a dedicated landing page at expressvpn.com/vpn-service/bbc-iplayer-vpn, titled "Best BBC iPlayer VPN: Secure & Fast UK Streaming." The landing page reads, in current form (verbatim, accessed for purposes of this declaration): "Stream BBC iPlayer with ExpressVPN. Avoid buffering and 'content not available' errors with high-speed UK servers (London, Midlands). Try it risk-free." The same page identifies the UK egress infrastructure: "ExpressVPN operates numerous physical 40Gbps servers across London, London Docklands, and the Midlands."

**B-15.** The same landing page, in its marketing copy, references the Panorama strand by name:

> "Whether you're catching Panorama at home or on the go, your VPN connection stays reliable with ExpressVPN." (ExpressVPN BBC iPlayer landing page, marketing copy section.)

**B-16.** Panorama is the long-running BBC current-affairs strand of which the Documentary was an episode. I do not offer this marketing copy as evidence that any person, in Florida or elsewhere, in fact accessed the Documentary or any other iPlayer content. I offer it, with the other providers' materials in this subsection, only as evidence that the major commercial VPN

providers openly market UK-egress access to BBC iPlayer as a product feature, which is consistent with the existence of a commercial market for such access.

**B-17.**  NordVPN maintains a dedicated public BBC support page at support.nordvpn.com/hc/en-us/articles/19560706992401-How-to-watch-BBC-with-NordVPN. The page reads, in current form (verbatim): "BBC iPlayer (UK), BBC Sounds: Connect to any VPN server in the United Kingdom. BBC America: Connect to any VPN server in the United States. BBC Australia: Connect to any NordVPN server in Australia." The third-party technology press coverage of NordVPN's BBC iPlayer capability reports that NordVPN operates approximately 440 UK server locations and markets a feature called "SmartPlay," which the company describes as automated streaming content routing.

**B-18.**  Surfshark publishes streaming guides identifying BBC iPlayer access as a supported use case. Surfshark's marketing materials identify multiple UK server locations and advertise the ability to access BBC iPlayer. Private Internet Access maintains public marketing materials and support documentation identifying BBC iPlayer access as a supported use case. ProtonVPN maintains a UK-egress infrastructure that the company markets for streaming use. CyberGhost maintains streaming-optimized servers that its marketing identifies as configured for specific streaming services, with BBC iPlayer listed by name in the interface. IPVanish maintains public guides identifying BBC iPlayer access among the streaming use cases its UK egress infrastructure supports.

**B-19.**  Each of the seven major commercial VPN providers maintains UK egress infrastructure, openly markets BBC iPlayer access as a supported use case, and provides customer-facing support documentation specifically directing customers on how to access BBC iPlayer through the provider's UK servers. Each of the seven operates UK-egress infrastructure through which an iPlayer request can be routed so as to present a United Kingdom origin. As stated above, I offer this as market context only, and not as evidence that any person in fact accessed the Documentary.

## H.  Taxonomy of circumvention techniques

Docusign Envelope ID: 88E4909E-8130-8726-8036-5029ADA51E2E
Case 1:25-cv-25894-RKA   Document 94-11   Entered on FLSD Docket 07/14/2026   Page 43 of 62

Case No. 1:25-cv-25894-RKA



*Figure 12. Circumvention ranked by detectability*

**B-20.** This subsection provides a structured taxonomy of techniques by which a viewer outside the United Kingdom can circumvent IP-based geographic restrictions of the type identified by the BBC in its Motion to Dismiss. The taxonomy is offered for the Court's reference and to provide a common technical vocabulary for the analysis that follows. Each technique is described with its mechanism, the standards or protocols it depends on, how the user's source IP appears to the destination service, and its detectability by the BBC's stated GeoGuard layer.

**B-21.** Eight technique classes are recognized in the network-engineering literature and in the BBC's own contracted vendor's product documentation. They fall into five high-level architectural approaches: tunneling (the VPN family), proxying (proxies and residential proxies), DNS-only redirection (Smart DNS), anonymizer overlay networks (Tor), and physical in-territory paths (mobile tethering). I describe each in turn.

## H.1 Commercial VPN services

**B-22.** A consumer subscribes to a paid VPN service such as those described in Appendix B, subsection G above. The user installs a client application that establishes an encrypted tunnel between the user's device and a VPN egress server in the United Kingdom. The protocols are IPsec (RFCs 4301-4303 with IKEv2 per RFC 7296), OpenVPN (open-source, SSL/TLS-based, runs over TCP or UDP), and WireGuard (modern UDP-based protocol integrated into the Linux kernel in 2020). The destination service sees only the VPN egress server's IP address. Detection mechanism: GeoGuard catalogues commercial VPN egress IP addresses in its VPN category. Detectability is rated medium because commercial VPN providers can stand up new egress IPs at any time, and the resulting IPs do not announce themselves as VPN egress points until the vendor identifies and adds them to the data set.

## H.2 Self-hosted VPN endpoints

**B-23.** A user with modest technical skill rents a virtual machine in a UK data center (Amazon EC2, Microsoft Azure, Google Cloud, Hetzner, DigitalOcean, OVH), installs an open-source VPN server, and obtains a personal VPN egress whose IP address may never have appeared in any commercial VPN database. The standards and protocols are the same as commercial VPNs; the differentiator is who owns the egress. The destination service sees a UK cloud-provider IP, typically within an autonomous system registered to the cloud provider. Detection mechanism: GeoGuard maintains a hosting / datacenter ASN detection category that flags IPs known to belong to hosting providers. However, a substantial fraction of legitimate traffic also originates from cloud-hosted endpoints (corporate VPNs, Apple Private Relay, mobile carrier NAT egress through cloud), which makes blanket hosting-ASN blocking impractical for any consumer streaming service. Self-hosted VPN endpoints are among the hardest commercial-grade circumvention classes for IP-reputation databases because the endpoint may never have been observed before.



*A private endpoint is harder to detect than a commercial VPN: its address has never been listed.*

*Figure 13. A self-hosted VPN endpoint*

## H.3 HTTP / SOCKS proxy servers

**B-24.** An application-layer forwarder. The user configures a browser or other client to send HTTP(S) or SOCKS traffic through a proxy server in the destination country. The standards include the HTTP CONNECT method (RFC 7230 et seq.) and SOCKS4/SOCKS5 (RFC 1928). The destination service sees the proxy server's IP. If the proxy is in the UK, BBC iPlayer sees a UK IP. Detection mechanism: GeoGuard catalogues open and commercial proxy services in its Proxy category. Detectability rated easy-to-medium because public open-proxy lists are widely

Docusign Envelope ID: 88E4909E-8130-8726-8036-5029ADA51E2E
Case 1:25-cv-25894-RKA   Document 94-11   Entered on FLSD Docket 07/14/2026   Page 45 of 62

Case No. 1:25-cv-25894-RKA

circulated and easily ingested; commercial proxy services with stable infrastructure are also relatively detectable.

### H.4  Residential proxies (the hardest detection class)

**B-25.**  A residential proxy uses an IP address that belongs to a real consumer ISP, supplied by a real residential subscriber whose device participates in the proxy network. Participation is sometimes voluntary (in exchange for free service or modest payment), sometimes a consequence of bundled-application installation, and sometimes a consequence of device compromise. The standards are application-layer forwarding, typically over HTTPS with TLS encryption. Major commercial residential-proxy networks (BrightData, Oxylabs, Smartproxy, IPRoyal) operate millions of endpoint IPs. The destination service sees an IP that, on its face, looks like a normal UK home broadband subscriber: ASN belongs to a UK consumer ISP (BT, Virgin Media, Sky, TalkTalk).



*A commercial-VPN address can be put on a block list. This one cannot, because the vendor concedes a provider "can't risk blocking genuine users."*

*Figure 14. The residential-proxy gap*

**B-26.**  Detectability: HARDEST. Residential proxies are the most challenging class for any IP-based detection layer, and the detection vendor itself acknowledges this. GeoComply states in its own published materials that residential-proxy detection "may seem like a can't-win situation" because such addresses "may be indistinguishable from genuine user traffic." This is the principal current circumvention class that defeats VPN-based detection. The peer-reviewed empirical study Mi et al. (IEEE S&P 2019) documented six million distinct residential-proxy egress IPs distributed across more than 230 countries and 52,000 Internet service providers; Du et al. (ACM IMC 2024) documented the IP-leasing infrastructure underlying these networks.

### H.5  Proxy-over-VPN

**B-27.** A layered configuration. The user first connects to a VPN, then directs traffic through a proxy reachable over the VPN tunnel. The destination service sees the proxy's IP; the VPN layer is invisible. Detection mechanism: GeoGuard maintains a dedicated Proxy-over-VPN detection category. Detectability is rated medium-to-hard because the layering reduces the number of TLS- or behavioral-fingerprint signals visible to the destination service.

### H.6  Tor (the easiest detection class)

**B-28.** Tor (The Onion Router) is a free, open-source overlay network that routes traffic through three randomly selected relays before reaching the destination. The user's public-facing source IP is the IP of the final relay (the "exit node"). Exit nodes are operated by volunteers worldwide; the complete list is published by the Tor Project. Detection: EASIEST. Tor exit-node IPs are the easiest class for any detection vendor to enumerate and block. Tor is essentially irrelevant for high-quality streaming circumvention because the three-relay overlay introduces substantial latency that disrupts adaptive-bitrate streaming, and the exit-node list is publicly enumerable.

### H.7  Smart DNS services

**B-29.** Smart DNS services do not move the user's general traffic; they intercept DNS lookups for specific streaming-service domains (e.g., bbc.co.uk, iplayer.bbc.co.uk) and redirect those, and only those, to a proxy that passes the requests on with an in-territory source IP. The standards are the DNS protocol (RFC 1035 and successors) and standard HTTPS. The destination service sees the Smart DNS provider's in-territory proxy IP for streaming requests; other services see the user's real IP. Detection mechanism: GeoGuard maintains a Smart DNS Proxy detection category. Detectability rated medium. Smart DNS is lighter-weight than a VPN and is marketed specifically for streaming use cases because it preserves video throughput.

### H.8  Physical UK SIM / mobile tethering

**B-30.** Included for taxonomic completeness. A user physically present in the UK obtains a UK mobile-carrier SIM (physical or eSIM) and tethers a streaming device to that SIM. The egress is a UK mobile-carrier IP, drawn from carrier-grade NAT. The destination service's view is the carrier's NAT egress, which is a real UK mobile-carrier IP. Detection: not applicable to a Florida-located viewer because this technique requires physical presence in the UK. Mentioned because it illustrates the limits of IP-based geo-restriction: a UK-carrier IP, even one drawn from

Docusign Envelope ID: 88F4900F-9130-8726-8036-5029ADA51E2E
Case 1:25-cv-25894-RKA   Document 94-11   Entered on FLSD Docket 07/14/2026   Page 47 of 62

Case No. 1:25-cv-25894-RKA

carrier-grade NAT shared by thousands of subscribers, is indistinguishable from any other UK mobile subscriber.

### H.9  Synthesis of the taxonomy

**B-31.** The eight techniques catalogued in this subsection are mature, openly marketed (in the case of techniques H.1 through H.7), inexpensive (typically $5 to $12 per month for commercial VPN; less for proxies and Smart DNS; free for Tor), and accessible to a typical Internet user with modest technical skill. The BBC's vendor publicly categorizes and attempts to detect the first seven (the seven that involve out-of-territory users); only the residential-proxy class is described by the vendor as a structurally difficult detection problem the vendor cannot fully solve. The taxonomy is the operational ground against which the BBC's "prevents access" representation is to be evaluated.

### I.  Protocol-level signals available to VPN detection beyond IP-list lookups



*Figure 8. Detection is heuristic: a list plus behavioral signals*

**B-32.** The IP-list-based VPN detection described in subsections B through E above is the dominant approach used by GeoGuard and similar commercial data products. It is not the only approach available in the network-engineering literature. This subsection identifies the protocol-level signals that have been described in the peer-reviewed literature as supplementary VPN-detection techniques, and identifies the technical reasons these techniques are difficult to deploy at consumer streaming scale. The subsection is provided as engineering context to explain why GeoGuard, as described by Mr. Cooper, relies on the IP-list approach rather than on protocol-level techniques even though protocol-level techniques exist in principle.

## I.1  TCP fingerprinting (TTL, MSS, window scaling)

**B-33.** Each operating system's TCP/IP stack initializes new connections with characteristic values: the initial Time-To-Live field (typically 64 for Linux/macOS, 128 for Windows), the Maximum Segment Size advertised in the SYN packet, the window-scaling option, the timestamp option, and the order of TCP options in the SYN packet. When a request reaches an HTTPS server, the receiving server has access to the TCP-level SYN packet from the client. If the request transits a VPN tunnel, the TCP characteristics observed at the server may reflect the VPN client's encapsulation behavior rather than the originating device's native stack. The technique is described in the academic networking literature (e.g., the p0f passive fingerprinting tool, in use since approximately 2005). The limitation: modern operating system TCP stacks have largely converged on Linux-like defaults; smartphone and IoT devices often run Linux-derived stacks; and many VPN clients (especially WireGuard) transparently pass the underlying device's TCP characteristics. TCP fingerprinting alone produces high false-positive and false-negative rates and is not deployed by the major VPN-detection vendors as a primary classifier.

## I.2  TLS fingerprinting (JA3 and JA4)

**B-34.** When an HTTPS client opens a TLS connection, it sends a ClientHello message that includes its supported cipher suites, supported elliptic curves, extension types, and the order in which these are listed. Different TLS libraries (OpenSSL, BoringSSL, NSS, Schannel, the Go crypto/tls package) produce distinguishably different ClientHello messages. JA3 (introduced 2017) and the more recent JA4 (introduced 2023) are public methodologies that hash the ClientHello fields into a short string that fingerprints the originating TLS library. Some VPN clients introduce distinctive ClientHello signatures that, in principle, identify the traffic as VPN-originated. The limitation: modern web browsers, mobile apps, smart-TV apps, and game consoles each produce their own characteristic JA3/JA4 hashes; matching against a positive VPN list requires continuous curation of new VPN-client signatures; and several major commercial VPN clients now actively defeat JA3/JA4 fingerprinting by mimicking common browser ClientHello signatures. JA3/JA4 fingerprinting is a useful supplementary signal but not a deterministic classifier.

## I.3  Latency analysis and the geodesic-impossibility constraint

Docusign Envelope ID: 88E4909E-8130-8726-8036-5029ADA51E2E
Case 1:25-cv-25894-RKA   Document 94-11   Entered on FLSD Docket 07/14/2026   Page 49 of 62

Case No. 1:25-cv-25894-RKA

**B-35.** The Internet is bound by the speed of light. A request originating from a London IP address that exhibits a measured round-trip time of approximately 80 milliseconds to a London-based server is consistent with a London origin. A request from the same claimed London IP address exhibiting an RTT of 220 milliseconds to a London-based server, where the great-circle distance from the server to any plausible London egress point is approximately 0 to 30 milliseconds of speed-of-light propagation, raises the inference that the traffic is, in fact, transiting an additional hop, possibly a VPN tunnel from a more distant origin. Latency-based VPN detection is described in academic literature (Khan et al., ACM IMC 2018; Ramesh et al., NDSS 2022). Its operational limitations include congestion-induced latency variability, mobile-network handoff jitter, and the fact that low-latency commercial VPNs with UK egress can produce latency profiles broadly consistent with native UK traffic. Latency analysis is not deployed by major commercial VPN-detection vendors at the consumer-streaming scale.

### I.4  DNS resolution side-channel signals

**B-36.** When an HTTPS client makes a request to a streaming service, the client first resolves the service's hostname through the Domain Name System. The DNS query path provides incidental signals: which DNS resolver the client uses (the user's ISP, a public resolver such as Google 8.8.8.8 or Cloudflare 1.1.1.1, or the VPN provider's own DNS servers); the EDNS Client Subnet field (if present, reveals an approximate location of the originating client); and the timing of DNS queries relative to subsequent connection establishment. The DNS side-channel signals are most informative when the client uses a recursive DNS resolver located geographically far from its claimed location. The limitation: most modern VPN clients route DNS queries through the VPN tunnel, neutralizing the geographic-disclosure value of EDNS Client Subnet; and consumer VPN users frequently configure custom DNS resolvers that are independent of their claimed location, which removes the signal. DNS side-channel analysis remains a research-grade technique, not a deployed commercial classifier.

### I.5  Why GeoGuard relies on IP-list classification

**B-37.** The four protocol-level techniques described above all share three properties that limit their commercial deployability against consumer-grade streaming circumvention. First, each technique generates substantial false-positive and false-negative rates under real-world conditions. Second, each technique can be defeated by commercial VPN clients that actively

normalize their TCP, TLS, latency, and DNS behavior to mimic native traffic. Third, each technique imposes per-request computational and operational overhead that becomes meaningful at streaming scale (billions of requests per year, as the BBC reports for iPlayer). The combination of these three properties means that the dominant commercial approach to VPN detection, as implemented by the BBC's vendor, is IP-list classification with periodic updates. The IP-list approach is the most operationally tractable approach at scale; it is also the approach with the most acknowledged residual leakage, as the vendor's own published 0.9 percent figure reflects.

### J. Carrier-Grade NAT and the modern mobile-network geolocation challenge

**B-38.** The geolocation analysis in subsections A through C of this Section is most accurate for traditional fixed-line residential subscribers whose IP addresses are assigned through a one-subscriber-per-public-IP model. That model is no longer the dominant model in the modern consumer Internet. This subsection identifies two structural changes in IP-address-assignment practices that further reduce the accuracy of country-level IP geolocation, both of which became operationally dominant over the past decade, and both of which intersect the question of consumer-grade access to BBC iPlayer.

#### J.1 Carrier-Grade NAT in mobile networks

**B-39.** Public IPv4 address exhaustion (the IANA central pool was depleted in February 2011; the regional registries followed) has driven mobile carriers worldwide to deploy Carrier-Grade Network Address Translation (CGNAT, also known as Large-Scale NAT or NAT444). Under CGNAT, a single public IPv4 address may be shared among thousands of mobile subscribers, who are distinguished only by the carrier's internal port-mapping records. From the perspective of any external server, a request from any of those thousands of subscribers appears to originate from the same public IP. The implication for IP geolocation: country-level geolocation of a CGNAT-shared address depends on the geographic distribution of all the subscribers behind that address. For UK mobile carriers (BT, EE, O2, Vodafone, Three), a CGNAT public IP typically serves UK subscribers and is geolocated to the UK with reasonable accuracy. But CGNAT also makes more granular geolocation (region, city, neighborhood) impossible in principle, because the public IP shares no specific location signal beyond the carrier's CGNAT pool location.

### J.2  IPv6 transition and prefix-based geolocation

**B-40.** In parallel with CGNAT deployment, mobile and fixed carriers have rolled out IPv6 across consumer access networks. IPv6 introduces three changes relevant to geolocation. First, IPv6 prefix delegation typically assigns each subscriber a /56 or /64 prefix; the prefix corresponds to a much smaller geographic area than IPv4 CGNAT shared addresses. Second, IPv6 privacy extensions (RFC 4941, RFC 8981) cause individual devices to generate ephemeral addresses within the subscriber's prefix that change periodically; geolocation databases that key on individual addresses see continuous churn. Third, dual-stack deployment means that the same subscriber may present an IPv4 address (CGNAT, shared with thousands of others) on one connection and an IPv6 address (granular to the subscriber) on the next. The IP-geolocation database the BBC's vendor maintains must continuously track both address families. Inconsistencies between the IPv4 and IPv6 geolocation databases are a documented operational source of country-level misclassification.

### J.3  The intersection with VPN egress identification

**B-41.** CGNAT and IPv6 prefix delegation both complicate the parallel task of identifying VPN egress. A commercial VPN provider that operates UK egress infrastructure on a UK ISP's commercial-hosting tier presents its egress IPs to the BBC's GeoGuard data set in the same way any UK consumer ISP CGNAT pool would. Distinguishing the two requires the vendor to maintain a curated database of commercial hosting IP ranges and VPN egress points. The technical observation is that as commercial VPN providers expand their UK egress capacity and use IP-leasing arrangements (documented in Du et al., ACM IMC 2024) to obtain UK IP blocks that do not appear in standard commercial hosting IP ranges, the VPN egress identification task becomes operationally harder.

### K.  The geofeed mechanism (RFC 8805) and its operational limitations

**B-42.** This subsection describes the geofeed mechanism, standardized by the Internet Engineering Task Force in RFC 8805 (August 2020), as one of the input sources for IP geolocation databases. The mechanism's design assumes voluntary participation by network operators; the technical limits of that assumption affect the accuracy of any IP geolocation product (including GeoGuard) that relies on geofeed data.

Case No. 1:25-cv-25894-RKA

### K.1 How geofeed works

**B-43.** Under RFC 8805, a network operator that owns or routes an IP-address block publishes a self-authored CSV-format file (the "geofeed") at a URL referenced from the operator's WHOIS records. The geofeed file lists the geographic location (country, region, city) that the network operator asserts for each sub-block of its IP address space. IP-geolocation database vendors discover the geofeed by parsing the WHOIS records, retrieving the file, and incorporating the operator's self-asserted location data into the vendor's database. The mechanism is intended to give network operators a standardized way to correct geolocation errors when their actual IP-block geography differs from what vendors would infer from BGP routing or latency measurements.

### K.2 The voluntariness limitation

**B-44.** The first operational limitation of the geofeed mechanism is its voluntariness. RFC 8805 imposes no requirement that network operators publish geofeeds. As of the most recent public measurement studies (Du et al., ACM IMC 2024, and related work), geofeed coverage of the global IPv4 routing table is substantially below universal. The IP blocks operated by commercial VPN providers, by residential-proxy networks, and by IP-leasing intermediaries are disproportionately under-represented in geofeed coverage, because publication of an accurate geofeed for a VPN egress block would be self-defeating from the VPN provider's commercial perspective.

### K.3 The verification limitation

**B-45.** The second operational limitation is the absence of any RFC-level verification mechanism. The geofeed file at the operator-controlled URL is, by design, the operator's self-assertion of geographic location. The geolocation database vendor incorporating the geofeed has no built-in mechanism to verify the assertion against independent measurement. A network operator could, in principle, publish a geofeed asserting UK locations for IP blocks that actually serve a non-UK customer base; an automated geolocation database that incorporates such a geofeed without independent verification would inherit the misclassification. Vendors mitigate this risk through additional inputs (BGP analysis, latency measurement, registry data, ground-truth measurement) but the geofeed itself does not provide verification.

### K.4  The lag limitation

**B-46.**  The third operational limitation is update lag. Network operators publish geofeed updates at their own cadence (the RFC does not mandate any update frequency). When an IP block changes operational geography, for example through IP-leasing or operational reassignment, the geofeed update may lag the operational change by days, weeks, or months. During the lag interval, the geolocation database carries stale assertions. The hourly cadence at which the BBC ingests the GeoGuard data set (Cooper Dep. at p. 31) is the vendor's downstream attempt to track changes; it cannot recover information the upstream geofeed has not published.

### K.5  Implications for the present analysis

**B-47.**  The geofeed mechanism is one of several input sources to commercial IP-geolocation databases. It is, in the network-engineering view, the mechanism with the highest design intent to provide accurate per-block country-level location data. Its operational limitations (voluntariness, absence of verification, update lag) are the structural reasons that even a vendor relying on the best available input data sources can publish only a 99.1 percent country-level accuracy figure rather than 100 percent. The 0.9 percent residual the BBC's vendor publishes is the cumulative engineering consequence of these and the other limitations described in this Section.

Case No. 1:25-cv-25894-RKA

## APPENDIX C:  THE PEER-REVIEWED EMPIRICAL RECORD

**C-1.**    This Section summarizes the peer-reviewed empirical literature on the operation of IP geolocation and the commercial VPN and residential proxy ecosystems. The literature establishes that geographic-restriction systems built on IP geolocation are inherently probabilistic; that the commercial VPN ecosystem is of substantial empirically-measured scale; and that the residential-proxy ecosystem on which the most sophisticated geo-circumvention now relies comprises millions of distinct egress IPs distributed across substantially all of the world's Internet networks. The studies cited in this Section span the years 2011 through 2024 and are the leading peer-reviewed empirical studies in their respective areas.

### A.  Foundational geolocation accuracy work, Poese et al. (CCR 2011) and Shavitt and Zilberman (JSAC 2011)

**C-2.**    Two papers published in 2011 are the foundational empirical studies on commercial IP geolocation accuracy. Poese et al. (ACM SIGCOMM CCR 2011) concluded that the surveyed commercial databases exhibit substantial variation in accuracy across regions, network types, and reporting granularity. Shavitt and Zilberman (IEEE JSAC 2011) found consistent and non-trivial cross-vendor disagreement on the geographic location of the same IP addresses, a finding consistent with the database-construction methodologies in which different vendors weight different data sources differently.

### B.  Modern geolocation database accuracy, Gharaibeh et al. (IMC 2017) and Livadariu et al. (ANRW 2020)

**C-3.**    M. Gharaibeh et al., "A Look at Router Geolocation in Public and Commercial Databases," Proceedings of the ACM Internet Measurement Conference (IMC '17), November 2017, DOI 10.1145/3131365.3131380, evaluated the country- and city-level accuracy of the leading commercial IP-geolocation databases against a ground-truth dataset. The authors concluded that the databases are not reliable for geolocating routers and that there is substantial country-level error in the data. A 2021 reproduction reported that approximately five percent of database entries miss the true location by more than 1,000 kilometers, on the order of country-level error.

**C-4.** I. Livadariu et al., "On the Accuracy of Country-Level IP Geolocation," IRTF Applied Networking Research Workshop (ANRW '20), 2020, documented persistent country-level errors among commercial databases as of 2020 and confirmed that the basic accuracy limitations identified in earlier work have not been overcome by subsequent vendor improvements.

### C. Forensic and evidentiary use of IP geolocation, Komosny (PeerJ 2023)

**C-5.** D. Komosny, "Evidential value of country location evidence obtained from IP address geolocation," PeerJ Computer Science, Vol. 9, e1305, March 30, 2023, DOI 10.7717/peerj-cs.1305, is the first peer-reviewed published paper to address specifically the forensic and evidentiary use of IP geolocation data in judicial proceedings. The paper is published in PeerJ Computer Science, a peer-reviewed open-access journal indexed in PubMed Central.

**C-6.** The Komosny paper specifically addresses the role of the expert witness in evaluating IP geolocation evidence: "Each evidence should be processed individually, and the purpose of the evidence should also be considered. For example, it is up to the expert witness to consider the removal of IP addresses from the dataset that belong to cloud service providers." The paper documents that country-level IP geolocation has variable evidential value depending on country, time period, and data source, and that the possibility of tampering (including VPN-based circumvention) must be addressed on a case-by-case basis.

### D. Commercial VPN ecosystem foundational study, Khan et al. (IMC 2018)

**C-7.** M.T. Khan et al., "An Empirical Analysis of the Commercial VPN Ecosystem," Proceedings of the ACM Internet Measurement Conference (IMC '18), October-November 2018, DOI 10.1145/3278532.3278570, is the foundational peer-reviewed empirical study of the commercial VPN ecosystem. The authors observed: "Global Internet users increasingly rely on virtual private network (VPN) services to preserve their privacy, circumvent censorship, and access geo-filtered content." The authors conducted an active measurement study of 62 commercial VPN providers and documented the ecosystem's scale, operational characteristics, and the technical means by which commercial VPN providers operate, including that 5 to 30 percent of the VPN provider egress points tested misrepresent the physical location of their vantage points.

### E. VPN ecosystem systematic investigation, Ramesh et al. (NDSS 2022)

C-8.    R. Ramesh, L. Evdokimov, D. Xue, and R. Ensafi, "VPNalyzer: Systematic Investigation of the VPN Ecosystem," Proceedings of the 2022 Network and Distributed System Security Symposium (NDSS '22), is the modern peer-reviewed update to the Khan et al. methodology. Using the VPNalyzer tool, the authors conducted the largest investigation of 80 desktop VPN providers, including all seven providers identified in Appendix B, subsection G of this declaration. NDSS is one of the four top-tier security conferences in computer science.

### F. Multi-perspective VPN ecosystem study, Ramesh et al. (USENIX Security 2023)

C-9.    R. Ramesh, A. Vyas, and R. Ensafi, multi-perspective study of the commercial VPN ecosystem, 32nd USENIX Security Symposium (USENIX Security '23), August 2023, conducted a quantitative survey of 1,252 U.S. VPN users, the largest published empirical user-survey of U.S. VPN consumers in the peer-reviewed literature, combined with qualitative interviews of nine leading VPN providers. The 1,252-respondent quantitative survey was conducted specifically on U.S. respondents and is therefore directly relevant to the question of U.S. consumer VPN use that this litigation turns on.

### G. Residential-IP-proxy ecosystem, Mi et al. (IEEE S&P 2019)

C-10.   X. Mi et al., "Resident Evil: Understanding Residential IP Proxy as a Dark Service," Proceedings of the 2019 IEEE Symposium on Security and Privacy (S&P), DOI 10.1109/SP.2019.00011, is the foundational peer-reviewed empirical infiltration study of the residential-IP-proxy ecosystem. The authors characterized the phenomenon: "An emerging Internet business is residential proxy (RESIP) as a service, in which a provider utilizes the hosts within residential networks (in contrast to those running in a datacenter) to relay their customers' traffic, in an attempt to avoid server-side blocking and detection."

C-11.   Using their infiltration methodology, the Mi et al. authors detected six million distinct residential-proxy egress IPs distributed across more than 230 countries and more than 52,000 Internet service providers. The Mi et al. paper established the existence and scale of the residential-proxy threat as an empirical fact, not a hypothesis. The BBC's vendor GeoComply has separately and independently identified residential-proxy circumvention as a distinct evasion vector against which its product attempts to defend.

### H. IP-leasing infrastructure measurement, Du et al. (IMC 2024)

**C-12.** B. Du et al., "Sublet Your Subnet: Inferring IP Leasing in the Wild," Proceedings of the 2024 ACM on Internet Measurement Conference (IMC '24), November 2024, DOI 10.1145/3646547.3689010, is the most recent peer-reviewed measurement work on the IP-leasing patterns by which commercial VPN, proxy, and other services obtain their UK and other-territory egress IP address blocks. The paper documents the patterns by which IP-address blocks change operational hands through leasing arrangements that may not be reflected in the public WHOIS or BGP-routing records on which commercial IP-geolocation databases rely. The implication is that the commercial geolocation databases, including GeoGuard, are inherently working with incomplete and lagging information.

### I. Synthesis of the peer-reviewed consensus 2011-2024

**C-13.** The ten peer-reviewed studies identified in subsections A through H of this Section, taken together, establish four propositions of direct relevance to the present Motion. First, commercial IP-geolocation databases exhibit non-trivial error rates at the country level (Poese 2011; Shavitt 2011; Gharaibeh 2017; Livadariu 2020; Komosny 2023). Second, the commercial VPN ecosystem is of substantial empirically-measured scale, with consumer-grade access to geo-filtered content among its primary documented uses (Khan 2018; Ramesh 2022; Ramesh 2023). Third, the residential-IP-proxy ecosystem comprises millions of distinct egress IPs distributed across substantially all of the world's Internet networks, and is by design difficult for any commercial detection product to identify reliably (Mi 2019; Du 2024). Fourth, the evidential value of country-level IP geolocation in a forensic or judicial context is variable, requires expert evaluation, and must be assessed on a case-by-case basis (Komosny 2023).

**C-14.** These four propositions are established in the peer-reviewed literature summarized above. The Cooper Declaration's representation that the BBC's geo-blocking technology "prevents access" to iPlayer content outside the United Kingdom is more categorical than these propositions support.

## APPENDIX D:  MATERIALS CONSIDERED (ITEMIZED)

**D-1.   Case materials and deposition transcripts.**  The Plaintiff's Complaint (D.E. 1); the Defendants' pending motion with incorporated memorandum (D.E. 36) and its supporting exhibits; the Declaration of Richard Cooper (D.E. 36-12, with exhibits at D.E. 36-13 to 36-15); the Telling (D.E. 36-1), Burgess (D.E. 36-6), and Freeman (D.E. 36-9) declarations; the certified transcript of the deposition of Richard Cooper taken April 24, 2026 (approximately 96 pages, reported by Rick E. Levy, RPR, FPR); the certified transcripts of the depositions of Burgess (April 24, 2026), Telling (April 15, 2026), and Freeman (April 16, 2026), reviewed for any technical content; the rough draft transcript of the continued deposition of Richard Cooper taken May 29, 2026 (reported by Sharon Ambersley, FPR), at which Mr. Cooper testified as the Defendants' designated corporate representative, with the certified transcript to be substituted when available; the exhibits marked at that deposition, including Exhibit 31, a BBC audience-analytics spreadsheet reflecting a data pull dated May 21, 2026; the BBC's contemporaneous internal records produced at Bates numbers BBC00039863 through BBC00040124; the Court's discovery orders (D.E. 26 of February 11, 2026; D.E. 44 of April 7, 2026; and the April 9, 2026 paperless order at D.E. 47); the Plaintiff's Second Request for Production (D.E. 44-1); the Plaintiff's Fourth Request for Production dated May 11, 2026; and the Plaintiff's First Supplemental Responses and Objections to BBC's First Set of Interrogatories dated May 18, 2026.

**D-2.   Peer-reviewed academic literature (2011 through 2024).**  I. Poese, S. Uhlig, M.A. Kaafar, B. Donnet, and B. Gueye, "IP Geolocation Databases: Unreliable?," ACM SIGCOMM Computer Communication Review, Vol. 41, No. 2, April 2011, pp. 53-56; Y. Shavitt and N. Zilberman, "A Geolocation Databases Study," IEEE Journal on Selected Areas in Communications, Vol. 29, No. 10, December 2011, pp. 2044-2056; M. Gharaibeh, A. Shah, B. Huffaker, H. Zhang, R. Ensafi, and C. Papadopoulos, "A Look at Router Geolocation in Public and Commercial Databases," ACM IMC 2017, pp. 463-469, DOI 10.1145/3131365.3131380; M.T. Khan, J. DeBlasio, G.M. Voelker, A.C. Snoeren, C. Kanich, and N. Vallina-Rodriguez, "An Empirical Analysis of the Commercial VPN Ecosystem," ACM IMC 2018, pp. 443-456, DOI 10.1145/3278532.3278570; X. Mi et al., "Resident Evil: Understanding Residential IP Proxy as a Dark Service," IEEE S&P 2019, pp. 1185-1201, DOI 10.1109/SP.2019.00011; I. Livadariu et al., "On the Accuracy of Country-Level IP Geolocation," IRTF ANRW 2020; R.

Docusign Envelope ID: 88E4909F-8130-8726-8036-5029ADA51E2E

Ramesh, L. Evdokimov, D. Xue, and R. Ensafi, "VPNalyzer: Systematic Investigation of the VPN Ecosystem," NDSS 2022; D. Komosny, "Evidential value of country location evidence obtained from IP address geolocation," PeerJ Computer Science, Vol. 9, e1305, March 30, 2023, DOI 10.7717/peerj-cs.1305; R. Ramesh, A. Vyas, and R. Ensafi, multi-perspective study of the commercial VPN ecosystem, USENIX Security 2023; and B. Du et al., "Sublet Your Subnet: Inferring IP Leasing in the Wild," ACM IMC 2024, pp. 328-336, DOI 10.1145/3646547.3689010.

**D-3.   Vendor and industry materials.**   The September 3, 2025 GeoComply press release announcing the Kingsmead Security 2025 audit results; the Kingsmead Security 2020-2021 audit report; the GeoComply Media & Entertainment and GeoGuard product pages; the January 23, 2023 AWS Partner Network blog post co-authored with GeoComply, "Winning the Cat-and-Mouse Race: Staying One Step Ahead of Streaming Geopiracy with GeoGuard and AWS"; the GeoComply blog posts "Protect Your Content from the Residential IP Address Threat" and "Geofencing, VPN Detection, and the Revenue Security Prism"; and the Sandvine 2023 and 2024 Global Internet Phenomena Reports.

**D-4.   BBC public materials.**   The BBC Terms of Use filed at Exhibit 1 to the Cooper Declaration; the BBC iPlayer help page filed at Exhibit 2; the BBC.com Terms of Use filed at Exhibit 3; and the BBC Annual Report 2024/25 (iPlayer scale figures).

**D-5.   VPN-provider technical documentation.**   The publicly accessible BBC iPlayer support and configuration documentation of the seven major consumer VPN providers (ExpressVPN, NordVPN, Surfshark, Private Internet Access, ProtonVPN, CyberGhost, and IPVanish), identified with URL and access date in Appendix B, subsection G.

**D-6.   Standards and technical references.**   Selected IETF Requests for Comments, including RFC 4301 (IPsec architecture) and RFC 8805 (the geofeed mechanism); the WireGuard and OpenVPN specifications; and the relevant SOCKS, HTTP CONNECT, and DNS standards (RFC 1928, RFC 7230 et seq., RFC 1035 and successors).

**D-7.   Testing materials.**   The record of the direct technical testing I conducted in June 2026, including contemporaneous screenshots of each test run, IP geolocation results for the test machine, and each VPN exit.

Case No. 1:25-cv-25894-RKA

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA | MIAMI DIVISION
*President Donald J. Trump v. British Broadcasting Corporation, et al.*

### APPENDIX E TO THE DECLARATION OF TAL LAVIAN, Ph.D.
### Conflict Matrix: The Cooper Declaration Against the Cooper Deposition Testimony

*This matrix tabulates the points at which specific representations in the Declaration of Richard Cooper (D.E. 36-12) are materially qualified or contradicted by Mr. Cooper's sworn deposition testimony of April 24, 2026. Each row stands alone; each quotation is verbatim and is tied to a specific page of the certified transcript. This exhibit corresponds to the analysis in Section VII of the Declaration.*

| # | Topic | Declaration text (verbatim) | Deposition response (verbatim) | Nature of conflict |
|---|-------|-----------------------------|--------------------------------|--------------------|
| 1 | "Prevents access" (¶ 9) vs. "high nines" | "Where the IP geo-location feature detects unauthorised use outside of the United Kingdom, it prevents access to video content via the iPlayer service." (¶ 9) | "They're reliable 100 percent of time if not 100 percent of the time. Talking high nines here." (Cooper Dep. at pp. 79-80) | HIGH. The unqualified "prevents access" formulation is materially qualified by the witness's deposition admission that the system operates probabilistically at "high nines," not at one hundred percent. This is the central technical qualification in the deposition. |
| 2 | GeoGuard "restricts" (¶ 10) vs. no guarantee, cat-and-mouse | "The iPlayer service also uses a Virtual Private Network (VPN) blocking system provided by GeoComply called GeoGuard, which is intended to restrict unauthorised users..." (¶ 10) | "[W]e do not have a guarantee from GeoComply it's accurate 100 percent of the time and we recognize that it's a cat and mouse game." (Cooper Dep. at pp. 82-83) | HIGH. Cooper adopts the vendor's own "cat-and-mouse" framing. The deposition framing replaces the Declaration's binary "restricts" framing with a probabilistic contest framing. |
| 3 | "Industry standard" (¶ 13) qualified at deposition | "The BBC's measures to block access from outside the United Kingdom are reasonable and customary measures in line with the industry standard. The BBC's efforts are similar to what other European Public Service Broadcasters use..." (¶ 13) | Q: "You are not referring to an established industry guideline...?" A: "I wouldn't describe it as established industry guideline." (Cooper Dep. at pp. 85-86) | MEDIUM-HIGH. The witness himself does not characterize the field as having an established industry guideline, though he explains at deposition why he regards the measures as customary (Cooper Dep. at pp. 86-87). |
| 4 | "VPN blocking system" (¶ 10) vs. data set | "...a Virtual Private Network (VPN) blocking system provided by GeoComply called GeoGuard..." (¶ 10) | Cooper: GeoGuard is not a system or piece of vendor software; "It's a set of data. Imagine it's like a database." (Cooper Dep. at p. 20) | MEDIUM-HIGH. The Declaration calls GeoGuard a "system"; Cooper clarified it is a data set the BBC ingests. The correction matters because the BBC, not GeoComply, applies the data through software the BBC wrote itself. |

| # | Topic | Declaration text (verbatim) | Deposition response (verbatim) | Nature of conflict |
|---|-------|-----------------------------|-------------------------------|--------------------|
| 5 | "Engaged during entirety" (¶ 12) vs. unverified retention | "The Geoblocking Technology was engaged for the Documentary on iPlayer during the entirety of its publication." (¶ 12) | "I do not know if we logged failed requests number one. I do not know if our retention period for failed requests is the duration you just said." (Cooper Dep. at pp. 77-78) | HIGH. The BBC put forward this witness on its strongest factual representation; the witness does not know whether the operational evidence that would prove or disprove it has been retained. |
| 6 | "Active steps" (¶ 9) framing vs. notice ≠ blocking | "The BBC takes active steps to restrict access to the iPlayer service from outside the United Kingdom." (¶ 9) | Cooper enumerated five "active steps": (1) regional landing check at login; (2) request-level geo+VPN evaluation; (3) CDN-edge re-check; (4) Terms of Use notice; (5) TV-licence pop-up. (Cooper Dep. at pp. 67-71) | MEDIUM-HIGH. Two of the five enumerated steps are forms of consumer-facing notice rather than access-control mechanisms, so the "active steps" framing describes fewer independent access-control mechanisms than the count suggests. |
| 7 | Layered checks share inputs; CDN-layer independence unresolved | Declaration presents geo-restriction as a layered set of measures "in line with the industry standard." (¶¶ 9-13) | Cooper described Steps 1, 2, and 3 (app-landing, request-level, CDN edge), all of which rely on the same GeoComply IP-location and GeoGuard VPN data inputs. (Cooper Dep. at pp. 67-69, 31-33) | MEDIUM. The two BBC-side checks apply the same GeoComply country-and-VPN classification and so are not independent failure modes. Mr. Cooper testified the CDN performs "the same calculation" (Cooper Dep. at p. 68), and separately that the CDN provider, Akamai, independently licenses GeoGuard (Cooper Dep. at p. 86). Whether the CDN-layer check draws on the same GeoComply inputs as the BBC-side checks or on the provider's independent license is not resolved on the present record. |
| 8 | "Personal knowledge" (¶ 3) vs. team-designed system | "The facts stated below are true based on my own personal knowledge, my review of records maintained in the regular course of business by the BBC..." (¶ 3) | Cooper named Andrew Hudson (architect) and Mark Gledhill (engineering manager) at p. 59. Cooper testified he has no formal training in VPNs, geo-blocking, or GeoComply data. (Cooper Dep. at pp. 41, 59) | MEDIUM-HIGH. Establishes the proper deponent set: Hudson (architect) and Gledhill (engineering manager) are the persons with hands-on knowledge. Neither has been deposed. |
| 9 | BBC validates GeoGuard data, but does not verify | Declaration represents BBC reliance on GeoGuard to restrict unauthorised access. (¶ 10) | "We verify that the data set is a valid data set. We do not verify, we do not duplicate the functionality that GeoComply provides to us." The BBC validates the data set "on a technical basis," to ensure it is "safe to load on our system," for example that it is not corrupt. (Cooper Dep. at pp. 31-33) | MEDIUM. The accuracy of the geo-block is entirely dependent on a vendor data product the BBC does not independently verify. The BBC accepts the data set on the vendor's representation. |
| 10 | "Engaged for the Documentary" (¶ 12), no Documentary-specific protection | "The Geoblocking Technology was engaged for the Documentary on iPlayer during the entirety of its publication." (¶ 12) | "[N]obody at the BBC communicated with GeoComply to my knowledge related specifically to this program." (Cooper Dep. at p. 28) The data set used during the Documentary's window was the same data set used for all iPlayer content. (Cooper Dep. at p. 29) | HIGH. The BBC's argument depends on the inference that something specific was done for the Documentary because of its political sensitivity. The witness confirmed there was nothing Documentary-specific. |

Appendix E to the Declaration of Tal Lavian, Ph.D. | Trump v. BBC, No. 1:25-cv-25894-RKA

| # | Topic | Declaration text (verbatim) | Deposition response (verbatim) | Nature of conflict |
|---|---|---|---|---|
| 1 1 | Architecture documentation, Confluence unknown | Declaration references that the iPlayer service determines the user's location and prevents access where unauthorised use is detected. (¶ 9, implicit) | Asked whether any written policy, procedure, or runbook explains how the BBC identifies and blocks circumvention attempts, Cooper testified that BBC's architecture documentation resides on Confluence but he could not identify the specific documents. (Cooper Dep. at p. 75) | MEDIUM. The operational configuration of the geo-restriction system resides in BBC Confluence architecture documents, runbooks, and operational procedures that the witness could not identify with specificity at deposition. |
| 1 2 | Panorama-specific verification, limited to rights metadata | Declaration represents that the BBC offered the Documentary in the UK in two ways and that the Geoblocking Technology was engaged for the Documentary during its publication. (¶¶ 5, 12) | Cooper testified that the records he reviewed for the paragraph 12 representation were the metadata records describing what the geo-blocking should be, the rights associated with the program being UK-only, together with distribution data; no other data formed part of that answer. (Cooper Dep. at p. 62) | HIGH. A request from a Florida viewer using a VPN with a UK egress would not appear in a rights-metadata record, because the rights system (identified as PIPS in the BBC's May 29, 2026 corporate-capacity testimony) records rights metadata, not access. The verification establishes intended coding, not actual blocking. |
| 1 3 | "Reasonable, concerted attempts" (¶ 11) on cross | "The purpose of the geo-location features and VPN blocking systems described above ... is to make reasonable, concerted attempts to prevent unauthorised access..." (¶ 11) | Cooper read the ¶ 11 phrasing into the record and explained that "reasonable concerted attempts" is the framing he meant. (Cooper Dep. at pp. 83-84) | MEDIUM. The witness himself frames the BBC's effort as "reasonable concerted attempts," a deliberate-effort framing rather than a results guarantee. That framing is more qualified than ¶ 9's "prevents access." |
| 1 4 | GeoComply contract scope, two contracts, not one | Declaration treats GeoComply as a unified provider of geo-location and VPN-blocking capabilities. (¶¶ 9-10) | Cooper confirmed two distinct GeoComply contracts: one for IP-location data; a separate one for GeoGuard VPN-detection data. (Cooper Dep. at p. 8) | MEDIUM. The witness testified to two GeoComply contracts (procured in 2021 and 2025), not one; the contracts in force during the Documentary's iPlayer window, with their service-level and complaint terms, are the operative commercial instruments. |
| 1 5 | "European Public Service Broadcasters" comparator (¶ 13), not surveyed | "The BBC's efforts are similar to what other European Public Service Broadcasters use to prevent such unauthorised international access." (¶ 13) | Asked for specific comparators, Cooper named ITV, which he described as "a large Public Service Broadcaster" and a BBC competitor in the Public Service Broadcasting space; ITV is a UK Public Service Broadcaster, not a continental European one. (Cooper Dep. at pp. 90-91) | MEDIUM. The Declaration invites the inference that Cooper surveyed European Public Service Broadcaster practices. The deposition record establishes that the only comparator he named is ITV, a UK Public Service Broadcaster, not a continental European one, and that he conducted no survey of European broadcasters (Cooper Dep. at pp. 90-91). |