**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, | Case No. 25-CV-25894-RKA |
| Plaintiff, | |
| v. | |
| BRITISH BROADCASTING CORPORATION a/k/a BBC, BBC STUDIOS DISTRIBUTION LIMITED, and BBC STUDIOS PRODUCTIONS LIMITED, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, President Donald J. Trump ("Plaintiff' or "President Trump"), by and through undersigned counsel, hereby files this Memorandum of Law in Opposition to the Motion to Dismiss [ECF No. 36] ("Motion") filed by Defendants, British Broadcasting Corporation a/k/a BBC ("BBC"), BBC Studios Distribution Limited ("BBC Distribution"), and BBC Studios Productions Limited ("BBC Productions") ("BBC Distribution" and "BBC Productions" are collectively, the "Studios Defendants") (BBC and the Studios Defendants are collectively, the "Defendants"). In support thereof, Plaintiff states as follows:

**INTRODUCTION**

Defendants' Motion advocates an untenable proposition—that a foreign corporation may produce a documentary about an American President (and Florida resident) (the "Documentary"), intentionally time that Documentary to an American election that would decide the President's and the Country's future, film part of it on American soil, market that Documentary into the United States through a route it knew its own technology allows, apologize through its own Chairman for the Documentary's undisputed manipulation—and then insist that no American court may hold it

accountable. The law of personal jurisdiction exists precisely to prevent such a wrongful and unjust result.

Defendants ask this Court to improperly dismiss this action at the threshold on two grounds: lack of personal jurisdiction under Rule 12(b)(2), and failure to state a claim under Rule 12(b)(6). Neither argument has merit.

Defendants' Rule 12(b)(2) argument has only further weakened since the Motion was filed. Their four declarations have been tested in deposition, and the declarants' sworn testimony contradicts the very incorrect claims that Defendants ask the Court to treat as conclusive. Defendants built their wrongful jurisdictional argument on a single premise: that the BBC's geo-blocking technology somehow "prevents access" to iPlayer outside the United Kingdom, so the Documentary could not have reached Florida, and Defendants did not target this forum. Their own witnesses disproved that premise under oath.

The BBC's principal technical witness—who swore in his declaration that the technology "prevents access"—conceded that the system is not completely reliable, that the BBC has no guarantee of accuracy from its vendor, and that VPN blocking is a "cat and mouse game" the BBC often loses. The BBC's editorial witness could not rule out Florida viewership, and its news witness admitted that he was unfamiliar with the technology and reviewed no records before, incorrectly, attesting to the "industry standard."

Even more damning, the BBC's own documents show that the Documentary's producers— at least one of whom was at all times employed by the BBC—emailed several individuals in the United States in the days before the Documentary aired, instructing them on how to circumvent the BBC's geo-blocking efforts so that they could watch the Documentary from the United States. The problem is not simply that the BBC's supposed protections were a "cat and mouse game." It is that the BBC knew exactly where the backdoor in its system was, walked U.S. viewers through it on request, and even advertised that U.S. access on social media.

Defendants' Rule 12(b)(6) arguments also fail. Defendants do not deny that they spliced President Trump's speech. Instead, they ask the Court to accept their "innocent edit" explanation, which contradicts their apology, rely on materials outside the Complaint, and attempt to decide contested issues of defamatory meaning, falsity, and actual malice that firmly belong to the jury.

2

The Court should reject that invitation. Further, Defendants' attempt to use the single-action rule to dispose of President Trump's Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim also fails. The FDUTPA claim is not a duplicative defamation claim repackaged under another label. It challenges Defendants' unfair and deceptive conduct in trade or commerce, including their manipulation and dissemination of the Documentary—conduct that is independently actionable under Fla. Stat. § 501.204.

Accordingly, Defendants' Motion should be denied in its entirety.

## ARGUMENT

### I.      Legal Standard.

A federal court applies a two-step analysis to determine whether it has personal jurisdiction over a nonresident defendant: *first*, whether the plaintiff has alleged facts sufficient to subject the defendant to the forum state's long-arm statute; and *second*, whether the exercise of jurisdiction comports with the Due Process Clause. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). A plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Id.* A defendant may then challenge jurisdiction "by submitting affidavit evidence in support of its position," after which "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)).

Two settled principles govern how the Court evaluates the competing evidence. *First,* conflicts must be resolved, and reasonable inferences drawn, in Plaintiff's favor. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010); *Louis Vuitton*, 736 F.3d at 1350. *Second*, the burden-shifting framework presupposes affidavits that actually support the movant's position. Here, Defendants' jurisdictional declarations do not. They are contradicted by the declarants' own deposition testimony, Defendants' contemporaneous records, and Plaintiff's expert. At most, they create disputed jurisdictional facts that must be resolved in Plaintiff's favor at the prima facie stage. *Id.*; *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999).

On a Rule 12(b)(6) motion, the Court accepts the Complaint's well-pleaded allegations as true and draws all reasonable inferences in Plaintiff's favor; it may not credit a defendant's competing characterization of its own conduct or intent, nor consider disputed extra-pleading

3

material. *Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1360–61 (S.D. Fla. 2021).

## II.     The Court Has Personal Jurisdiction Over the Defendants.

Defendants' jurisdictional argument cannot be reconciled with the sworn testimony of their own witnesses. Rather than the clean, one-sided record that the Motion wishes to portray, the depositions have produced a record replete with disputed facts—each of which the Court must resolve in Plaintiff's favor. *Louis Vuitton,* 736 F.3d at 1350. Defendants are subject to personal jurisdiction. At a bare minimum, the existing factual disputes preclude dismissal.

### A.     The Court has specific jurisdiction.

The existence of specific jurisdiction in this dispute is manifest. Plaintiff invokes Florida's tortious act provision, Fla. Stat. § 48.193(1)(a)(2), and the *Calder* effects test. The *Calder* effects test is satisfied where the tort was (i) intentional, (ii) aimed at the forum, and (iii) caused harm the defendant should have anticipated would be suffered in the forum. *Calder v. Jones,* 465 U.S. 783, 789-90 (1984); *Louis Vuitton,* 736 F.3d at 1356. Due process is satisfied where the defendant's suit-related conduct creates a substantial connection with the forum. *Walden v. Fiore,* 571 U.S. 277, 284 (2014). Here, the BBC committed an intentional tort—defamation—expressly aimed at a Florida resident, with harm it knew would be felt in Florida. The record establishes each element.

#### 1.     The BBC deliberately targeted the Documentary at a global, unrestricted U.S. audience.

The Documentary was the BBC's own editorial product. BBC producer Matthew Hill remained an employee while seconded to October Films to work on the Documentary. The BBC retained authority over his pay, leave, discipline, and appraisals, continued paying him, and used his BBC email throughout production. *See* **Exhibit A** (Telling[1] Tr.) 53:4-23; **Exhibit B** (Burgess[2] Rule 30(b)(6) Tr.) 12:18-14:1211:5-12:14. **Exhibit C** (Secondment Agreement). The BBC also retained final editorial signoff over the Documentary. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 10:7-21. Defendants, therefore, cannot separate from the BBC's own intent, knowledge, promotion, and distribution decisions.

---

[1]     Mr. Leo Telling ("Telling") was the BBC's Executive Producer on the Documentary.

[2]     Mr. Richard Burgess ("Burgess") is the Director of News Content for the BBC.

4

The BBC's *own* commissioning documents likewise confirm that the Documentary was conceived, timed, and structured around the U.S. presidential election. The Programme Production Agreement and Commissioning Specification, memorializing an April 4, 2024 discussion between October Films' Neil Breakwell and the BBC's Editorial Representative Leo Telling, states that *the BBC would be "mindful of the effects of our reporting that could be seen in territories where the vote could be affected" when reporting on a foreign election*. *See* **Exhibit D** at 6 (emphasis added). The foreign election referenced was the 2024 U.S. presidential election. The relevant territories where the vote could be affected included the United States, including Florida. This was not generic language about foreign affairs coverage. This was the BBC's contemporaneous acknowledgment that its reporting could be seen in places where the U.S. vote could be affected, which means seen in the U.S., and that the BBC understood the consequences of that fact.

The production records make the same point. The Commissioning Specification adopted a holdback clause "due to the … need to broadcast ahead of the US Election on 5th November 2024." and contemplated 10 to 15 days of filming in the United States. *Id.* Pitch materials framed the Documentary around "November's election," and expressly tracked potential "revelation[s] from DC, Florida, New York or Georgia." *See* **Exhibit E** (PITCH 3); **Exhibit F** (Pitch v.5). These records show that—from the start—the BBC and its production team focused on the American election, American political events, and specific U.S. jurisdictions, including Florida.

Internal BBC emails confirm the same U.S.-focused purpose. The BBC team chose the premiere date to "increase[] the window for international broadcast ahead of the US election … which is crucial," and described the Documentary as destined for "a global audience of tens of millions" on platforms "most notably … BBC Worldwide and Amazon Prime (via BBC Select)." *See* **Exhibit G** (Wightman 3/14/24 email); **Exhibit H** (Towey 5/1/24 email). Those statements directly contradict Defendants' position that the Documentary was aimed only at a U.K. audience and that U.S. viewing was incidental or unforeseeable.

The BBC also promoted the Documentary through an official, globally accessible BBC channel. On the night of broadcast, the BBC posted on its official Panorama account on X that "Trump: A Second Chance?" was "On @BBCiPlayer now," and *included* a direct link to the Documentary on iPlayer. *See* **Exhibit I** (x.com/BBCPanorama/status/1850952403182321990).

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

The BBC admits that the Panorama X account is international-facing and available in the United States. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 81:7-82:9; 82:21-25; **Exhibit J** (Cooper[3] 30(b)(6) Tr.) 33:7-17. This post reached a substantial audience. The BBC measured 84,798 views, among other metrics, and relied on that engagement. *See* **Ex. I**. The BBC cannot credibly claim that none of those views came from the United States. *Id*. Having promoted the publication and a way to watch it to a global audience, the BBC cannot now characterize this as a case of mere website accessibility.

The BBC and October Films specifically contemplated U.S. viewing. October Films, copying BBC Current Affairs producer Matthew Hill, emailed a U.S. participant and stated that the film would air on Panorama, would be available for replay on BBC iPlayer, and could be watched in the United States through VPN access. *See* **Exhibit L** (Towey 10/25/24 email). Hill did not correct that statement, object to it, or say that U.S. viewing was unauthorized. Nor did he instruct October Films to retract the statement or tell the U.S. participant that the film was intended only for U.K. viewers. Hill's silence matters because he was the BBC employee embedded in the production, and the BBC retained editorial control over the program. *See* **Ex. A** (Telling Tr.) 53:4-23, 116:23-117:1; **Ex. C** (Secondment Agreement); **Ex. B** (Burgess Rule 30(b)(6) Tr.) 10:7-21; 12:18-14:12. Indeed, on at least one occasion in response to an email asking "Any chance we can get a link for the US folks?" Hill himself responded with "Sure," followed by a hyperlink and password. *See* **Exhibit M** (Hill 10/29/24 email). This evidence directly contradicts Defendants' claim that U.S. viewing was unforeseeable or unauthorized, it was actually both foreseeable and authorized by the BBC.

The Documentary's distribution structure confirms that the program was positioned for international and U.S. distribution exploitation. International rights ran from October Films to Blue Ant to Little Dot Studios, which held U.S. distribution rights until imposing a restriction on November 10, 2025—*after* Plaintiff threatened suit. *See* ECF No. 36-1 (Telling Decl.) ¶ 24; **Ex. A** (Telling Tr.) 116:6-20. The BBC's own internal communications likewise described the program as intended for a "global audience of tens of millions" on platforms including "BBC Worldwide

---

[3]      Richard Cooper is the BBC's Director of Digital Distribution.

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

and Amazon Prime (via BBC Select)." *See* **Ex. G** (Wightman 3/14/24 email); **Ex. H** (Towey 5/1/24 email). This record cannot be reconciled with Defendants' wrongful claim that the Documentary was solely a U.K. broadcast with no meaningful U.S. aim.

Together, the evidence shows coordinated BBC conduct directed toward the United States, not "mere accessibility." The BBC created an election-timed documentary about a Florida-resident U.S. presidential candidate, promoted it globally through an unrestricted official channel, and positioned it for international and U.S. consumption. Under *Calder*, that is affirmative, intentional, U.S.-directed conduct aimed at the United States and at the Florida resident whose election the Documentary targeted. The BBC's aim was not merely foreseeable, it was targeted and planned. Cooper admitted that from the day the Documentary went live, the BBC's logs recorded attempted access from the United States, confirming "evidence of attempt to access" from this country. *See infra* § II.A.2; **Ex. J** (Cooper Rule 30(b)(6) Tr.) 36:5-14.

Defendants' citations to "mere accessibility" cases do not change the result. *Moore v. Cecil*, 109 F.4th 1352 (11th Cir. 2024), *Nunes v. CNN*, 2023 WL 2468646 (M.D. Fla. Mar. 1, 2023), and *Bioheart v. Peschong,* 2013 WL 1729278 (S.D. Fla. Apr. 22, 2013) turned on the absence of evidence that the defendant directed the publication at the forum. The present case is different. The record shows that the BBC created, timed, promoted, and distributed the Documentary with the United States in mind; commissioning records directly tied the Documentary to the U.S. election; internal emails emphasized international broadcast before that election; the official Panorama account promoted it through a globally accessible post with a direct iPlayer link useable in the U.S.; BBC records measured tens of thousands of views; production communications contemplated VPN viewing from the United States; and the distribution chain included U.S. rights.

Defendants' lead authority, *Karnas v. Cuban,* 2025 WL 3759241 (S.D. Fla. Dec. 30, 2025), does not help them, it does the opposite and shows why jurisdiction is proper here. There, jurisdiction failed because plaintiffs offered no evidence that defendants targeted Florida. The promotional activity there was directed at "national (if not worldwide) audiences, not specifically at Florida residents," and plaintiffs offered no evidence that the defendants "took aim at a Florida audience specifically." *Id.* at *7-8. Livestreaming a Dallas press conference, running a worldwide app promotion, and displaying arena signage on nationally broadcast Dallas home games was

7

generic marketing that merely reached Floridians. Thus, the Court held that "posting information on the internet is not sufficient by itself" to establish jurisdiction. *Id.* at *7.

This record is different. The BBC created an election-timed Documentary about a specific Florida resident—the leading candidate in the very election the Documentary was built around—whose reputation and businesses are centered in Florida. The BBC's own commissioning documents acknowledged that the reporting "could be seen in territories where the vote could be affected," contemplated 10–15 days of filming in the United States, and tracked anticipated developments from "Florida" by name. It was partially filmed at Mar-a-Lago in Palm Beach, Florida. The BBC then promoted it through an unrestricted, international-facing official channel with a direct, clickable link to the defamatory work, while its production team—with a BBC employee copied—affirmatively supplied U.S. contacts with instructions for accessing the Documentary from the United States.

### 2.      The BBC's own "block" defense collapsed.

The centerpiece of the Motion is the assertion that the BBC "took active measures to block Americans from viewing this Documentary." *See* Motion 17. That claim rests entirely on the Declaration of Richard Cooper ("Cooper Decl."). *See* ECF No. 36-12 ¶¶ 9–11. But Cooper's deposition testimony eviscerated that assertion, and Plaintiff's network engineering expert, Dr. Tal Lavian ("Dr. Lavian"), confirms that the BBC's assertion that its geo-blocking system "prevents access" overstates what the technology can actually do. *See* **Exhibit K** (Lavian Decl. ¶ 18 (Opinion 1)).

Cooper—the BBC's Director of Digital Distribution—admitted that the geo-blocking system is *not* represented to work every time. When asked about the efficacy of the geo-blocking system, he conceded that there is "no guarantee" that the feature works "every single time." *See* **Ex. J** (Cooper Rule 30(b)(6) Tr.) 79:8-80:2. As to VPN blocking, Cooper testified that the BBC "do[es] not have a guarantee from GeoComply [the vendor of the product] it's accurate 100 percent of the time," and described VPN detection as "a cat and mouse game … because they are continuously trying to get around the protection." *See id.* 81:23-83:12. In a cat-and-mouse game, the mouse often wins.

Dr. Lavian explains why this is not mere semantics. IP-based geographic restriction is

"inherently probabilistic rather than deterministic," with "vendor-admitted residual rates," a conclusion supported by ten peer-reviewed empirical studies between 2011 and 2024. *See* **Ex. K** (Lavian Decl. ¶ 27 (Opinion 10)). The BBC's own vendor, GeoComply, agrees. Its public materials describe geo-blocking as a "cat-and-mouse race," report a VPN-detection rate of only 99.1 percent—leaving a roughly 0.9 percent residual—and concede that detecting residential-proxy circumvention "may seem like a can't-win situation." *See id.* ¶ 23 (Opinion 6). Cooper used the same "cat and mouse" framing, but his declaration disclosed none of these admissions to the Court. *See id.* ¶ 28 (Opinion 11).

Indeed, Cooper confirmed that the BBC's logs already register attempted access from the United States. Asked whether the BBC is "certain that no one in the United States accessed or attempted to access" the Documentary, Cooper could not state that he is certain. He further confirmed that the BBC's information "does" reflect "whether there was attempted access of viewership of the Documentary by anyone in the United States," that each such logged request captures the originating IP address, the apparent location, and a date-and-time stamp, and that the precise number of U.S. attempts could be retrieved—"[w]e can find that data"—but that he had simply not "looked up or remembered to bring [it] to this session." *See* **Ex. J** (Cooper Rule 30(b)(6) Tr.) 37:3-39:17. When the BBC did run that query, its own records confirmed Florida access. Specifically, the BBC produced a spreadsheet extracted from its audience-analytics system—data "pool[ed] as [of] May 21, 2026," nineteen months after the broadcast and five months into this litigation—reflecting that, during the period that the Documentary was available, there were **34** successful play-starts of the Documentary attributed ***solely to Florida***. **Exhibit N** (Data Pool Spreadsheet); **Ex. J** (Cooper Rule 30(b)(6) Tr.) 100:25-101:103:17; 121:5-25. Cooper confirmed those "34 attempts definitely happened," that all were successful play-starts, and that he "would not testify that they did not occur." *See id.* 142:25-144:22. The BBC now shockingly resists its own production, urging that the analytics figure is somehow "not reliable" because the country attribution is "enrich[ed]" from the IP address "after the event" and is "data that we have created as part of that analysis." *See id.* 92:5-93:18. That after-the-fact disclaimer cuts against the BBC, not for it. The witness who generated the "reliability" critique admitted he is "not a data scientist," has "no data forensics training," and was not designated an expert, (*see id.* 139:20-140:21).

9

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Further, at the prima facie stage, the Court construes this conflict—between the BBC's own produced data and the BBC's after-the-fact, lay, baseless critique of it—in Plaintiff's favor. *Louis Vuitton*, 736 F.3d at 1350. It is also no answer to say—as Cooper attempted to—that he later "enrich[ed]" some of those Florida records and traced one IP to a U.K. data center; that very exercise confirms that the BBC's contemporaneous distribution logs do not capture the country of a request, so any country determination is necessarily a litigation-driven reconstruction, performed by a self-described non-expert, on which no dismissal can rest. *See id.* 92:5-93:18; 139:20-140:21.

Dr. Lavian identifies the same gap. The BBC's representations address only its routing decisions, not actual audience reception. *See* **Ex. K** (Lavian Decl. ¶ 25 (Opinion 8)). There is "no evidence in the record … that the BBC undertook any after-the-fact technical audit to determine whether the Documentary was actually viewed from United States Internet endpoints," because that question could be answered only through "operational logs." *See id.* Defendants cannot seek jurisdictional dismissal based on a blocking system that they admit is imperfect, while declining to run the very query that would show whether the Documentary reached Florida.

The "Bundesliga emails" produced by the BBC in discovery confirm that the BBC's problem was real. *See* **Exhibit O**. In these emails, a rights-holder to Bundesliga soccer matches which were purportedly only viewable in the U.K., reported that "certain VPNs were not blocked," allowing geo-restricted BBC content, *i.e.*, the Bundesliga soccer matches, to be "easily viewed" outside the U.K. through specific consumer VPNs (*e.g.,* ExpressVPN, NordVPN, PIA, Proton, and Surfshark). *See id.* Cooper himself explained that some VPNs "route the traffic through residential IPs," making the traffic appear to come from an "unwitting user" and therefore "look[] legitimate." *See id.* In other words, the BBC's own system cannot reliably distinguish a VPN user abroad from a genuine U.K. resident. That is precisely the residential-proxy vulnerability that Dr. Lavian identifies as the hardest to defeat, because the egress IP address is designed to look like a real residential subscriber's address, and "may be indistinguishable from genuine user traffic." *See* **Ex. K** (Lavian Decl. ¶¶ 23, 45 (Opinion 6)).

Nor was the BBC's back-up registration wall meaningful. The Bundesliga rights-holder reported that users could bypass it by entering "a random name and a fake UK postcode (without any further verification)." *See* **Ex**. **O**. Thus, the same geo-blocking system that Defendants

10

incorrectly claim "blocked Americans" from viewing the Documentary also failed to block VPN users from viewing a live sport. *See id.*

This record is fatal to Defendants' lead authority, *Carsey-Werner Co. v. BBC*, 2018 WL 1083550 (C.D. Cal. Feb. 23, 2018). *Carsey-Werner* rejected jurisdiction based on *unauthorized* VPN piracy where the plaintiff offered only speculation that viewers might have circumvented the block. This record is different. The BBC's own engineer admits that the block is imperfect and a "cat and mouse game." The BBC's own documents show named consumer VPNs defeating the block. The BBC admits that it cannot rule out Florida viewership. Unlike the plaintiff in *Carsey-Werner*, Plaintiff does not speculate that circumvention might have occurred: the BBC's own production confirms it. Its audience-analytics records (*see* **Ex. N**) reflect 34 successful play-starts of the Documentary attributed to Florida alone, and its corporate representative confirmed those "34 attempts definitely happened." *See supra* § II.A.2. The BBC affirmatively and proactively promoted the Documentary to a worldwide audience with a clickable iPlayer link and personally supplied U.S. viewers with instructions for bypassing the geo-block. The technical record itself also has materially changed since 2018. As Dr. Lavian explains, seven of the ten peer-reviewed studies on VPN and residential-proxy circumvention postdate *Carsey-Werner*, as do GeoComply's key public admissions: its 2023 "cat-and-mouse race" description, its 2025 audit reporting a 0.9 percent residual rate, and its "can't-win situation" concession. *See* **Ex. K** (Lavian Decl. ¶¶ 23-24 (Opinions 6, 11)). *Carsey-Werner* turned on the absence of contact that the defendant "themselves created with the state." Here, the BBC created those contacts itself.

### 3.    BBC personnel actively helped U.S. residents circumvent the geo-block.

Any suggestion that the BBC tried to keep the Documentary from U.S. viewers is refuted by contemporaneous emails in which the production team—***with BBC producer Matthew Hill copied***—did the opposite. In the days surrounding the broadcast, October Films producer Megan Towey emailed at least six U.S.-based participants and contacts, including congressional staff, the Lincoln Project, and a University of California professor, to announce the premiere of the Documentary in U.S. Eastern and Pacific time, offered to send "a link to the film after it airs," and explained that "you would need a VPN to watch in the United States," supplying articles on "how to access the iPlayer through VPN." *See* **Exhibit P**.

11

These are not the communications of a broadcaster trying to wall off the United States. They are affirmative efforts, made with and through the BBC's own producer, to deliver the Documentary to U.S. viewers knowing full well how BBC's feigned geo-blocking efforts could be circumvented. In one exchange, October Films wrote that "[e]ither Matt or I will make sure you get a link sometime next week." *See id.* (BBC00038511). Hill himself told a U.S. recipient that "it's highly likely we will be back in the US in the not-too-distant future." *See id.* (BBC00038546).

Most tellingly, the BBC's own employee delivered a link to view the Documentary to a *Florida* resident. On October 29, 2024, BBC Current Affairs producer Matthew Hill, writing from his BBC email account, sent the Lincoln Project's Whitney Hayes a working download link to the Documentary—"you can download the film here"—and asked her to "forward to Rick" and convey the BBC's thanks "for his time." *See id.* (BBC00038546). The "Rick" whom Hill asked to receive the film was Rick Wilson, a contributor to the Documentary—and a known *Florida* resident. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 63:19-64:2 (confirming Wilson was a film contributor who "resides in Florida"). This is the opposite of a broadcaster walling off the forum: a BBC employee affirmatively transmitted the defamatory work to a known Florida resident, in connection with the very Documentary at issue. That a BBC employee—not even October Films— sent the film, knowing it was destined for a Florida resident, is conduct the BBC "itself create[d]" with this forum. *Walden*, 571 U.S. at 284.

Nor was the VPN workaround obscure or speculative. Dr. Lavian explains that the seven major commercial VPN providers operate U.K. egress infrastructure and "openly market[] the ability to access BBC iPlayer from outside the United Kingdom" for about $5 to $12 per month, with only modest technical skill required. *See* **Ex. K** (Lavian Decl. ¶ 24 (Opinion 7)). Tellingly, ExpressVPN's dedicated "Best BBC iPlayer VPN" landing page markets that capability to readily circumvent geo-blocking by reference to Panorama: "Whether you're catching *Panorama* at home or on the go, your VPN connection stays reliable with ExpressVPN." *See id.* ¶¶ 103, 222. When the BBC's team told U.S. contacts that they "would need a VPN to watch in the United States," and sent instructions for using one, it was directing them to a functioning, commercially available

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

path into iPlayer.[4]

Public reporting confirms that U.S. access was foreseeable and intended. Technology outlets published step-by-step guides for U.S. readers explaining how to watch "Trump: A Second Chance?" and *Panorama* "from anywhere with a VPN," specifically listing U.S. Eastern and Pacific broadcast times. *See* **Exhibit Q**. Dr. Lavian explains that consumer-VPN access to iPlayer from abroad "has been continuously documented in the trade and consumer press" for nearly the entire life of BBC iPlayer, and that the BBC has long been a sophisticated participant in that environment. *See* **Ex. K** (Lavian Decl. ¶ B-12). A defendant that knows its content is being marketed to U.S. viewers via VPN, and that itself supplies the VPN instructions, cannot claim it did not aim its actions at the United States. *Calder*, 465 U.S. at 789–90.

### 4. BBC personnel filmed in the United States—including Florida footage—for the Documentary.

The Motion's opening line—that the Documentary "was produced in London, not Florida"—is contradicted by Defendants' witnesses and documents. BBC producer Matthew Hill worked on the Documentary while seconded to October Films under a loan-out agreement; he remained on the BBC payroll, reported to BBC Executive Producer Leo Telling, and was assigned specifically as "Producer, 'Panorama: Trump.'" *See* **Ex. C**. Telling also conceded that the BBC retained final editorial signoff over both the U.K. and international versions of the Documentary. *See* **Ex. A** (Telling Tr.) 120:13-16.

The production was not confined to London. The team filmed in the United States, and BBC emails confirm that it filmed a rally in South Carolina and "inside Mar-a-Lago." *See* **Exhibit R** (Hill 3/7/24 email). Telling further admitted that the materials he reviewed included a license "specific to Florida," and that Mar-a-Lago footage was filmed and used. *See* **Ex. A** (Telling Tr.) 129:17-130:20. The license invoices for that footage are dated November 5, 2024—after the October 28, 2024 broadcast—creating a disputed question about how the footage was used before

---

[4]     Dr. Lavian offers this marketing evidence as "market context only." *See* **Ex. K** (Lavian Decl. ¶ B-19). His point is the narrower technical one that VPN access to iPlayer is a real, marketed, and supported capability—which is precisely the capability the BBC's team directed its U.S. recipients to use.

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

it was licensed. *See* ECF No. 36-1 (Telling Decl.) Ex. 1; *see also* **Ex. A** (Telling Tr.) 95:19-98:5. These are disputed jurisdictional facts, and they must be resolved in Plaintiff's favor.

### 5.    Defendants' long-arm arguments fail on this record.

Plaintiff's claims satisfy multiple independent provisions of Florida's long-arm statute. *First*, § 48.193(1)(a)(2) (commission of a tortious act in Florida) is met because Florida treats defamatory material about a Florida resident as a tortious act in Florida when it is placed online, accessible in Florida, and accessed—or "published"—there. *Internet Solutions Corp. v. Marshall,* 39 So. 3d 1201, 1215 (Fla. 2010); *see also Wendt v. Horowitz,* 822 So. 2d 1252, 1260 (Fla. 2002) (electronic or written communications into Florida suffice). Indeed, the Florida Supreme Court specifically concluded that:

> [A]llegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an "electronic communication into Florida" when the material is accessed (or "published") in Florida. In the context of the World Wide Web, given its pervasiveness, an alleged tortfeasor who posts allegedly defamatory material on a website has intentionally made the material almost instantly available everywhere the material is accessible. By posting allegedly defamatory material on the Web about a Florida resident, the poster has directed the communication about a Florida resident to readers worldwide, including potential readers within Florida. When the posting is then accessed by a third party in Florida, the material has been "published" in Florida and the poster has communicated the material "into" Florida, thereby committing the tortious act of defamation within Florida. This interpretation is consistent with the approach taken regarding other forms of communication.

*Internet Solutions,* 39 So. 3d at 1215.

The Eleventh Circuit applies the same rule. *See Catalyst Pharms., Inc. v. Fullerton,* 748 F. App'x 944, 947 (11th Cir. 2018) (requiring a prima facie showing of access by a third party in Florida). Additionally, Fla. Stat. § 48.193(1)(a)(2) also reaches out-of-state tortious conduct that causes injury in Florida. *Licciardello v. Lovelady,* 544 F.3d 1280, 1283 (11th Cir. 2008).

Here, the Documentary was accessible, and accessed in Florida, and President Trump—a Florida resident—suffered reputational and economic injury in Florida. The access element is not left to inference alone. The BBC's own production establishes it. As discussed above, the BBC's audience-analytics records reflect at least 34 successful play-starts of the Documentary attributed to Florida during the period it was available, and Cooper confirmed that those "34 attempts

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

definitely happened." *See supra* § II.A.2; **Ex. N**; **Ex. J** (Cooper Rule 30(b)(6) Tr.) 142:25-143:9. The BBC's weak effort to discount that figure as "unreliable" rests on an after-the-fact, litigation-generated reconstruction by a self-described non-expert, *see supra* § II.A.2, and on a prima facie record that the Court resolves in favor of Plaintiff. At a minimum, that admission—coupled with the residential-proxy traffic that the BBC concedes is served rather than blocked—is more than sufficient to show access by a third party in Florida. *Catalyst Pharms.*, 748 F. App'x at 947.

*Second*, § 48.193(1)(a)(1) (carrying on a business) is satisfied by the BBC's continuous Florida-directed business activity, including its 25-person Coral Gables, FL, office; ongoing PBS, NPR, and CBS partnerships distributing BBC content in the United States; Florida-specific BBC.com news and weather pages; and numerous paid Florida subscribers. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 53:9-54:20; , 83:4-15; Compl. ¶¶ 16–21.

*Third,* the same record independently satisfies § 48.193(1)(a)(6) (causing injury in Florida by acts outside the State coupled with Florida solicitation, service, or distribution activity). Any one of these three provisions independently supports long-arm jurisdiction.

The Complaint states—and Defendants' witnesses confirm—that the BBC carries on continuous business in Florida. The BBC maintains a Florida office at 255 Alhambra Circle, Coral Gables, FL; publishes Florida-directed content through dedicated "Florida – BBC News," "Florida – BBC Weather," and "Miami – BBC News" pages; and sells subscriptions to thousands of Floridians through BBC.com and BritBox, which offers access to BBC content, including *Panorama. See* Compl. ¶¶ 17-21. Together, these facts constitute "substantial and not isolated activity in Florida." Compl. ¶ 21.

Burgess's testimony confirms the corporate integration behind those allegations. BBC News USA, Inc., which staffs the Coral Gables office, "falls under the BBC umbrella" as a "subsidiary of the BBC." *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 51:9-31:14-32:5. The Coral Gables staff serve BBC Mundo and BBC Monitoring—BBC divisions editorially controlled from London, and some report directly into Burgess's own department. *See id.* 83:4-85:16. The BBC News international stream is "accessible in the United States." *See id.* 12:5-18. The BBC maintains continuous PBS, NPR, and CBS partnerships through which BBC content "might be distributed … in the United States." *See id.* 53:9-17. Vitally, the BBC sends journalists to, and reports from,

15

Florida. *See id.* 52:16-23.

This is the continuous, Florida-directed business activity that § 48.193(1)(a)(1) reaches. The connexity requirement is satisfied because Plaintiff's claims arise from the same line of business through which the BBC operates in Florida—publishing and distributing BBC content. That is the business through which the Documentary was made, promoted, and disseminated, and through which BBC made *Panorama* content available to Floridians via BritBox.

### B.      The Studios Defendants' Sworn "No Role" Position Is Plainly Contradicted.

The Motion asserts that the Studios Defendants "had no role in creating or producing the Documentary," relying on Freeman's declaration that they had "no involvement whatsoever." Freeman Decl. ¶ 9. However, that categorical denial cannot be squared with Freeman's own testimony, and any resulting dispute must be resolved in Plaintiff's favor. *See Louis Vuitton,* 736 F.3d at 1350.

Freeman admitted that BBC Select—a division of BBC Distribution, since folded into BritBox—was directly approached by the Documentary's distributor and evaluated whether to acquire U.S. distribution rights to the Documentary. *See* **Exhibit S** (Freeman Rule 30(b)(6) Tr.) 15:16-16:4.. That is involvement. Evaluating U.S. rights to the very work at issue is a forum-directed contact, even if the deal did not close. Personal jurisdiction turns on whether the defendant reached into the forum in connection with the claim, not on whether a particular transaction was consummated. The declaration's sweeping "no involvement whatsoever" is at least, a disputed jurisdictional fact, if not affirmatively misleading. *Id.*

The Studios Defendants' ordinary business removes any doubt. Freeman testified that the Studios Defendants' U.S. trading subsidiary routinely distributes BBC content in the United States and remits the resulting revenue upstream to the Studios Defendants. *See id.* at 47:19-23. He further testified that the Studios Defendants' U.S. operations—including BBC Select, BBC.com, and BritBox—are continuous, subscription-based services with paying U.S. subscribers. *See id.* 49:11-50:23. The Studios Defendants are in the business of placing BBC programming before U.S. audiences for profit, they do so continuously, and they were approached to do exactly that with this Documentary.

On this record, a blanket "no role" denial cannot defeat jurisdiction. The evidence shows U.S.-facing distribution activity, a direct approach concerning U.S. rights to the Documentary, and ongoing revenue-generating U.S. operations built around BBC programming.

<b>C.      Exercising jurisdiction comports with fair play and substantial justice.</b>

Once minimum contacts are shown, Defendants must present a "compelling case" that jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). Defendants cannot. Florida has a strong interest in providing a forum for a Florida resident defamed by a Documentary about him, timed to an American election, filmed in part on American soil, pushed into the United States through a route that the BBC knew its own technology would allow, as well as directly distributed by BBC employees to Florida residents. A defendant whose own logs record U.S. attempts to view the Documentary, and who can retrieve that count but elects not to, can hardly characterize this forum as a stranger to its conduct. *See* **Ex. N; Ex. P**. Plaintiff's interest in convenient relief is clear; he resides here. Further, any supposed burden on Defendants is minimal given their admitted U.S. and Florida presence, including a 25-person Florida office, a U.S. trading subsidiary that distributes its content here, continuous U.S. broadcaster partnerships, and U.S. subscribers. A global media enterprise that marketed the defamatory Documentary to "a global audience of tens of millions," and later apologized through its Chairman after the manipulation surfaced, cannot credibly claim that litigating in Florida offends fair play.

**III.    The Complaint States a Claim.**

Defendants' arguments under Rule 12(b)(6) also fail. Defendants do not contest that the manipulated splicing of President Trump's Speech occurred. Nor could they: the entire, unedited Speech had been public for nearly three years before the Documentary aired; the BBC publicly admitted that its edit "gave the mistaken impression that [President Trump] had made a direct call for violent action" (which did not occur); and its own internal reviewer concluded that "Panorama had spliced together two clips from separate parts of [President Trump's] speech," which "created the impression that Trump said something he did not and, in doing so, materially misled viewers." Compl. ¶¶ 52, 59. Defendant BBC Chair Samir Shah's apology to President Trump is *prima facie* evidence of culpability. Unable to dispute the manipulation, Defendants ask the Court to do what Rule 12(b)(6) forbids—to weigh disputed facts, credit a self-serving "innocent edit" narrative

17

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

drawn from material outside the Complaint under an improper request for judicial notice, and resolve questions of defamatory meaning, falsity, and actual malice that belong to the jury. The Motion should be denied because the Complaint pleads each element of defamation *per se* and pleads each element of its FDUTPA claim in abundant factual detail.

### A.      The Complaint States a Claim for Defamation.

To state a defamation claim under Florida law, a plaintiff must allege "(1) publication; (2) falsity; (3) [that the] actor [acted] with knowledge or reckless disregard as to the falsity on a matter concerning a public official…; (4) actual damages; and (5) [that the] statement [was] defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). A publication is defamatory *per se* when, considered alone and without innuendo, "it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace" or "tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). The Complaint satisfies each element.

### 1.      Defendant BBC published the Documentary.

Defendant BBC published the Documentary on October 28, 2024, on BBC iPlayer, BBC One, and BBC Two. *See* ECF No. 1, ¶¶ 1, 2, 12, 36, 105. The Documentary was available on BBC iPlayer beginning October 28, 2024, until November 13, 2025, when it was taken down by Defendants. *See* ECF No. 1, ¶ 49. As explained above, Defendant BBC published the Documentary globally, including the United States and Florida. *See supra* § II.A.

### 2.      The defamatory statements are false.

The defamatory statements are identified with precision in the Complaint. *See* ECF No. 1, ¶¶ 42-44, 105(a)-(c). The Documentary deceptively depicted President Trump speaking a single, continuous sentence: "We're going to walk down to the Capitol, and I'll be there with you. And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *See* ECF No. 1, ¶¶ 43, 105(a). President Trump never made that statement. In reality, the first clause was spoken at 12:12 p.m. (14:52 into the Speech), and the "fight like hell" clause came nearly ***fifty-five minutes*** later, at 1:07 p.m. (69:30 into the Speech). *See* ECF No. 1, ¶¶ 44, 105(b). Defendants spliced the two statements together and omitted the President's express statement, made less than one minute after the first clause, that the crowd should march "to peacefully and patriotically make your voices heard." *See* ECF No. 1, ¶¶ 45, 105(c). As pleaded,

18

these Defamatory Statements falsely portray President Trump as "engaging in supposed calls for rioting and violence that he never actually made." *See* ECF No. 1, ¶ 108. Accordingly, the Complaint explains why the Defamatory Statements are false, which dictates that the Motion must be denied.

### 3.     The statements are capable of defamatory meaning.

The defamatory character of the statements is apparent on their face—from the distorted and spliced nature of the depiction itself—and so the claim sounds in defamation *per se*, not *per quod*. A statement is defamatory *per se* when it is injurious on its face and "does not require any additional explanation"; it is *per quod* when the words "are not inherently injurious, but rather are injurious only as a consequence of extrinsic facts, such as… innuendo." *Scobie v. Taylor*, 2013 WL 3776270, at *2 (S.D. Fla. July 16, 2013) (cited only to explain applicable standard); *Mas Canosa v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1257-58 (S.D. Fla. 2021) (applying the same standard to defamation *per se* and defamation *per quod*).

Here, no extrinsic fact or innuendo is needed to grasp the defamatory meaning. The Documentary fabricated a continuous sentence that President Trump never said: "We're going to walk down to the Capitol, and I'll be there with you. And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *See* ECF No. 1, ¶¶ 42, 105(a). Worse, Defendants omitted President Trump's intervening call to proceed "peacefully and patriotically" toward the Capitol. *See* ECF No. 1, ¶¶ 44, 105(c). "Defendants had no factual basis for this false depiction of President Trump." ECF No. 1, ¶ 107. A viewer needs nothing beyond the doctored Documentary itself to understand it as portraying the President as directing his supporters to commit violence. The plain language of Defendants' spliced and distorted Defamatory Statements about President Trump are defamatory *per se*, and require no additional context to understand them.

Moreover, the Defamatory Statements subject President Trump to "hatred, distrust, ridicule, contempt, or disgrace" and "injure [him] in his… profession" as a politician and officeholder. *See supra Richard*, 62 So. 2d at 598; *see also* ECF No. 1, ¶¶ 105, 108. A false statement that a public figure incited an insurrection is indisputably defamatory *per se*. Because the pleaded fabrication "would have a different effect on the mind of the [viewer] from that which

19

the… truth would have produced," it is actionable. *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999).

Defendants lean heavily on this Court's decision in *Block v. Matesic*, 789 F. Supp. 3d 1131 (S.D. Fla. 2025), for the proposition that a defamation-by-implication plaintiff must show that the defendant intended to convey the false impression. But *Block* is readily distinguishable, and in two respects actually supports President Trump. First, *Block* was decided at summary judgment—on a fully developed evidentiary record, after discovery—not on a motion to dismiss. *See* 789 F. Supp. 3d at 1147-49 (applying Rule 56 and weighing the summary-judgment evidence of express malice and special damages). Its holding that the *evidence* was insufficient to prove malice says nothing about whether the present Complaint *pleads* malice plausibly. Defendants' attempt to import a post-discovery evidentiary ruling into a Rule 12(b)(6) motion is precisely the conflation the four-corners rule forbids. *See Dershowitz,* 541 F. Supp. 3d at 1360-61. Second, in *Block*, the Court denied a motion to dismiss a defamation *per se* counterclaim at the pleading stage, confirming the low threshold that governs here. *Block v. Matesic*, 2023 WL 8527670, at *7 (S.D. Fla. Dec. 8, 2023) ("Matesic has adequately pled a claim of defamation *per se* because he effectively alleges that Block's 2023 Letter 'tends to subject [him] to hatred, distrust, ridicule, contempt, or disgrace.' *Rubinson v. Rubinson*, 474 F. Supp. 1270, 1274 (S.D. Fla. 2020) (Marra, J.)."). Here, President Trump identifies, with precision and by timestamp, the true facts that Defendants manipulated—the actual words of the Speech at 12:12 p.m., 1:07 p.m., and 12:13 p.m.—and exactly how Defendants spliced and omitted them to fabricate a sentence he never spoke and omit a statement that he did make. *See* ECF No. 1, ¶¶ 42-45, 105(a)-(c). Under the very framework Defendants invoke, those allegations state a claim.

To the extent there is any uncertainty as to whether the Defamatory Statements are capable of defamatory meaning, which there should not be, Florida law is clear that "[t]he questions of whether the broadcast contained false statements and/or statements that could be interpreted as false are questions of fact which should be left for a jury to determine where the communication is ambiguous and is reasonably susceptible of a defamatory meaning." *Pep Boys v. New World Commc'ns of Tampa, Inc.*, 711 So. 2d 1325, 1328 (Fla. 2d DCA 1998); *see also Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018) ("Whether the publication is defamatory becomes an issue

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650│ Coral Gables, Florida 33134
Telephone: (305) 614-4071

of fact for the jury only where the publication is susceptible of two reasonable interpretations, one of which is defamatory."); *see also Trump v. Am. Broad. Companies, Inc.,* 742 F. Supp. 3d 1168, 1180 (S.D. Fla. 2024) ("Where a court first determines the statements are susceptible to a defamatory interpretation, factual questions arise that should be resolved by the trier of fact — here, a jury.").

Therefore, the Complaint plausibly states that the Defamatory Statements are capable of defamatory meaning and any questions of fact are reserved for the jury. The Motion must be denied.

### 4.     The Complaint plausibly infers that Defendants published the Documentary with actual malice.

Actual malice is adequately pleaded where the complaint alleges "facts giving rise to a reasonable inference that the defendant published the [content] knowing that it was false or with reckless disregard for whether it was false or not." *See Dershowitz,* 541 F. Supp. 3d at 1367 (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016)). At the pleading stage, a plaintiff "need only allege sufficient facts to permit the inference that [the defendant] published [the] statements with actual malice," and those "hurdles… are by no means insurmountable." *Project Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024). Here, the Complaint pleads multiple facts which demonstrate that Defendants published the Documentary with actual malice.

***The entire Speech was available to Defendants for nearly three years***. Defendants possessed the complete, unedited Speech—which had been broadcast live and was publicly available since January 6, 2021—for nearly three years before they published the Documentary on October 28, 2024. *See* ECF No. 1, ¶¶ 42-45, 105(a)-(c). With the true Speech in hand, the intentional splicing of two sentences spoken nearly fifty-five minutes apart, coupled with the deliberate omission of the "peacefully and patriotically" call to action, spoken less than one minute after the first clause, is itself *prima facie* evidence that Defendants knew—or, at minimum, recklessly disregarded—that the Defamatory Statements were false. *See* ECF No. 1, ¶¶ 51, 52, 106, 111. Indeed, "it would have been impossible for [the] BBC's journalists and producers to splice together two distinct parts of the Speech from nearly 55 minutes apart unless they were

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

acting intentionally," and the manipulation "could never have occurred by accident." ECF No. 1, ¶ 52. One cannot accidentally falsely assemble a sentence the speaker never spoke from a transcript one already possesses. Defendants therefore "knew at and prior to the time they published the Panorama Documentary that the BBC's depiction of President Trump's Speech was false," "possessed information… which showed that their… depiction… [was] false," and "had no factual basis for this false depiction." ECF No. 1, ¶¶ 54, 107.

**Defendants have previously distorted President Trump's Speech**. The Complaint further alleges that the Documentary was not an isolated defamatory edit, but part of a pattern: Defendant BBC also aired spliced and distorted statements that President Trump never made during his January 6 Speech on *Newsnight* in 2022, which—"[l]ike Panorama"—made it "appear that Mr. Trump was encouraging his supporters to riot" by "linking statements made nearly an hour apart in his speech." *See* ECF No. 1, ¶¶ 62, 63, 65. BBC personnel raised concerns about the *Newsnight* edit at the time, yet the BBC repeated the same distortion. *See* ECF No. 1, ¶¶ 68, 69, 70. Defendants' prior distortion of the same Speech at issue in this action underscores, and definitely, at the very least, plausibly infers that Defendants knew or should have known that the Defamatory Statements in the Documentary were false. The Complaint also states that the Defendant BBC "admi[tted]" to multiple "instances of false statements" about President Trump, Compl. ¶¶ 72, 75, and that its leadership "bore President Trump ill will" and "wanted him to lose the 2024 Presidential Election," Compl. ¶ 54, ¶ 78. Established case law states that, "ill will or motive, when combined with other evidence, may amount to actual malice." *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 44 (Fla. 4th DCA 2010) (*Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 668 (1989)).

**Samir Shah's public apology underscores Defendants' actual malice**. In response to Plaintiff's retraction demand, Samir Shah, Defendant BBC's Chairman, stated:

> Let me address immediately your speech of 6 January 2021. The way the speech was edited in the documentary gave a misleading impression of what you said. The editing unintentionally created the impression of a single, continuous section of your speech, rather than excerpts from different points in the speech. ***This gave the mistaken impression that you had made a direct call for violent action. That was an editorial error and it should not have happened. I have stated clearly and publicly that the BBC apologises [sic] for that error of judgement. As it was your***

22
**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

*speech that was edited in a misleading way, and you were the object of that editorial error*, I would also like to apologise [*sic*] to you directly for this mistake.

ECF No. 1, Exhibit B (emphasis added).

Unless Defendants knew or should have known that the Defamatory Statements were false, Mr. Shah would have never apologized for publishing them. Consequently, Plaintiff has adequately pled that Defendants' actual malice can be plausibly inferred from the allegations in the Complaint, and the Motion must be denied.

### 5. Plaintiff has adequately pled his damages.

Defendants wrongly claim that President Trump failed to plead "actual damages." *See* ECF No. 36, § (II)(B)(1). However, Defendants misstate applicable Florida law and ignore the well-pleaded allegations of the Complaint. Relying on *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021), and *Edelstein v. WFTV, Inc.*, 798 So. 2d 797 (Fla. 4th DCA 2001), Defendants incorrectly argue that President Trump is subject to the pleading standard applicable to defamation *per quod* claims, not defamation *per se*. Notably, nothing in *Corsi* or *Edelstein* changes the pleading standard applicable to defamation *per se* claims. Instead, they merely stand for the proposition that "the Florida Supreme Court's decision in *Mid-Florida Television Corp.* [*Mid-Florida Television Corp. v. Boyles*, 467 So. 2d 282 (Fla. 1985)] makes clear that a plaintiff suing a media defendant must nevertheless plead malice and damages." *Id*.

President Trump has adequately pled malice, as laid out above, and his damages against the Defendants. *See* ECF No. 1, ¶¶ 97-102, 112. Specifically, President Trump states that "the injury to President Trump's business and personal reputation inflicted by these Defendants, and their efforts to falsely, maliciously, and defamatorily portray President Trump as a violent insurrectionist, continue into the present, thereby causing massive economic damage to his brand value and significant damage and injury to his future financial prospects, in addition to continuing to harm his reputation as President of the United States of America." ECF No. 1, ¶ 100. President Trump further alleges that his "damages take the form of direct harm to his professional and occupational interests, including, without limitation, the value of his brand, properties, and businesses, and severe diminishment and tarnishing of his reputation as a politician, leader, and businessman in the eyes of the American public and around the world." ECF No. 1, ¶ 101. These

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650│ Coral Gables, Florida 33134
Telephone: (305) 614-4071

damages allegations are sufficient to state a claim for defamation *per se*—President Trump is not subject to the heightened pleading standard applicable to a defamation *per quod* claim. *See Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999) ("[F]or *per quod* actions, the plaintiff must allege and prove special damages.").

Defendants' reliance on *Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003) is misplaced, because *Philpot* concerned "the narrow question of whether the trial court abused its discretion in requiring an evidentiary hearing to prove actual damages under the circumstances presented." This action is at a materially different stage. Defendants' reliance on *Zimmerman v. Allen*, 2014 WL 3731999, at *9 (Fla. 18th Cir. Ct. June 30, 2014) is procedurally inapposite because it concerned an award of a final judgment on the defendants' motion for summary judgment.

To the extent that *Harrington v. Veritext, LLC*, 2025 WL 1591614, at *21 (S.D. Fla. May 1, 2025), *report and recommendation adopted,* No. 1:24-CV-22787-KMM, 2025 WL 3282698 (S.D. Fla. Oct. 24, 2025) is applicable to this action, it supports Plaintiff's position, not Defendants'. In *Harrington*, the Court dismissed the plaintiff's defamation claim because it found that "Plaintiff also fail[ed] to plausibly allege both actual damages and that the statements harmed his reputation or exposed him to hatred, ridicule, contempt, or business injury. … As to reputational damage, Plaintiff fails to identify the precise statements he alleges are defamatory." *See id*. Here, as explained above, President Trump identifies the precise Defamatory Statements that are actionable, and states why they have caused him to suffer financial and reputational harm. *See* ECF No. 1, ¶¶ 42-44, 100-101. Notably, a defamation plaintiff need only allege the *types* of damages claimed, not a sum certain. *Show Plus Promotions, LLC v. Valley Nat'l Bancorp*, 2024 WL 3745213, at *9 (S.D. Fla. May 13, 2024); *Yergey v. Brinker Fla., Inc.*, 2020 WL 10817751, at *2 (M.D. Fla. 2020).

Defendants' conclusory allegation that President Trump could not have possibly suffered any harm from the Documentary because he won the 2024 United States Presidential election and "carried Florida" is nothing but argument of counsel and is entirely disconnected from the allegation in the Complaint. Moreover, Defendants' improper reference to the January 6 Committee's Report is a backdoor, improper attempt to ask the Court to take judicial notice under

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Federal Rule of Evidence 201. *Compare* ECF No. 36, p. 20, n.7; *with Purple Innovation, LLC v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule "A",* 2024 WL 4652095, at *6 (S.D. Fla. Oct. 22, 2024), *report and recommendation adopted sub nom. Purple Innovation, LLC v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule "A",* 2024 WL 4652096 (S.D. Fla. Nov. 1, 2024) (collecting cases and rejecting application of the incorporation by reference doctrine: "Defendant makes a parallel argument with regards to its extrinsic evidence being considered for 12(b)(6) purposes because 'the documents are central to the claims-at-hand and their authenticity is undisputed.' The Undersigned disagrees because not only does the Complaint fail to make any reference to Defendant's extrinsic evidence, including the settlement agreement, but the evidence is not central to Plaintiff's claims. … Defendant's extrinsic evidence is at the heart of *its* arguments, not Plaintiff's claims.") (emphasis in original).[5]

Accordingly, Plaintiff has plausibly alleged his damages and the Motion, again, must be denied.

### 6. The statements are readily capable of being proven false (not opinion).

Defendants contend that the Documentary conveys only a protected "opinion" about January 6. The argument fails at the threshold because President Trump does not sue over commentary or characterization—he sues over a fabricated statement, which Defendant BBC apologized for. The determination of whether the President spoke the continuous sentence that the Documentary attributed to him is a binary question of historical fact, and the Complaint

---

[5]     Defendants also ask the Court, in footnote 8 of their Motion to Dismiss, to take judicial notice of multiple cases concerning prosecutions against defendants who were charged with crimes related to the events that occurred on January 6, 2021. *See* ECF No. 36, n. 8. Defendants claim to rely on these cases for their argument that "nothing better reflects how President Trump's supporters understood his remarks than their own statements, and over 100 defendants charged with offenses related to January 6 told the courts that they interpreted President Trump's remarks as a call to action." *Id.* Because Defendants demand that the Court take judicial notice that these statements are true, Defendants' request is improper. *See Trump v. Dow Jones & Co., Inc.,* 2026 WL 979572, at *6 (S.D. Fla. Apr. 13, 2026) ("'[C]ourts may take judicial notice of documents such as ... newspaper articles ... for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements).'") (quoting *U.S. ex rel. Osheroff v. Humana,* 776 F.3d 805, 811 n.4 (11th Cir. 2015) and citing *Cofield v. Alabama Public Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir. 1991)).

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

demonstrates its falsity by direct comparison: it sets out, side by side and by timestamp, what the Documentary depicted and what the President actually said at 12:12 p.m., 1:07 p.m., and 12:13 p.m. *See* ECF No. 1, ¶¶ 42-44, 105(a)-(c). Defendants' splicing and distorting of President Trump's Speech was not a subjective assessment or expression of what Defendants thought about President Trump. *See NextPlat Corp. v. Seifert*, 2023 WL 2652577, at *12 (S.D. Fla. Jan. 9, 2023) ("The fact that Seifert maintains that another person could draw a different conclusion after a full review of the facts does not make the Company's assessment of Seifert's acts anything other than opinion") (citing *Turner*, 879 F.3d at 1264 and *Michel*, 816 F.3d at 697).

Any claim that the Defamatory Statements represent mixed opinion is incorrect and, in any event, such statements are actionable. Moreover, such a determination must be made after evaluating the evidence—not through the adjudication of a motion to dismiss. *See Dershowitz,* 541 F. Supp. 3d at 1367 ("The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion. CNN argues that because the impeachment trial was widely covered by it and other media outlets, the underlying facts were 'known to the audience' and, therefore, a finding of pure opinion may still be made. The court must consider numerous factors in determining whether a comment or editorial is based upon publicly disclosed facts. These include construing 'the statement in its totality,' considering 'the context in which the statement was published,' and accounting for 'all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published.' Although some of these factors are alleged in the Complaint or are available to the Court at the motion to dismiss stage, other factors relating to the context of the broadcasts and their audience are not before the Court. This requires a more fully developed record. At this stage, the Court concludes that Dershowitz's Complaint meets the plausibility standard for alleging a false statement of fact.") (internal citations omitted).

Because the Complaint shows the attributed sentence is provably false, the statements are actionable and the Motion must be denied.

### 7.    The Complaint states a claim against the Studios Defendants.

Defendants argue the Complaint impermissibly "groups" the Studios Defendants with the BBC. That argument misreads both the Complaint and the governing standard. On a Rule 12(b)(6)

26

motion, the Court is confined to the four corners of the Complaint, must accept its well-pleaded allegations, and draw all reasonable inferences in Plaintiff's favor. *Dershowitz,* 541 F. Supp. 3d at 1360-61. It may not weigh competing evidence or credit a defendant's characterization of its own conduct. *Id.*

As pleaded, the Complaint specifically alleges that the Studios Defendants "co-produced and published the Panorama Documentary." Compl. ¶¶ 13–14, 51–52. Publication and participation in producing the defamatory work are precisely the acts that give rise to liability, so the Complaint adequately "specif[ies] which … defendants are responsible for which acts." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). *Wyndham Vacation Ownership, Inc. v. CLS, Inc.*, 2018 WL 9869799 (S.D. Fla. Nov. 5, 2018), is inapposite: there the complaint tied *no* defendant to *any* act, whereas here a single specific act—production and publication of one Documentary—is alleged against each named Defendant. Moreover, the deposition record now confirms a Studios Defendant's involvement: BBC Distribution's division (BBC Select) evaluated U.S. distribution of this very Documentary. *See* **Ex. S** (Freeman Rule 30(b)(6) Tr.)15:16-16:4.

The Studios Defendants' contention that they "had no role" in the Documentary is, at bottom, a factual denial—and a disputed one. Whatever the ultimate allocation of roles among the BBC entities, that is a merits question to be resolved on a developed record, not a basis to dismiss a complaint that pleads each Defendants' involvement in the Documentary with the requisite specificity.

### B.     The Complaint States a Claim Under FDUTPA.

Finally, Defendants wrongly argue the FDUTPA claim is barred by the "single-action rule" and that the Documentary is not "trade or commerce." Both arguments fail. The single-action rule provides only that "[i]f the defamation count fails, the other counts based on the same publication must fail as well." *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1320 (S.D. Fla. 2020). Because the defamation claim is well-pleaded and survives, the predicate for dismissing the FDUTPA count does not exist.

Nor is the FDUTPA claim foreclosed on the grounds that it involves non-commercial activity. FDUTPA defines "trade or commerce" broadly to reach the "advertising, soliciting,

27

providing, offering, or distributing" of goods or services, Fla. Stat. § 501.203(8), and "the prohibition is broad enough to protect against… unfair or deceptive conduct as to a single party or under a single transaction." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Moreover, the Documentary and the Defamatory Statements were not expressly limited to the interests of the Defendants and President Trump. The Documentary is about the 2024 United States Presidential Election, which has had, and continues to have, overwhelming, numerous consequential impacts globally. Critically, Florida courts have held that a defamatory publication *is* actionable under FDUTPA where, as here, it is not a protected statement of pure opinion. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167-69 (Fla. 4th DCA 2015) (holding that a FDUTPA claim premised on a defamatory publication may proceed; plaintiff need not be a "consumer," and the First Amendment did not bar the claim where the statements were not mere opinion).

Defendants' contention that President Trump pleads no FDUTPA "actual damages" also fails. President Trump has adequately pled that he sustained reputational harm, which is recoverable under FDUTPA. *See* ECF No. 1, ¶¶ 100-101. *See Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012) (explaining that reputational damage is "actionable under FDUTPA"). Whether the challenged conduct constitutes "trade or commerce" is a fact-laden inquiry that cannot be resolved against the Plaintiff on the pleadings by crediting Defendants' characterization of their own Documentary.

Thus, President Trump has stated a FDUTPA claim under Florida Statute § 501.204.

## IV.      Alternatively, The Court Should Grant Leave to Amend.

Should the Court find any deficiency, which it should not, leave to amend should be freely given. *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988). None of the recognized reasons to deny amendment—undue delay, bad faith, repeated failure to cure, prejudice, or futility—is present. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006). An amendment, if needed, which it should not be, would add further facts on falsity, defamatory innuendo, and actual malice as to each Defendant, and the jurisdictional facts developed in the depositions. Those facts include the BBC's admission that its logs record attempted U.S. access to the Documentary and that the number of such requests is retrievable—data Plaintiff is entitled to

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

develop and plead. *See, e.g., Wallis v. Cueto*, 2017 WL 6388914, at \*7 (S.D. Fla. Aug. 9, 2017) (granting Plaintiff's request for leave to amend defamation claim following dismissal of claim); *Jetaire Aerospace, LLC v. AerSale, Inc.,* 2024 WL 1934514, \*3 (S.D. Fla. Apr. 17, 2024); *Log Creek, LLC v. Kessler,* 717 F. Supp. 2d 1239, 1251 (N.D. Fla. 2010); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 707 (11th Cir. 2016) (granting plaintiff's motion for leave to amend in a defamation action); *Aflalo v. Weiner*, 2018 WL 3235529, at \*5 (S.D. Fla. July 2, 2018) (granting leave to amend in a defamation action); *XTec, Inc. v. Hembree Consulting Services, Inc.*, 2014 WL 12729173, at \*4 (S.D. Fla. Aug. 1, 2014) (dismissing defamation counterclaim with leave to amend).

## V.      Request for Oral Argument and Evidentiary Hearing.

Pursuant to S.D. Fla. L.R. 7.1(b)(2), Plaintiff requests oral argument. The jurisdictional issues turn on disputed facts developed through the depositions of Messrs. Cooper, Burgess, Telling, and Freeman, among others, whose live cross-examination would aid the Court in resolving the conflicts between their declarations and their sworn testimony, which must be resolved in Plaintiff's favor. Plaintiff estimates two hours, including witness examination.

**CONCLUSION**

For the foregoing reasons, Plaintiff President Donald J. Trump respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety, or, in the alternative, if needed, grant leave to amend to address any deficiency, and award such further relief the Court deems just and proper.

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Dated: June 8, 2026

Respectfully submitted,

**BRITO, PLLC**
2121 Ponce de Leon Blvd.
Suite 650
Coral Gables, FL 33134
Tel:  305-614-4071
Fax:  305-440-4385

*/s/Alejandro Brito*
Alejandro Brito
Florida Bar No. 098442
abrito@britopllc.com
apiriou@britopllc.com
Michael O. Mena
Florida Bar No. 010664
mmena@britopllc.com
Jalaine Garcia
Florida Bar No. 58632
jgarcia@britopllc.com
Ian Michael Corp
Florida Bar No. 1010943
icorp@britopllc.com

*Counsel to Plaintiff,*
*President Donald J. Trump*
Edward Andrew Paltzik
Taylor Dykema PLLC
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com
(*pro hac vice application forthcoming*)

Daniel Zachary Epstein
Epstein & Co. LLC
8903 Glades Rd, Ste A8 #2090
Boca Raton, FL 33434
Tel: 510-239-7430
dan@epsteinco.co
(*pro hac vice application forthcoming*)

*Counsel to Plaintiff,*
*President Donald J. Trump*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 8, 2026 the foregoing was served via the Court's

CM/ECF System upon:

Charles D. Tobin, Esq.
Ballard Spahr, LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Tobinc@ballardspahr.com

*Counsel for Defendants British Broadcasting*
*Corporation, BBC Studios Productions Limited*
*and BBC Studios Distribution Limited*

/s/Alejandro Brito

**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071