**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

PRESIDENT DONALD J. TRUMP, an individual,

Plaintiff,

v.

BRITISH BROADCASTING CORPORATION a/k/a BBC,

Defendant.
_______________________________________/

Case No. 1:25-cv-25894-JTK

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff President Donald J. Trump ("Plaintiff" or "President Trump"), by and through undersigned counsel, hereby files this Memorandum of Law in Opposition to the Motion to Dismiss Plaintiff's First Amended Complaint [D.E. 133] ("Motion") filed by Defendant, British Broadcasting Corporation a/k/a BBC ("BBC" or "Defendant"). In support, Plaintiff states:

## INTRODUCTION

The BBC's Motion advances an untenable and unlawful proposition—that a foreign corporation may produce a fabricated and doctored documentary about an American President (and Florida resident) (the "Documentary"), intentionally schedule the publication of that Documentary to impact an American election that is deciding the future of the President and the United States of America as a whole, film a large part of it on American soil, market that Documentary into the United States through a route that the BBC knew its own technology allowed, apologize through its own Chairman for the Documentary's undisputed doctoring and manipulation—and then try to insist that no American court may hold it accountable. The law of personal jurisdiction exists precisely to prevent such a wrongful and unjust result.

The BBC asks this Court to improperly dismiss this action at the threshold on two grounds: lack of personal jurisdiction under Rule 12(b)(2), and failure to state a claim under Rule 12(b)(6). Both grounds fail on the record that the BBC itself created.

The BBC's Rule 12(b)(2) argument not only fails, it is actually even weaker now than when it was first made. The BBC resubmits the same four declarations that it filed with its original motion, but those declarations have now been contradicted by the declarant's depositions. The BBC built its wrongful jurisdictional argument on a single premise: that the BBC's geo-blocking technology somehow "prevents access" to iPlayer outside the United Kingdom, so the Documentary could not have reached Florida, and the BBC did not target this forum. All of that is wrong, and the BBC's own witnesses disproved its premise under oath. The BBC's principal technical witness—who swore in his declaration that the technology "prevents access"—conceded in deposition that the system is not completely reliable, that the BBC has no guarantee of accuracy from its vendor, and that VPN blocking is a "cat and mouse game" which the BBC often loses.

The BBC's editorial witness could not rule out Florida viewership, and its news witness admitted that he was unfamiliar with the technology, and had reviewed no records before incorrectly attesting that it was the "industry standard." Most significant of all, the BBC's own explanation of its technology defeats its argument: each of the BBC's three technical checks reads

only the IP address that the incoming connection presents, so a Florida viewer using a commercial VPN with a United Kingdom egress address clears all three checks, and is then provided the Documentary by the BBC's own content delivery network.

Defendant's 12(b)(2) position is fully undermined by the BBC's own documents, which demonstrate that the Documentary's producers—at least one of whom was a full-time BBC employee—emailed individuals in the United States in the days before the Documentary aired and instructed them on how to circumvent the BBC's geo-blocking efforts. The hole in BBC's position is not only that the BBC's supposed protections were a "cat and mouse game," but also that the BBC knew exactly where the backdoor in its own system existed, walked U.S. viewers through it on request, and even advertised that specific U.S. access on social media.

The BBC's Rule 12(b)(6) arguments also fail. The BBC does not deny that it spliced, doctored, and manipulated President Trump's Speech. Instead, it asks the Court to accept its "innocent edit" explanation that is squarely contradicted by its own apology, to rely on materials outside the FAC, and to decide contested issues of defamatory meaning, falsity, and actual malice that firmly belong to the jury. The single-action rule fares no better, because the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim challenges the BBC's unfair and deceptive conduct in trade or commerce, and it is independently actionable under Fla. Stat. § 501.204.

Accordingly, the BBC's Motion should be denied in its entirety.

## ARGUMENT

### I. Legal standard.

A federal court applies a two-step analysis to determine whether it has personal jurisdiction over a nonresident defendant: *first*, whether the plaintiff has alleged facts sufficient to subject the defendant to the forum state's long-arm statute; and *second*, whether the exercise of jurisdiction comports with the Due Process Clause. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). A plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Id.* A defendant may then challenge jurisdiction "by submitting affidavit evidence in support of its position," after which "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)).

Two settled principles govern how the Court evaluates the competing positions. *First,* conflicts must be resolved, and reasonable inferences drawn, in Plaintiff's favor. *PVC Windoors,*



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

*Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010); *Louis Vuitton*, 736 F.3d at 1350. *Second*, the burden-shifting framework presupposes affidavits that actually support the movant's position. Here, the BBC's jurisdictional declarations do not, and thus its contention regarding a lack of jurisdiction fails. The BBC's jurisdictional declarations are contradicted by the declarants' own deposition testimony, the BBC's contemporaneous records, and Plaintiff's expert witness. At most, the declarations create disputed jurisdictional facts that must be resolved in Plaintiff's favor at this stage. *Id.*; *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999).

That framework controls here. The Motion does not accept the FAC's allegations and test their legal sufficiency; it improperly asks the Court to find facts. The Motion also cites deposition transcripts to challenge the pleading, dismisses the BBC's own analytics data as unreliable, and asks the Court to prefer the BBC's witnesses' litigation explanations to their sworn admissions. Rule 12 does not work that way. *Louis Vuitton*, 736 F.3d at 1350; *PVC Windoors*, 598 F.3d at 810. To the extent that the Court concludes that the competing jurisdictional evidence cannot be resolved on the papers, the remedy is the evidentiary hearing that Plaintiff requests, not dismissal. *See infra* § V.

On a Rule 12(b)(6) motion, the Court accepts the First Amended Complaint's ("FAC") well-pleaded allegations as true, and draws all reasonable inferences in Plaintiff's favor; it may not credit a defendant's competing characterization of its own conduct or intent, nor consider disputed extra-pleading material. *Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1360–61 (S.D. Fla. 2021).

## II. The Court has personal jurisdiction over the BBC.

The BBC's jurisdictional argument cannot be reconciled with the sworn testimony of its own witnesses. Far from the clean, one-sided record that the Motion wishes to portray, jurisdictional discovery produced a record replete with disputed facts—each of which the Court should resolve in Plaintiff's favor. *Louis Vuitton,* 736 F.3d at 1350. The BBC is subject to personal jurisdiction. At a bare minimum, these disputes preclude dismissal.

### A. The Court has specific jurisdiction.

Specific jurisdiction here is manifest. Plaintiff invokes Florida's tortious act provision, Fla. Stat. § 48.193(1)(a)(2), and the *Calder* effects test, which is satisfied, as it is here, where the tort was (i) intentional, (ii) aimed at the forum, and (iii) caused harm the defendant should have anticipated would be suffered in the forum. *Calder v. Jones,* 465 U.S. 783, 789-90 (1984); *Louis*


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

*Vuitton,* 736 F.3d at 1356. Due process is satisfied where the defendant's suit-related conduct creates a substantial connection with the forum. *Walden v. Fiore,* 571 U.S. 277, 284 (2014). Here, the BBC committed an intentional tort—defamation—expressly aimed at a Florida resident, with harm that it knew would be felt in Florida. Express aiming is, as a matter of law, the settled way in which the Eleventh Circuit applies *Calder* to publication torts, and it asks one question: did the defendant's intentional conduct target the forum? *Calder*, 465 U.S. at 789-90. The Eleventh Circuit has repeatedly answered yes where a defendant directs an intentional tort at a known resident of the forum and causes injury there, *see Licciardello v. Lovelady*, 544 F.3d 1280, 1287-88 (11th Cir. 2008); *Louis Vuitton*, 736 F.3d at 1356-57, and *Walden* held only that a plaintiff's own forum connections cannot substitute for the defendant's forum connections. 571 U.S. at 284-86.

Even the authority on which the BBC relies upon identifies precisely what this record supplies. *Moore* found the effects test unmet because "there is no evidence that the defendant posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state specifically." *Moore v. Cecil*, 109 F.4th 1352, 1364 (11th Cir. 2024). Here, that evidence exists and has been sufficiently alleged. The BBC's own producer sent the Documentary to be forwarded to a named Florida resident, and its own team supplied the route by which viewers in this country, and Florida specifically, could watch the Documentary. The BBC did not merely hope to specifically reach an audience in Florida. It reached one, deliberately, by hand. That framing also disposes of the BBC's cited cases. Where a publisher's only forum contact is *circulation* or *accessibility*, the analysis reduces to whether volume alone establishes purposeful availment, and the answer is ordinarily no. Where the publisher *instead* identifies the route into the forum, tells particular recipients how to use it, and delivers the work itself, volume is beside the point, because the defendant has "itself create[d]" the contact rather than receiving it from a reader's unilateral act. *Walden*, 571 U.S. at 284. Every authority in the Motion is of the first kind and turned on the *absence* of forum-directed conduct. This case is of the second, and thus the Motion must be denied. *See infra* §§ II.A.1-4.

**1. The BBC deliberately targeted the Documentary at a global, unrestricted U.S. audience.**

The Documentary was the BBC's own editorial product. BBC producer Matthew Hill remained a BBC employee while seconded to October Films to work on the Documentary. The BBC retained authority over his pay, leave, discipline, and appraisals, continued paying him, and

used his BBC email throughout production. *See* **Exhibit A** (Telling[1] Tr.) 53:4-23; **Exhibit B** (Burgess[2] Rule 30(b)(6) Tr.) 12:18-14:12; **Exhibit C** (Secondment Agreement). The BBC also retained final editorial signoff over the Documentary. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 10:7-21**.** The BBC, therefore, cannot separate itself from its own intent, knowledge, promotion, and distribution decisions.

The BBC's *own* commissioning documents confirm that the Documentary was conceived, timed, and structured around the 2024 U.S. Presidential Election. The Programme Production Agreement and Commissioning Specification, memorializing an April 4, 2024, discussion between October Films' Neil Breakwell and the BBC's Editorial Representative Leo Telling, states that *the BBC would be "mindful of the effects of our reporting that could be seen in territories where the vote could be affected" when reporting on a foreign election. See* **Exhibit D** at 6 (emphasis added). The foreign election was the 2024 U.S. Presidential Election, and the territories where that vote could be affected are the United States, specifically including Florida. That is the BBC's contemporaneous acknowledgment that it understood the consequences of where its reporting would be seen, in the U.S. generally, and in Florida specifically.

The production records make the same point. The Commissioning Specification adopted a holdback clause "due to the … need to broadcast ahead of the US Election on 5th November 2024," and contemplated 10 to 15 days of filming in the United States. *Id.* Pitch materials framed the Documentary around "November's election," and expressly tracked potential "revelation[s] from DC, Florida, New York or Georgia." *See* **Exhibit E** (PITCH 3); **Exhibit F** (Pitch v.5). These records show that—from the start—the BBC and its production team focused on the American election, American political events, and specific U.S. jurisdictions, including Florida.

The BBC's attempt to neutralize these records fails. It argues that a pitch page describing battleground states "decided by small swings," names "Wisconsin" rather than Florida, and that Florida was not close. D.E. 133 at 7. That is a quarrel with one page of one draft of a pitch that went through multiple versions, and it ignores the version of the pitch page tracking developments from "DC, Florida, New York or Georgia" by name. *See* **Ex. E**; **Ex. F**; FAC ¶ 35 and Composite Ex. B. Purposeful direction is measured by what the defendant did toward the forum, not by

---

[1] Mr. Leo Telling ("Telling") was the BBC's Executive Producer on the Documentary.

[2] Mr. Richard Burgess ("Burgess") is the Director of News Content for the BBC.

whether a single pitch page lists the forum among its examples. The BBC's own commissioning file states that the BBC would be "mindful of the effects of our reporting that could be seen in territories where the vote could be affected." **Ex. D** at 6. The territory was the United States, and the candidate that the Documentary was built around, *i.e.*, President Trump, resides in Florida.

Internal BBC emails confirm the same U.S.-focused purpose. The BBC team chose the premiere date to "increase[] the window for international broadcast ahead of the US election … which is crucial," and described the Documentary as destined for "a global audience of tens of millions" on platforms "most notably … BBC Worldwide and Amazon Prime (via BBC Select)." *See* **Exhibit G** (Wightman 3/14/24 email); **Exhibit H** (Towey 5/1/24 email). Those statements directly contradict the BBC's untenable position in the Motion that the Documentary was aimed only at a U.K. audience, and that U.S. viewing was incidental or unforeseeable.

The BBC also promoted the Documentary through an official, globally accessible BBC channel. On the night of broadcast, the BBC posted on its official Panorama account on X that "Trump: A Second Chance?" was "On @BBCiPlayer now," with a direct link to the Documentary on iPlayer. *See* **Exhibit I**. Vitally, the BBC admits that the account is international-facing and available in the United States. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 81:7-82:9; 82:21-25; **Exhibit J** (Cooper[3] Rule 30(b)(6) Tr.) 33:7-17. The BBC measured 84,798 views of that post, and relied on that engagement. *See* **Ex. I**. Having promoted the publication, and a way to watch it to a global audience, the BBC cannot now call this mere website accessibility.

The BBC and October Films specifically contemplated U.S. viewing. October Films, copying BBC Current Affairs producer Matthew Hill, emailed a U.S. participant in the Documentary, and stated that the film would air on Panorama, would be available for replay on BBC iPlayer, and could be watched in the United States through VPN access. *See* **Exhibit L** (Towey 10/25/24 email). Hill did not correct that statement, object to it, or say that U.S. viewing was unauthorized. Nor did he instruct October Films to retract the statement or tell the U.S. participant that the film was intended only for U.K. viewers. Hill's silence matters because he was the BBC employee embedded in the production, and the BBC retained editorial control over the program. *See* **Ex. A** (Telling Tr.) 53:4-23, 116:23-117:1; **Ex. C** (Secondment Agreement); **Ex. B** (Burgess Rule 30(b)(6) Tr.) 10:7-21; 12:18-14:12.

---

[3] Richard Cooper is the BBC's Director of Digital Distribution.

Conversely, when asked, "Any chance we can get a link for the US folks?" Hill responded, "Sure," and sent the hyperlink and password. *See* **Exhibit M** (Hill 10/29/24 email). U.S. viewing was certainly not unforeseeable. The BBC itself directly authorized it. The distribution structure confirms that the program was positioned for international and U.S. distribution exploitation. International rights ran from October Films to Blue Ant to Little Dot Studios, which held U.S. distribution rights until it imposed a restriction on November 10, 2025—*after* Plaintiff threatened suit. *See* Telling Decl. ¶ 24*;* **Ex. A** (Telling Tr.) 116:6-20. The BBC's answer to a threatened lawsuit was to close off a U.S. distribution channel that it now claims to never have existed.

The BBC's own commercial arm confirms that fact. Martyn Freeman, BBC Studios' Chief Operating Officer, testified that BBC Select, then a division of BBC Studios Distribution, was directly approached by the Documentary's distributor, and evaluated whether to acquire U.S. distribution rights to this very Documentary. *See* **Exhibit S** (Freeman Rule 30(b)(6) Tr.) 15:16-16:4. He further testified that the BBC's U.S. trading subsidiary routinely distributes BBC content here, and remits the revenue upstream, and that the BBC's U.S. operations, including BBC Select, BBC.com, and BritBox, are continuous, subscription-based services with paying U.S. subscribers. *See id.* at 47:19-23; 49:11-50:23. A publisher whose commercial arm was actively shopping this film into the United States cannot call it a purely domestic U.K. broadcast.

Together, the evidence shows coordinated BBC conduct directed toward the United States, not "mere accessibility." Under *Calder*, it is affirmative, intentional conduct aimed at the United States, and at the Florida resident whose election the Documentary targeted. The BBC's aim was not merely foreseeable; it was targeted and planned. Cooper admitted that from the day that the Documentary went live, the BBC's logs recorded "evidence of attempt to access" the Documentary from the United States. *See infra § II.A.3;* **Ex. J** (Cooper Rule 30(b)(6) Tr.) 36:5-14.

The BBC's "mere accessibility" cases do not change the result. *Moore*, 109 F.4th at 1364, *Nunes v. CNN*, 2023 WL 2468646 at *4 (M.D. Fla. Mar. 1, 2023), and *Bioheart v. Peschong,* 2013 WL 1729278 at *5 (S.D. Fla. Apr. 22, 2013), each turned on the absence of evidence that the defendant directed the publication at the forum. An immense amount of such evidence has been presented here. The other cases cited by the BBC fare no better. As the BBC itself notes, *Johnson v. Borell* found jurisdiction lacking "absent evidence that Defendant manifested an intent to target and focus on Florida readers," where the harm arose solely from "potential access." (D.E. 133 at 10 (quoting 2026 WL 1077623, at *4)). Each of these cases turns on the word "absent." Here, the


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

evidence of intent is affirmative, and the access is not potential, but recorded. The present case is different. The publication in the United States, and Florida specifically, was directed by the BBC, and jurisdiction exists.

The BBC's lead authority, *Karnas v. Cuban,* 2025 WL 3759241 at *7 (S.D. Fla. Dec. 30, 2025), does the opposite of what the BBC seeks to rely on. Jurisdiction failed there because the plaintiffs offered no evidence that the defendants targeted Florida. The promotion was directed at "national (if not worldwide) audiences, not specifically at Florida residents," and nothing showed that the defendants "took aim at a Florida audience specifically." *Id.* at *7-8. Livestreaming a Dallas press conference, running a worldwide app promotion, and displaying arena signage during nationally broadcast home games were determined to be generic marketing.

This record is different. The BBC created an election-timed Documentary about a specific Florida resident—the leading candidate in the very election that the Documentary was built around—whose reputation and businesses are centered in Florida. Its commissioning documents acknowledged that the reporting "could be seen in territories where the vote could be affected," contemplated 10 to 15 days of filming in the United States, and tracked developments from "Florida" by name. Part of the Documentary was filmed at Mar-a-Lago in Palm Beach, Florida. The BBC then promoted it through an unrestricted, international-facing official channel with a direct link to the defamatory work, while its production team—with a BBC employee copied—affirmatively supplied U.S. contacts with instructions for accessing the Documentary from the United States. *Karnas* involved none of that. The Motion should be denied.

**2. BBC personnel actively helped U.S. residents circumvent the geo-block.**

Any suggestion that the BBC tried to keep the Documentary from U.S. viewers is refuted by contemporaneous emails in which the production team—***with BBC producer Matthew Hill copied***—did the opposite. In the days surrounding the broadcast, October Films producer Megan Towey emailed at least six U.S.-based participants and contacts, including congressional staff, the Lincoln Project, and a University of California professor. She announced the premiere of the Documentary in U.S. Eastern and Pacific times, offered to send "a link to the film after it airs," explained that "you would need a VPN to watch in the United States," and provided articles on "how to access the iPlayer through VPN." *See* **Exhibit P**.

These are not the communications of a broadcaster walling off the United States. They are affirmative efforts, made with and through the BBC's own producer, to deliver the Documentary

to U.S. viewers by a route that the BBC knew its geo-blocking would not close. In one exchange, October Films wrote that "[e]ither Matt [Hill] or I will make sure you get a link sometime next week." *See id.* (BBC00038511). Hill himself told a U.S. recipient that "it's highly likely we will be back in the US in the not-too-distant future." *See id.* (BBC00038546).

Most tellingly, the BBC's own employee delivered a link to view the Documentary to a *Florida* resident. On October 29, 2024, BBC Current Affairs producer Matthew Hill, writing from his BBC email account, sent the Lincoln Project's Whitney Hayes a working download link—"you can download the film here"—and asked her to "forward to Rick" and convey the BBC's thanks "for his time." *See id.* (BBC00038546). The "Rick" was Rick Wilson, a contributor to the Documentary, and a known *Florida* resident. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 63:19-64:2 (confirming Wilson was a film contributor who "resides in Florida"). A BBC employee—not October Films—transmitted the defamatory work to a known Florida resident. The BBC's intentional, affirmative conduct was expressly aimed at Florida, and it yielded a contact with this forum that the BBC "itself create[d]." *Walden*, 571 U.S. at 284; *Calder,* 465 U.S. at 789-90.

The BBC's attempted answer is that Plaintiff "offers no evidence or allegation that any of the recipients actually accessed iPlayer, let alone saw the Documentary," and that sending "a single viewing link to one contributor who may have been in Florida" cannot make Florida the focal point of the Documentary. D.E. 133 at 11. That argument mistakes the test. The effects test asks whether the publication of the Documentary was intentional, aimed at the forum, and calculated to cause harm that the defendant should have anticipated would be felt there. *Calder,* 465 U.S. at 789-90; *Louis Vuitton,* 736 F.3d at 1356. Every element measures what the defendant did. None asks what the recipient did next. A publisher that transmits a defamatory work into the forum has aimed its conduct there whether or not the addressee opens the envelope. Nor is the recipient's residence in doubt. The BBC's own corporate representative confirmed that Wilson was a film contributor who "resides in Florida." **Ex. B** (Burgess Rule 30(b)(6) Tr.) 63:19-64:2. The BBC's new hedge that Wilson "may have been in Florida" is contradicted by its own sworn testimony. The BBC does not need Wilson to have pressed play, because its own records confirm that the Documentary was, in fact, played from Florida. *See infra* § II.A.3.

Nor was the VPN workaround obscure or speculative. Plaintiff's network engineering expert, Dr. Tal Lavian, explains that the seven major commercial VPN providers operate U.K. egress infrastructure and "openly market[] the ability to access BBC iPlayer from outside the

United Kingdom" for roughly $5 to $12 per month, with only modest technical skill required. *See* **Ex. K** (Lavian Decl. ¶ 24 (Opinion 7)). Tellingly, ExpressVPN's dedicated "Best BBC iPlayer VPN" landing page markets that capability by reference to *Panorama* itself. *See id.* ¶¶ 103, 222. When the BBC's team told U.S. contacts that they "would need a VPN to watch in the United States," and sent instructions for using one, it was directing them to a functioning, commercially available path into iPlayer.[4] That proves that the BBC expressly aimed its conduct to the United States, and Florida specifically.

**3. The BBC's own "block" defense collapsed, and its own records confirm Florida access.**

The centerpiece of the Motion is the assertion that the BBC "took active measures to block Americans from viewing this Documentary." *See* D.E. 133 at 12. That claim rests entirely on the Declaration of Richard Cooper ("Cooper Decl."). *See* Cooper Decl. ¶¶ 9-11. Cooper's deposition testimony eviscerated that assertion, and Dr. Lavian confirms that the BBC's assertion that its geo-blocking system "prevents access" overstates what the technology can do. *See* **Exhibit K** (Lavian Decl. ¶ 18 (Opinion 1)).

Cooper—the BBC's Director of Digital Distribution—admitted that there is "no guarantee" that the geo-blocking system works "every single time." *See* **Ex. J** (Cooper Rule 30(b)(6) Tr.) 79:8-80:2. As to VPN blocking, Cooper testified that the BBC "do[es] not have a guarantee from GeoComply [the vendor of the product] it's accurate 100 percent of the time," and described VPN detection as "a cat and mouse game … because they are continuously trying to get around the protection." *See id.* 81:23-83:12. In a cat-and-mouse game, the mouse often wins. Begin with the BBC's own account of how its system works, because that account defeats its argument. Cooper identified five layers of protection—two contractual and three technical. *See* **Ex. J** (Cooper Rule 30(b)(6) Tr.) 21:10-22:25. The contractual layers are the iPlayer terms of use and a television-license affirmation: promises, not barriers, and a viewer who breaks a promise is still a viewer whom the BBC served. The three technical layers are: the BBC reads the IP address presented by

---

[4] Dr. Lavian offers this marketing evidence as "market context only." *See* **Ex. K** (Lavian Decl. ¶ B-19). The technical point stands: VPN access to iPlayer is a real, marketed capability, and it is the one that the BBC team directed its U.S. recipients to use. Public reporting also confirms that U.S. access was foreseeable and intended. Technology outlets published guides for U.S. readers explaining how to watch "Trump: A Second Chance?" and *Panorama* "from anywhere with a VPN," specifically listing U.S. Eastern and Pacific broadcast times. *See* **Exhibit Q**.



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

the incoming connection when the user reaches the site, once again when the user presses play, and a third time at content delivery before any video is sent. *See id.* 21:10-22:25; 114:11-18.

That is precisely why a VPN passes through it. A commercial VPN does not copy, host, or transmit the Documentary. It presents a United Kingdom egress IP address, which the BBC's three checks read and clear, after which the BBC's own delivery network streams the file to the device that requested it—here, to devices in Florida. On the BBC's own explanation of its own technology, the BBC received these requests, and the BBC delivered this Documentary into this forum. That is not a third party's unilateral act but the defendant's own conduct, performed by the defendant's own infrastructure. *Walden*, 571 U.S. at 284. Cooper also explained why the BBC even geo-blocks at all, and the reason is purely commercial. Rights holders, such as [redacted], require it so that "they can sell the content to other territories." *See id.* 23:5-13; 137:22-139:4. The BBC cannot treat the United States of America as a market worth protecting when it licenses content, and a stranger to its conduct when it is sued.

Dr. Lavian explains why this is not mere semantics. IP-based geographic restriction is "inherently probabilistic rather than deterministic," with "vendor-admitted residual rates," a conclusion supported by ten peer-reviewed empirical studies between 2011 and 2024. *See* **Ex. K** (Lavian Decl. ¶ 27 (Opinion 10)). The BBC's own vendor agrees. GeoComply (much like Cooper) describes geo-blocking as a "cat-and-mouse race," reports a VPN-detection rate of 99.1 percent—leaving a roughly 0.9 percent residual—and concedes that detecting residential-proxy circumvention "may seem like a can't-win situation." *See id.* ¶ 23 (Opinion 6). Cooper borrowed the same framing in his deposition, but his declaration disclosed none of these admissions to the Court. *See id.* ¶ 28 (Opinion 11).

Cooper further confirmed that the BBC's logs already register attempted access from the United States. He could not say that he was certain that no one here accessed the Documentary. He confirmed that the BBC's information "does" reflect "whether there was attempted access of viewership of the Documentary by anyone in the United States," that each such logged request captures the originating IP address, the apparent location, and a date-and-time stamp, and that the precise number of U.S. attempts could be retrieved—"[w]e can find that data"—but, despite having such capabilities, he had simply not "looked up or remembered to bring [it] to this [deposition] session." *See id.* 37:3-39:17. When the BBC did run that query, its own records confirmed Florida access. The BBC produced a spreadsheet extracted from its audience-analytics

system—data "pool[ed] as [of] May 21, 2026," nineteen months after the broadcast and five months into this litigation—reflecting **34** successful play-starts attributed ***solely to Florida*** during the period in which the Documentary was available. **Exhibit N** (Data Pool Spreadsheet); **Ex. J** (Cooper Rule 30(b)(6) Tr.) 100:25-103:17; 121:5-25. Cooper confirmed that those "34 attempts definitely happened," that all were successful play-starts, and that he "would not testify that they did not occur." *See id.* 142:25-144:22.

The BBC now shockingly resists its own production, urging that the figure is "not reliable," because the country attribution is "enrich[ed]" from the IP address "after the event." *See id.* 92:5-93:18. That after-the-fact disclaimer cuts against the BBC. The witness who generated the critique admitted he is "not a data scientist," has "no data forensics training," and was never designated as an expert. *See id.* 139:20-140:21. His claim that he later traced one IP to a U.K. data center only proves Plaintiff's point. The BBC's contemporaneous distribution logs do not capture the country of a request, so every country determination is necessarily a litigation-driven reconstruction, performed by a self-described non-expert, on which dismissal cannot rest. *See id.* 92:5-93:18; 139:20-140:21.

Cooper's testimony also creates the conflict that forecloses dismissal. He testified that the systems on which the BBC relies for geo-blocking reflect no U.S. access, and that a user detected in the United States would have been blocked. **Ex. J** (Cooper Rule 30(b)(6) Tr.) 39:18-25. Yet the BBC's own audience data records 34 successful Florida play-starts that Cooper confirmed "definitely happened." **Ex. N**; *see id.* 142:25-144:22. Both cannot be true, and the conflict is resolved in Plaintiff's favor at this stage. *Louis Vuitton*, 736 F.3d at 1350.

Dr. Lavian identifies the same gap. *See* **Ex. K** (Lavian Decl. ¶ 25 (Opinion 8)). There is "no evidence in the record … that the BBC undertook any after-the-fact technical audit to determine whether the Documentary was actually viewed from United States Internet endpoints." *See* **Ex. K** (Lavian Decl. ¶ 25 (Opinion 8)). The BBC cannot seek dismissal based on the strength of a blocking system it admits is imperfect, while declining to run the very query that would show whether the Documentary reached Florida, and attempting to ignore its own data, which ***proves dozens of play-starts in Florida***.

The "Bundesliga emails" that the BBC produced confirm the failure was real. *See* **Exhibit O**. A rights-holder to Bundesliga soccer matches, which were purportedly only viewable in the U.K., reported that "certain VPNs were not blocked," allowing geo-restricted BBC content to be


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

"easily viewed" abroad through named consumer VPNs (*e.g.,* ExpressVPN, NordVPN, PIA, Proton, and Surfshark). *See id.* Cooper explained that some VPNs "route the traffic through residential IPs," making it appear to come from an "unwitting user" and therefore "look[] legitimate." *See id*. The BBC's system cannot reliably distinguish a VPN user abroad from a genuine U.K. resident—precisely the residential-proxy vulnerability that Dr. Lavian identifies as the hardest to defeat. *See* **Ex. K** (Lavian Decl. ¶¶ 23, 45 (Opinion 6)).

Nor was the BBC's back-up registration wall meaningful. The same rights-holder reported that users bypassed it by entering "a random name and a fake UK postcode (without any further verification)." *See* **Ex**. **O**. The same geo-blocking system that the BBC incorrectly claims "blocked Americans" from viewing the Documentary, demonstrably failed to block VPN users from viewing live sporting events. *See id.*

This record is fatal to the BBC's lead authority, *Carsey-Werner Co. v. BBC*, 2018 WL 1083550 (C.D. Cal. Feb. 23, 2018). *Carsey-Werner* rejected jurisdiction based on *unauthorized* VPN piracy where the plaintiff offered only speculation. Here, Plaintiff does not speculate. The BBC's employees directed multiple individuals to circumvent the BBC's geo-blocking software. *See* Exhibit L & M. The BBC's own engineer admits that the block is imperfect. Its own documents show named consumer VPNs defeating the block. Its own audience-analytics records (*see* **Ex. N**) reflect 34 successful Florida play-starts, its corporate representative confirmed those "34 attempts definitely happened," and its own personnel promoted the film worldwide with a clickable iPlayer link, and, vitally, personally supplied U.S. viewers with instructions for bypassing the geo-block. The technical record itself has also materially changed since 2018. As Dr. Lavian explains, seven of the ten peer-reviewed circumvention studies postdate *Carsey-Werner. See* **Ex. K** (Lavian Decl. ¶¶ 23-24 (Opinions 6, 11)). *Carsey-Werner* turned on the absence of contacts that the defendant "themselves created with the state." Here, the BBC created those contacts itself.

Nor does *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15 (D.D.C. 2017), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018), carry the weight that the BBC places on it. *Triple Up* actually proves Plaintiff's point. The defendant there geoblocked only videos it had uploaded itself, and the plaintiff's argument was premised on a pure failure-to-geoblock theory, which was the theory that the court rejected, because such a rule "would effectively mandate geoblocking for any website operator wishing to avoid suit in the United States." *Id.* at 25. The foregoing sentence that the BBC quotes from *Triple Up* is preceded by its holding: "To be sure, the proposition that a

website's affirmative geoblocking efforts should weigh against the exercise of personal jurisdiction is unobjectionable." *Id.* Plaintiff advances no failure-to-geoblock rule. This case rests not on what the BBC failed to do, but on what it did: its own producer sent a working link to be forwarded to a Florida resident. *See* **Ex. P** (BBC00038546). Its production team told U.S. contacts that "you would need a VPN to watch in the United States," and supplied instructions. *See* **Ex. P**; FAC ¶ 38. Its official *Panorama* account posted a clickable iPlayer link worldwide. *See* **Ex. I**. A publisher that maintains a fence while its own employees hand out the key to it has not excluded the forum. It has invited it.

The BBC's remaining jurisdictional argument is a red herring and one of arithmetic. It contends that thirty-four play-starts from ten users are "isolated or sporadic" contacts insufficient under *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 366 n.4 (2021), and that they represent "0.006% of the 570,000 successful requests of the Documentary." D.E. 133 at 10. The argument is an attempt to distract from the fact that the BBC filmed parts of the Documentary in Florida and published the Documentary in Florida. *See* **Exhibit R** (Hill 3/7/24 email); *see also* **Ex. N**; **Ex. P**. Even if the Court were to reach this argument, which it should not, it fails for three reasons.

*First,* every authority that the BBC assembles is a circulation-volume case, which is inapposite here. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419 (5th Cir. 2005), involved a German-language magazine that sent roughly seventy of its 750,000 weekly issues into Texas. *Id.* at 422. *Chaiken v. VV Publishing Corp.*, 119 F.3d 1018 (2d Cir. 1997), involved an Israeli newspaper that sent four copies a day into Massachusetts. *Id.* at 1029. The BBC's remaining examples are the same on its own description: a Hong Kong company that "sold up to 5% of products in Florida" and a German defendant that "sold 23 meat grinders into Florida." D.E. 133 at 10 (describing *Thane Int'l v. Braden*, 2008 WL 11399575 (S.D. Fla. Jan. 22, 2008), and *Maschinenfabrik Seydelmann v. Altman*, 468 So. 2d 286 (Fla. 2d DCA 1985)). Each involved a defendant that lawfully placed its product into the forum, and the only question was whether quantity alone established purposeful availment. The BBC identifies no case in which the defendant's own employee transmitted the challenged work to a named resident of the forum, because that is not a volume issue at all.

*Chaiken*, in fact, defeats the BBC's argument. The Second Circuit did not rest on the percentage. Having observed that the four daily copies were "a tiny fraction of [the newspaper's]



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

total circulation," the court did not stop there. It added: "Moreover, unlike the defendants in *Calder,* Modiin did not 'expressly aim[ ]' its actions at Massachusetts." *Id.* at 1029. Volume mattered there only because express aiming was absent. Where the plaintiff shows targeted conduct, which is undoubtedly present here, volume is not the measure. *Calder* itself turned not on arithmetic, but on the defendants' conduct being "expressly aimed" at the forum, just as the BBC's conduct was here. 465 U.S. at 789.

*Second,* the long-arm inquiry imposes no volume threshold. Under *Internet Solutions*, defamatory material about a Florida resident is "published" in Florida when it is accessed here. 39 So. 3d at 1215. The Eleventh Circuit requires only "a prima facie showing of access by a third party in Florida." *Catalyst Pharms.*, 748 F. App'x at 947. Thirty-four confirmed play-starts are thirty-three more than that standard requires.

*Third*, the BBC's own data defeat its argument. The BBC computes a percentage from the very data it asks this Court to disregard as "not reliable." It cannot ask the Court to selectively analyze its own data to fit its desired narrative. The 570,000 successful requests for the Documentary is itself an admission: the BBC concedes that more than half a million successful requests throughout the world were served for a program it describes as walled off and available only to U.K. license-fee payers. Cooper conceded that the BBC could retrieve the number of attempted accesses from the United States and simply had not done so. **Ex. J** (Cooper Rule 30(b)(6) Tr.) 37:3-39:17.

*Finally*, the BBC wrongly contends that when a viewer uses a VPN, "it is the VPN provider that directs the Documentary to Florida, not the BBC." D.E. 133 at 9. *Walden* does not reach that far. It concerns contacts manufactured by a plaintiff or by a stranger to the defendant, and holds that such contacts cannot substitute for the defendant's own. 571 U.S. at 284-85, 291. Here the Defendant made the contacts. *Walden* does not immunize a defendant whose own employees identified the workaround, recommended it, and supplied the file, as was done by BBC and its employees here. Nor does it change the fact that the BBC served the content, or absolve the BBC of knowing that its geo-blocking efforts were vulnerable at the time that the Documentary was accessed in Florida. *See* Ex. O. Cooper also described three technical checks, the last performed by the BBC's own content delivery network before any video is sent. *See* **Ex. J** (Cooper Rule 30(b)(6) Tr.) 21:10-22:25, 114:11-18. The BBC's systems received these requests, and nevertheless delivered the Documentary to the United States, and Florida specifically.


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

**4. BBC personnel filmed in the United States—including Florida footage—for the Documentary.**

The Motion's opening line—that the Documentary "was produced in London" and that the BBC "did not air [it] in the U.S."—is contradicted by the BBC's own witnesses and documents. BBC producer Matthew Hill worked on the Documentary in the United States, while seconded to October Films under a loan-out agreement; he remained on the BBC payroll, reported to BBC Executive Producer Leo Telling, and was assigned specifically as "Producer, 'Panorama: Trump.'" *See* **Ex. C**. Telling also conceded that the BBC retained final editorial signoff over both the U.K. and international versions. *See* **Ex. A** (Telling Tr.) 120:13-16.

The production was not confined to London. The BBC emails confirm that the team filmed a rally in South Carolina and "inside Mar-a-Lago." *See* **Ex. R** (Hill 3/7/24 email). Telling admitted that the materials he reviewed included a license "specific to Florida," and that Mar-a-Lago footage was filmed and used. *See* **Ex. A** (Telling Tr.) 129:17-130:20. The license invoices for that footage are dated November 5, 2024—after the October 28, 2024, broadcast—raising a disputed question about how the footage was used before it was licensed. *See* Telling Decl. Ex. 1; *see also* **Ex. A** (Telling Tr.) 95:19-98:5. These are disputed jurisdictional facts, and they must be resolved in Plaintiff's favor.

The BBC's response is instructive. It dropped the failed Mar-a-Lago argument that it raised in its prior Motion to Dismiss, but it refiled the declaration on which that losing argument rested. Mr. Telling continues to swear that "no member of the production team, nor any other employee or contractor of the BBC or October Films, traveled to Florida." D.E. 133-12 (Telling Decl.) ¶¶ 10, 12-13. His deposition and the BBC's own emails say otherwise. *See* **Ex. A** (Telling Tr.) 129:17-130:20; **Ex. R** (Hill 3/7/24 email). Telling himself and the BBC concede, however, that its production team spent "approximately 10 days" filming in the United States for this Documentary. D.E. 133-12 (Telling Decl.) ¶ 10. This is precisely the irreconcilable conflict that Florida law addresses, and it is resolved in Plaintiff's favor at the prima facie stage or, failing that, at a limited evidentiary hearing. *Guarino v. Mandel*, 327 So. 3d 853, 860 (Fla. 4th DCA 2021).

**5. The BBC's long-arm arguments fail on this record.**

Plaintiff's claims satisfy multiple independent provisions of Florida's long-arm statute.

*First*, § 48.193(1)(a)(2) (commission of a tortious act in Florida) is met because Florida treats defamatory material about a Florida resident as a tortious act in Florida when it is placed


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

online, accessible in Florida, and accessed—or "published"—there. *Internet Solutions Corp. v. Marshall,* 39 So. 3d 1201, 1215 (Fla. 2010); *see also Wendt v. Horowitz,* 822 So. 2d 1252, 1260 (Fla. 2002) (electronic or written communications into Florida suffice). The Florida Supreme Court held:

> By posting allegedly defamatory material on the Web about a Florida resident, the poster has directed the communication about a Florida resident to readers worldwide, including potential readers within Florida. When the posting is then accessed by a third party in Florida, the material has been "published" in Florida and the poster has communicated the material "into" Florida, thereby committing the tortious act of defamation within Florida.

*Internet Solutions,* 39 So. 3d at 1215.

The Eleventh Circuit applies the same rule, which militates squarely in Plaintiff's favor. *See Catalyst Pharms., Inc. v. Fullerton,* 748 F. App'x 944, 947 (11th Cir. 2018) (requiring a prima facie showing of access by a third party in Florida). Additionally, Fla. Stat. § 48.193(1)(a)(2) also reaches out-of-state tortious conduct that causes injury in Florida. *Licciardello,* 544 F.3d at 1283.

The BBC's contrary authorities do not touch this rule, and one case refutes the BBC outright. *Guarino*, 327 So. 3d at 854-55, is not an internet publication case at all. It concerns breach of fiduciary duty, conversion, and civil conspiracy claims against a Colorado resident and a law firm arising out of the affairs of a Nevada corporation, and it neither cites to nor discusses *Internet Solutions*. The sentence that the BBC quotes is not actually *Guarino*'s holding; the court was quoting *Kaminsky v. Hecht*, 272 So. 3d 786, 788 (Fla. 4th DCA 2019). What *Guarino* decided is instructive here. The Fourth District Court of Appeal restated the settled rule that "if the affidavits cannot be reconciled, the court must hold a limited evidentiary hearing," 327 So. 3d at 860 (citing *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 503 (Fla. 1989)), and applied it by drawing the distinction that matters here: it directed dismissal as to the defendant whose Florida contacts were never established, but, "[b]ecause of the irreconcilable allegations as to whether tortious conduct was directed into Florida," it reversed and remanded "for a limited evidentiary hearing." *Id.* at 866. That is precisely the posture that the BBC has created here.

*Head Kandy, LLC v. McNeill*, 2023 WL 7323284 (S.D. Fla. Nov. 7, 2023), further helps Plaintiff. It is an online defamation case, in which the court sustained jurisdiction over the defamation claim, applying *Internet Solutions* in the same analysis. *Id.* at *9, *11 (quoting *Internet Solutions*, 39 So. 3d at 1214-15). The counts as to which the court invoked the "mere injury"


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

language that the BBC quotes were the two that alleged nothing but financial harm felt in Florida, and the court expressly set them apart from the defamation claim, observing that "unlike the Breaches of Contract and Defamation claims," the plaintiff had not shown that the statements were received in Florida. *Id.* at *10. The BBC's own authority therefore applies *Internet Solutions* exactly as Plaintiff urges.

*Head Kandy* also answers the BBC's theory that a third party, not the publisher, delivered the work into Florida. The defendant there argued that "someone else may have re-posted" her statements. The court rejected the argument at the prima facie stage, construing "all reasonable inferences in favor of Plaintiff as the Court must." *Id.* at *9 n.3. The BBC's VPN-provider argument fails for the same reason.

A related answer disposes of *Imerys Talc America, Inc. v. Ricketts*, 262 So. 3d 799, 803 (Fla. 4th DCA 2018), which the BBC cites for the wrongful proposition that a consumer's unilateral act of carrying a product into the forum cannot support jurisdiction. That language is not an *Imerys* holding either; the court was quoting *Asahi*'s description of *World-Wide Volkswagen*. *Id.* at 803. *Imerys* turned on the total absence of forum contacts. *Id.* at 806. A VPN is not a consumer carrying a bottle of talc across a state line, and the BBC is not a defendant without contacts. The VPN is a delivery path that the BBC's own personnel identified, recommended, and used to place this Documentary in front of viewers in this country, and in Florida specifically.

Here, the Documentary was accessible and accessed in Florida, and President Trump—a Florida resident—suffered reputational injury in Florida. The access element is not left to inference alone at all. The BBC's own production establishes it. The BBC's audience-analytics records reflect at least 34 successful play-starts, and Cooper confirmed that those "34 attempts definitely happened." *See supra* § II.A.3; Ex. N; **Ex. J** (Cooper Rule 30(b)(6) Tr.) 142:25-143:9. That admission is more than sufficient to show access by a third party in Florida. *Catalyst Pharms.*, 748 F. App'x at 947.

*Second*, § 48.193(1)(a)(1) (carrying on a business) is satisfied by the BBC's continuous Florida-directed business activity, including its 25-person Coral Gables, FL, office; ongoing PBS, NPR, and CBS partnerships distributing BBC content in the United States; Florida-specific BBC.com news and weather pages; and numerous paid Florida subscribers. *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 53:9-54:20, 83:4-15; FAC ¶¶ 14-18. These inextricable links satisfy the connexity requirement because Plaintiff's claims arise from the same line of business through


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

which the BBC operates in Florida—publishing and distributing BBC content. That is the business through which the Documentary was made, promoted, and disseminated. The FDUTPA claim confirms connexity. It targets the BBC's conduct in trade or commerce—the advertising, soliciting, and distributing of the Documentary, Fla. Stat. § 501.203(8)—which is the same commercial activity through which the BBC operates in this forum. *See infra* § III.B.

Because §§ 48.193(1)(a)(2) and (1)(a)(1) each independently supply long-arm jurisdiction, the Court need not reach § 48.193(1)(a)(6), and Plaintiff does not press that provision here.[5] The BBC's attempt to convert the FAC's narrowing into a jurisdictional concession fails. Streamlining the FAC to reputational harm refines the damages at issue. It does not narrow the BBC's contacts with Florida, and those contacts—not the Plaintiff's damages theory—are what the due process inquiry measures. *Walden,* 571 U.S. at 284-85. Burgess's testimony confirms the corporate integration behind those allegations. BBC News USA, Inc., which staffs the Coral Gables office, "falls under the BBC umbrella" as a "subsidiary of the BBC." *See* **Ex. B** (Burgess Rule 30(b)(6) Tr.) 51:9-52:5. The Coral Gables staff serve BBC Mundo and BBC Monitoring—BBC divisions editorially controlled from London—and many report directly into Burgess's own department. *See id.* 83:4-85:16. The BBC News international stream is "accessible in the United States." *See id.* 12:5-18. The BBC maintains continuous PBS, NPR, and CBS partnerships through which BBC content "might be distributed … in the United States." *See id.* 53:9-17. Vitally, the BBC sends journalists to, and reports from, Florida. *See id.* 52:16-23. This is the continuous, Florida-directed business activity that § 48.193(1)(a)(1) reaches.

**B. Exercising jurisdiction comports with fair play and substantial justice.**

Once minimum contacts are shown, as they have been here, the BBC bears the burden of presenting a "compelling case" that jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). It has not come close to meeting that burden. Florida has a strong interest in providing a forum for a Florida resident defamed by a Documentary about him, timed to an American election, filmed in part on American soil, pushed into the United States

---

[5] The FAC pleads both specific and general jurisdiction under Florida Statutes §§ 48.193(1) and 48.193(2). Because specific jurisdiction is amply established, the Court need not reach general jurisdiction, which is also established. Plaintiff does not abandon it, however, and the BBC should not be heard to argue waiver from the ordering of this brief. Should the Court reach general jurisdiction, the same disputed jurisdictional facts identified above require, at a minimum, a limited evidentiary hearing. *Guarino*, 327 So. 3d at 860.



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

through a route that the BBC knew its own technology would allow, and directly distributed by BBC employees to Florida residents. A defendant, with offices and business operations in the U.S., whose own logs record U.S. attempts to view the Documentary, and who can retrieve that count but elects not to, can hardly characterize this forum as a stranger to its conduct. *See* **Ex. N; Ex. P**. Plaintiff's interest in convenient relief is clear; he resides here. Further, any supposed burden on the BBC is minimal given its admitted U.S. and Florida presence, including a 25-person Florida office, a U.S. trading subsidiary that distributes its content here, continuous U.S. broadcaster partnerships, and U.S. subscribers. A global media enterprise that marketed the defamatory Documentary to "a global audience of tens of millions," and later apologized through its Chairman after the doctoring and manipulation surfaced, cannot credibly claim that litigating in Florida offends fair play.

The BBC's assertion that Plaintiff "cannot point to a single person who viewed the Documentary in Florida," D.E. 133 at 12, is answered by the BBC's own production. If the BBC wants those viewers identified by name, it holds the logs that would do so, and Cooper confirmed that "[w]e can find that data." **Ex. J** (Cooper Rule 30(b)(6) Tr.) 37:3-39:17. The BBC cannot withhold the evidence and then argue from its absence.

## III. The FAC states a claim.

The BBC's arguments under Rule 12(b)(6) also fail. The BBC does not contest that the manipulated splicing and doctoring of President Trump's Speech occurred. Nor could it: the entire, unedited Speech had been public for nearly three years before the Documentary aired; the BBC publicly admitted that its edit "gave the mistaken impression that [President Trump] had made a direct call for violent action" (which did not occur); and its own internal reviewer concluded that "Panorama had spliced together two clips from separate parts of [President Trump's] speech," which "created the impression that Trump said something he did not and, in doing so, materially misled viewers." FAC ¶¶ 62, 69. The apology from Defendant's Chairman, Samir Shah, to President Trump is *prima facie* evidence of culpability. Unable to dispute the manipulation, the BBC asks the Court to do what Rule 12(b)(6) forbids—weigh disputed facts, credit a self-serving "innocent edit" narrative drawn from material outside the FAC under an improper request for judicial notice, and resolve questions of defamatory meaning, falsity, and actual malice that belong to the jury.

### A. The FAC states a claim for defamation.

To state a defamation claim under Florida law, a plaintiff must allege "(1) publication; (2) falsity; (3) [that the] actor [acted] with knowledge or reckless disregard as to the falsity on a matter concerning a public official…; (4) actual damages; and (5) [that the] statement [was] defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). A publication is defamatory *per se* when, considered alone and without innuendo, "it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace" or "tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). The FAC satisfies each element.

#### 1. The BBC published the Documentary.

The BBC published the Documentary on October 28, 2024, on BBC iPlayer, BBC One, and BBC Two, where it remained available until the BBC took it down. *See* FAC ¶¶ 1, 2, 12, 47, 52, 59, 135. As shown above, the BBC published the Documentary globally, including in the United States and Florida. *See supra* § II.A.

#### 2. The defamatory statements are false.

The FAC identifies the defamatory statements with precision. *See* FAC ¶¶ 52-54, 135(a)-(c). The Documentary deceptively and falsely depicted President Trump speaking a single, continuous sentence he did not say: "We're going to walk down to the Capitol, and I'll be there with you. And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *See* FAC ¶¶ 52, 135(a). President Trump never made that statement. In reality, the first clause was spoken at 12:12 p.m. (14:52 into the Speech), and the "fight like hell" clause came nearly ***fifty-five minutes*** later, at 1:07 p.m. (69:30 into the Speech). *See* FAC ¶¶ 53, 135(b). The BBC spliced the two statements together, and omitted the President's express statement, made less than one minute after the first clause, that the crowd should march "to peacefully and patriotically make your voices heard." *See* FAC ¶¶ 54, 135(c). The result falsely portrays President Trump as "engaging in supposed calls for rioting and violence that he never actually made." *See* FAC ¶ 139. The BBC has admitted to both the doctoring of the statement, and the false impression caused by it.

#### 3. The statements are capable of defamatory meaning.

The defamatory character of the statements is apparent on their face—from the spliced, doctored, and distorted depiction itself—and the claim therefore sounds in defamation *per se*, not *per quod*. A statement is defamatory *per se* when it is injurious on its face and "does not require


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

any additional explanation"; it is *per quod* when the words "are not inherently injurious, but rather are injurious only as a consequence of extrinsic facts, such as… innuendo." *Scobie v. Taylor*, 2013 WL 3776270, at *2 (S.D. Fla. July 16, 2013) (cited only to explain applicable standard); *Mas Canosa v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1257-58 (S.D. Fla. 2021) (applying the same standard to defamation *per se* and defamation *per quod*).

No extrinsic fact or innuendo is needed to grasp the defamatory meaning. The Documentary, as admitted by the BBC in its apology, fabricated a continuous sentence that President Trump never said: "We're going to walk down to the Capitol, and I'll be there with you. And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *See* FAC ¶¶ 52, 135(a). *Worse, the BBC omitted President Trump*'s intervening call to proceed "peacefully and patriotically" toward the Capitol. *See* FAC ¶¶ 54, 135(c). *"Defendant had no factual basis for this false depiction of President Trump."* FAC ¶ 138. A viewer needs nothing beyond the doctored Documentary itself to understand it as falsely, maliciously, and defamatorily portraying the President as directing his supporters to commit violence. That is defamation *per se* on the face of the publication.

Moreover, the defamatory statements subject President Trump to "hatred, distrust, ridicule, contempt, or disgrace" and "injure [him] in his… profession" as a politician and officeholder. *See Richard*, 62 So. 2d at 598; *see also* FAC ¶¶ 135, 139. *A false depiction of a public figure inciting an insurrection is indisputably defamatory per se*. Because the pleaded fabrication "would have a different effect on the mind of the [viewer] from that which the… truth would have produced," it is actionable. *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999).

The BBC leans heavily, and mistakenly, on *Block v. Matesic*, 789 F. Supp. 3d 1131 (S.D. Fla. 2025), for the proposition that a defamation-by-implication plaintiff, which is not what is pled by President Trump here, must show that the defendant intended to convey the false impression. *Block* supports President Trump. *First,* it was decided at summary judgment—on a fully developed evidentiary record, after discovery—not on a motion to dismiss. *See id.* at 1147-49. Its holding that the *evidence* was insufficient to prove malice says nothing about whether the FAC pleads malice plausibly. The BBC's attempt to import a post-discovery evidentiary ruling into a Rule 12(b)(6) motion is precisely the conflation that the four-corners rule forbids. *See Dershowitz,* 541 F. Supp. 3d at 1360-61. *Second,* at the pleading stage, the same court denied a motion to dismiss a defamation *per se* counterclaim, which is the type of defamation here, because the viewer of the


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Documentary immediately realizes why the statements are defamatory. *Block v. Matesic*, 2023 WL 8527670, at *7 (S.D. Fla. Dec. 8, 2023). Here, President Trump identifies, with precision and by timestamp, the words spoken and exactly how the BBC spliced and omitted them to fabricate a sentence he never spoke and omit a statement that he did make. *See* FAC ¶¶ 52-54, 135(a)-(c). Under the BBC's own framework, that states a claim.

Because the FAC demonstrates that the Documentary is capable of defamatory meaning, whether it was defamatory must be resolved by the jury. *Pep Boys v. New World Commc'ns of Tampa, Inc.*, 711 So. 2d 1325, 1328 (Fla. 2d DCA 1998); *see also Trump v. Am. Broad. Companies, Inc.,* 742 F. Supp. 3d 1168, 1180 (S.D. Fla. 2024). Therefore, the FAC plausibly states that the defamatory statements are capable of defamatory meaning and any questions of fact are reserved for the jury. The Motion should be denied.

**4. The FAC plausibly infers that the BBC published the Documentary with actual malice.**

Actual malice is adequately pleaded where the complaint alleges "facts giving rise to a reasonable inference that the defendant published the [content] knowing that it was false or with reckless disregard for whether it was false or not." *Dershowitz,* 541 F. Supp. 3d at 1367 (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016)). At the pleading stage, a plaintiff "need only allege sufficient facts to permit the inference that [the defendant] published [the] statements with actual malice," and those "hurdles… are by no means insurmountable." *Project Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024). Here, the FAC clears those hurdles several times over.

The entire Speech was available to the BBC for nearly three years. The BBC possessed the complete, unedited Speech—which had been broadcast live and was publicly available since January 6, 2021—for nearly three years before it published the Documentary on October 28, 2024. *See* FAC ¶¶ 52-54, 135(a)-(c). With the true Speech in hand, the intentional splicing of two sentences spoken nearly fifty-five minutes apart, coupled with the deliberate omission of the "peacefully and patriotically" call to peaceful action, spoken less than one minute after the first clause, is itself *prima facie evidence that the BBC knew—or, at minimum, recklessly disregarded—that the defamatory statements were false. See* FAC ¶¶ 61, 62, 136, 142. Indeed, "it would have been impossible for [the] BBC's journalists and producers to splice together two distinct parts of the Speech from nearly 55 minutes apart unless they were acting intentionally," and the

manipulation "could never have occurred by accident." FAC ¶ 62. The BBC could not have accidentally assembled a false sentence President Trump never spoke, and edited out a statement he did make, from a transcript one already possesses.

***The BBC has previously distorted President Trump's same Speech***. In 2022, the BBC aired spliced statements on *Newsnight* that made it "appear that Mr. Trump was encouraging his supporters to riot" by "linking statements made nearly an hour apart in his speech"—and BBC personnel raised concerns at the time, yet the BBC repeated the same distortion. FAC ¶¶ 71, 74-78. A publisher that was warned about a specific distortion, yet commits it again, is not making an innocent mistake. The FAC further states that the BBC "admi[tted]" to multiple "instances of false statements" about President Trump, FAC ¶¶ 80-81, and that its leadership "bore President Trump ill will" and "wanted him to lose the 2024 Presidential Election," FAC ¶ 63. Established case law states that "ill will or motive, when combined with other evidence, may amount to actual malice." *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 44 (Fla. 4th DCA 2010) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 668 (1989)).

The BBC's own prior reporting confirms that it knew the true words. On February 13, 2021, it published an article titled "Capitol riots: Did Trump's words at rally incite violence?" quoting the Speech accurately. FAC ¶¶ 115-16. Three years later, the same institution published the opposite, doctored, statement. FAC ¶¶ 117-18. The BBC's response is that Plaintiff does not allege "that the reporters of that article had anything to do with the Documentary." D.E. 133 at 18. That misapprehends the allegation. Plaintiff does not contend that the 2021 reporters made the Documentary. He alleges that the accurate text of the Speech sat in the BBC's own published archive, available to the people who did make it, and that the BBC nonetheless assembled a sentence that the President never spoke and edited out a statement calling for peace and patriotism that he did speak. Whether that supports the inference of knowledge is a question for the factfinder, not for Rule 12. *See Project Veritas*, 121 F.4th at 1283.

The BBC's attempt to recast the omission as ordinary editing fares no better. It argues that the BBC had to omit portions of the Speech "to condense an hour-long speech into twelve seconds," and that omission is immaterial "absent any material change of meaning." D.E. 133 at 19. The material change of meaning, however, is the entire claim. The FAC does not complain that the Speech was shortened. It alleges that two clauses spoken nearly fifty-five minutes apart were joined into one continuous sentence, and that the President's intervening instruction to march



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

"peacefully and patriotically" was cut. FAC ¶¶ 119-20, 135(b)-(c). The BBC's own Chairman conceded the change in meaning and apologized for it, writing that the edit "gave the mistaken impression that you had made a direct call for violent action." FAC ¶ 118; Ex. K. A defendant that has admitted the meaning changed cannot obtain dismissal by asserting that it did not.

Nor does the failure to disclose the edit to the viewer of the Documentary assist the BBC. The FAC alleges that the BBC included no qualifying statement, clarification, or editor's note advising viewers that the Speech had been spliced and was "not a carbon copy" of what the President said. FAC ¶ 109. That is not a claim about journalistic custom. The undisclosed splice is evidence of intent to convey the false impression, which is precisely the element the BBC insists Plaintiff must plead. *See Block*, 789 F. Supp. 3d at 1167-68. Read with the rest of the FAC, it supports the inference. That is all Rule 12 requires. The BBC's own apology underscores actual malice. In response to Plaintiff's retraction demand, BBC Chairman Samir Shah wrote:

> Let me address immediately your speech of 6 January 2021. The way the speech was edited in the documentary gave a misleading impression of what you said. The editing unintentionally created the impression of a single, continuous section of your speech, rather than excerpts from different points in the speech. ***This gave the mistaken impression that you had made a direct call for violent action***. ***That was an editorial error and it should not have happened***. ***I have stated clearly and publicly that the BBC apologises* [*sic*] *for that error of judgement***. ***As it was your speech that was edited in a misleading way, and you were the object of that editorial error***, I would also like to apologise [*sic*] to you directly for this mistake.

FAC, Ex. K (emphasis added).

The BBC now wrongly claims that apology "militates against a finding of actual malice." D.E. 133 at 19. It does no such thing. Shah conceded the two facts that the BBC now disputes—that the edit created a false impression, and that the impression was that President Trump called for violence. Read together with the rest of the FAC, that letter is affirmative evidence of actual malice, not a defense to it. It concedes falsity and defamatory meaning by admission, leaving only the BBC's state of mind. An admission by the Chairman of the publishing entity that the publication conveyed precisely the false meaning the FAC alleges is *prima facie* evidence that the BBC understood the message its edit conveyed.

Moreover, the BBC had previously reported the exact words that President Trump did say during his Speech. *See* FAC ¶¶ 115-118. Despite its prior reporting on the Speech and the fact that the BBC spent months producing, editing, and developing the Documentary, the decision to


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

publish the Documentary with a distorted and spliced version of President Trump's Speech shows that the BBC knew that the Documentary was false or, at a minimum, that the BBC recklessly disregarded whether it was true. *See id*. Moreover, the BBC's characterization of the apology is not a fact the Court may adopt on a Rule 12(b)(6) motion. *See Dershowitz*, 541 F. Supp. 3d at 1360-61. Nor does *Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 959 (8th Cir. 2020), assist the BBC. It was decided on summary judgment, and the retraction there was prompt, which is why the publisher's readiness to correct bore on its state of mind at the time of publication. Here, the BBC said nothing for more than a year, apologizing only after Plaintiff's November 9, 2025, retraction demand. FAC ¶¶ 56-59, 110-11 & Ex. K. A correction extracted under threat of suit a year after the false, malicious, and defamatory statement is made is not evidence that the publisher harbored no doubts when it published. Thus, the BBC's characterization of the apology presents a jury question—not a basis for dismissal. The Motion should be denied.

**5. Plaintiff has adequately pled his damages.**

The BBC wrongly claims that President Trump failed to plead "actual damages." See D.E. 133 at 15-16. That misstates applicable Florida law, and ignores the well-pleaded allegations of the FAC. Relying on *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021), and *Edelstein v. WFTV, Inc.*, 798 So. 2d 797 (Fla. 4th DCA 2001), the BBC incorrectly argues that President Trump is subject to the pleading standard applicable to defamation *per quod* claims, not defamation *per se*. Notably, nothing in *Corsi* or *Edelstein* changes the pleading standard applicable to defamation *per se* claims. Both stand only for the proposition that a plaintiff suing a media defendant "must nevertheless plead malice and damages." *Corsi,* 519 F. Supp. 3d at 1119.

President Trump has adequately pleaded malice, as explained above, and damages against the BBC. *See* FAC ¶¶ 128-132, 139, 145. He alleges that "[t]he injury to President Trump's personal reputation inflicted by BBC and its efforts to wrongly portray President Trump as a violent insurrectionist has caused him to suffer, and continue to suffer, overwhelming reputational harm." FAC ¶ 131. He further alleges that the BBC's "deceptive and defamatory distortion, doctoring, and splicing damaged President Trump in his occupation, damaged his professional reputation, and portrayed him as engaging in supposed calls for rioting and violence that he never actually made." FAC ¶ 139. These damages allegations are sufficient to state a claim for defamation *per se*. President Trump is not subject to the heightened pleading standard applicable


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

to a defamation *per quod* claim. *See Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999) (holding that *per quod* actions require pleading and proving special damages).

That the FAC now rests on reputational harm helps Plaintiff rather than the BBC. Reputational injury is the very injury that defamation *per se* exists to redress: a publication is actionable *per se* precisely because it "tends to subject one to hatred, distrust, ridicule, contempt, or disgrace" or "tends to injure one in his trade or profession." *Richard*, 62 So. 2d at 598. The BBC's attempt to turn that refinement into a pleading defect inverts the doctrine. To the extent that *Harrington v. Veritext, LLC*, 2025 WL 1591614, at *21 (S.D. Fla. May 1, 2025), is applicable to this action, it supports Plaintiff's position, not the BBC's. The Court there dismissed the plaintiff's defamation claim because it found that "Plaintiff fail[ed] to identify the precise statements he alleges are defamatory." *See id.* at *21. Here, as explained above, President Trump identifies the defamatory statements precisely. *See* FAC ¶¶ 52-54, 131, 139. A defamation plaintiff need only allege the types of damages claimed, not a sum certain. *Yergey v. Brinker Fla., Inc.*, 2020 WL 10817751, at *2 (M.D. Fla. 2020). The BBC's remaining authorities are procedurally inapposite: *Anheuser-Busch* addressed only whether an evidentiary hearing on proof of damages was required, *Zimmerman* was decided on summary judgment, and the unpublished *Harrington* affirmance rested on an abandoned immunity ground having nothing to do with damages.

The BBC's conclusory allegation that President Trump could not have possibly suffered any harm from the Documentary because he won the 2024 United States Presidential election and "carried Florida" is nothing but argument of counsel, and is entirely disconnected from the allegations in the FAC. Moreover, the BBC's improper reference to the January 6 Committee's Report is a backdoor, improper attempt to ask the Court to take judicial notice under Federal Rule of Evidence 201. *Compare* D.E. 133, p. 16, n.10; *with Purple Innovation, LLC v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule "A",* 2024 WL 4652095, at *6 (S.D. Fla. Oct. 22, 2024) (collecting cases and rejecting incorporation by reference doctrine where the extrinsic evidence was central to the defendant's arguments rather than the plaintiff's claims).[6]

[6] In footnote 11 of its Motion to Dismiss, the BBC asks the Court to take judicial notice of criminal filings related to the events that occurred on January 6, 2021, in which the BBC characterized President Trump's remarks as a call to action, offering them to prove "how President Trump's supporters understood his remarks." *See* D.E. 133, n.11. Because the BBC offers those


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Plaintiff has plausibly alleged his damages, and the Motion, again, should be denied.

**6. The statements are readily capable of being proven false (not opinion).**

The BBC wrongly contends that the Documentary conveys only a protected "opinion" about January 6. The argument fails at the threshold, because President Trump does not sue over commentary or characterization. He sues over a fabricated statement, for which the BBC apologized. Whether he spoke the continuous sentence that the Documentary attributed to him is a binary question of historical fact, and the FAC establishes its falsity by direct comparison, setting out the timestamp, what the Documentary depicted, and what the President actually said. *See* FAC ¶¶ 52-54, 135(a)-(c). The BBC's splicing, doctoring, and distorting of President Trump's Speech is not a subjective assessment of anything. It is a representation about what President Trump said, and the recording proves it false.

The BBC's new, failed theory is revealing. It claims that by "condensing the 70-minute-long Speech into about twelve seconds," the Documentary "conveys an opinion of what the audience understood Plaintiff to say." D.E. 133 at 19. That is not opinion; it is attribution. The Documentary did not tell viewers how the President's supporters received his words. It showed the President, in his own voice and image, speaking a sentence that he never spoke. A quotation attributed to a speaker is a statement of fact about what the speaker said, and it is true or false depending on the tape. The BBC cannot convert a fabricated quotation into protected commentary by relabeling it in litigation, least of all, when its own Chairman has already conceded that the edit "gave the mistaken impression that [President Trump] had made a direct call for violent action." FAC ¶ 118; Ex. K. The BBC's reliance on *Trump v. CNN,* 2025 WL 3213203 (11th Cir. Nov. 18, 2025), only sharpens the distinction. The Eleventh Circuit affirmed the trial court because the "Big Lie" statement was, according to the Court, too ambiguous to be a statement of fact. *Id.* at *1-2. The BBC did not characterize the President's conduct; it put a sentence he did not speak in his mouth and took out a statement he did say. The recording supplies the "false statement of fact" that is "the *sine qua non* for recovery." *Id.* at *1.

Even if the Documentary were characterized as mixed opinion, which it is not, it would

---

statements for their truth, the request is improper. *See Trump v. Dow Jones & Co., Inc.,* 2026 WL 979572, at *6 (S.D. Fla. Apr. 13, 2026) ("'[C]ourts may take judicial notice of documents such as ... newspaper articles ... for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements).'") (internal citations omitted).



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

remain actionable, and that determination requires a developed record. *See Dershowitz,* 541 F. Supp. 3d at 1367 (holding that a complaint plausibly alleged statements of mixed opinion, and that the contextual factor bearing on whether they rested on publicly disclosed facts required "a more fully developed record). Because the attributed sentence is provably false, the statements are actionable, and the Motion should be denied.

**B. The FAC states a claim under FDUTPA.**

Finally, the BBC wrongly argues that the FDUTPA claim is barred by the "single-action rule," and that the Documentary is not "trade or commerce." Both arguments fail. The single-action rule provides only that "[i]f the defamation count fails, the other counts based on the same publication must fail as well." *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1320 (S.D. Fla. 2020). The defamation claim survives, so that predicate for dismissing the FDUTPA count does not exist.

Nor is the FDUTPA claim foreclosed as non-commercial activity. FDUTPA defines "trade or commerce" broadly to reach the "advertising, soliciting, providing, offering, or distributing" of goods or services, Fla. Stat. § 501.203(8), and the prohibition reaches "unfair or deceptive conduct as to a single party or under a single transaction." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Moreover, the Documentary and the defamatory statements were not expressly limited to the interests of the BBC and President Trump. The Documentary is about the 2024 United States Presidential Election, which has had, and continues to have, an overwhelming consequential impact globally. Critically, Florida courts have held that a defamatory publication *is* actionable under FDUTPA where, as here, it is not a protected statement of pure opinion. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167-69 (Fla. 4th DCA 2015) (holding that a FDUTPA claim premised on a defamatory publication may proceed and that the plaintiff need not be a "consumer"). The jurisdictional record supplies the commercial character that the BBC wrongly says is missing, and it is the BBC's own record. Cooper testified that the BBC restricts non-U.K. access because rights holders require it so that "they can sell the content to other territories." **Ex. J** 23:5-13. BBC Studios' Chief Operating Officer testified that BBC Select was approached about acquiring U.S. distribution rights to this very Documentary, and that BBC Select, BBC.com, and BritBox are continuous, subscription-based services with paying U.S. subscribers. **Ex. S** 15:16-16:4; 49:11-50:23. That is the "advertising, soliciting, providing, offering, or distributing" of a service that § 501.203(8) reaches,

and *Tobinick* and *Bongino* do not immunize it: they hold only that editorial content is not commercial speech solely because its publisher also has commercial purposes. Plaintiff's claim is addressed not to the Documentary's viewpoint but to the BBC's conduct in the marketplace.

The BBC's newest, also failed, FDUTPA argument turns on a misreading of the FAC. It seizes on the allegation that the Documentary "solicited viewers . . . not to vote for [Plaintiff]," FAC ¶ 158, and says this "underscores the non-economic nature of Plaintiff's claims." D.E. 133 at 20. It does the opposite. FDUTPA reaches "soliciting," and expressly includes "any nonprofit or not-for-profit person or activity." Fla. Stat. § 501.203(8). The FAC pleads the BBC's publication and distribution of the Documentary in Florida and throughout the United States as the trade or commerce at issue, FAC ¶¶ 155-159, and the BBC's own witnesses confirmed that it distributes content here through continuous, revenue-generating operations. *See supra* § II.A.

The BBC's contention that President Trump pleads no FDUTPA "actual damages" also fails. Reputational harm is recoverable under FDUTPA. *See Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012) (explaining that reputational damage is "actionable under FDUTPA"); *see also* FAC ¶¶ 131, 161. Whether the challenged conduct constitutes "trade or commerce" is a fact-laden inquiry that cannot be resolved against the Plaintiff on the pleadings by crediting the BBC's characterization of its own Documentary. Thus, President Trump has stated a FDUTPA claim under Fla. Stat. § 501.204.

## IV. Alternatively, the Court should grant leave to amend.

Should the Court find any deficiency, which it should not, leave to amend should be freely given. *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988). None of the recognized reasons to deny amendment is present. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006). The FAC was Plaintiff's first amended pleading, filed with leave of Court. If the Court identifies a defect, Plaintiff can cure it with the jurisdictional and merits facts already developed in discovery, including any further data that the BBC produces regarding attempted and successful access to the Documentary from the United States. *See, e.g., Wallis v. Cueto*, 2017 WL 6388914, at *7 (S.D. Fla. Aug. 9, 2017) (granting leave to amend defamation claim following dismissal).

## CONCLUSION

For the foregoing reasons, Plaintiff President Donald J. Trump respectfully requests that the Court deny the BBC's Motion to Dismiss in its entirety, or, in the alternative, grant leave to amend to address any deficiency, and award such further relief as the Court deems just and proper.


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

**REQUEST FOR ORAL ARGUMENT AND EVIDENTIARY HEARING**

Pursuant to S.D. Fla. L.R. 7.1(b)(2), Plaintiff requests oral argument and, if the Court believes the jurisdictional record cannot be resolved in Plaintiff's favor on the papers, an evidentiary hearing. The jurisdictional issues turn on the conflicts between the declarants' declarations and their sworn testimony, which live cross-examination would help resolve. Because the BBC asks the Court to weigh that evidence rather than to test the FAC's sufficiency, the alternative to crediting Plaintiff at the prima facie stage is an evidentiary hearing, not dismissal. That is what Florida law directs: where the competing jurisdictional submissions "cannot be reconciled, the court must hold a limited evidentiary hearing to determine jurisdiction." *Guarino*, 327 So. 3d at 860 (citing *Venetian Salami Co.*, 554 So. 2d at 503).



**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Dated: September 14, 2026

Respectfully submitted,

**BRITO, PLLC**
2121 Ponce de Leon Blvd.
Suite 650
Coral Gables, FL 33134
Tel: 305-614-4071
Fax: 305-440-4385

*/s/ Alejandro Brito*
Alejandro Brito
Florida Bar No. 098442
abrito@britopllc.com
apiriou@britopllc.com
Michael O. Mena
Florida Bar No. 10664
mmena@britopllc.com
Jalaine Garcia
Florida Bar No. 58632
jgarcia@britopllc.com
Ian Michael Corp
Florida Bar No. 1010943
icorp@britopllc.com

Edward Andrew Paltzik
Taylor Dykema PLLC
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com
(*pro hac vice admitted*)

*Counsel for Plaintiff President Donald J. Trump*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 14, 2026, the foregoing was served via the Court's CM/ECF System upon:

Charles D. Tobin, Esq.
Ballard Spahr, LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Tobinc@ballardspahr.com

*Counsel for Defendant British Broadcasting Corporation*

*/s/ Alejandro Brito*


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071