UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 25-CV-25894-RKA

PRESIDENT DONALD J. TRUMP, AN INDIVIDUAL,
Plaintiff,

vs.

BRITISH BROADCASTING CORPORATION a/k/a BBC, BBC STUDIOS DISTRIBUTION LIMITED, and BBC STUDIOS PRODUCTIONS LIMITED,
Defendants.

Zoom Oral Remote Videoconference

CONFIDENTIAL DEPOSITION of

LEO TELLING

Taken on Behalf of the Plaintiff

DATE TAKEN: Wednesday, April 15th, 2026

TIME: 9:09 a.m. - 12:57 p.m.

LOCATION: Via remote videoconference

Examination of the Witness taken by:

Janie S. Heagney, court reporter
US Legal Support
(All participants are in their own remote locations participating by videoconference and/or telephone.)

APPEARANCES:

For the Plaintiff:
IAN CORP, ESQ., (via videoconference/telephonic)
BRITO, PLLC
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, Florida 33134
Tel: (305)614-4071
Fax: (305)440-4385
Email: abrito@britopllc.com

For the Defendants:
CHARLES D. TOBIN, ESQ., (via videoconference/telephonic)
Ballard Spahr, LLP
1909 K. Street, NW
12th Floor
Washington, DC 20006
Email: Tobinc@ballardspahr.com

ALSO PRESENT:
JALAINE GARCIA, ESQ.
Brito, PLLC

SASHA DUDDING, ESQ.
Ballard Spahr, LLP

NICK WILCOX, ESQ.
In-house attorney for BBC



INDEX OF CONFIDENTIAL EXAMINATION


| WITNESS | PAGE |
|---|---|
| LEO TELLING | |
| Direct Examination by IAN CORP, ESQ. .............. | 4 |
| Cross Examination by CHARLES TOBIN, ESQ. ........ | 126 |
| CERTIFICATE OF OATH ............................ | 133 |
| CERTIFICATE OF REPORTER ......................... | 134 |
| Sig.letter .................................... | 135 |


INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Declaration | 33 |
| Exhibit 2 | Document | 55 |




LEO TELLING,

A Witness of lawful age, being first duly sworn in accordance with law, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CORP:
Q. And good morning, Mr. Telling. My name is Ian Corp. I'm one of the attorneys along with my colleague, Ms. Garcia, who's observing this morning and this afternoon on your side of the pond on behalf of the -- of the President.
Have you given a deposition before?
A. I have not, no.
Q. If you indulge me, I'll just go over a few of the ground rules with you so we can try to make this a bit smoother of a process today.
So I'm going to ask you a series of questions. All I'm expecting from you is your -- is an answer to that question based on what you know. I'm not asking you to guess. I'm not asking you to speculate or anything of the sort. If I ask you a question and you answer it, the record is going to reflect as if you understood that question. So if at any point you don't understand a question, let me know. I'm happy to rephrase it, restate it, what have you.



If at any point you need to take a break for whatever reason, you need to make a phone call, you need to use a restroom, just let me know. We're happy to accommodate you.
From time to time, your attorneys may object to a question that I ask. That is for purposes of the record. And unless they instruct you not to answer a question, you are obligated to answer the question that's being asked.
Do you have any questions for me, sir?
A. No. That's clear. Thank you.
Q. Okay. Could I ask you to perhaps, maybe your attorney can help you, just to move your camera a bit because where the room is positioned, there is a bit of light shining on you and I can't clearly see -- thank you. I don't know if there is --
A. -- the light in here.
MR. TOBIN: This might be an appropriate moment to recite our discussion from earlier. Since we have not concluded discussions about the Protective Order that we sent over, pending entry of the protective order, we've agreed to provisionally keep the depositions this week and next week confidential and just among the parties at present pending conclusion of the discussion of

Protective Order and, of course, entry of the Order. Is that acceptable?
MR. CORP: Sure. Subject to our ongoing discussion and negotiation over its terms and final approval by the Court. That's fine.
MR. TOBIN: Thank you.
BY MR. CORP:
Q. Okay. Mr. Telling, did you review any documents to prepare for today's deposition?
A. I did a few, yes.
Q. What did you review?
A. I reviewed my statements to -- mainly to the Court. And I looked at the letter that the chairman wrote to the President. Trying to remember if there are any other documents that I looked at. I -- I can't recall what type -- if there is anymore.
Q. When you say the "chairman" you referring -- who are you referring to?
A. That's Samir Shah.
Q. Chairman of the -- the BBC?
A. Of the BBC sorry, yes.
Q. That's okay.
Those documents, were they provided to you by anybody?
A. They were provided by my legal team.



Q. And when you say your "legal team", who are you referring to?
A. I'm referring to Chuck Tobin who's sitting next to me and Sasha Dudding and Nick Wilcox who's in the room.
Q. Okay. And who is the last individual that you referred to?
A. Nick Wilcox.
Q. And what is Mr. Wilcox' role?
A. He is in-house legal counsel for the BBC.
Q. Other than your -- well, let me rephrase. Back up.
Did you speak with anyone to prepare for today's deposition?
A. Just with my legal team.
Q. Anyone else beyond the legal team, and I take it that you mean Mr. Tobin, Miss Dudding and perhaps Mr. Wilcox?
A. Yeah. Those three people that we've been speaking to about the deposition, yeah.
Q. And no one else?
A. No one else, no.
Q. As part of your preparation for today's deposition, did you take any notes?
A. No. I haven't made any notes.



Q. Are you currently employed?
A. I am, yes.
Q. By whom?
A. By the British Broadcasting Corporation.
Q. Okay. Since when have you been employed by the BBC?
A. I have been full time staff since 2003.
Q. And I won't go all the way back to since you started at the BBC, but can you tell me from 2020 until present what roles you've had at the BBC?
A. I was a -- still a producer in 2020, and I was made an executive producer towards the back end of 2021, as I recall.
Q. When you say back end of 2021, do you mean Q3, Q4? Can you be more specific?
A. Sorry. Yeah, around Q4.
Q. Okay. And just generally speaking, were you always in a production role since you've worked at BBC?
A. Yes.
Q. Since Q4 2021, you've been an executive producer and maintained that role ever since until the present?
A. Yes, that's correct.
Q. Describe for me, please, what your responsibilities as an executive producer at the BBC



are?
A. So I'm, actually, a line manager who manages teams of journalists who were making various projects. I oversee the editorial. I get involved in the budgeting, in the scheduling and making sure the programs are delivered to their project and schedule and to the editorial specification that we set.
Q. Did I hear you say line producer?
A. No. It -- like a line manager -- like a line management. So I report to the editor of Panorama, and I -- I have responsibility for -- the direct responsibility for looking after the teams of journalist who are making an individual program. So there may be 4, or 5, 6 or more teams that I'm responsible for any one time that I oversee.
Q. And those teams that you oversee, what roles do they have. As you mentioned journalists. So I just want to ensure that we cover all the bases --
A. -- sure.
Q. So go ahead.
A. So there would be a producer director who is a journalist first and foremost. But they are also directing the documentary. And sometimes they film it as well. We have multi sort of skilled people who can do all of those things. And then there will be

possibly an assistant producer or a researcher who are there to assist the producer, the director -- producer, director in their job to gathering all the material, work out, you know, what needs to go to the program and help them push it through the edit -- editing process and the final to completion.
Q. So those teams consist of producers, directors, researchers, editors. Any other roles?
A. Sometimes there's a reporter in the team. And if it's a big team, there may be people doing graphics and other -- other roles, more technical roles dealing with production.
Q. Anything else?
A. I mean, there are financial and budgetary people, but they tend to sit out. They don't tend to sit directly in the team, but they assist the team to make sure they are staying on project, booking hotels and flights and logistics, things like that.
So there's a core team of people at Panorama who assist the -- the program making team. And then there's two archivists -- archive producers. They are responsible for sourcing and clearing archive material which we need to make the programs.
Q. And I'm generalizing. But all of these individuals in some fashion report to you?



A. Yeah. I mean, the core production team, the three or four people on the core production team, the reporter, producer, assistant producer, researcher, if they're all those roles -- they're not always all of those roles, they report directly to me. The archivists don't report directly to me, but I would get involved with talking to them and speaking to them if there was an issue about some thing going wrong or, you know, needed to be find out.
Q. And you've mentioned that you report to the editor of Panorama, correct?
A. That's correct.
Q. And who is that individual?
A. That is Karen Wightman.
Q. Has it been Ms. Wineman {sic} since Q4 2021 when you served as an executive producer?
A. Yes. She's been acting editor and then confirmed as editor.
MR. TOBIN: May we spell her last name for the court reporter's benefit for you?
MR. CORP: Yes, please. Maybe -- I may be mispronouncing it because I can't hear it properly.
THE WITNESS: Sorry about that. It's W-i-g-h-t-m-a-n -- Wightman.



BY MR. CORP:
Q. Wightman. Thank you very much.
So other than reporting to Miss Wightman, is there anyone else that you report to, Mr. Telling?
A. No. She's my direct boss, basically, yeah.
Q. And above her, how many levels are there between her and the chair of the BBC -- Mr. Shah?
A. Well, complicated. There's a head of journalism as the head of long-form commissioning above the head of journalism. And then there's a deputy director of news, I think, if there's anyone immediately above the head of long-form commissioning. And there's quite a few subsections of BBC news organization. Then there's, I think, it's the deputy director and then the director of news. And then the director general and then the chairman, I believe, are the layers.
Q. Okay. So bear -- bear with me one second. Because I want to distill this a bit.
So you mentioned first going -- starting at Ms. Wightman moving up. You mentioned the head of journalism.
A. Yeah.
Q. Who is that?
A. So that is Jim Gray.



Q. Okay. Does he have any other titles other than head of journalism that you're aware of?
A. No. He -- formally we think of him as the deputy head of department.
Q. Deputy head of which department?
A. Of the long-form commissioning department.
Q. Okay. What I gathered from your testimony was that long-form commissioning was the next position in the chain of hierarchy.
A. That's correct.
Q. Okay. And so Mr. Gray is both head of journalism and head of the long -- long-form commissioning department?
A. No. That's Joanna Carr. He's deputy to Joanna Carr who's the head of the long-form commissioning department.
Q. This -- does Miss Carr also go by Joe?
A. Joe, yeah.
Q. Okay. Then after that, you mentioned the deputy director, correct?
A. Yeah.
Q. And that's deputy director of news?
A. Yeah. That's currently Richard Burgess.
Q. Since 2021, let me rephrase, since Q4 of 2021 when you were involved until present, was it someone

else?
A. I'm trying to remember.
MR. TOBIN: Object to the form of the question. Answer as best as you can.
A. I will do my best. I think, it was him in 2021, yes.
BY MR. CORP:
Q. Who's next on the -- on the hierarchical --
A. -- it's director of news.
Q. And who would that be?
A. That's currently Johnson Monroe.
Q. Was it also Mr. Monroe since Q4 2021, to your knowledge?
A. No. That was -- it was Deborah Turness.
Q. Can you spell her last name, please.
A. Yes, sure. It's T-u-r-n-e-s-s.
Q. Do you have an understanding of when she stopped serving in that role?
A. She resigned in November last year.
Q. Do you have any understanding why she resigned?
MR. TOBIN: Object to the form of the question. Go ahead and answer the question.
A. As I understand it from the -- from what she published on -- what was published of her resignation



letter, it was at least in part to do with the -- the furore around the -- the edit of Panorama program.
BY MR. CORP:
Q. So the documentary that's at issue in this case?
A. Yes.
Q. Who's next after director of news?
A. Then I think it's the director general.
Q. Okay. Who's that?
A. That is -- what's his name? Rhodri -- currently it's Rhodri Talfan Davies -- I forgot his name. It's -- he's -- he's an interim director.
Q. Can you spell his last name, please?
A. I'm going to need to refer to the documents to do that for you because I can't remember how it's spelled. I'm afraid it's a Welsh name and it's not dripping off my tongue I'm afraid.
Q. That's okay. We can get to that later.
A. Yeah, sure.
Q. And you mentioned he's the interim director, right?
A. Yeah, that's right.
Q. Do you have an understanding why he's serving only as an interim director?
MR. TOBIN: Object to the form of the



question. Answer it the best you can.
A. Well, there's a recruitment process going on at the moment, and I think they just appointed a new director general who is coming in -- in a few month's time. So they needed someone in the interim.
Q. Who is above director general, if anyone?
A. Then I think it's the chair of the board who is Samir Shah.
Q. Going back to your responsibilities as an executive producer, other than overseeing the individuals that you identified in teams of those roles, what else, if anything, do your responsibilities include?
A. I'm involved in the overall program planning, looking at the schedule with the executive team, planning what sort of programs we might do in the future and dealing with any issues that come up as a result of that. I look after some independent production companies as well where they are asked to make a program or they -- they make you a program for us. And I occasionally get involved in pitching programs that we're making to overseas broadcasters for co-productions.
Q. Anything else? I'm sorry --
(Court reporter interruption for



clarification)
THE WITNESS: To overseas production companies like broadcasters overseas. Oh, sorry, broadcast -- overseas broadcasters.
BY MR. CORP:
Q. Do any of your responsibilities include negotiating contracts on behalf of the BBC?
A. Yes. I do sometimes get involved in that particular individual programs but -- yeah.
Q. Let me be more specific. Did you -- did you negotiate any of the contracts that are related to the Panorama documentary at issue in this case?
A. I signed off on the contract between us and October Films, yes, the production agreement.
Q. Any others?
A. Not related to this program, no.
Q. When you say signed off, what do you mean by that?
A. I have to read through the production agreement and check that it meets the specifications that we required from the independent production company both the editorial and the technical specifications. So I read it and ensure that from a -- from a production point of view, we are happy with what we are agreeing with the independent production

company. So it's clear what they have to -- what the program has to be and the form it has to take.

So there's -- there's quite a lot of detailed information on there about that. And then when I'm happy, I sign the form and the commission is -- is put into place.

Q. And correct me if I'm wrong, but I take it to mean that you're referring to the program production agreement that's identified in your Declaration that's between the BBC and October Films?

A. Yes, that's right.

Q. As an executive producer, do you have any responsibilities concerning how BBC distributes its content?

A. Yeah. In some senses, yes, I do have some -- some responsibility about that.

Q. Please explain.

A. So if it's an in-house production that's made by the in-house production team, I will meet with representatives from BBC Studios Limited who are our distributors because we don't distribute our own programs. And I will talk with them about which territories they think might be interested. And sometimes there are Co-Pro Agreements where the broadcaster comes in before we finish the program and



they have an influence on the editorial.

So if we were dealing with a broadcaster in Germany, they might want Germany interviewees or people -- a story based in Germany or if we felt that it fitted our editorial, we would say okay, you're coming in with some money to the budget, so we'll work together to make a program that appeals to both audiences.

And sometimes it's just a simple matter of the BBC Studios will buy the finished, not buys -- that's the wrong word, but they will invest and they will take the finished program, and then they will try and sell it to broadcasters after broadcast.

Q. Anything else that generally applies in the ambit of your responsibility as an executive producer regarding content distribution?

A. Just trying to think. Maybe if there was an issue with -- what recently comes to mind where there was an issue with a contributor for safety, and we didn't want the program shown in a certain jurisdiction, then I would make sure that there was a block put on program being shown anywhere else.

For instance, if you film inside Iran, it can't be shown on the BBC Persian Service. So you make sure that the program isn't distributed anywhere where



that could get picked up.

Q. And in terms of -- I want to make sure we're using the same phrase. You mentioned "blocking". Did I hear that correctly or did you use a different phrase?

MR. TOBIN: What phrase did you use, is his question?

A. Yeah. What phrase did I use? First of all -- sorry.

BY MR. CORP:

Q. Maybe I misinterpreted it so if you want to just rephrase it.

A. Yeah. So it would be about whether or not a particular film could be shown in a particular territory. And there may be copyright reasons for that or there could be safety reasons for that. There could be various different reasons why you wouldn't allow a film to be shown in a particular territory. So you would ask either you'd ask the distributor not to distribute it to those territories or you would ensure that -- that if it was on YouTube, the BBC can block anyone from that country from logging in to see it.

Q. Okay. And the -- let me see if I can draw a distinction. You were the one that makes that decision, correct?



MR. TOBIN: Object to form. Go ahead and answer.

MR. CORP: And I will explain what I mean. Let me explain what I mean so you can see where I'm going because I'm not trying to trick you.

THE WITNESS: Sure.

BY MR. CORP:

Q. You don't have -- let me back up.

Do you have any experience in computer science?

A. I did a computer science A-level when I was a teenager.

Q. Okay. Any practical experience meaning you're engaged in the day-to-day process with computer science?

A. No.

Q. How about computer coding?

A. No. I've never done any coding.

Q. Okay. Computer programming? No experience either?

A. No. I mean, other than helping my children with their school homework.

Q. Fair. So when I ask, are you the individual who makes the decision to say this program can only be shown in these jurisdictions. I'm drawing a

distinction between how that decision is implemented.
So my first question going back to what I was asking was: Is it you that determines whether a particular program and, I mean, generally, I'm not talking about this documentary. We'll get there.
But generally speaking, if you're the executive producer, is it you that makes the decision as to where the program will be distributed?
A. Yeah. I would take the editorial. I would be the editorial decision maker. Usually in -- in conversation with the editor to make sure she didn't have any objections or any other issues.
But, yeah, I would probably be the person who was involved in telling the relevant to her -- BBC or the distributor about which -- which region it could be shown in.
Q. And when you say "the editor", you're referring to Ms. Wightman?
A. Ms. Wightman, yes.
Q. Would anyone other than yourself or Ms. Wightman be a part of the decision to determine generally where content is distributed?
A. Other people, other sorts of stakeholders in the news organization might because there may be safety concerns for a bit of the BBC. One of the BBC bureaus,


for example, you know, there were threats against people in various countries. And if we're making a program, you know, in -- in Russia, we would talk to the experts from the Russian, you know, who -- who manage the Russian team and make sure they -- to see if they had any concerns about safety or any issues if the program was shown in that territory.
So it would vary -- vary on a case by case basis.
Q. Just so we're on the same page. When you refer to the phrase "bureau", is that similar to a satellite office that's on site?
MR. TOBIN: Object to the form of the question.
A. BBC has, yeah, I mean, they have a -- bureaus in lots of different countries which are run by BBC staff and then people who are employed by the BBC who work there. And there would be freelancers as well. So there'd be a mixture of people that are directly employed by the BBC and -- and a freelance staff.
BY MR. CORP:
Q. To your knowledge, does the BBC have any bureaus in the United States?
A. Yes.
Q. How many?


A. I couldn't tell you how many. I personally visited the New York Bureau and the Washington DC Bureau. Other than that, I couldn't tell you how many there are.
Q. Based on your nearly 25 years of employment at BBC, can you give me an estimate?
MR. TOBIN: Object to the form of the question. Calls for speculation. Lack of foundation.
MR. CORP: Go ahead, sir.
A. Well, I would imagine there's at least one or two on the West Coast, but I don't know how many more there are than that.
BY MR. CORP:
Q. So you're aware of a handful at least and there may be more?
A. Yeah.
MR. TOBIN: Object to the form of the question.
BY MR. CORP:
Q. Are you aware of any in Florida?
A. I understand there is a -- there's a -- there is a building that is associated with the BBC in Florida, yes.


Q. Is that the bureau, as we've been discussing?
A. I don't believe it is, no.
Q. So are you aware of any bureaus that the BBC has in Florida?
A. No.
Q. So I know we went on a bit of a tangent there. Let's go back to what we're discussing earlier. So, and you may have answered this already, Mr. Telling, and if so, I apologize.
But we mentioned that you, Ms. Wightman make the decision to determine where content is distributed generally. Did you identify anyone else?
A. No. I mean, we are the two main people who make those decisions. The programs that I'm working on -- there are two other executive producers who would have the same responsibilities as me.
Q. What about Richard Cooper? Is that someone who would have -- who would be involved -- excuse me -- in the decision to determine where content is distributed?
A. No. Not unless there was, I think, he's -- he's involved in the studios. Unless there is some contractual reason that I'm not aware of, but I think you have to ask him. But he's never come into my sphere of consciousness as it were, you know, I never

had any contact with him.
Q. You've never spoken to Richard Cooper?
A. No.
Q. Richard Cooper, Director of Digital Distribution of BBC, never spoken to him?
A. No.
Q. So after the decision is made as to where content will be distributed, to the extent any content is going to be excluded from a particular jurisdiction, how was that decision implemented?
MR. TOBIN: Object to the form of the question. You can answer as best you can.
A. I would send an email, put it in writing the concerns and send it to BBC Studios. And if it's for an independent production company, they may have their own distributor and I won't have a direct relationship with that distributor. So then I would communicate it to the executive producer of the indie who would pass it on.
BY MR. CORP:
Q. And after you send an email or some other written correspondence, is there a process to approve what you're recommending?
A. No, not really, no.
Q. After that email is sent, is that a result of



the discussions that you and Ms. Wightman already had?
A. Yeah. We would have discussed it first and whatever the concern we would have it, we would say -- we wouldn't put it in detail, but we would say we're concerned about contributors safety. So we prefer it, you know, we not prefer it, we do not want this being shown in that particular territory.
Q. And to whom is that correspondence addressed to?
A. So that's -- that would normally be to BBC Studios or it may be to the co-production partners if there was a coproduction -- coproduction partners, we would have to tell them because they may have their own distribution agreements and licensing.
Q. To be a bit more specific, I'm going to zoom out and zoom back in.
So two of the parties that are named as Defendants in this case, one of them is BBC Studios Distribution Limited and another is BBC Studios Productions Limited.
Are you aware of that?
A. Yes.
Q. So when you say BBC Studios, are you referring to either of those entities?
A. I'm referring to the distribution part of BBC



Studios. I don't really have anything to do with the BBC Studios Productions.
Q. Okay. So to back up, once the -- once the decision as to content distribution between yourself and Ms. Wightman is made, you send an email to BBC Studios Distributions for implementation of that decision. Fair?
A. Yeah. That's right.
Q. And afterward, are you involved whatsoever in overseeing how that decision is ultimately implemented and for lack of a better phrase -- enforced?
A. No.
MR. TOBIN: Object to the form of the question.
BY MR. CORP:
Q. To your knowledge, who's responsible at BBC Studios Distributions to ensure that the content is distributed according to the parameters set forth in your correspondence?
A. I do not know.
Q. And you identified as well that -- that correspondence would also be sent to BBC's co-production partners, correct?
A. If there were any, yeah.
Q. Right. For the documentary that's at issue



in this case, Mr. Telling, was there anyone other than yourself and Miss Wightman that participated in the decision to determine where the documentary would be distributed?
MR. TOBIN: Object to the form of the question. Answer as best you can.
A. Ultimately we didn't have -- we didn't have any concerns about where it was distributed. So we didn't -- we, basically, handed that over because -- because it was an independent production company production, they retained the rights to distribute it. So they had the relationship with the distributor.
There was no reason for us to limit its distribution. But -- so we didn't have any conversation with them. It would have been Neil Breakwell at October Films who would have had any of those conversations with the October Films distributor.
BY MR. CORP:
Q. So BBC was not concerned about where the documentary at issue in this case was distributed?
MR. TOBIN: Object to the form of the question. You can answer as best you can.
A. We didn't have any editorial concerns about where it was going to be broadcast, no.
BY MR. CORP:

Q. Is it your understanding that BBC essentially outsourced the distribution to October Films? Is that your testimony?
MR. TOBIN: Object to the form of the question.
A. It's not -- I don't think it's accurate to say "outsource". I think, it's a normal practice when you commission an independent producer part of the -- we pay a license fee. We call it a license fee. So we license the program from the independent production company to ultimately own the product. They own the copyright. So we only obtain a license to show the program for a particular period.
And then ultimately the production company owns the intellectuals and copyrights in the program. So its up to them what they do with it. But it's the contract that we have -- if there are editorial concerns, we have any problems, then they have to come to us to -- to check it. But we don't -- we don't get involved in it because it's their intellectual property.
BY MR. CORP:
Q. Who is the independent production company that you're referring to here?
A. In this case it's October Films Limited.


Q. And BBC paid a license fee to October Films to broadcast the documentary on its platforms?
A. Yes.
Q. How much was the license fee?
A. I can't recall the exact figure, but it would have been more than [redacted] pounds.
Q. And how, if I may ask, did you arrive at that number? Is that because you personally participated in the negotiation of a license fee?
A. No. We -- we have what we call a tariff for a program. So an hour long film is around -- depending on the program, is upwards -- starts about [redacted] pounds and can go up to a lot more than that depending on the project.
And we ask the independent production company to bill -- to make a budget. When they know what the editorial specification for the program is, we ask them to create a budget. And they come back to us and say this is what the budget is, and we can say, well, it's too high, you need to bring it down by this amount or it's too low.
We think you're underspending in that area. We need you to, you know, put in a bit more for this particular aspect. So we did -- we discuss it with them. But it's -- it's on a project by project basis.


Q. To your understanding, the full scope of the relationship between BBC and October Films in connection with the documentary at issue in this case, is in the program production agreement that's identified in your declaration, correct?
A. Yes, that's right.
Q. So bear with me as I try to work through this because we have not yet seen the program production agreement. And so I'm going to be asking you a series of questions that may come across as a bit cumbersome and awkward.
So just try to work with me for a second.
A. Sure.
Q. So what I've gathered so far, Mr. Telling, is that the documentary in, according to you, is owned by October Films. Did I capture that correctly?
A. Ultimately yes. They -- they -- they own the intellectual property -- the program, yeah.
Q. Okay. And BBC paid a license fee of about $[redacted] to October Films to later broadcast that on its platforms, fair?
A. Yeah. It would have been pounds a bit more than --
Q. -- pounds, apologies.
A. Yeah. Yeah.


MR. CORP: Okay. In your Declaration and if you have it in front of you, I can -- I can point you to it, if not, I can pull it up on the screen. I see that your counsel may be grabbing a copy for you.
MR. TOBIN: Yeah. And I'm happy to put a copy in front of him.
MR. CORP: Okay. Thank you, Chuck. So we'll -- we'll mark that Miss Heagney as Exhibit 1 to the deposition.
(Exhibit 1 was marked for identification)
MR. CORP: I'd like to turn your attention, Mr. Telling, to paragraph 5. Let me know when you're there.
A. Yeah.
BY MR. CORP:
Q. So it says here that you were BBC's executive producer on the Panorama episode at issue in this case, Trump A Second Chance which is thereafter defined as the Documentary.
Do you see that?
A. Yes.
Q. So if October Films as you testified is the owner, then explain for me please how it is that you're making the statement that you're the executive producer

Page 34

on this episode?
A. So I'm -- I'm the BBC executive producer. So I -- I look after the project as it goes through production. And I am involved in discussions with the independent production company about the editorial and any other issues that come up. And they have their own executive producer who works for them. He looks after their interests.
So effectively I'm -- I suppose you could say I'm looking after the interests of the BBC and making sure that they stick to the production agreements.
Q. So it was your responsibility as executive producer to hold October Films to account under its obligations in the program production agreement?
A. Yes. If necessary I can -- I can step in and say, you know, they -- if they came up with the -- a program that was ten minutes shorter than we wanted, I would have to say to them this is unacceptable. We need you to go back and make another ten minutes of program.
Q. Okay. How about from a more general perspective? Was it your responsibility to ensure that they complied with their obligations under the program production agreement -- they being October Films?
MR. TOBIN: Object to the form of the

Page 35

question. Answer as best you can.
A. I mean, the bits of the program production agreement that I'm most familiar with, that I'm most worried about, are the editorial specification and the sort of duration of the film, and, you know, the issues -- the issues around who, you know, who -- who we have agreed will contributors be, who we've agreed the format of the program will be, and, you know, I leave it to business -- BBC business affair's colleagues to deal with the other contractual issues.
BY MR. CORP:
Q. Well, sure, I mean, I'm -- you're not an attorney, correct?
A. Yeah.
Q. You're not a solicitor, you're not a barrister, you don't have any legal training?
A. Right.
Q. My question wasn't about enforcement of the agreement or anything like that. But more so what you eluded to the editorial, journalistic and production portions of them.
Was it you that had oversight and responsibility to holding October Films to account under that agreement?
A. Yes.

Page 36

Q. So your testimony and your Declaration describe October Films as independent, fair?
A. Yes.
Q. How do you reconcile that if you've testified that you as -- on behalf of the BBC were overseeing and ensuring that October Films was complying and ensuring that the documentary met BBC's editorial standards and judgment?
MR. TOBIN: Go ahead.
A. I suppose the best example, I mean, maybe the example is best way to go is, if you were building a house and you had a subcontractor, you would hire an electrician to do the wiring. The electrician is -- is an independent contractor. But you -- as you're the -- if you're the -- if you're the program manager of the building work and you oversee that individual's work and you make sure it's up to scratch, up to scratch and up to standard, so they are an independent contractor.
If you had a dispute with them, you'd be, you know, in court with them with their company that they owe rather than them being an employee. You can't say to them, you know, I'm going to put you on a disciplinary or sack you, it doesn't work like that because there's the contract between the two parties. So it's more like a contract supervision role, if that

Page 37

makes sense.
BY MR. CORP:
Q. In other words, BBC oversaw and took responsibility for the documentary. Fair?
MR. TOBIN: Object to the form -- object to the form of the question. Mischaracterizes his testimony. Answer as best you can.
A. I see my role as -- as -- as making sure that the production company sticks to the editorial side of the production agreement. That is -- that is how I see my job. Part of the production agreement is that they acknowledge that we ultimately will have editorial control. So if we want something changing in the program, they subject to the, you know, the budgets and all the -- all the other things in the agreement that they will do what we ask. And my job is to -- is sort of to supervise that arrangement and that relationship.
BY MR. CORP:
Q. So irrespective of who the owner of the documentary is, it was subject to BBC's editorial standards, guidelines and judgment, fair?
A. Yes, that's fair.
Q. We touched on this briefly, Mr. Telling, can you explain to me a bit more about what BBC Studios Distribution Limited is and how if at all it's

connected to BBC beyond what you've already described this morning or this afternoon on your side of the pond.

MR. TOBIN: And can I interject. I'm not getting in the way of the question, Ian, but you have used the phrase BBC distinctly from BBC Studios. So can we agree when you use the word BBC, you're referring to the Defendant BBC Corporation as distinct from the other two Defendants?

MR. CORP: That -- that's what I've always intended to communicate, Mr. Telling. So if you've misunderstood, I apologize. But that's what I'm referring to. BBC or the BBC, that's what I mean. And if I elaborate by adding studios, distribution or studios production, I'll do that. And if at any point it's not clear what I'm referring to, please just let me know.

MR. TOBIN: Thank you for that.

MR. CORP: Yeah, of course.

A. So I will answer the best I can. I'm not an expert on the structure of the BBC which is quite complex. But as I understand it, BBC Studios Distribution just does what it says. It distributes content which is either made by BBC Corporation or by



BBC Studios content creation which is a separate legal probably three separate legal entities we're discussing here. And BBC Studios Distribution takes content from across BBC. And, I think, from outside the BBC as well, I believe, they do distribute other people's content as well.

And then whatever profits they make from that, some of that money comes back into BBC Corporation to help fund Public Service Broadcasting. And then there's a separate BBC Studios arm which makes programs, and that's a separate legal entity. None of these two bodies had anything to do with this documentary. They were not involved at any stage because it was an independent production company.

They held the distribution rights and they exercised those rights to use their own distributors. So BBC Distribution wasn't involved and BBC Studios Production wasn't involved because they just produce content. They don't make it. Sorry. They don't distribute it. Apologies.

BY MR. CORP:

Q. That's all right. I hear you, and we'll get there. Just try to listen to the question that I'm asking that'll -- that'll help move this a long a bit further.



From what I recall from what you just said, from what I recall earlier, you mentioned as well that you don't have a specific understanding of as to what BBC Studios Productions Limited does in terms of its operations, correct?

MR. TOBIN: Object to the form of the question.

A. As I understand it, they make content. That is their primary role and goal.

BY MR. CORP:

Q. Do you have any other -- any other understanding beyond that?

A. No. As I understand it, that is their primary, you know, business imperative.

Q. What is your understanding of BBC Studios America?

MR. TOBIN: Object to the form of the question.

A. I don't know very much about that particular organization body.

BY MR. CORP:

Q. What do you know about it?

MR. TOBIN: Same objection.

A. Are you -- is this the same old, I don't know if this is the same organization that runs BBC Select.



Because that's the only other organization I understand that operates in America.

BY MR. CORP:

Q. I apologize. Did you say BBC Select?

A. Select is the only other organization that I deal with in America that distributes BBC content.

Q. Well, my question, sir, is just what is your understanding of what BBC Studios America is? You indicated you might know something about it, and I'm just curious if you could answer that question, please.

A. I don't know anymore about it other than the name of the organization, if I'm honest.

Q. Okay. How about BBC News USA?

A. No. I'm not familiar with that neither.

Q. BBC News USA, BBC Studios America, BBC Studios Productions, BBC Studios Distribution, you'd agree with me these are all different entities?

MR. TOBIN: Object to the form of the question --

BY MR. CORP:

Q. -- according to your understanding, Mr. Telling.

MR. TOBIN: Same objection. Calls for legal conclusion. Answer as best you can.

A. Yeah. As best as I know they are different

legal entities.
BY MR. CORP:
Q. Here is why I ask you. I just want to confirm that you've only ever been employed by the BBC and not these other entities, to your knowledge.
A. No. I've only been employed by the BBC Broadcasting Corporation, yeah.
Q. Okay. Are you familiar with Blue Ant Media?
A. Inasmuch as I know that the distributor of October Films works with, that's about as much as I know about them.
Q. Well, yeah. And how did you obtain that understanding?
A. When we commission the film from October, they told us that they work with the company called Blue Ant and that information was passed to me by October Films.
Q. In your Declaration at paragraph 22 and 23, you refer to them, if you want to take a moment and review it before I ask you questions just go ahead let me know.
A. Oh, yeah, yeah, I've got it.
Q. So therein you state that October Films, that they entered into a license agreement with Blue Ant. Do you see that?



A. Yeah.
Q. Have you ever seen that licensing agreement between October Films and Blue Ant Media?
A. No.
Q. And then you state in paragraph 23 that Blue Ant then sublicensed its rights to the distribution of the documentary to Little Dots Studios.
Do you see that?
A. Yes.
Q. Do you have any familiarity with Little -- Little Dots Studios?
A. Only as a, you know, recently when I discovered that they sublicensed it for this production, I've had no contact with them.
Q. Did you ever see the sublicensing agreement between Blue Ant and Little Dots Studios?
A. No, I didn't.
Q. Mr. Telling, if you could, please, turn for me to paragraph three of your Declaration. Let me know when you're there.
A. Yeah.
Q. So here it states that -- well, take a moment, read it to yourself and let me know when you're ready.
A. Yeah.



Q. So it states here that the -- the -- the information stated below is true based on your personal knowledge, your review of records maintained in the regular course of business by the BBC or information made available to me within the BBC.
You see that?
A. Yeah.
Q. What records did you review in connection with preparation -- preparing this Declaration?
A. I believe I had an email from Neil Breakwell about Blue Dot and Blue Ant -- sorry, excuse me, Blue Ant and Little Dot. And it was email correspondence between us about which territories it had been shown in. And I satisfied myself that it wasn't shown in the US.
And what else did I review? I think that's in terms of the licensing, those are the things that -- it's email correspondence that I had between myself and Neil Breakwell.
Q. Did you review any other records that were maintained in the regular course of business by the BBC in connection with this Declaration?
MR. TOBIN: You mean generally and not specifically as to the distribution issues --
MR. CORP: -- right, right. And let me,



yeah, and I'm sorry to interrupt.
MR. TOBIN: I just want to make sure he understood --
THE WITNESS: -- yeah, sure.
BY MR. CORP:
Q. So Mr. Telling let me -- let me zoom out a bit and just kind of guide you to where I'm going with this.
So this paragraph it states that some information is based on what you personally know, things that were made available to you and things that you review.
I'm just trying to get an accounting of what it is you reviewed and then we'll go onto the other portions of it, you know --
A. -- sure.
Q. So, again, this is generally, what did you review to help prepare this Declaration?
A. It was my email correspondence between myself and the independent production company, email correspondence between myself and the producer. I looked at the licensing agreement for the various archive clips that we mentioned. Just go through this one, make sure I don't miss anything out. I think I looked at the documentary pitch.

Yeah. I looked at the script -- the international version which doesn't contain the edit in question because it was a shorter version of the program. I think, those are the only documents I reviewed.

Q. Okay. So let's recap. What I have so far is emails between you and Mr. Breakwell, emails between you and October Films, the licensing agreement, what you stated is archive clips, and we will double click on that in a second. The pitch deck for the documentary and the script of the international version of the documentary along with emails with what you stated as the producer.

Did I capture that correctly?

A. Yes. Matthew Hill is the producer.

Q. I'm sorry. Say that last part, again?

A. Matthew Hill is the producer.

Q. Okay. And so you meant to say -- when you said producer, that was singular?

A. Yeah.

Q. When you say archive clips, what are you referring to?

A. I'm referring to the clips that are identified in section 13 of my Declaration which is the -- the shops in Florida.



Q. Are you --

A. -- Actively.

Q. Okay. Are you referring to the images that are referenced in Exhibit 1 to your Declaration?

A. Yes. I reviewed those documents -- Exhibit 1.

MR. TOBIN: Object to the form of the question retroactively.

BY MR. CORP:

Q. And I know that the images -- it's more than just the images that are in Exhibit 1 and it's an invoice, but what's indicated as Line Item No. One, Line Item No. Two, No. Three and No. Four and No. Five, those are the images that you're referring to when you state archive clips?

A. I'm not saying that.

MR. TOBIN: We're not able to track your identification of line items. Could you be a little more direct in where you want him to look --

MR. CORP: -- sure, sure, sure, sure.

BY MR. CORP:

Q. So Exhibit 1, is an invoice, Mr. Telling, and in the invoice --

THE WITNESS: -- oh, I see.



BY MR. CORP:

Q. -- it describes line items one through five. And so I'm just trying to make sure we're on the same page, that when you say archive clips, you're referring to those five images and nothing else.

MR. TOBIN: As opposed to the references in his Declaration Paragraph 13 or ...

A. Yeah, those are the pictures -- those are the clips that the BBC was involved in licensing or the, sorry, October Films is involved in licensing. I don't know if you've got the Celebro media licensing agreement there which is the other thing that's in that section. There's two -- two --

MR. TOBIN: I'm sorry, the court reporter, you want to ask --

(court reporter interruption for getting closer to the microphone)

BY MR. CORP:

Q. So Mr. Telling, I don't know if we got off track. But let me rephrase and see if we can get on track.

So paragraph 13, it's got -- it's got several subparagraphs -- six in total.

A. Yes.

Q. And one of those it refers to Exhibit 1. And



exhibit 1 contains five images which we've said is line items one through five.

Earlier in your testimony, you stated that you reviewed archive clips. My question is: Do the archive clips -- are the archive clips, excuse me, limited to the images one through five and Exhibit 1 or do they refer to everything that's identified in paragraph 13 subparagraphs A through F?

A. I think it's -- the answer is everything. It's the whole Exhibit 2 is meant the other -- the other --

Q. Okay.

A. -- it's there.

Q. Okay. So other than the emails between you and Mr. Breakwell, the emails with October Films, the emails with Mr. Hill, the licensing agreement, the archive clips that we've now discussed, the pitch deck for the documentary and the script of the international version of the documentary, is there any other document that you reviewed in connection with this Declaration?

A. Not that I can recall.

Q. Okay. This Declaration, who prepared it?

A. Our legal team prepared it.

Q. Did you edit it?

A. I didn't edit it. I made comments on it

Page 50

and --

MR. TOBIN: -- please stop right there. And don't disclose any substantive information exchanged with Counsel.

MR. CORP: Yeah. I'm only asking, you know, yes or no, you know, does this exist not, you know, what its contents are. That's obviously privileged --

MR. TOBIN: -- stricken. Thank you.

BY MR. CORP:

Q. Other than Counsel, was this Declaration shared with anyone else?

MR. TOBIN: Object to the form of the question.

A. Not to my knowledge.

BY MR. CORP:

Q. And to be more specific, I'm referring to drafts of the Declaration.

A. I think it was all privileged people who were copied in under privilege, as I recall.

Q. So to your knowledge is -- this was shared between yourself and legal counsel whether it's in-house or outside counsel?

A. Yes.

MR. CORP: It's all right with every one,

Page 51

let's take five or ten minutes and meet back at 10:30 Eastern, yeah, I would imagine it's 3:30 p.m. on your side?

MR. TOBIN: Sounds about right. That sounds right. Thank you.

MR. CORP: All right.

(Break taken at 10:21 AM)

BY MR. TOBIN:

Q. Mr. Telling, during the break, did you speak with anybody?

A. I spoke with the people in the breakout room but not my immediate legal team, no.

Q. Who did you speak with?

A. I spoke with George Wong and Rachel -- what is her surname?

Q. And what did you discuss?

A. I discussed how this was going, how I was feeling.

Q. And what did they say in response?

MR. TOBIN: Object to the form of the question. Calls for attorney-client privilege. These two people are lawyers. The other person I'll identify to you is Rachel Rourke, R-o-u-r-k-e. She's in-house counsel for BBC as is Mr. Wong. And so I would instruct you not to

Page 52

answer the substance of any discussions you had without legal issues in the case.

And I'll ask you, did you discuss legal issues in the case?

THE WITNESS: No, we didn't.

BY MR. CORP:

Q. Mr. Telling, turning your attention to paragraph five of your Declaration. Let me know when you're there.

A. Yes.

Q. So it states in paragraph five that you are the executive producer for BBC for the documentary at issue in this case.

You see that?

A. Yes.

Q. Other than you, were there any other executive producers for the documentary?

MR. TOBIN: Object to the form of the question. I don't think your question accurately quoted paragraph five. If you could rephrase it.

BY MR. CORP:

Q. Mr. Telling, you -- was there any other executive producer other than yourself for the documentary, sir?

A. It was Neil Breakwell for October Films.

Page 53

Q. Other than Mr. Breakwell and yourself, anyone else?

A. No.

Q. Who were the producers at the BBC for the documentary?

A. It wasn't a producer at the BBC. There was a Matthew Hill, the producer. He was and still is a BBC employee. And he was subject to a, what we call, a loan out agreement with the October Films.

Q. You mentioned he was on a loan out agreement?

A. Correct.

Q. Can you describe what that is?

A. Sure. So happens from time to time that we work with an independent production company, and we have in mind a specific person who we want to make the documentary. Then we will loan them out to the independent production company, and they work for the company, they report to the company. But they are still paid by the BBC.

And as part of the production agreement, the production company reimburses BBC for their salary so they don't take any sort of unfair commercial advantage.

Q. Anyone else other than Mr. Hill?

A. I think Megan Towey was credited as a

producer on the program.
Q. I'm sorry, can you repeat that name, sir, it didn't come through?
A. Sorry. Megan, I think, it's Towey, T-o-w-e-y.
Q. Megan, M-e-g-a-n?
A. Yeah.
Q. Towey, T-o-w-e-y?
A. I think that's how you spell it.
Q. Okay. What was -- I'm sorry -- there was crosstalk.
What was her role?
A. She was a -- a journalist who worked on the program. And she's credited as a producer. She's a -- like a senior journalist. So where someone is a more senior journalist, they often get a production credit as a producer.
Q. To your knowledge what contributions did Miss Towey have as a senior journalist toward the documentary?
A. She was involved in arranging the filming and finding contributors for the program, liaising with them, arranging interviews, interviewees, you know, where we needed to be and when and work with Matthew to find the people that were going to appear in the



program.
Q. Anyone else other than the individuals that you identified?
A. I have to look back at the program credit, but I know there was Maxine Hughes worked on the program as a sort of booker. She was trying to obtain interviews with people. I can't recall exactly what credit she had on the program now. But her role was mainly to find, produce interviewees. And she was the person who had the access with the Front Row Joes. I believe she may have had produced a credit as well, if I recall now.
MR. CORP: Ms. Dudding, I'm emailing you Exhibit 2. Let me know when you get it. And it's a copy of the BBC's Responses to the Plaintiff's First Set Of Interrogatories. So to the extent anyone has a copy that is available and can give it to the witness, wonderful. If not, just let me know when he has it up on the screen.
(Exhibit 2 was marked for identification)
MR. TOBIN: Bear with me about 10 seconds. I think, I may.
MS. DUDDING: I have a copy that I can pull up on the computer as well. But ...
MR. TOBIN: Unfortunately, I do not. So



Sasha, if you can use your computer that would be great.
MS. DUDDING: The email hasn't come through yet. But it's just -- I have it up here -- it's the BBC's Responses to Plaintiff's First Interrogatories?
MR. CORP: Yes.
MR. TOBIN: We'll agree that we'll use our copy to track what you're doing and that --
MR. CORP: -- yeah, that's fine, I mean, we're talking about the same thing.
So Mr. Telling, let me know when you get to -- starts at page 4 and I'll turn your attention to Interrogatory No. Two. Just let me know when you're there.
THE WITNESS: Yes.
MR. CORP: So --
THE WITNESS: -- yeah, we there now.
BY MR. CORP:
Q. All right. So take a moment, please, if you will, and just read what Interrogatory Number. Two says and let me know when you're finished?
A. All right. I'm reading it now.
Q. Okay. While you're finishing up reading that, I'll direct your attention to the answer which



begins with a series of interrogatories, I'm sorry, a series of objections in response to the answer to that interrogatory.
A. Yeah.
Q. And then toward the bottom of the page 5, you'll indicate that it states subject to Without waiving the foregoing, the BBC answers to the following persons employed by BBC were involved in the development of the documentary. Then there's a chart that spills over to page 6 and ends on -- it ends on page six.
A. Yeah. I can see all those list of names, yeah. Do you want me to read through the names?
Q. No, I don't. And I'm just trying to think of how I phrase my question because --
A. -- I'm sorry.
Q. No. It's not your fault. It's just trying to see how I can best come up with it. And I'll just give a narrative to explain what I'm looking for. I'm just trying to get an understanding of who had the most involvement on a day-to-day basis for the development of the documentary.
So I imagine it might draw an objection from Mr. Tobin and that's fine. But that's really what I'm asking you for when I ask this.

Page 58

So reviewing that chart that's on page 5 and page 6, can you, please, tell me, Mr. Telling, who had the most involvement in the developments of the documentary?

MR. TOBIN: Object to the form of the question.

MR. CORP: You see, I told you he was going to object.

MR. TOBIN: As anticipated. Didn't want to disappoint you.

MR. CORP: Okay. Go ahead.

A. The -- my understanding of the word development is distinct from production. So the development in my mind is the stages that lead up to the commissioning and the actual production phase where they're gathering material and so I can answer, you know, on -- on that -- on that basis.

BY MR. CORP:

Q. But before you do, if I may interrupt you. As you said, and you gave a few terms.

A. Yeah.

Q. And those were the commissioning, the production and the development, correct?

A. That's right.

Q. All right. So let's break that down. When

Page 59

you say "commissioning", what do you mean by that?

A. Okay. So shall I take them in chronological order? That would be helpful?

Q. Whatever you'd like sir, go ahead.

A. Yeah. So the development of the documentary begins when the initial conversations between myself and Neil Breakwell and we are at that point, we don't have a contractual relationship. There's no commission. So we are discussing an idea. And I -- that in my mind is what the development of the documentary is.

And then at the point that we're happy that we got the right editorial brief, we sign the contract, and then the program goes into -- at that point it's the commissioning point. So that's the sort of point in time. And then there's another process which is the production process. And then there's the post-production and broadcast and by post-production, I mean, the editing of the documentary.

Q. Okay. So the -- what -- what I understand there to be is essentially five stages, if you will. And stage one, development. Stage two, commissioning. Stage three, production. Stage four, post production --

A. Yeah.

Page 60

Q. Stage five, broadcasting.

A. Correct.

Q. Now I want to turn your attention briefly to Interrogatory No. Three which begins on page eight?

A. Okay. Six, seven -- eight.

Q. All right. And that interrogatory just to speed run through this, it asks to identify every one who was involved at the BBC in editing the document --

A. -- yeah.

Q. And the answer that's given by the BBC subject to the foregoing objections essentially directs back to the individuals listed in the chart on page five and page six. Do you see that?

A. Yeah.

Q. Is there anyone on this chart that -- let me rephrase.

Is there anyone that participated in stages one through four which sequentially are development, commissioning, production and post-production that are not listed on this chart?

A. Okay. Let me look. No. I can't see anyone missing.

Q. And I'll -- if you could, please, go back to the first interrogatory. Let me know when you're there. It starts on page two.

Page 61

A. Yeah.

Q. So that interrogatory asks who at the BBC was involved in the broadcast of the documentary.

A. Yeah.

Q. And Page 3, again, following the objections and subject to those objections, it gives a chart of individuals that's there on page three.

Do you see that?

A. Yeah.

Q. Is there anyone at the BBC that was involved in the broadcast to the documentary that's not listed on this chart?

MR. TOBIN: Subject to the objections we raised in the documentary.

MR. CORP: Of course, yes.

MR. TOBIN: I'm sorry --

MR. CORP: -- and to be clear, Mr. Telling -- Right, Mr. Telling, I'm not asking about, you know, entry level employees for lack of a better phrase, but individuals that had significant and material involvement in broadcast.

THE WITNESS: -- yeah. I think that's a complete list of anyone that had any sort of significant editorial input or responsibility.

BY MR. CORP:

Q. Okay. And I'll just continue on with the next chart that's on page four that's responsive to Interrogatory No. One which is, again, describing individuals involved in the broadcast.

Now this is for people outside of BBC. Take a moment look at the chart and tell me if there is anyone else that -- or if there is anyone else better said that's missing from that chart.

A. I can't think of anyone, no.

Q. Okay. Can you do the same exercise for me please, in regards to the chart on page seven which refers to Interrogatory No. Two and tell me if there is any other individuals outside of BBC, again, significantly involved in the development of the documentary that are not listed on that chart?

A. No. I can't see anyone.

Q. And take a look -- be sure to look at the spillover of that same chart on page eight, let me know if your answer is still the same --

A. -- yeah. Just I can't think of anyone that's been missed off, no.

MR. CORP: Okay. So turn back to the Declaration please and -- Ms. Heagney, by the way, the interrogatories we've been discussing, we'll mark those as Exhibit 2 if they weren't already.



BY MR. CORP:

Q. So going -- just turn to page 2. We're going to talk about a few of the paragraphs that are listed there. So the first, I'll turn your attention to is No. Six. And I'll just read directly from it.

It states the BBC discussed and approved the pitch for the documentary in London. You see that?

A. I do, yes.

Q. What are you basing this statement off of?

A. On my personal knowledge of the discussions I had with Neil Breakwell in this building prior now and, yeah, I mean, that's -- that's my personal experience of how this -- where it was -- where it was initially discussed.

Q. And earlier you had mentioned that you had reviewed the pitch deck to prepare -- let me rephrase.

Earlier you mentioned that you reviewed the pitch deck for the documentary to prepare this declaration. Do you recall that?

A. I do, yes.

Q. Was that the same pitch deck that you and Mr. Breakwell discussed in connection with the statement that you made in paragraph six?

A. I think there were two in the end. It was a -- there was an initial one which was an idea that I



had come up with. And then there was a subsequent one that was commissioned. And we went through a sort of process -- of back and forth process and eventually got to the second one which was the program that was made.

Q. Do I understand your testimony correctly to mean that there were two different pitch decks?

A. Yeah.

Q. This discussion that you had with Mr. Breakwell, when -- when did it occur?

A. From memory it was around June 2023. I couldn't give you the exact date.

Q. Was it only one discussion or was it more than one?

A. No. It was more than one. It was an initial conversation where I outlined to him what I thought the program should be. We met for a reasonable amount of time, I think an hour or two. And then he went away and wrote pitch which he eventually got to me which we discussed. And then there was another pitch that was written, I think, Matthew Hill by that time had come onto the project and he wrote the second pitch.

Q. Okay. So handful of meetings about the discussion and approval of the pitch, fair?

MR. TOBIN: Object to the form of the question. Answer it as best you can.



A. Yeah. I can't remember the exact number, but there would have been back and forth on email and phone calls about what was the content of the first pitch, whether it was, you know, whether it was what we wanted or not. I can't recall of this distance exactly how many there were, but I do recall at least two face to face meetings plus more phone calls and possibly some Zoom calls or team meetings like this one.

BY MR. CORP:

Q. Okay. Initially it was only you and Mr. Breakwell, and then that expanded to include Mr. Hill, Mr. Breakwell and yourself?

A. Correct, yes.

Q. Mr. Breakwell wrote the first pitch, Mr. Hill wrote the second pitch.

A. Correct.

Q. The first pitch was not --

A. -- not commissioned.

Q. Approved -- was not approved. Not commissioned. Okay.

And who made the decision not to commission the first pitch?

A. That was Joanna Carr.

Q. To your understanding why was the first pitch not approved, I'm sorry, let me rephrase.

Page 66

To your understanding, why was the first pitch not commissioned?

A. Sure. So as I recall once she -- when she read the pitch, she felt that it was not sufficiently distinctive enough that it was centered around the trials that were the upcoming trials and the ongoing -- some of the ongoing trials that were -- President Trump was facing. And she felt that the news coverage around those trials would satisfy, you know, what viewers needed to know about them. And that we weren't going to be adding anything particularly distinctive.

Q. Can you elaborate on what your understanding of the word "distinctive" is?

A. Sure. It gets used a lot here. I think what -- what she meant by that is that people who followed the news would have known the detail of what was going on with these trials, what was central, you know, allegations were, what the facts were. The people that we could interview would have already been on the news or the trials in some case at least one of them was going to be televised, that people would have seen this material before, and that by the time we completed our documentary which would have taken six to nine months, there wouldn't be much appetite for people to watch it, again, in a documentary format because

Page 67

they would have already seen it on the news.

Q. So in other words not enough to draw people's attention?

MR. TOBIN: Object to the form of the question.

A. I think her concern was that, you know, always that we're thinking about our UK audience meeting a need. If we had to kind of figure out what is the unmet need. And if we know that there's a lot of information out there, then it would be less useful and duplicative, and we don't want to, you know, waste public money effectively making something that the people who already consumed from other outlets.

BY MR. CORP:

Q. And then the second pitch, that one, was it exclusively developed to your understanding by Mr. Hill or did Mr. Breakwell have involvement as well?

A. I don't recall Mr. Breakwell having any involvement in that one. I mean, he would have looked at it when it was written and maybe he made some comments. I can't recall at this distance, I'm afraid.

Q. And so after -- let me back up, actually, I apologize.

Ms. Carr, when she declined to commission the first pitch, how was that decision communicated back to

Page 68

you?

A. In an email.

Q. All right. And then the second pitch, it was presented to you, correct?

A. Yes.

Q. And then did you share that pitch or presented better said to Ms. Carr?

A. Yeah. After allowing Karen Wightman the editor to read it entirely, she would have had some feedback on it. She -- I'm sure we would have given Matthew some feedback about it.

Q. Okay. So sequentially Mr. Hill to yourself to Ms. Wightman and then to Ms. Carr?

A. Yeah. I mean, it's sort of iterative -- like lots of television, it's sort of iterative process. There may have been a copy back and forth, but, yes, that's essentially the sequence of events.

Q. And who ultimately commissioned the second pitch? Is that Ms. Carr?

A. It's a sort of multi-stage process. So she is the commissioning editor for current affairs as well as the -- she's -- another role that she has is as well as head of long-form commissioning. And if she -- it's a sort of -- if she -- it's her tick {phonetic}. The next thing is we take it to a commissioning meeting

Page 69

with BBC1 executives and they say yes or no, make the final decision. But we can't take it to that meeting until she gives it sort of nod of approval, if you see what I mean.

Q. Who ultimately at the BBC commissioned the second pitch?

MR. TOBIN: Object to the form of the question. Asked and answered. Go ahead.

A. Well, it's sort of a -- sort of a team thing in the room of people who were in the room in what's called a "chips meeting" which is a channel, an iPlayer meeting. So there's -- there's -- I think, it was Yasemin Rashit was there at the time. And the guy called Dan McGolpin. And I think between them and Jo Carr, many other people, that I can't remember who were at the meeting, but that's -- it's essentially the channel controller. They all agree that we're going to make a program.

BY MR. CORP:

Q. Can you repeat the names that you did recall that were on that committee, please?

A. I think it was Yas -- Yasemin, Rashit which is R-a-s-h-i-t.

Q. Okay.

A. I think the other person who would have been

Page 70

there, I don't think I was at that meeting, so I have been to these meetings, but it's sporadic. So, I think, the other person is the key -- other key person is Stan McGolpin, M small c, g-o-l-p-i-n.
Q. Is there a name for this committee? And I apologize if I'm using that term presumptively. I'm just not sure how else to identify.
A. Sure. We call it a Chips meeting, c-h-i-p-s which is like an acronym. I think it stands for channel and iPlayer.
Q. Okay. And from what I gathered from your testimony, is it fair to say that the Chips meeting yielded a majority vote so to speak to commission --
A. Yeah.
Q. -- the second pitch?
A. Yeah. I mean, I think, the meeting I have been to yeah, there's a sort of -- they go around the room say what do we think? And if everybody says yes, then the program is commissioned.
Q. Generally speaking, Mr. Telling, once a pitch is commissioned, I would imagine changes happen from time to time as production is ongoing and changes as to the original pitch may occur.
Is that fair?
A. Yes, that's fair.

Page 71

Q. Generally speaking, how would changes to a pitch be documented, if at all?
A. I think there would be an email correspondence between the Chips -- if it was a significant deviation, then there would be an email sent to the -- Joanna Carr and the commissioner, and she would just let the rest of the Chips team know that this, I think, by email, it would be an email with a trail to say this part of the editorial has changed significantly. And, in fact, was worrisome to the commissioning team, they may -- it's possible that they could decommission the program.
Q. And if, for example, let me say it differently.
If there is a proposed change in the scope of a pitch, would any approval to that scope then come from Chips?
A. Potentially. It would need to be a very significant departure from what had been put, you know, in front of them. Because quite often, you know, you would -- you would say what you were aiming to get, and you would say potentially contributors may include, but if you were completely changing the direction of the film, and you would expect them to say whether it was going to carry on because, obviously, they be getting a

Page 72

product that they weren't expecting.
Q. Were there any changes to the scope of the commissioned pitch for the documentary that is at issue in this case?
A. Not that were any of significant -- I don't recall any -- any that we had any need to alert anyone to that, no.
Q. So the original scope of the pitch did not materially change from the time it was commissioned through the time of broadcast?
A. I think there was a wish list of, you know, potential contributors and people within the Republican party that in the end we couldn't secure. Not interested in taking part. So it would be some names on that document that didn't appear in the -- in the end with the final program, but I don't think there was a significant deviation, no.
Q. If you could turn for me to paragraph nine of the Declaration and let me know when you're there?
A. Yeah, let's see, yes.
Q. So paragraph nine, it states the research for the documentary was primarily conducted in England.
Do you see that?
A. Yes.
Q. So you, well, you were the executive

Page 73

producer. Who was responsible for overseeing the research for the documentary at issue?
A. I mean primarily that would have been Neil Breakwell.
Q. And to your knowledge, who if anyone was reporting directly to him in connection with the research that was being done for the documentary?
A. It would have been two main people -- were Matthew Hill and Megan Towey.
Q. And you say "main people". Is there anyone else?
A. Well, there's Maxine Hughes and Chloe Ross who were working in the US, you know, different parts of the program, but they were -- they were sort of self-contained bits, if you know what I mean.
Q. You said Miss Hughes and who else?
A. I think her name is Chloe Ross which is on the list that you have -- the Interrogatory -- Interrogatory List.
Q. And you stated that Miss Hughes and Miss Ross were working on the documentary in the United States?
A. Yeah --
Q. -- I'm sorry. go ahead.
A. -- I wasn't closed involved in it -- I wasn't closely involved in overseeing their work. So I mean I

Page 74

had a skeleton knowledge of this. I don't have any real detailed first-hand knowledge. Neil Breakwell would have been their immediate supervisor.
Q. So let me back up for a second just to clarify something. Miss Hughes and Miss Towey are listed on BBC's interrogatory answers as freelance producers. Do you see that?
A. Yeah. Can you get that back up in front of me.
Q. Sure. I apologize.
A. It's okay.
MR. TOBIN: What page?
MR. CORP: That's going to be on Ms. Towey on page 8, Ms. Hughes is on page 7, tail end.
THE WITNESS: Yeah.
BY MR. CORP:
Q. Okay. So can you explain for me, please, what -- how -- let me say it differently. What I'm trying to understand is how freelance producers are contracted I would assume by the BBC in connection with a particular project.
So can you explain to me how that works to your understanding?
A. Sure. I mean, they weren't contracted to the BBC for this project. That was all handled by October

Page 75

Films but I can talk about how the BBC contracted freelancers.
Q. Well, I ask only because you indicated that -- well, let me see -- let me see if we can clean it up -- clean this up a bit.
Did the BBC contract any freelance producers for the documentary?
A. No.
Q. Okay. Where in the United States was Ms. Ross working on the documentary?
A. I know she, I believe, she's based in DC in the bureau there.
Q. To your knowledge, did she work on the documentary anywhere else but the DC bureau?
A. Not to my knowledge, no, not to my knowledge.
Q. Did you speak with Ms. Ross during the development of the documentary?
A. No. I've never met her. I don't think I do. She, yeah, as I say, this is slightly different set up because if -- if it had been an in-house production I would know a lot more about people working on that. But as it's an independent production, they hired these people through -- and some of them have been introduced to them I think through Matthew, but I don't have any sort of direct relationship with them.

Page 76

I've never met any of them apart from seeing Megan on a Teams link during the production. So my knowledge of them is pretty -- is pretty scant.
Q. We're talking about Chloe Ross, correct?
A. Yeah, Chloe Ross I don't think I've met.
Q. Okay. She you understand that she's employed by BBC at least based on what's represented in these interrogatory answers?
A. Yeah.
Q. Okay. I just wanted to make sure we're on the same page because you were referring to people that were hired by October Films, but that's not what's listed here. So I just wanted to make sure we reconciled anything that needed to be -- it seems like we're on the same page.
A. Yeah.
Q. So other than Mr. Breakwell, Mr. Hill, Ms. Towey, Ms. Hughes and Ms. Ross, was anyone else involved in the research for the documentary?
A. Not to my knowledge.
Q. To you understanding, what did their research consist of?
A. They were reaching out to potential contributors. And they were organizing the filming with the Front Row Joes. And they would have been

Page 77

involved in, you know, working on -- on a schedule of filming and -- and the production schedule.
Q. So just general news gathering connected with --
A. -- yeah.
Q. -- with the documentary, nothing special?
A. -- I mean, yeah.
Q. To your knowledge based on the research conducted by these five individuals, did any of them pitch their own ideas toward altering the scope of the documentary?
A. I have no knowledge of that, if they did.
Q. Assume for a second that they did, to whom would that request have been -- let me rephrase.
Assume for a second that it did, to whom would that pitch have been made?
MR. TOBIN: Object to the form of the question. You can answer as best you can.
A. I would imagine that if they had something that they wanted to include in the documentary, they'd speak to Matthew on the first instance and potentially to Neil Breakwell in the second.
And then if he thought it was a good idea, he would call me and make sure I was on the same page. As I say, there weren't many calls of that nature that I'm

Page 78

aware of.
BY MR. CORP:
Q. So given here, going back to what you state in No -- in paragraph nine of your Declaration where you indicate that the research for the documentary was primarily conducted in England, we discussed that some of it took place in the United States.
Is there anywhere else that -- where the research was conducted?
A. Not to my knowledge, no.
Q. And to your knowledge, where specifically in the United States did the research occur?
A. I know where the filming took place. I can't tell you the location of where every phone call may have been made. But the filming took place in Ohio and Washington DC. And there was another bit of filming that was done remotely, one of the rallies where the Front Row Joes went I can't at this second recall where that was. I think it was -- I scan through the script to remind myself where that was.
But it was one of the rallies that's in the film that you see in the film. I think you see the Front Row Joes parking up and getting into their cars and staying the night before -- before a rally.
Q. Are you saying that the only filming that

Page 79

took place in the United States for the documentary was on -- was about the Front Row Joes rally?
A. No. That's not the only film. There was filming in Ohio which was with Chris Gibbs who was in the film who's the rancher. And Rick Frazier is also in Ohio. And then there were other interviews that were conducted in Washington DC.
Q. So DC, Ohio. Anywhere else?
A. To say there was one bit of remote filming that was done by, I think, Maxine did some filming directed remotely by Matthew at a rally. But that's the only other bit of filming that I'm aware of.
Q. And that was the Front Row Joes rally?
A. Yeah. Well, it was obviously -- it's President Trump's rally -- the Front Row Joes attending.
Q. Correct, correct.
A. Yeah.
Q. And you don't recall where that took place?
A. No, I'm sorry, I don't think I can refresh my memory looking at the program.
Q. But nevertheless it was filming that -- who was it that you said again, that did it?
A. I think it was Maxine Hughes because she had the existing relationship with the Front Row Joes,

Page 80

yeah.
Q. So Hughes did the filming subject to the direction and control of Mr. Hill, did I capture that?
A. Yeah.
Q. Did any research occur in Florida?
A. No.
Q. And how are you certain of that?
A. I've spoken to the production team. I've spoken to Matthew and to Megan and to Maxine about where they did their research. And they all told me they didn't do any research in Florida.
Q. Did any filming occur in Florida?
A. No, not this production, no.
Q. And you went through all of the notes that each of the five individuals that you identified as part of the research for the documentary to confirm that none of the research they did was in Florida?
MR. TOBIN: Object to the form of the question. Answer as best you can.
A. No. I didn't measure the notes. We had a conversation about it.
BY MR. CORP:
Q. So how are you certain then, that none of the research that they did had any connection to Florida?
A. Because I believe them.

Page 81

Q. Is it possible that they left something out?
MR. TOBIN: Object to the form of the question.
A. Anything is possible. But they want to work with the BBC. They know that they have to be, you know, honest and accurate in what they tell us and if they got a reputation for telling lies, then, you know, they wouldn't be employed anywhere.
BY MR. CORP:
Q. So either way you have no way of knowing for sure, correct?
MR. TOBIN: Object to the form of the question.
A. I guess, you know, I believe them.
BY MR. CORP:
Q. But, otherwise, you don't have a way of knowing for sure correct, sir?
MR. TOBIN: Object to the form of the question. Asked and answered. Answer as best you can.
A. I do not have any way of knowing for sure, no.
BY MR. CORP:
Q. Turning your attention to paragraph ten of the Declaration, let me know when you're there?

Page 82

A. Yeah.
Q. Take a moment to review it. It's a long paragraph. I won't read it verbatim into the record. Let me know when you're done.
A. Yeah.
Q. So we talked about the research team paragraph ten identify -- states the production team. Do you see that?
A. Yeah.
Q. Who was on the production team?
A. The core production team is Matthew Hill and Meagan Towey. And, obviously, we identified other people that, you know, played smaller part, but they are -- they are the core team.
Q. I'm sorry, I -- didn't come through all the way on my end. Who -- when you said "they are the core team", who are you referring to?
A. Megan Towey and Matthew Hill.
Q. To whom did Towey and Hill directly report to?
A. Neil Breakwell.
Q. Now, if you look at the second sentence of paragraph ten, it states, members of the English production team.
Do you see that?

Page 83

A. Yeah.
Q. Is that limited to Miss Towey and Mr. Hill?
A. Yes.
Q. So there's no distinction between the production team in sentence one and the English production team in sentence two of paragraph ten?
A. No, I don't think so.
Q. And the same would apply to what's in the third sentence when it states, however, no member of the production team. You're, again, referring only to Miss Towey and Mr. Hill?
A. Yeah. And then the freelancers and the people that, you know, specifically smaller roles is covered off, is employee or contractor of the BBC or October Films.
Q. And where -- so in the second sentence, it refers to a trip to the United States for about ten days to interview and film various individuals for the documentary.
Do you see that?
A. Yeah.
Q. To your knowledge, did Ms. Towey and Mr. Hill go on this trip together?
A. Yes, they did.
Q. Did they travel to the same locations?

Page 84

A. I don't honestly know if they were both in the same place at the same time or they split up for a while and came back. I don't -- I don't have any visibility of their detailed schedule, I'm afraid.
Q. To your knowledge, what was the purpose of this trip beyond the general description that's given in the second sentence of paragraph ten?
A. It was to film with Chris Gibbs and Rick Frazier in Ohio. And, I believe, they filmed a number of interviews in Washington DC -- people who were based there.
Q. Any other purpose?
A. Not to my knowledge.
Q. Did -- let me back up. To your knowledge, who else was interviewed during that trip?
A. Again, I wasn't across all the logistics of this because of the slight distance between me and October Films. But I'll try to give you the best answer I can. I think, it was Congressman Thompson, Julie Farnham and Rick Wilson, I think, they were all interviewed in DC, maybe others, I can't recall.
Q. Did all of the interviews that were recorded on this trip in some fashion following post production, did they appear on the final cut of the broadcast?
A. You know, I don't, I don't think I, actually,

Page 85

know the answer to that. Maybe some -- some delayed films they made drops or didn't work out. I don't honestly know the answer.
Q. Do you know if Ms. Hill and Miss Towey went anywhere else in the United States other than Ohio and DC during this trip?
A. I've asked and they -- they didn't.
Q. And that's just, again, based on their representation to you and nothing else, correct?
A. Yeah.
Q. Zooming out for a second, Mr. Telling, so from what I've gathered thus far, it seems that Mr. Hill for lack of a better phrase, was the boots on the ground producer for BBC in connection with the documentary.
Is that fair?
A. Yeah. That's fair.
Q. And then if he needed your -- let me rephrase it and back up.
Explain to me if you would, please, the relationship and -- the employment relationship, supervisory relationship, managerial relationship etc. between you and Mr. Hill in connection with the documentary?
A. So he was on the almost a continent to say,

Page 86

So his immediate line manager would have been Neil Breakwell. So if he had any immediate problems or issues related to the film, he would contact Neil Breakwell. And if it couldn't be resolved within that, you know, within -- within October Films, then they would come to me.

So that's the way this was managed, this side of it went. Contractually, obviously, he still remained a member of BBC staff. But, I think, on the basis of a loan out agreement, he was expected to abide by the line management structure in October Films.

Q. Subject to, of course, BBC's editorial guideline's standards and judgment?

A. Sure, yeah.

Q. And if, for example, let me say this different.

Because what I'm trying to get an understanding of is when, for example, you would get involved in the production and development of the documentary, generally speaking. So if there was an issue that could not be resolved between -- if there was an issue that could not be resolved by Mr. Hill, it was then brought to Mr. Breakwell's attention, fair?

A. Yeah.

Q. And then if it was something that could not

Page 87

be resolved by Mr. Breakwell, then it got to your attention, fair?

A. Yeah.

Q. So then is it fair to say that there were perhaps limited instances or few instances in which your input was required for the development of the documentary?

A. Yeah. I can only remember two specifics which I'm happy to share with you. One was to do with the budget and wanting to try and afford another filming trip. And, I think, we worked out what we could do remotely in the end. And then there was a second issue around Megan'S contract. Matthew wanted her to stay on longer because he needed someone to help him with the fact checking process. And so I think we -- we had a conversation about that. And that was worked out as well. So it's quite limited contact between me and -- and the production team sort of during the whole process.

Q. Who primarily had editorial oversight at the BBC for the document?

A. Well, that would be me and Karen Wightman the editor -- ultimately two of us.

Q. Who at the BBC had oversight on fact checking?

Page 88

A. Same -- two of us.

Q. Who at the BBC had oversight on verification of sources of information?

A. Yeah. That would be me and Karen as well.

Q. You said that you had involvement with the budget or the documentary, correct?

A. Yeah. That was right at the beginning, not the day-to-day management of it.

Q. Who had day-to-day management of the budget?

A. That was Neil Breakwell with his production, manager. She's on the -- she's on the interrogatory schedule. I can't remember her name now. I didn't have any contact with her but maybe probably through email.

Q. You said it was somebody else at October Films that helped out with day-to-day management of the budget?

A. Yeah, they had a production manager --Julia --

Q. -- do you know who it was? Becky Morris? I'm just going to rattle some names off and tell me if any of them hit. So Becky Morris?

A. I don't know what role she had to be honest. That's not familiar to me.

Q. Julia Baldwin?

Page 89

A. Yeah, Julia Baldwin was the person I had some contact with.

Q. Is she the other female that you --

A. -- she's the production -- sorry.

MR. TOBIN: Go ahead. I think he's waiting for you to finish your question.

MR. CORP: Oh, no, no. I thought what -- there was some cross talk so I'll start it, again.

BY MR. CORP:

Q. Was Miss Baldwin the individual who you identified as also having day to day management oversight of the budget for the document?

A. I believe so, I think, you know, obviously, people at October Films should know better than me the company structure and who's more senior. and who's in charge. But that was the person that I had some sort of contact with.

Q. What other -- so, let me back up. So you mentioned you had contact with Miss Baldwin at October Films. You, obviously, mentioned so far you've had contact with Mr. Breakwell at October Films.

Is there anyone else that you had contact with at October Films regarding the documentary?

A. I can't think of anyone, I mean, there may have been people copied in on the emails, that I can't

Page 90

recall who were -- people that needed to know how things were progressing at October Films, but I don't remember having any conversations with anyone else.
Q. Okay. To turn your attention back to your Declaration, Mr. Telling, paragraph ten, take a look at the last sentence starting with however. Let me know when you're there.
A. Yeah.
Q. Read it to yourself for a second and let me know when you're done, please.
A. Yeah.
Q. So what are you basing that statement off of?
A. I'm basing that on my conversations with the production team and my knowledge of, you know, where they were planning -- what they told me during the production.
Q. So just based on representations that they made to you, fair?
MR. TOBIN: Object to the form of the question. Mischaracterizes his testimony.
Answer as best you can.
A. It's information that I gathered across the totality of the production plus asking direct questions about, you know, have you been to Florida? Did you call anyone? Did you make any freedom of information

Page 91

requests? Did you ask for any records?
I asked quite direct questions. And the answer has always been no.
BY MR. CORP:
Q. So you stated information gathered during the totality of the production of the documentary, correct?
A. Yeah. I mean, I never -- I never heard of any plan for when I had an update from Neil or from Matthew. There was never any plan to go to Florida. And I never heard back any filming there. And then when the issue came up, I wanted to satisfy myself that, that was right. So I met with the people, you know, from the research, and they told me that they hadn't contacted anyone even in Florida.
Q. Do you recall when we went through a series of documents that you reviewed in connection with the preparation of this declaration, the emails with Mr. Breakwell, the licensing agreement, emails with October Films, emails with Mr. Hill, so on and so forth?
A. Yes.
Q. Is there -- are there any documents other than those that we already discussed that you're referring to in your statement where you say information gathered during the totality of the

Page 92

documentary?
MR. TOBIN: Object to the form of the question. You can answer it as best you can.
A. I can't tell you specific documents, no. I'm just dredging my memory of all the correspondence. There will be -- I'll be conflating emails and conversations on the phone that I would have had with Neil and with Matthew, and I can't separate them out two and a half years later as to which one is which. But there was never any -- any suggestion that they were ever going to go to Florida.
BY MR. CORP:
Q. Turn your attention please to paragraph 11 in your Declaration.
A. Yeah. Sure. I get there.
Q. And take a moment to review it, let me know when you're finished, please.
A. Yeah.
Q. How do you know that statement to be true?
A. I directly asked the production team these questions, and they told me that they absolutely didn't film any interviews or request any public records.
Q. And, again, that's Miss Towey and Miss Hill, I'm sorry, Miss Towey and Mr. Hill.
A. Yeah. And I asked the same of Maxine because

Page 93

she was involved in both with the filming. So she shot some of the material with the Front Row Joes and she was the original contact. She had the relationship with the Front Row Joes. So I asked her that specific question as well.
Q. Take a look at paragraph 12. Let me know when you're there.
A. Yeah.
Q. So I want to turn your attention to the second sentence. And I'll just read it in part. It states neither the BBC nor October Films sent any employees to Florida to film that footage.
Do you see that?
A. Yeah.
Q. In terms of sending employees either that belong to the BBC or October Films, was that something that was under your purview or someone else's?
A. That would have been Neil Breakwell's responsibility to figure out who was going where and what sort of contractual relationship they had, you know.
Q. Did you have any personal knowledge as to where employees were being sent in connection with the documentary?
A. I knew there was a filming trip to Ohio. And

Page 94

I knew they were going to DC. But I didn't know, I mean, that's to say, I didn't hear about any other filming trips.

Q. Day to day is what I meant. You know, whether it's going to be out of, you know, out of the country or down the street?

A. Yeah. I mean, and I knew about Matthew's main filming trip. And I know that he wanted to do a subsequent one. And I think in the end we had to do remote filming so I know that there was never any conversation about going to Florida or sending anyone, you know, freelancer or a member of staff.

Q. Generally speaking, that was under Mr. Breakwell's purview, not yours.

A. Yeah, yeah, sorry --

MR. TOBIN: Object to the form of the questions. Answer as best you can answer.

THE WITNESS: Yeah. He -- Neil Breakwell had the sort of day-to-day responsibility for managing the team and the deployments and was across more with the details. I would only ever be consulted if there was a sort of big editorial problem or a big budget consideration that they wanted to expand the scope of a building trip or do an extra one.

Page 95

BY MR. CORP:

Q. Let's go to paragraph 13. Let me know when you're there.

A. Yeah.

Q. And -- okay. So -- so we talked about this already a little bit. Paragraph 13 contains six subparagraphs A through F. I'm turning your attention to paragraph A -- subparagraph A, excuse me, we can get started there.

That paragraph refers to Exhibit 1.

A. Yes.

Q. To your understanding, Mr. Telling, the documentary at issue in this case, it was first broadcast in October 28th, 2024, correct?

A. Yeah. If that's the right day.

Q. Please turn to Exhibit 1 and let me know when you're there.

A. Yeah.

Q. So page -- well, this is an invoice. It's directed to the accounts payable division of October Films. And if you look to the left of that, it says, it has an invoice date of November 5th, 2024.

Do you see that?

A. Yeah.

Q. Also has a sales order date of November 5th,

Page 96

2024.

Do you see that?

A. I do.

Q. And then if you look to -- you go down a little bit and then go to the right, there is customer VAT number. And then at the bottom of that box, it states due date December 5th, 2024. Do you see that?

A. Yeah.

Q. Now turn your attention, please, to the line items one through five and just starting with No. one, it says start date November 5th, 2024.

Do you see that?

A. Yeah.

Q. Line item two, start date is also November 5th, 2024. You see that?

A. Yeah.

Q. Take a moment and review 3 through 5 which I'll represent to you it states the same thing. But after you review just confirm.

A. Yeah.

Q. So going back to paragraph 13A, BBC is essentially saying that these images were not created by it, but rather they were licensed out and then were published through the document, correct?

A. Yes. That's right.

Page 97

Q. And can you reconcile for me, please, how that's true given that the documentary was broadcast on October 28th and these images weren't licensed until at least November 5th, 2024?

A. I'm not an expert on the licensing process, but I do know that we often order the material or we download it from a website and include it in a program. And then we license it once we finish the program. And then there is weeks or sometimes months go by, when the paper -- essentially all the paperwork continues to be done for the program.

And so -- so that could take weeks or even months. And depending on the complexity of the project. So my best guess, the discrepancy is that the film archivist, until the film is absolutely finished, we don't pay for anything. We don't know precisely what we're going to use. So we may have downloaded a clip from the Getty website, for example, and they will know that we've downloaded a sort of five minute long clip. If we use all five minutes of it, it's going to cost thousands of thousands of pounds.

So we don't pay for it until we know exactly how much we're going to use. And then that -- that paperwork is only begun after broadcast generally speaking. And, I think, the -- the license holders

know they have some record of when it was broadcast. They're invoicing, again, this is just a guess, I don't -- I don't do this. But I'm assuming that, that is the, the date when they were contacted and asked for the license.

Q. And is this a process that you -- let me rephrase.

Given that this invoice was sent to October Films and we have described your role as being more senior and detached from the day to day, I would presume, but correct me if I'm wrong, that you were not involved in this licensing process?

MR. TOBIN: Object to the form of the question. Answer as best you can.

A. I wasn't involved in any of the licensing, no.

BY MR. CORP:

Q. So your knowledge of this is just based -- is second hand either from what others told you or from just what the documents show?

MR. TOBIN: Object to the form of the question.

A. I would say it's based on my knowledge of how the process happens when we're in-house. So I know from conversations with our archivists that they are



working for weeks on end after the film goes out squaring away the paperwork. It's kind of done on a trust basis. The archives allows us as a trusted broadcaster to have access to material and then we pay for it later.

BY MR. CORP:

Q. And that's just based on your general experience not specifically what happened in this instance?

MR. TOBIN: Object to the form of the question.

A. No. I can't tell you how October Films run their archives. I just know how we do it in-house or I should say just the Panorama is my -- the limit of my experience.

BY MR. CORP:

Q. To your knowledge, the archivist as you described that term, would that for October Films, would that be Stuart Robinson?

A. Yeah. He was helping them with the archive. It was him and Paul Alexander were the two archive producers. They were helping source the material. But, obviously, October Films had to pay for it, again, it's a slightly discontinuous process where they then -- once they've license -- once they've found it



and we've entered it into the program, we hand it over to October to regularize all the paperwork and make sure all the people that need to be paid get paid.

Q. Turn your attention to 13C. Let me know when you're there.

A. Yeah.

Q. So take a moment to review it and let me know when you're ready.

A. Yeah.

Q. So it states here that the footage -- and I'll skip ahead was licensed from CBS under reciprocal license with the BBC entered into in London.

Do you see that?

A. Yes.

Q. Are you referring to a -- a contract of some sort here?

A. I believe there is -- as I understand it, the BBC has the relationship with CBS where there's a -- there's a reciprocal arrangement to use each other's material. And that must -- I'm assuming that there is a written contract that sets that up. But I'm not had sight of it, but I know from other production that we regularly able to use CBS material.

Q. Moving right along to 13D. Let me know when you're there.



A. D you said?

Q. Yes. 13D.

A. D, yeah, okay, yeah, I'm there.

Q. So go over to the next page on number. four, the last sentence. It states, the BBC was able to use that footage through a reciprocal agreement it has with a pool of US television networks which it entered into in London.

You see that?

A. Yeah.

Q. And, again, I -- are you referring to another written agreement between the BBC and a host of counterparties here?

A. Yeah, I mean, again, this is based on my knowledge from previous productions where -- where material is pulled by the broadcast -- by the US Broadcasters. Then there are circumstances in which we can use that, I think, it's, I haven't seen the contract.

And generally speaking, I rely on the advice of specialist archivist on whether we can use it or not. There are sometimes exceptions.

Q. All right. Okay. 13E, let me know when you're there.

A. Yeah.

Page 102

Q. So 13, last sentence states, BBC approved the brief footage -- let me rephrase.
BBC approved this brief footage for use in the documentary pursuant to the doctrine of fair use. You see that?
A. Yeah.
Q. The approval, how was that documented, if at all?
A. That was -- there was a spreadsheet created with all the archive clips. And ultimately we take advice from a intellectual property lawyer generally inside the BBC and decide whether or not we're going to use it.
Q. Okay. So that logs everything. But my question was a bit more specific as to how the approval for it was documented. Is it in an email? Is it part of a conversation or something else?
A. It could be either, I mean, ultimately Karen Wightman, the editor, could disregard the legal advice if it wasn't -- if the legal advice was you shouldn't use it, she can disregard that and say we'll take the risk. And then she will either tell or email the archivist and say we're going to use this. So, you know, it can be either -- there isn't a formal system for it.

Page 103

MR. CORP: Can we go off the record for about 30 seconds?
(Discussion off the record.)
BY MR. CORP:
Q. Mr. Telling, turning your attention to paragraph -- let's go to 14 really quick. Before we had discussed -- and I'll speed through this -- before we had discussed what knowledge you had as to whether any portion of this documentary was filmed, researched, etc. in Florida.
Do you recall that?
A. I do, yeah.
Q. And the basis for your statement on 14 is what we discussed earlier -- there's nothing else to add?
MR. TOBIN: Object to the form of the question.
BY MR. CORP:
Q. And I'll be more clear. It's based on representations of what others told you and the totality of the information that you gathered during the documentary and your participation as executive producer.
A. Yes, that's fine.

Page 104

Q. So looking at 15 in the Declaration, it states the scripting and editing of the documentary including a portion of it at issue on this case depicting portions of President Trump's speech on January 6th, 2021 occurred in England.
You see that?
A. I do.
Q. So in this paragraph, you refer to England. And paragraph nine you refer to England. In paragraph ten you refer to England as well.
Is there any more specific location you can give us because, otherwise, in your Declaration, it refers to London?
A. Yeah. It was mostly in London. But Megan Towey, who works on the production, works remotely a lot of the times. And she lives in Manchester, England. So it was more accurate to say England.
Q. When you refer to -- when you say in paragraph 15 the scripting of the documentary.
What did you mean by that?
A. I mean the process by which maybe Matthew and Megan would write or assemble the clips really because there isn't a script as such in the sense of -- because there's no narration -- to document a script is a document that assembles all the various clips. And

Page 105

that we've gone backwards and forwards between Matthew and Megan and, you know, initially until I got myself and Neil got involved later.
Q. Other than the individuals you previously identified, did anyone else participate in the scripting of the documentary?
A. Karen Wightman would have been involved at the end when we're finalizing the film as were Nikki O'Donnell and Ric Bailey.
Q. Anyone else --
A. -- Jim Gray -- Jim Gray as well, very near to the end.
Q. Anyone else?
A. I don't believe so, no.
Q. Who participated in the editing of the documentary?
A. The editor who's the person that operates the editing equipment and is sort of creative individual in their own right is Lawrence Williamson. So he was the editor with -- sitting with Matthew. And Megan was involved in all the hearings that we had at the documentary. As was Karen Wightman and myself. And then ultimately later on Ric Bailey, Nikki O'Donnell, Jim Gray all saw the program before it was finalized and fed in comments which were addressed.

Page 106

Q. I'm sorry, could you repeat those names, please, because I started writing notes but --
A. Sure.
Q. I got -- I got Lawrence?
A. Laurence Williamson is the pitcher -- what we call the pitcher editor.
Q. Right.
A. He works directly with Matthew Hill.
Q. Okay.
A. He's sometimes in the same room, sometimes remotely, but they are the sort of core editing team. Megan Towey would have been involved in watching early drafts of it and looking at the script with Matthew and feeding in thoughts and corrections if she's thought we got something wrong. And then Neil Breakwell saw the film first, before I did.
Then I'm next in line in terms of the chronology. And then the next person to see it is Karen Wightman after I viewed it several times and fed in my comments. And then after that Nikki O'Donnell, Sarah McColl, sorry, the lawyer forgot to mention her, and Ric Bailey and then Jim Gray, I think, he was maybe the last -- or maybe Ric Bailey was the last person and Jim Gray was the penultimate one.
Q. So Mr. Williamson, Mr. Hill, Ms. Towey,

Page 107

Mr. Breakwell, yourself, Ms. Wightman, Miss McColl, Miss O'Donnell, Mr. Bailey and Mr. Gray, not necessarily in that order.
A. Yeah. The last two may be transposed around but that's -- that's the -- that's pretty much it, yeah.
Q. You mentioned there were drafts. How many drafts of the documentary were there?
A. I think the script numbers go over a hundred. But Matthew saves -- every time he saves a version of the script he gives it a new number. So every time he made -- made several versions a day. So he was constantly updating the script through the production process, I forget exactly how long the edit was, I think, it was ten or 12 weeks of editing.
So there were dozens of versions of the program. It would change hour by hour so if you -- if you count those as individual versions, then, you know, it's impossible to give a fully accurate answer.
Q. So based on your understanding, over a hundred drafts of the documentary?
A. Of the script, yeah, the saved version of the script, I think, he got well over a hundred in terms of the number of -- I can't recall the number for the final script. But, I think, it's well over a hundred.

Page 108

Q. When you say "the script", you're not referring to the documentary as a whole, you just mean the script itself?
A. Yeah.
MR. TOBIN: Object to the form of the question.
BY MR. CORP:
Q. Okay. So over a hundred drafts of the script. Now how about the documentary in its entirety?
A. Do you mean? I mean, again, this is the --
Q. -- let me try to -- let me try to put it in layman's terms. I don't work in your business so I don't, I don't know that whether the script is analyzed in one way and there's drafts of that.
I was assuming that it was just this is the documentary with music, with images, with video, the script, and we're just setting it as we go. So if it's broken down by process then please identify them for me so we can be on the same page as to how many drafts of each item there are.
A. Sure. So the post production process, where they start assembling the clips, they work on -- on a non-linear editing system which is, basically, a computer. And you -- you've got what we call a timeline. And the timeline is populated by all the

Page 109

clips in sequence. So they can -- and then they can move those clips around, they can swap them, they can change them out. They can put new stuff in. They can lay in music.
And that process is a kind of iterative evolving organic process that takes place over weeks and weeks. So in terms of versions of the documentary, there's always a version that's evolving and growing and it's like a living breathing thing and it's getting longer and shorter. In terms of, you know, when I see it, we call that viewing.
So in terms of how many views there were, I think, I have five or six, four or five of my own and then with Karen three or four or five, and then there was some final viewings. So there's probably upwards of a dozen viewings where we sat down and considered the whole documentary. That's clear.
Q. Okay. So from what I've gathered so far, over a hundred drafts of the script. There's a working draft, if you will, of the documentary itself at which point the working draft is presenting in a viewing. Then edited. And then presented, again, in a subsequent viewing. And that's an iterative process until you get to the final version?
A. Yes.

Page 110

Q. Okay. Those individual viewings, are they logged -- saved or documented somewhere?
MR. TOBIN: Object to the form. Answer as best you can.
A. There will be a back up of the editing project which is what we call the software that runs the edit is called Aavid software. And the -- we call it a project which means, basically, the program. So the back up of the project should be I'm assuming it's at October Films because it was edited in their premises. But they -- they had the edit suite. And I'm assuming that all those versions would be you could reconstruct them from the old computer files, if you needed to.
BY MR. CORP:
Q. Earlier in this line of questioning you had given an answer regarding comments that would be given by yourself or someone else.
Do you recall that?
A. Yes.
Q. How would those comments be communicated?
A. Initially verbally. I remember going to the first viewing with Matthew, and we talked a lot about the program and what needed to be done, what wasn't working and what was working. I can't recall the

Page 111

details at this distance, but we had quite a long conversation several hours. And Matthew would have made notes to those conversations.
Q. Other than those verbal communications, any other method by which these comments were communicated?
A. Yeah. Later -- later in the process when the legal and editorial policy colleagues were involved, there would be written notes on email. And sometimes there was an -- there may be annotated versions of the script. I don't -- I can't recall whether we did annotate. Some projects use a annotated script, and some projects people just say Cell 56. Music is too loud. You know, Cell 50 -- 59, change this for something else.
So sometimes it's cell by cell on the script, and sometimes it's annotated directly onto the script. See what I mean? I can't recall how we did it on that project.
Q. And if those comments were annotated on the cells or directly into that current draft of the script, they, to your knowledge, would still be there?
A. Yeah. Assuming that they were, I mean, they were sent by email or an annotated script or, you know, but sometimes I wrote, I mean, I wrote longhand notes onto a paper version of the script in the edit suite.

Page 112

And Matthew may have, you know, I -- as I recall, he made his notes directly onto a paper version of the script. He would then work to implement those notes. And then the scripts were probably thrown away and recycled.
You wouldn't -- you wouldn't routinely keep the old scripts but obviously anything that is communicated on email would be -- would be saved.
Q. Turn your attention to paragraph 18 of your Declaration, please.
A. Yeah.
Q. Let me know when you're there.
A. Yeah, I'm there.
Q. So it states here the BBC did not have contractual rights to and, therefore, it did not broadcast, stream or distribute the documentary in the United States including to any of its partnerships with US Broadcasters.
Do you see that?
A. I do, yeah.
Q. So you are stating with absolute certainty that the documentary was not broadcast anywhere in the United States?
A. Yes.
Q. And what are you basing that -- let me

Page 113

rephrase. How are you certain of that?
A. I have spoken to the people who run BBC Select and BritBox. And they have -- they also deal with BBC.com. I know that they didn't have the right -- they would have had to buy the right from Blue Dot -- Little Dot -- sorry -- sorry -- I'm mixing the two names. They would have had to buy the rights if they wanted to broadcast it, and they didn't.
I've seen the an email from Little Dot that Neil Breakwell sent me which confirms the territories where it had been sold and the US was not one of them.
Q. Are you certain that no American citizen has seen the documentary?
MR. TOBIN: Object to the form of the question.
Answer the best you can.
A. I'm afraid -- I don't know that I can know every American citizen, sir. I got no idea whether somebody in America has seen it or not.
BY MR. CORP:
Q. How about any Florida resident? Do you have any knowledge as to whether -- let me rephrase.
Are you certain that no Florida resident has seen the document?
MR. TOBIN: Object to the form of the

Page 114

question.

A. Again, I don't have -- I need to know every single resident in Florida to be certain, but I can't be certain of that, no.

BY MR. CORP:

Q. At the end of paragraph 18, it states you -- US Broadcasters referring to united States Broadcasters. Do you see that?

A. Yes.

Q. Which broadcasters are you referring to here?

A. Primarily our relationship is with CBS. We have had top relationships with other broadcasters including PBS on a sort of project by project basis. If there had been a relationship with any of those people, then I would have had email correspondence with them. We would have discussed scheduling, timing, when they could show it. If they wanted to make any alterations to it inevitably things get shortened or they want to change things, then they would have to clear that with me. And I've had no correspondence like that at all.

Q. Turn to paragraph 24. Let me know when you're there.

A. Yeah.

Q. So it states here referring to BBC Studios

Page 115

Production Limited and BBC Studios Distribution Limited, that neither had any role in the creation or production of the documentary.

Do you see that?

MR. TOBIN: Ian, I think, you run us into the wrong paragraph.

THE WITNESS: Oh, yeah.

MR. TOBIN: For the record, would you tell him which paragraph you wanted him to look at, please.

MR. CORP: Paragraph 20, gentlemen.

MR. TOBIN: We heard you say 24.

MR. CORP: Oh, no, no, paragraph 20.

THE WITNESS: Okay.

MR. CORP: So are you there?

THE WITNESS: Yeah. Can you just repeat the question?

BY MR. CORP:

Q. I'll repeat it. No problem. So it states neither BBC Studios Distribution Limited nor BBC Studios Production Limited had any role in the creation or production of the documentary.

Do you see that?

A. I do, yeah.

Page 116

Q. How about the editing of the documentary?

A. No.

Q. How about the research of the documentary?

A. No.

Q. How about the -- well, let me rephrase.

From what I gathered so far, Mr. Telling, you're saying that BBC outsourced distribution of the documentary to October Films, and they then licensed it to Blue Ant who then sublicensed it to Little Dot?

MR. TOBIN: Object to the form of the question.

A. Yeah. Again, it's -- it's slightly different than outsourcing. It's -- it's the contractual arrangement when we work with an independent production company that they own the ultimate distribution rights as part of their intellectual property they get from the -- the -- the program.

So yes, October Films have those rights, and they sold them onto the two distributors that we've been discussing, yeah.

BY MR. CORP:

Q. Who at BBC -- let me rephrase.

We're on the same page that BBC had final say on editorial decision making on the content of the documentary, correct?

Page 117

A. Yes, that's right.

Q. To your understanding, could October Films override an editorial decision of the BBC in connection with the documentary?

A. No.

Q. How about Blue Ant?

A. No. I mean, it would -- it should have been written. I haven't viewed the contract, but the understanding I have is that if they want to change anything in the program, they have to come to us with a script in advance and give us a reasonable amount of time. That's all -- I think this is written into the contract, that any changes to the program have to be signed off by me. And that's been the -- I've been through that process several times with other -- with other productions so I know that process works.

Q. In connection with this documentary, did you sign off on any request to change the documentary by October Films?

A. No.

Q. How about Blue Ant?

A. No.

Q. How about Little Dot?

A. No.

Q. So turning to paragraph 21, let me know when

Page 118

you're there.
A. Yeah.
Q. So it refers to an international version of the documentary that was created by October Films.
You see that?
A. Yeah.
Q. Why was an international version of the documentary create -- well, let me rephrase.
Why are you defining this and this Declaration as an international version?
A. Because when you are licensing a film, a large part of the cost of that is the clearance of the archive material. If you want it to be shown worldwide, the cost of the archive clearances is much higher than if you're showing it domestically.
BBC is only really focused on the UK audience and our UK broadcast because often films had the right to a distribution agreement. And they were going to avail themselves of those rights, they have to make an international version which could be -- which for which the archive could be cleared and which generally needed to be shorter because international broadcasters have adverts unlike the BBC.
So they don't want a 59 minute long film. They want a 40 -- they want something that's between,

Page 119

you know, 45 and 50 odd minutes, and they -- so they insist on it being shorter. So you, generally speaking, for any, I know that the Panorama -- the Panorama is a one hour long or 59 minutes long. And they get shortened to be produced for international versions. And that is a standard process. So it gives in parallel -- as we're finishing the main UK broadcasters, which is what we all focused on. And October Films had another edit suite, then another editor and the producer in there, who were tracking our changes to make sure, they editorially aligned. But were also collapsing sections of the program so they could be -- so they could reduce the overall duration of the film.
Q. So in this paragraph 21, it states that this international version of the documentary was created by October Films. When you say "created", can you elaborate on what you mean by that? And the reason I ask for the elaboration is because previously the -- the original documentary was subject to the editorial judgment of BBC and had final say.
Is that the same for the international version that you're describing in paragraph 21?
A. Yes, it is. I still had editorial oversight, the final script version of that, and I reviewed and

Page 120

signed off the 45 minute long version.
Q. Who made the decision to create the international version of the document as you described it here in paragraph 21?
A. Well, the decision was made by October Films then I guess Neil Breakwell would have been involved in that and his immediate superiors because they wanted to exploit the, you know, the rights that they held for the international distribution.
Q. Did they need, to your understanding, BBC's approval in order to do so?
A. No. They didn't need the approval to make the thing itself. But they did need our editorial signoff to make sure it didn't deviate from BBC guidelines or, you know, what our editorial kind of brief was for the rest of the program.
Q. And BBC ultimately gave its editorial approval to trim about 15 minutes of the documentary?
MR. TOBIN: Object to the form.
A. I did sign that version off yes, so yes.
BY MR. CORP:
Q. And when you say "you signed off" was that communicated -- was that something you, actually, signed? Was it an email that you sent green light go ahead or some other form of approval?

Page 121

A. I believe it was on an email. I was sent a final link like a remote viewing link which I watched the documentary and I compared it -- and I watched it alongside the script, and then I sent them an email saying I was happy with the final version.
Q. Why did the international version exclude President Trump's speech on January 6, 2021?
A. They were short for time, and they needed to collapse a several version -- several sections of the film had to be crunched down. And that was one of the sections that was crunched down. And the essential point we're driving to was to do with the court cases that he was facing. So they found a different clip that bridged the gap for them and -- and worked editorially for us. So everyone was happy with the edit.
Q. Any other reason?
A. Not that I'm aware of no, just the time.
Q. Turn for me, please, to paragraph 24 of your declaration. Let me know when --
A. Yeah.
Q. So take a moment to review it, let me know when you're done.
A. Yeah.
Q. It states here Little Dot Studios which

Page 122

acquired the rights after President Trump's 2025 operation, never broadcast or otherwise published a documentary in the United States due to other programming priorities.

Do you see that?

A. Yeah.

Q. How do you know that statement to be true?

A. I believe that's, again, from an email sent to me showing Little Dot's licensing arrangements and I'm aware spreadsheets of places where the program could have been sold. And the conversation, I think, it goes with Neil Breakwell about the reasoning.

Q. Looking at the next sentence where it states Little Dot placed a restriction on its internal rights management system preventing any future broadcast to the documentary.

Do you see that?

A. Yeah.

Q. How do you know that to be true?

A. I think that was in a phone call with Neil Breakwell.

Q. Any other basis for that statement?

A. I think subsequently our legal team have looked at it.

MR. TOBIN: Please don't disclose anything further about any information that you may have heard from Counsel.

Page 123

BY MR. CORP:

Q. So other than that conversation and whatever your attorneys may have told you, that's the extent of your basis for this statement? And, again, I'm not asking you to reveal anything that your attorneys communicated to you.

A. Yeah, That's right.

Q. Twenty-five, let me know when you're there?

A. Yeah.

Q. Take a moment and read and once you're done if you could, please, answer how you know this statement to be true.

A. Yeah. I joined a teams call with colleagues who work across BBC BritBox and Select, Allmusic.com in the US and asked them about possibility for it being distributed by them. I think they were offered it and they declined or they just didn't respond to it.

I think there's a positive note from them that they were offered a list of programs and they just didn't get back about that particular one. So they confirmed that they never been available. They never had any licenses for it.

Q. Who participated on this meeting?

Page 124

A. I had to refresh my memory from the -- from the meeting calendar invite because I can't now recall the name. And there were -- some of our legal team were on the call as well.

Q. Twenty-six of your Declaration, let me know when you're there.

A. Yeah.

Q. It states at the end, I will read the whole thing. If a documentary was ever posted on YouTube or another platform publicly accessible in Florida, that would have been wholly unauthorized by the Defendants.

You see that?

A. Yeah.

Q. Specifically on the phrase "wholly unauthorized". Is there a specific policy or procedure of BBC that you're referring to?

A. Yeah. It happens a few times where people have posted copies of Panoramas on YouTube or on other sites. And there's a team of the BBC that specialize in getting those things taken down. And if we're alerted to it, we'll ask them to get in touch with -- with whichever platform it's on and ask them and take it down.

Q. Would that apply as well to the other two Defendants that are in this case?

Page 125

A. I don't know what their procedures are. I'd be -- yeah, I couldn't tell you what their procedures are, but by anyone else, they want to protect their intellectual copyright.

Q. All right. To your knowledge, have there been any changes in BBC's editorial standards and guidelines in the last 12 months?

A. Yeah. A new version came in on the back end of last year. I think it was slightly revised version.

Q. And when you say the back end of last year 2025, can you be more specific?

A. Not really, it's a -- it's -- I think, it's about September/October time.

Q. Okay. They have not been updated since then?

A. No.

Q. To my knowledge before this 2025 amendment for lack of a better phrase, when was the last time before that, that BBC's editorial standards and guidelines were updated?

A. It's several years -- many years possibly after ten years. I can't recall. But it's a good number of years. Certainly goes way back beyond from what I can recall, certainly way before I started when I became the executive producer.

MR. TOBIN: Might we take a break. It's been

Page 126

two hours.
MR. CORP: I was going to say that's a good idea because I may be wrapped up. So let's take five. If anything, meet back at 12:40 my time and that would be what 6:40 your time?
MR. TOBIN: Yeah. If we can make it ten, if you don't mind?
MR. CORP: That's fine. Let's do 6:45 your time.
MR. TOBIN: Sounds great. Thank you.
(Break taken at 12:33 PM)
MR. CORP: Okay. I don't have any further question for you at this time, Mr. Telling, thank you for your patience today.
MR. TOBIN: I'm going to ask you just a few questions if you will indulge me for a few more minutes.

CROSS EXAMINATION

BY MR. TOBIN:
Q. Mr. Telling, you recall Mr. Corp asking you questions about where the production team that came to the United States traveled?
A. Yeah.
Q. Do you remember you testified that they traveled to Ohio and Washington DC?

Page 127

A. Yeah.
Q. And you remember there was a, you testified that there was a third location that they went to.
A. That's right.
Q. You could not remember the name of that location.
A. Yeah.
Q. Is that correct?
A. Yeah. That's right. The time he asked me the question, yeah.
Q. Have you since recalled it?
A. Yeah. It was South Carolina.
Q. Okay. Thank you.
And so does your testimony stand that from everything you know in your role as executive producer and overseeing the documentary for the BBC, that no one traveled into the State of Florida to gather news for this documentary?
MR. CORP: -- objection. Leading.
THE WITNESS: -- yeah.
MR. CORP: -- objection. Leading. Go ahead.
MR. TOBIN: This is Cross Examination, Counsel.
MR. CORP: Of your witness, Mr. -- Mr. Tobin. Go ahead.

Page 128

BY MR. TOBIN:
Q. Are there any other states -- I'll rephrase. Are there any other states based on your knowledge as the overseeing executive here at the BBC, are there any other states other than Ohio, South Carolina and Washington DC that the crew traveled -- traveled to -- to gather information for this documentary?
A. No.
Q. Okay. We're going over -- Counsel was asking you questions about paragraph 13 of your Declaration. You can take a look at that for one moment.
A. Yeah.
Q. Paragraph 13 is the area where you addressed the sources of some of the material referred to in the President's Complaint in this case.
You are aware of that?
A. Yes.
Q. Okay. Can you tell me everything you did to gather the information in paragraph 13 that's in this Declaration?
A. Yeah. So I spoke with Matthew Hill, and I spoke with Paul Alexander who was the archivist involved in sourcing the material. And then I viewed the paperwork that was provided by October Films.
Q. And I don't think we've talked about Paul

Page 129

Alexander at any length. Who is he?
A. Paul is an in-house BBC archive producer, and he was, again, he was on a loan out to comment for October Films. So he was sorting the material. And ultimately October Films would deal with the copyright and pay for the clearances.
Q. Okay. So was it Mr. Alexander's role, do I understand you to say, to identify the material that needed to be licensed?
A. Yeah. He ran that spreadsheet that I was referring to about what status each clip would have and how much it would cost to clear. So he was very involved with the whole process of finishing -- finishing the programs.
Q. Okay. And he and you both worked for BBC?
A. Yeah.
Q. At the time of this Declaration, you had a conversation with him and this reflects information that you gathered from him?
A. That's right, yes.
Q. And from Mr. Hill?
A. That's right.
Q. And your review of the documentation pertaining to the documentary?
A. That's right, yes.

Page 130

Q. Including a schedule of information?
A. I didn't review the archive log. But I did review the things that were provided where we had license that was of Florida. That's specific to Florida rather than the whole archive log which is an enormous document.
Q. You have any awareness of when each of the information, each of the images reflected in paragraph 13A through F were filmed with respect or in comparison to when the first meetings occurred to discuss making the film Second Chance?
A. Yeah. They were -- I think certainly the Mar-a-Lago was filmed before we even thought about the idea of making a program. So that was months before we even had first discussions. I don't know about the date of the TikTok stuff, but I assume it must be the same date. It's off the event at Mar-a-Lago. It may be that the wide angle shot may be more recent than that because it's -- it doesn't depict the moment in time. It's just a general view --
Q. Sure.
A. -- of the state. So I couldn't attest to that. But certainly the Front Row Joes that is at least two months and, you know, before we even began discussions. So it couldn't have been -- we wouldn't

Page 131

have commissioned anyone to do that because we didn't have a program at that point.
Q. Okay. Thank you. Of your knowledge, did the BBC broadcast, stream or otherwise transmit the film Second Chance into the United States?
A. No, it didn't, I mean, that's part of my role when programs are going out in other territories to know about this and be involved in that process, and that I didn't ever have any information it's going to be broadcast in America.
Q. Do you have any information that it was broadcast in America?
A. No.
Q. What is your belief with respect to whether it was broadcast in America?
A. From all the inquiries I made and searches, you know, I can't -- there's no -- there's no evidence that I can find or see that it was broadcast --
Q. -- that the BBC ever broadcast --
A. -- yeah. That the BBC -- the BBC wouldn't have broadcast it. I would have been involved in that process.
Q. You would know to a certainty whether that happened?
A. Yeah. Because I would have to sign off on a

Page 132

version of the BBC to broadcast it.
Q. And so if I asked you the same series of questions as Florida whether it was the BBC broadcast streamed or otherwise transmitted -- did the film make it to Florida, what would your answer --
A. -- it would be the same, actually, no communication or correspondence or anyone has spoken to me about it being shown in Florida.
MR. TOBIN: Okay. I have no further questions.
MR. CORP: Nothing further at this time. Mr. Telling, thank you.
MR. TOBIN: All right. Thank you, Ian, very much. Can we go off the record for a second. I just have question for you.
MR. CORP: Sure. Ms. Heagney, we'll take a rough, please.
MR. TOBIN: We'll take a rough as well, and if they order -- when they order, we'll read and sign.
(The Oral Remote Videoconference Deposition ended at 12:57 PM)

Page 133

CERTIFICATE OF OATH
(VIDEOCONFERENCE PROCEEDINGS)

STATE OF FLORIDA)
COUNTY OF LONDON)

I, Janie S. Heagney, Florida Professional Reporter and Notary Public, State of Florida, certify that LEO TELLING appeared remotely before me via Zoom Videoconference on the 15th day of April, 2026 and was duly sworn.

WITNESS my hand and official seal this 27th day of April, 2026.

Janie S. Heagney

Janie S. Heagney
Florida Professional Reporter
Notary Public, State of Florida

Personally known ____________
Produced Identification - Yes
Type of Identification Produced - Work ID

Page 134

CERTIFICATE OF REPORTER

STATE OF FLORIDA)
COUNTY OF LONDON)

I, JANIE S. HEAGNEY, Florida Professional Reporter, do hereby certify that I was authorized to and did stenographically report the Oral Remote Videoconference Deposition of LEO TELLING, that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 136, is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor financially interested in the action.

Dated this 27th day of April, 2026.

[signature]
JANIE S. HEAGNEY
Florida Professional Reporter

Page 135

April 27th, 2026
CHARLES D. TOBIN, ESQ.
Ballard Spahr, LLP
ballardspahr.com
In Re: President Donald J. Trump, an individual vs. British Broadcasting Corporation et al

Dear Mr. Tobin:
For your convenience, attached hereto you will find an Errata Sheet for the use of LEO TELLING in entering any changes to the deposition, taken Wednesday, April 15th, 2026.

Please photocopy the executed document and forward a copy of the executed document to all counsel involved in this matter for placement in the transcript.

If no changes are to be noted, please indicate that on the Errata Sheet and forward a copy to all counsel so they may be advised that no changes were made.

We find that the above procedure facilitates handling of the signature matter and puts the necessary documents directly into the hands of counsel.

Thank you for your prompt attention to this matter.

Very truly yours,
[signature]
Janie S. Heagney, court reporter
cc: Ian Corp, Esq.

Page 136

Re: PRESIDENT DONALD J. TRUMP, an individual vs. BRITISH BROADCASTING CORPORATION a/k/a BBC, BBC STUDIOS DISTRIBUTION LIMITED, and BBC STUDIOS PRODUCTIONS LIMITED

April 15th, 2026/LEO TELLING

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE____________________
______________________________________________
REASON________________________________________
PAGE_____ LINE_____ CHANGE____________________
______________________________________________
REASON________________________________________
PAGE_____ LINE_____ CHANGE____________________
______________________________________________
REASON________________________________________
PAGE_____ LINE_____ CHANGE____________________
______________________________________________
REASON________________________________________
PAGE_____ LINE_____ CHANGE____________________
______________________________________________
REASON________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________          ___________
(LEO TELLING)                     Date

**Exhibits**

**EX 0001 Leo T elling 041526**
33:9,11 47:4,5,6,11, 23 48:25 49:1,6 95:10,16
**EX 0002 Leo T elling 041526**
49:10 55:14, 20 62:25

**$**

**$**[redacted]
32:20

**-**

**--julia**
88:19

**1**

**1**
33:9,11 47:4,6,11,23 48:25 49:1,6 95:10,16
**10**
55:21
**10:21**
51:7
**10:30**
51:2
**11**
92:13
**12**
93:6 107:15 125:7
**12:33**
126:11
**12:40**
126:4
**12:57**
132:22
**13**
46:24 48:7, 22 49:8 95:2,6 102:1 128:10,13,19
**13A**
96:21 130:9
**13C**
100:4
**13D**
100:24 101:2
**13E**
101:23
**14**
103:6,13
**15**
104:1,19 120:18
**18**
112:9 114:6

**2**

**2**
49:10 55:14, 20 62:25 63:2
**20**
115:11,13
[redacted]
31:6,12
**2003**
8:7
**2020**
8:9,11
**2021**
8:13,14,20 11:15 13:24 14:6,12 104:5 121:7
**2023**
64:10
**2024**
95:14,22 96:1,7,11,15 97:4
**2025**
122:1 125:11,16
**21**
117:25 119:15,23 120:4
**22**
42:18
**23**
42:18 43:5
**24**
114:22 115:12 121:19
**25**
24:5
**28th**
95:14 97:3

**3**

**3**
61:5 96:17
**30**
103:2
**3:30**
51:2

**4**

**4**
9:14 56:13
**40**
118:25
**45**
119:1 120:1

**5**

**5**
9:14 33:13 57:5 58:1 96:17
**50**
111:13 119:1
**56**
111:12
**59**
111:13 118:24 119:4
**5th**
95:22,25 96:7,11,15 97:4

**6**

**6**
9:14 57:10 58:2 121:7
**6:40**
126:5
**6:45**
126:8
**6th**
104:5

**7**

**7**
74:14

**8**

**8**
74:14

**A**

**A-LEVEL**
21:11
**Aavid**
110:7
**abide**
86:10
**able**
47:17 100:23

101:5
**above**
12:6,9,12 16:6
**absolute**
112:21
**absolutely**
92:21 97:15
**acceptable**
6:2
**access**
55:10 99:4
**accessible**
124:10
**accommodate**
5:4
**accordance**
4:3
**account**
34:13 35:23
**accounting**
45:13
**accounts**
95:20
**accurate**
30:6 81:6 104:17 107:19
**accurately**
52:19
**acknowledge**
37:12
**acquired**
122:1
**acronym**
70:9
**across**
32:10 39:4 84:16 90:22 94:20 123:16
**acting**
11:17
**Actively**
47:2
**actual**
58:15
**add**
103:15
**adding**
38:15 66:11
**addressed**
27:8 105:25 128:13
**advance**
117:11
**advantage**
53:23
**adverts**
118:23
**advice**
101:20 102:11,19,20
**affair's**
35:9
**affairs**
68:21
**afford**
87:10
**afraid**
15:16,17 67:21 84:4 113:17
**afternoon**
4:10 38:2
**afterward**
28:9
**age**
4:2
**agree**
38:7 41:17 56:8 69:17
**agreed**
5:22 35:7
**agreeing**
17:25
**agreement**
17:14,20 18:9 32:4,9 34:14,24 35:3,19,24 37:10,11,15 42:24 43:2, 15 45:22 46:8 48:12 49:16 53:9, 10,20 86:10 91:18 101:6, 12 118:18
**agreements**
18:24 27:14 34:11
**ahead**
9:20 14:23 21:1 24:10 36:9 42:20 58:11 59:4 69:8 73:23 89:5 100:11 120:25 127:21,25
**aiming**
71:21
**alert**
72:6
**alerted**
124:21
**Alexander**
99:21 128:22 129:1
**Alexander's**
129:7
**aligned**
119:11
**allegations**
66:18
**Allmusic.com**
123:16
**allow**
20:17
**allowing**
68:8
**allows**
99:3
**alongside**
121:4
**alterations**
114:18
**altering**
77:10
**ambit**
19:15
**amendment**
125:16
**America**
40:16 41:2, 6,8,15 113:19 131:10,12,15
**American**
113:12,18
**amount**
31:20 64:16 117:11
**analyzed**
108:13
**angle**
130:18
**annotate**
111:11
**annotated**
111:9,11,16, 19,23
**answer**
4:19,22 5:7, 8 14:4,23 16:1 21:2 26:12 29:6, 22 35:1 37:7 38:21 41:10, 24 49:9 52:1 56:25 57:2 58:16 60:10 62:19 64:25 77:18 80:19 81:19 84:19 85:1,3 90:21 91:3 92:3 94:17 98:14 107:19 110:3,17 113:16 123:13 132:5
**answered**
25:8 69:8 81:19
**answers**

57:7 74:6 76:8
**Ant** 42:8,16,24 43:3,6,16 44:11,12 116:9 117:6, 21
**anticipated** 58:9
**anybody** 6:24 51:10
**anymore** 6:16 41:11
**anyone** 7:13,16 12:4,11 16:6 20:22 22:20 25:12 29:1 50:12 53:1, 24 55:2,17 60:15,17,21 61:10,23 62:7,9,16,20 72:6 73:5,10 76:18 89:22, 24 90:3,25 91:14 94:11 105:5,10,13 125:3 131:1 132:7
**apart** 76:1
**apologies** 32:24 39:20
**apologize** 25:9 38:13 41:4 67:23 70:6 74:10
**appeals** 19:7
**appetite** 66:24
**applies** 19:14
**apply** 83:8 124:24
**appointed** 16:3
**appropriate** 5:18
**approval** 6:5 64:23 69:3 71:16 102:7,15 120:11,12, 18,25
**approve** 26:22
**approved** 63:6 65:19, 25 102:1,3
**archive** 10:21,22 45:23 46:9, 21 47:15 48:4 49:4,5, 17 99:20,21 102:10 118:13,14,21 129:2 130:2, 5
**archives** 99:3,13
**archivist** 97:15 99:17 101:21 102:23 128:22
**archivists** 10:21 11:6 98:25
**area** 31:22 128:13
**arm** 39:10
**around** 8:16 15:2 31:11 35:6 64:10 66:5,8 70:17 87:13 107:4 109:2
**arrangement** 37:17 100:19 116:14
**arrangements** 122:9
**arranging** 54:21,23
**arrive** 31:7
**asked** 5:9 16:19 69:8 81:19 85:7 91:2 92:20,25 93:4 98:4 123:17 127:9 132:2
**asking** 4:20 22:3 32:9 39:24 50:5 57:25 61:18 90:23 123:7 126:20 128:9
**asks** 60:7 61:2
**aspect** 31:24
**assemble** 104:22
**assembles** 104:25
**assembling** 108:22
**assist** 10:2,16,20
**assistant** 10:1 11:3
**associated** 24:23
**assume** 74:20 77:13, 15 130:16
**assuming** 98:3 100:20 108:15 110:9,12 111:22
**attending** 79:16
**attention** 33:12 52:7 56:14,25 60:3 63:4 67:3 81:24 86:23 87:2 90:4 92:13 93:9 95:7 96:9 100:4 103:5 112:9
**attest** 130:22
**attorney** 5:13 35:13
**attorney-client** 51:21
**attorneys** 4:8 5:5 123:5,7
**audience** 67:7 118:16
**audiences** 19:8
**avail** 118:19
**available** 44:5 45:11 55:17 123:23
**aware** 13:2 24:15, 21 25:3,23 27:21 78:1 79:12 121:18 122:10 128:16
**awareness** 130:7
**awkward** 32:11

**B**

**back** 7:12 8:8,12,

14 16:9 21:8 22:2 25:7 27:16 28:3 31:18 34:19 39:8 51:1 55:4 60:12, 23 62:22 64:3 65:2 67:22,25 68:16 74:4,8 78:3 84:3,14 85:19 89:18 90:4 91:10 96:21 110:5, 9 123:22 125:8,10,22 126:4

**backwards**
105:1

**Bailey**
105:9,23 106:22,23 107:2

**Baldwin**
88:25 89:1, 10,19

**barrister**
35:16

**based**
4:19 19:4 24:5 44:2 45:10 75:11 76:7 77:8 84:10 85:8 90:17 98:18, 23 99:7 101:14 103:19 107:20 128:3

**bases**
9:18

**basically**
12:5 29:9 108:23 110:8

**basing**
63:9 90:12, 13 112:25

**basis**
23:9 31:25 57:21 58:17 86:10 99:3 103:13 114:13 122:22 123:6

**BBC**
6:20,21 7:10 8:6,9,10,18, 25 12:7,13 17:7 18:10, 13,20 19:10, 24 20:21 22:14,25 23:15,16,17, 20,22 24:6, 23 25:3 26:5,14 27:10,18,19, 23,25 28:2, 5,16 29:19 30:1 31:1 32:2,19 34:2,10 35:9 36:5 37:3,24 38:1,6,8,14, 22,23,25 39:1,3,4,8, 10,17 40:4, 15,25 41:4, 6,8,13,15,16 42:4,6 44:4, 5,21 48:9 51:24 52:12 53:4,6,7,19, 21 57:7,8 60:8,10 61:2,10 62:5,13 63:6 69:5 74:20, 25 75:1,6 76:7 81:5 83:14 85:14 86:9 87:21, 24 88:2 93:11,16 96:21 100:12,18 101:5,12 102:1,3,12 112:14 113:2 114:25 115:1,20 116:7,22,23 117:3 118:16,23 119:21 120:14,17 123:16 124:16,19 127:16 128:4 129:2,15 131:4,19,20 132:1,3

**BBC's**
28:22 33:17 36:7 37:20 55:15 56:5 74:6 86:12 120:10 125:6,18

**Bbc.com.**
113:4

**BBC1**
69:1

**bear**
12:18 32:7 55:21

**Becky**
88:20,22

**began**
130:24

**beginning**
88:7

**begins**
57:1 59:6 60:4

**begun**
97:24

**behalf**
4:10 17:7 36:5

**belief**
131:14

**believe**
12:16 25:2 39:5 44:10 55:11 75:11 80:25 81:14 84:9 89:13 100:17 105:14 121:1 122:8

**belong**
93:16

**below**
44:2

**benefit**
11:20

**best**
14:4,5 16:1 26:12 29:6, 22 35:1 36:10,11 37:7 38:21 41:24,25 57:18 64:25 77:18 80:19 81:19 84:18 90:21 92:3 94:17 97:14 98:14 110:4 113:16

**better**
28:11 61:19 62:7 68:7 85:13 89:14 125:17

**big**
10:10 94:22, 23

**bill**
31:16

**bit**
4:16 5:13,14 12:19 22:25 25:6 27:15 31:23 32:10, 22 37:24 39:24 45:7 75:5 78:16 79:9,12 95:6

96:5 102:15
**bits**
35:2 73:15
**block**
19:22 20:21
**blocking**
20:3
**Blue**
42:8,16,24 43:3,5,16 44:11 113:5 116:9 117:6, 21
**board**
16:7
**bodies**
39:12
**body**
40:20
**booker**
55:6
**booking**
10:17
**boots**
85:13
**boss**
12:5
**bottom**
57:5 96:6
**box**
96:6
**break**
5:1 51:7,9 58:25 125:25 126:11
**breakout**
51:11
**Breakwell**
29:16 44:10, 19 46:7 49:15 52:25 53:1 59:7 63:11,22 64:9 65:11, 12,14 67:17, 18 73:4 74:2 76:17 77:22 82:21 86:2,4 87:1 88:10 89:21 91:18 94:18 106:15 107:1 113:10 120:6 122:12,21
**Breakwell's**
86:23 93:18 94:14
**breathing**
109:9
**bridged**
121:14
**brief**
59:13 102:2, 3 120:16
**briefly**
37:23 60:3
**bring**
31:20
**Britbox**
113:3 123:16
**British**
8:4
**broadcast**
17:4 19:13 29:24 31:2 32:20 59:18 61:3,11,21 62:4 72:10 84:24 95:14 97:2,24 98:1 101:16 112:16,22 113:8 118:17 122:2,15 131:4,10,12, 15,18,19,21 132:1,3
**broadcaster**
18:25 19:2 99:4
**broadcasters**
16:22 17:3,4 19:13 101:17 112:18 114:7,8,10, 12 118:22 119:8
**broadcasting**
8:4 39:9 42:7 60:1
**broken**
108:18
**brought**
86:23
**budget**
19:6 31:16, 18,19 87:10 88:6,9,17 89:12 94:23
**budgetary**
10:14
**budgeting**
9:5
**budgets**
37:14
**building**
24:23 36:11, 16 63:11 94:24
**bureau**
23:11 24:2,3 25:1 75:12, 14
**bureaus**
22:25 23:15, 23 25:3
**Burgess**
13:23
**business**
35:9 40:14 44:4,21 108:12
**buy**
19:10 113:5, 7
**buys**
19:10

**C**

**c-h-i-p-s**
70:8
**calendar**
124:2
**call**
5:2 30:9 31:10 53:8 70:8 77:24 78:14 90:25 106:6 108:24 109:11 110:6,7 122:20 123:15 124:4
**called**
42:15 69:11, 14 110:7
**calls**
24:8 41:23 51:21 65:3, 7,8 77:25
**camera**
5:13
**capture**
32:16 46:14 80:3
**Carolina**
127:12 128:5
**Carr**
13:14,15,17 65:23 67:24 68:7,13,19 69:15 71:6
**carry**
71:25
**cars**
78:23
**case**
15:5 17:12 23:8 27:18 29:1,20 30:25 32:3 33:18 52:2, 4,13 66:20

72:4 95:13 104:3 124:25 128:15
**cases** 121:12
**CBS** 100:11,18,23 114:11
**Celebro** 48:11
**cell** 111:12,13,15
**cells** 111:20
**centered** 66:5
**central** 66:17
**certain** 19:20 80:7, 23 113:1,12, 23 114:3,4
**certainly** 125:22,23 130:12,23
**certainty** 112:21 131:23
**chain** 13:9
**chair** 12:7 16:7
**chairman** 6:13,17,20 12:16
**Chance** 33:19 130:11 131:5
**change** 71:15 72:9 107:17 109:3 111:13 114:19 117:9,18
**changed** 71:9
**changes** 70:21,22 71:1 72:2 117:13 119:11 125:6
**changing** 37:13 71:23
**channel** 69:11,17 70:10
**charge** 89:16
**chart** 57:9 58:1 60:12,15,20 61:6,12 62:2,6,8,11, 15,18
**check** 17:20 30:19
**checking** 87:15,25
**children** 21:21
**chips** 69:11 70:8, 12 71:4,7,17
**Chloe** 73:12,17 76:4,5
**Chris** 79:4 84:8
**chronological** 59:2
**chronology** 106:18
**Chuck** 7:3 33:8
**circumstances** 101:17
**citizen** 113:12,18
**clarification** 17:1
**clarify** 74:5
**clean** 75:4,5
**clear** 5:11 18:1 38:17 61:17 103:19 109:17 114:20 129:12
**clearance** 118:12
**clearances** 118:14 129:6
**cleared** 118:21
**clearing** 10:22
**clearly** 5:15
**click** 46:9
**clip** 97:18,20 121:13 129:11
**clips** 45:23 46:9, 21,23 47:15 48:4,9 49:4, 5,17 102:10 104:22,25 108:22 109:1,2
**closed** 73:24
**closely** 73:25
**closer** 48:17
**Co-pro** 18:24
**co-production** 27:11 28:23
**co-productions** 16:23
**Coast** 24:12
**coding** 21:17,18
**collapse** 121:9
**collapsing** 119:12
**colleague** 4:9
**colleagues** 35:10 111:7 123:15
**come** 16:17 25:24 30:18 31:18 32:10 34:6 54:3 56:3 57:18 64:1, 20 71:16 82:15 86:6 117:10
**comes** 18:25 19:18 39:8
**comment** 129:3
**comments** 49:25 67:21 105:25 106:20 110:17,21 111:5,19
**commercial** 53:22
**commission** 18:5 30:8 42:14 59:9 65:21 67:24 70:13
**commissioned** 64:2 65:18, 20 66:2 68:18 69:5 70:19,21 72:3,9 131:1

**commissioner**
71:6
**commissioning**
12:9,12
13:6,8,13,16
58:15,22
59:1,15,22
60:19 68:21,
23,25 71:11
**committee**
69:21 70:5
**communicate**
26:17 38:12
**communicated**
67:25 110:21
111:5 112:8
120:23 123:8
**communication**
132:7
**communications**
111:4
**companies**
16:19 17:3
**company**
17:22 18:1
26:15 29:10
30:11,14,23
31:15 34:5
36:20 37:9
39:14 42:15
45:20 53:14,
17,18,21
89:15 116:15
**compared**
121:3
**comparison**
130:9
**Complaint**
128:15
**complete**
61:23
**completed**
66:23
**completely**
71:23
**completion**
10:6
**complex**
38:23
**complexity**
97:13
**complicated**
12:8
**complied**
34:23
**complying**
36:6
**computer**
21:9,11,14,
17,19 55:24
56:1 108:24
110:13
**concern**
27:3 67:6
**concerned**
27:5 29:19
**concerns**
22:25 23:6
26:14 29:8,
23 30:18
**concluded**
5:20
**conclusion**
5:25 41:24
**conducted**
72:22 77:9
78:6,9 79:7
**confidential**
5:24
**confirm**
42:4 80:16
96:19
**confirmed**
11:18 123:23
**confirms**
113:10
**conflating**
92:6
**Congressman**
84:19
**connected**
38:1 77:3
**connection**
32:3 44:8,22
49:20 63:22
73:6 74:20
80:24 85:14,
23 91:16
93:23 117:3,
17
**consciousness**
25:25
**consideration**
94:23
**considered**
109:16
**consist**
10:7 76:22
**constantly**
107:13
**consulted**
94:21
**consumed**
67:13
**contact**
26:1 43:14
86:3 87:17
88:13 89:2,
17,19,21,22
93:3
**contacted**
91:14 98:4
**contains**
49:1 95:6
**content**
18:14 19:16
22:22 25:11,
19 26:8
28:4,17
38:25 39:1,
3,6,19 40:8
41:6 65:3
116:24
**contents**
50:7
**continent**
85:25
**continue**
62:1
**continues**
97:10
**contract**
17:13 30:17
36:24,25
59:13 75:6
87:13
100:15,21
101:19
117:8,13
**contracted**
74:20,24
75:1
**contractor**
36:14,18
83:14
**contracts**
17:7,11
**contractual**
25:23 35:10
59:8 93:20
112:15
116:13
**Contractually**
86:8
**contributions**
54:18
**contributor**
19:19
**contributors**
27:5 35:7
54:22 71:22
72:12 76:24
**control**
37:13 80:3
**controller**
69:17
**conversation**
22:11 29:15
64:15 80:21
87:16 94:11
102:17 111:2
122:11 123:4
129:18
**conversations**
29:17 59:6
90:3,13 92:7

98:25 111:3
**Cooper**
25:17 26:2,4
**copied**
50:20 89:25
**copies**
124:18
**coproduction**
27:12
**copy**
33:4,7
55:15,17,23
56:9 68:16
**copyright**
20:15 30:12
125:4 129:5
**copyrights**
30:15
**core**
10:19 11:1,2
82:11,14,16
106:11
**Corp**
4:6,8 6:3,7
11:21 12:1
14:7 15:3
17:5 20:10
21:3,7 23:21
24:10,14,20
26:20 28:15
29:18,25
30:22 33:1,
8,12,16
35:11 37:2,
18 38:11,20
39:21 40:10,
21 41:3,20
42:2 44:25
45:5 47:9,
21,22 48:1,
18 50:5,10,
16,25 51:6
52:6,21
55:13 56:7,
10,17,19
58:7,11,18
61:15,17,25
62:22 63:1
65:9 67:14
69:19 74:13,
16 78:2
80:22 81:9,
15,23 89:7,9
91:4 92:12
95:1 98:17
99:6,16
103:1,4,18
108:7 110:15
113:20 114:5
115:11,13,
15,18 116:21
120:21 123:3
126:2,8,12,
20 127:19,
21,24
132:11,16
**Corporation**
8:4 38:9,25
39:9 42:7
**correct**
8:23 11:11,
12 13:10,20
18:7 20:25
28:23 32:5
35:13 40:5
53:11 58:23
60:2 65:13,
16 68:4 76:4
79:17 81:11,
17 85:9 88:6
91:6 95:14
96:24 98:11
116:25 127:8
**corrections**
106:14
**correctly**
20:4 32:16
46:14 64:5
**correspondence**
26:22 27:8
28:19,22
44:12,18
45:19,21
71:4 92:5
114:15,20
132:7
**cost**
97:21
118:12,14
129:12
**counsel**
7:10 33:4
50:4,11,22,
23 51:24
123:2 127:23
128:9
**count**
107:18
**counterparties**
101:13
**countries**
23:2,16
**country**
20:22 94:6
**course**
6:1 38:20
44:4,21
61:15 86:12
**court**
6:5,13 11:20
16:25 36:20
48:14,16
121:12
**cover**
9:18
**coverage**
66:8
**covered**
83:14
**create**
31:18 118:8
120:2
**created**
96:22 102:9
118:4
119:16,17
**creation**
39:1 115:2,
21
**creative**
105:18
**credit**
54:16 55:4,
8,11
**credited**
53:25 54:14
**crew**
128:6
**cross**
89:8 126:18
127:22
**crosstalk**
54:11
**crunched**
121:10,11
**cumbersome**
32:10
**curious**
41:10
**current**
68:21 111:20
**customer**
96:5
**cut**
84:24

## D

**Dan**
69:14
**date**
64:11 95:22,
25 96:7,11,
14 98:4
130:16,17
**Davies**
15:11
**day**
89:11 94:4
95:15 98:10
107:12
**day-to-day**
21:14 57:21
88:8,9,16
94:19
**days**
83:18

**DC**
24:2 75:11, 14 78:16 79:7,8 84:10,21 85:6 94:1 126:25 128:6
**deal**
35:10 41:6 113:3 129:5
**dealing**
10:12 16:17 19:2
**Deborah**
14:14
**December**
96:7
**decide**
102:12
**decision**
20:25 21:24 22:1,7,10,21 25:11,19 26:7,10 28:4,7,10 29:3 65:21 67:25 69:2 116:24 117:3 120:2,5
**decisions**
25:14
**deck**
46:10 49:17 63:16,18,21
**decks**
64:6
**declaration**
18:9 32:5 33:1 36:1 42:18 43:19 44:9,22 45:18 46:24 47:4 48:7 49:20,22 50:11,18 52:8 62:23 63:19 72:19 78:4 81:25 90:5 91:17 92:14 104:1, 12 112:10 118:10 121:20 124:5 128:10,20 129:17
**declined**
67:24 123:19
**decommission**
71:12
**Defendant**
38:8
**Defendants**
27:18 38:10 124:11,25
**defined**
33:19
**defining**
118:9
**delayed**
85:1
**delivered**
9:6
**department**
13:4,5,6,13, 16
**departure**
71:19
**depending**
31:11,13 97:13
**depict**
130:19
**depicting**
104:4
**deployments**
94:20
**deposition**
4:12 6:9 7:14,20,24 33:10 132:21
**depositions**
5:23
**deputy**
12:10,14 13:4,5,14, 20,22
**describe**
8:24 36:2 53:12
**described**
38:1 98:9 99:18 120:3
**describes**
48:2
**describing**
62:3 119:23
**description**
84:6
**detached**
98:10
**detail**
27:4 66:16
**detailed**
18:3 74:2 84:4
**details**
94:21 111:1
**determine**
22:21 25:11, 19 29:3
**determines**
22:3
**developed**
67:16
**development**
57:9,21 58:13,14,23 59:5,10,22 60:18 62:14 75:17 86:19 87:6
**developments**
58:3
**deviate**
120:14
**deviation**
71:5 72:17
**different**
20:4,17 23:16 41:17, 25 64:6 73:13 75:19 86:16 116:12 121:13
**differently**
71:14 74:18
**Digital**
26:4
**direct**
4:5 9:11 12:5 26:16 47:19 56:25 75:25 90:23 91:2
**directed**
79:11 95:20
**directing**
9:23
**direction**
71:23 80:3
**directly**
10:16 11:5,6 23:19 63:5 73:6 82:19 92:20 106:8 111:16,20 112:2
**director**
9:21 10:2,3 12:11,15,16 13:20,22 14:9 15:7,8, 12,20,24 16:4,6 26:4
**directors**
10:8
**directs**
60:11
**disappoint**
58:10
**disciplinary**
36:23
**disclose**
50:3 122:25
**discontinuous**
99:24
**discovered**
43:13

**discrepancy**
97:14
**discuss**
31:24 51:16
52:3 130:10
**discussed**
27:2 49:17
51:17 63:6,
14,22 64:19
78:6 91:23
103:7,8,14
114:16
**discussing**
25:1,7 39:2
59:9 62:24
116:20
**discussion**
5:19,25 6:4
64:8,12,23
103:3
**discussions**
5:20 27:1
34:4 52:1
63:10
130:15,25
**dispute**
36:19
**disregard**
102:19,21
**distance**
65:5 67:21
84:17 111:1
**distill**
12:19
**distinct**
38:9 58:13
**distinction**
20:24 22:1
83:4
**distinctive**
66:5,11,13
**distinctly**
38:6
**distribute**
18:21 20:20
29:11 39:5,
20 112:16
**distributed**
19:25 22:8,
22 25:11,20
26:8 28:18
29:4,8,20
123:18
**distributes**
18:13 38:24
41:6
**distribution**
19:16 26:5
27:14,19,25
28:4 29:14
30:2 37:25
38:16,24
39:3,15,17
41:16 43:6
44:24 115:1,
20 116:7,15
118:18 120:9
**Distributions**
28:6,17
**distributor**
20:19 22:15
26:16,17
29:12,17
42:9
**distributors**
18:21 39:16
116:19
**division**
95:20
**doctrine**
102:4
**document**
49:19 60:8
72:15 87:21
89:12 96:24
104:24,25
113:24 120:3
130:6
**documentary**
9:23 15:4
17:12 22:5
28:25 29:3,
20 31:2
32:3,15
33:20 36:7
37:4,20
39:13 43:7
45:25 46:11,
12 49:18,19
52:12,17,24
53:5,16
54:20 57:9,
22 58:4
59:5,11,19
61:3,11,14
62:15 63:7,
18 66:23,25
72:3,22
73:2,7,21
75:7,10,14,
17 76:19
77:6,11,20
78:5 79:1
80:16 83:19
85:15,24
86:20 87:7
88:6 89:23
91:6 92:1
93:24 95:13
97:2 102:4
103:9,22
104:2,19
105:6,16,22
107:8,21
108:2,9,16
109:7,17,20
112:16,22
113:13
115:3,22
116:1,3,8,25
117:4,17,18
118:4,8
119:16,20
120:18 121:3
122:3,16
124:9
127:16,18
128:7 129:24
**documentation**
129:23
**documented**
71:2 102:7,
16 110:2
**documents**
6:9,15,23
15:14 46:4
47:5 91:16,
22 92:4
98:20
**doing**
10:10 56:9
**domestically**
118:15
**Dot**
44:11,12
113:6,9
116:9 117:23
121:25
122:14
**Dot's**
122:9
**Dots**
43:7,11,16
**double**
46:9
**download**
97:7
**downloaded**
97:17,19
**dozen**
109:16
**dozens**
107:16
**draft**
109:20,21
111:20
**drafts**
50:18 106:13
107:7,8,21
108:8,14,19
109:19
**draw**
20:23 57:23
67:2
**drawing**
21:25
**dredging**
92:5
**dripping**
15:17

**driving**
121:12
**drops**
85:2
**Dudding**
7:4,17
55:13,23
56:3
**due**
96:7 122:3
**duly**
4:2
**duplicative**
67:11
**duration**
35:5 119:13

**E**

**earlier**
5:19 25:7
40:2 49:3
63:15,17
103:14
110:16
**early**
106:12
**Eastern**
51:2
**edit**
10:5 15:2
46:2 49:24,
25 107:14
110:7,11
111:25 119:9
121:16
**edited**
109:22
110:10
**editing**
10:5 59:19
60:8 104:2
105:15,18
106:11
107:15
108:23 110:5
116:1
**editor**
9:10 11:11,
17,18 22:11,
17 68:9,21
87:23 102:19
105:17,20
106:6 119:10
**editorial**
9:4,7 17:22
19:1,5 22:9,
10 29:23
30:17 31:17
34:5 35:4,20
36:7 37:9,
12,20 59:13
61:24 71:9
86:12 87:20
94:22 111:7
116:24 117:3
119:20,24
120:13,15,17
125:6,18
**editorially**
119:11
121:15
**editors**
10:8
**effectively**
34:9 67:12
**eight**
60:4,5 62:18
**either**
20:19 21:20
27:24 38:25
81:10 93:15
98:19
102:18,22,24
**elaborate**
38:15 66:12
119:18
**elaboration**
119:19
**electrician**
36:13
**else's**
93:17
**eluded**
35:20
**email**
26:13,21,25
28:5 44:10,
12,18 45:19,
20 56:3 65:2
68:2 71:3,5,
8 88:14
102:16,22
111:8,23
112:8 113:9
114:15
120:24
121:1,4
122:8
**emailing**
55:13
**emails**
46:7,12
49:14,15,16
89:25 91:17,
18,19 92:6
**employed**
8:1,5 23:17,
20 42:4,6
57:8 76:6
81:8
**employee**
36:21 53:8
83:14
**employees**
61:19 93:12,
15,23
**employment**
24:5 85:21
**end**
8:12,14
63:24 72:13,
16 74:14
82:16 87:12
94:9 99:1
105:8,12
114:6 124:8
125:8,10
**ended**
132:22
**ends**
57:10
**enforced**
28:11
**enforcement**
35:18
**engaged**
21:14
**England**
72:22 78:6
104:5,8,9,
10,17
**English**
82:23 83:5
**enormous**
130:6
**ensure**
9:18 17:23
20:20 28:17
34:22
**ensuring**
36:6
**entered**
42:24 100:1,
12 101:7
**entirely**
68:9
**entirety**
108:9
**entities**
27:24 39:2
41:17 42:1,5
**entity**
39:11
**entry**
5:21 6:1
61:19
**episode**
33:18 34:1
**equipment**
105:18
**essential**
121:11
**essentially**
30:1 59:21
60:11 68:17
69:16 96:22
97:10

**estimate**
24:6
**event**
130:17
**events**
68:17
**eventually**
64:3,18
**everybody**
70:18
**everyone**
121:15
**evidence**
131:17
**evolving**
109:6,8
**exact**
31:5 64:11
65:1
**exactly**
55:7 65:5
97:22 107:14
**Examination**
4:5 126:18
127:22
**examined**
4:3
**exceptions**
101:22
**exchanged**
50:4
**exclude**
121:6
**excluded**
26:9
**exclusively**
67:16
**excuse**
25:18 44:11
49:5 95:8
**executive**
8:12,20,25
11:16 16:10,
15 18:12
19:15 22:7
25:15 26:18
33:17,25
34:2,7,12
52:12,17,23
72:25 103:22
125:24
127:15 128:4
**executives**
69:1
**exercise**
62:10
**exercised**
39:16
**exhibit**
33:9,11
47:4,5,11,23
48:25 49:1,
6,10 55:14,
20 62:25
95:10,16
**exist**
50:6
**existing**
79:25
**expand**
94:24
**expanded**
65:11
**expect**
71:24
**expected**
86:10
**expecting**
4:18 72:1
**experience**
21:9,13,19
63:12 99:8,
15
**expert**
38:22 97:5
**experts**
23:4
**explain**
18:17 21:3,4
33:24 37:24
57:19 74:17,
22 85:20
**exploit**
120:8
**extent**
26:8 55:16
123:5
**extra**
94:24

**F**

**face**
65:6,7
**facing**
66:8 121:13
**fact**
71:10 87:15,
24
**facts**
66:18
**fair**
21:23 28:7
32:21 36:2
37:4,21,22
64:23 70:12,
24,25 85:16,
17 86:23
87:2,4 90:18
102:4
**familiar**
35:3 41:14
42:8 88:24
**familiarity**
43:10
**far**
32:14 46:6
85:12 89:20
109:18 116:6
**Farnham**
84:20
**fashion**
10:25 84:23
**fault**
57:17
**fed**
105:25
106:19
**fee**
30:9 31:1,4,
9 32:19
**feedback**
68:10,11
**feeding**
106:14
**feeling**
51:18
**felt**
19:4 66:4,8
**female**
89:3
**figure**
31:5 67:8
93:19
**files**
110:13
**film**
9:23 19:23
20:14,18
31:11 35:5
42:14 71:24
78:22 79:3,5
83:18 84:8
86:3 92:22
93:12 97:15
99:1 105:8
106:16
118:11,24
119:14
121:10
130:11 131:4
132:4
**filmed**
84:9 103:9
130:9,13
**filming**
54:21 76:24
77:2 78:13,
15,16,25
79:4,9,10,
12,22 80:2,
12 87:11
91:10 93:1,
25 94:3,8,10
**films**
17:14 18:10
29:16,17
30:2,25 31:1
32:2,16,20

33:23 34:13, 24 35:23 36:2,6 42:10,17,23 43:3 46:8 48:10 49:15 52:25 53:9 75:1 76:12 83:15 84:18 85:2 86:5,11 88:16 89:14, 20,21,23 90:2 91:19 93:11,16 95:21 98:9 99:12,18,23 110:10 116:8,18 117:2,19 118:4,17 119:9,17 120:5 128:24 129:4,5
**final** 6:5 10:6 69:2 72:16 84:24 107:25 109:15,24 116:23 119:21,25 121:2,5
**finalized** 105:24
**finalizing** 105:8
**financial** 10:14
**find** 11:9 54:25 55:9 131:18
**finding** 54:22
**fine** 6:5 56:10 57:24 103:24 126:8
**finish** 18:25 89:6 97:8
**finished** 19:10,12 56:22 92:17 97:15
**finishing** 56:24 119:7 129:13,14
**first** 4:2 9:22 12:20 20:8 22:2 27:2 55:16 56:5 60:24 63:4 65:3,14,17, 22,24 66:1 67:25 77:21 95:13 106:16 110:23 130:10,15
**first-hand** 74:2
**fitted** 19:5
**five** 47:13 48:2,5 49:1,2,6 51:1 52:8, 11,20 59:21 60:1,13 77:9 80:15 96:10 97:19,20 109:13,14 126:4
**flights** 10:18
**Florida** 24:21,24 25:4 46:25 80:5,11,12, 17,24 90:24 91:9,14 92:11 93:12 94:11 103:10 113:21,23 114:3 124:10 127:17 130:4,5 132:3,5,8
**focused** 118:16 119:8
**followed** 66:16
**following** 57:7 61:5 84:23
**follows** 4:4
**footage** 93:12 100:10 101:6 102:2, 3
**foregoing** 57:7 60:11
**foremost** 9:22
**forget** 107:14
**forgot** 15:11 106:21
**form** 14:3,22 15:25 18:2,5 21:1 23:13 24:7,18 26:11 28:13 29:5,21 30:4 34:25 37:5,6 40:6,17 41:18 47:7 50:13 51:20 52:18 58:5 64:24 67:4 69:7 77:17 80:18 81:2, 12,18 90:19 92:2 94:16 98:13,21 99:10 103:16 108:5 110:3 113:14,25 116:10 120:19,25
**formal** 102:24
**formally** 13:3
**format** 35:8 66:25
**forth** 28:18 64:3 65:2 68:16 91:20
**forwards** 105:1
**found** 99:25 121:13
**foundation** 24:9
**four** 11:2 47:13 59:23 60:18 62:2 101:4 109:13,14
**Frazier** 79:5 84:9
**freedom** 90:25
**freelance** 23:20 74:6, 19 75:6
**freelancer** 94:12
**freelancers** 23:18 75:2 83:12
**front** 33:2,7 55:10 71:20 74:8 76:25 78:18, 23 79:2,13, 15,25 93:2,4 130:23
**full** 8:7 32:1
**fully** 107:19
**fund** 39:9
**furore** 15:2

**future**
16:17 122:15

**G**

**g-o-l-p-i-n**
70:4
**gap**
121:14
**Garcia**
4:9
**gather**
127:17
128:7,19
**gathered**
13:7 32:14
70:11 85:12
90:22 91:5,
25 103:21
109:18 116:6
129:19
**gathering**
10:3 58:16
77:3
**gave**
58:20 120:17
**general**
12:16 15:8
16:4,6 34:21
77:3 84:6
99:7 130:20
**generalizing**
10:24
**generally**
8:17 19:14
22:4,6,22
25:12 44:23
45:17 70:20
71:1 86:20
94:13 97:24
101:20
102:11
118:21 119:2
**gentlemen**
115:11
**George**
51:14
**Germany**
19:3,4
**getting**
38:5 48:16
71:25 78:23
109:9 124:20
**Getty**
97:18
**Gibbs**
79:4 84:8
**give**
24:6 55:17
57:19 64:11
84:18 104:12
107:19
117:11
**given**
4:12 60:10
68:10 78:3
84:6 97:2
98:8 110:17
**goal**
40:9
**goes**
34:3 59:14
99:1 122:12
125:22
**going**
4:17,22 11:8
12:20 15:14
16:2,9 21:5
22:2 26:9
27:15 29:24
32:9 36:22
45:7 51:17
54:25 58:7
63:2 66:10,
17,21 69:17
71:25 74:13
78:3 88:21
92:11 93:19
94:1,5,11
96:21 97:17,
20,23
102:12,23
110:22
118:18
126:2,15
128:9 131:7,
9
**good**
4:7 77:23
125:21 126:2
**grabbing**
33:4
**graphics**
10:11
**Gray**
12:25 13:11
105:11,24
106:22,24
107:2
**great**
56:2 126:10
**green**
120:24
**ground**
4:15 85:14
**growing**
109:8
**guess**
4:20 81:14
97:14 98:2
120:6
**guide**
45:7
**guideline's**
86:13
**guidelines**
37:21 120:15
125:7,19
**guy**
69:13

**H**

**half**
92:9
**hand**
98:19 100:1
**handed**
29:9
**handful**
24:15 64:22
**handled**
74:25
**happen**
70:21
**happened**
99:8 131:24
**happy**
4:25 5:3
17:24 18:5
33:6 59:12
87:9 121:5,
15
**head**
12:8,9,10,
12,21 13:2,
4,5,11,12,15
68:23
**Heagney**
33:9 62:23
132:16
**hear**
9:8 11:22
20:4 39:22
94:2
**heard**
91:7,10
115:12 123:2
**hearings**
105:21
**held**
39:15 120:8
**help**
5:13 10:5
39:9,24
45:18 87:14
**helped**
88:16
**helpful**
59:3
**helping**
21:21 99:20,
22
**hierarchical**
14:8
**hierarchy**
13:9

**high**
31:20
**higher**
118:15
**Hill**
46:15,17 49:16 53:7, 24 64:20 65:12,14 67:16 68:12 73:9 76:17 80:3 82:11, 18,19 83:2, 11,22 85:4, 13,23 86:22 91:19 92:23, 24 106:8,25 128:21 129:21
**hire**
36:12
**hired**
75:22 76:12
**hit**
88:22
**hold**
34:13
**holders**
97:25
**holding**
35:23
**homework**
21:22
**honest**
41:12 81:6 88:23
**honestly**
84:1 85:3
**host**
101:12
**hotels**
10:17
**hour**
31:11 64:17 107:17 119:4
**hours**
111:2 126:1
**house**
36:12
**Hughes**
55:5 73:12, 16,20 74:5, 14 76:18 79:24 80:2
**hundred**
107:9,21,23, 25 108:8 109:19

**I**

**Ian**
4:8 38:5 115:5 132:13
**idea**
59:9 63:25 77:23 113:18 126:3 130:14
**ideas**
77:10
**identification**
33:11 47:18 55:20
**identified**
16:11 18:9 28:21 32:5 46:24 49:7 55:3 80:15 82:12 89:11 105:5
**identify**
25:12 51:23 60:7 70:7 82:7 108:18 129:8
**images**
47:3,10,11, 14 48:5 49:1,6 96:22 97:3 108:16 130:8
**imagine**
24:11 51:2
57:23 70:21 77:19
**immediate**
51:12 74:3 86:1,2 120:7
**immediately**
12:12
**imperative**
40:14
**implement**
112:3
**implementation**
28:6
**implemented**
22:1 26:10 28:10
**impossible**
107:19
**in-house**
7:10 18:18, 19 50:23 51:24 75:20 98:24 99:13 129:2
**include**
16:13 17:6 65:11 71:22 77:20 97:7
**including**
104:3 112:17 114:13 130:1
**independent**
16:18 17:21, 25 26:15 29:10 30:8, 10,23 31:15 34:5 36:2, 14,18 39:14 45:20 53:14, 17 75:22 116:14
**indicate**
57:6 78:5
**indicated**
41:9 47:12 75:3
**indie**
26:18
**individual**
7:6 9:13 11:13 17:9 21:23 89:10 105:18 107:18 110:1
**individual's**
36:16
**individuals**
10:25 16:11 55:2 60:12 61:7,20 62:4,13 77:9 80:15 83:18 105:4
**indulge**
4:14 126:16
**inevitably**
114:18
**influence**
19:1
**information**
18:4 42:16 44:2,4 45:10 50:3 67:10 88:3 90:22, 25 91:5,25 103:21 123:1 128:7,19 129:18 130:1,8 131:9,11
**initial**
59:6 63:25 64:14
**initially**
63:13 65:10 105:2 110:22
**input**
61:24 87:6
**inquiries**
131:16
**inside**
19:23 102:12

**insist**
119:2
**instance**
19:23 77:21
99:9
**instances**
87:5
**instruct**
5:7 51:25
**intellectual**
30:20 32:18
102:11
116:16 125:4
**intellectuals**
30:15
**intended**
38:12
**interested**
18:23 72:14
**interests**
34:8,10
**interim**
15:12,20,24
16:5
**interject**
38:4
**internal**
122:14
**international**
46:2,11
49:18 118:3,
7,10,20,22
119:5,16,22
120:3,9
121:6
**interrogatori es**
55:16 56:6
57:1 62:24
**interrogatory**
56:14,21
57:3 60:4,6,
24 61:2
62:3,12
73:18,19
74:6 76:8
88:11
**interrupt**
45:1 58:19
**interruption**
16:25 48:16
**interview**
66:19 83:18
**interviewed**
84:15,21
**interviewees**
19:3 54:23
55:9
**interviews**
54:23 55:7
79:6 84:10,
22 92:22
**introduced**
75:23
**invest**
19:11
**invite**
124:2
**invoice**
47:12,23,24
95:19,22
98:8
**invoicing**
98:2
**involved**
9:4 11:7
13:25 16:14,
21 17:8
22:14 25:18,
22 28:9
30:20 34:4
39:13,17,18
48:9,10
54:21 57:8
60:8 61:3,10
62:4,14
73:24,25
76:19 77:1
86:19 93:1
98:12,15
105:3,7,21
106:12 111:7
120:6 128:23
129:13
131:8,21
**involvement**
57:21 58:3
61:21 67:17,
19 88:5
**iplayer**
69:11 70:10
**Iran**
19:23
**irrespective**
37:19
**issue**
11:8 15:4
17:12 19:18,
19 28:25
29:20 32:3
33:18 52:13
72:3 73:2
86:21,22
87:13 91:11
95:13 104:3
**issues**
16:17 22:12
23:6 34:6
35:6,10
44:24 52:2,4
86:3
**item**
47:12,13
96:14 108:20
**items**
47:18 48:2
49:2 96:10
**iterative**
68:14,15
109:5,23

**J**

**January**
104:5 121:7
**Jim**
12:25
105:11,24
106:22,24
**Jo**
69:14
**Joanna**
13:14,15
65:23 71:6
**job**
10:3 37:11,
16
**Joe**
13:17,18
**Joes**
55:10 76:25
78:18,23
79:2,13,15,
25 93:2,4
130:23
**Johnson**
14:11
**joined**
123:15
**journalism**
12:9,10,22
13:2,12
**journalist**
9:13,22
54:13,15,16,
19
**journalistic**
35:20
**journalists**
9:3,17
**judgment**
36:8 37:21
86:13 119:21
**Julia**
88:25 89:1
**Julie**
84:20
**June**
64:10
**jurisdiction**
19:21 26:9
**jurisdictions**
21:25

**K**

**Karen**
11:14 68:8

87:22 88:4 102:18 105:7,22 106:19 109:14
**keep**
5:23 112:6
**key**
70:3
**kind**
45:7 67:8 99:2 109:5 120:15
**knew**
93:25 94:1,7
**know**
4:19,24 5:3, 16 10:4 11:9 23:1,3,4 24:12 25:6, 25 27:6 28:20 31:16, 23 33:13 34:16 35:5, 6,8 36:20,22 37:14 38:18 40:14,19,22, 24 41:9,11, 25 42:9,11, 21 43:12,19, 23 45:10,15 47:10 48:11, 19 50:5,6,7 52:8 54:23 55:5,14,19 56:12,15,22 58:17 60:24 61:19 62:18 65:4 66:9, 10,18 67:6, 9,11 71:7, 19,20 72:11, 19 73:13,15 75:11,21 77:1 78:13 81:5,6,7,14, 25 82:4,13 83:13 84:1, 25 85:1,3,4 86:5 88:20, 23 89:13,14 90:1,6,10, 14,24 91:13 92:16,19 93:6,21 94:1,4,5,8, 10,12 95:2, 16 97:6,16, 19,22 98:1, 24 99:13 100:4,7,22, 24 101:23 102:24 105:2 107:18 108:13 109:10 111:13,23 112:1,12 113:4,17 114:2,22 117:16,25 119:1,3 120:8,15 121:20,22 122:7,19 123:10,13 124:5 125:1 127:15 130:15,24 131:8,17,23
**knowing**
81:10,17,21
**knowledge**
14:13 23:22 28:16 42:5 44:3 50:15, 21 54:18 63:10 73:5 74:1,2 75:13,15 76:3,20 77:8,12 78:10,11 83:22 84:5, 13,14 90:14 93:22 98:18, 23 99:17 101:15 103:8 111:21 113:22 125:5,16 128:3 131:3
**known**
66:16

**L**

**lack**
24:8 28:11 61:19 85:13 125:17
**large**
118:12
**Laurence**
106:5
**law**
4:3
**lawful**
4:2
**Lawrence**
105:19 106:4
**lawyer**
102:11 106:21
**lawyers**
51:22
**lay**
109:4
**layers**
12:17
**layman's**
108:12
**lead**
58:14
**Leading**
127:19,21
**leave**
35:9
**left**
81:1 95:21
**legal**
6:25 7:1,10, 15,16 35:16 39:1,2,11 41:23 42:1 49:23 50:22 51:12 52:2,3 102:19,20 111:7 122:23 124:3
**length**
129:1
**LEO**
4:1
**letter**
6:13 15:1
**level**
61:19
**levels**
12:6
**liaising**
54:22
**license**
30:9,10,12 31:1,4,9 32:19 42:24 97:8,25 98:5 99:25 100:12 130:4
**licensed**
96:23 97:3 100:11 116:8 129:9
**licenses**
123:24
**licensing**
27:14 43:2 44:17 45:22 46:8 48:9, 10,11 49:16 91:18 97:5 98:12,15 118:11 122:9
**lies**
81:7
**light**
5:15,17 120:24
**limit**
29:13 99:14

**limited**
18:20 27:19, 20 30:25 37:25 40:4 49:6 83:2 87:5,17 115:1,2,20, 21
**line**
9:2,8,9 47:12,13,18 48:2 49:1 86:1,11 96:9,14 106:17 110:16
**link**
76:2 121:2
**list**
57:12 61:23 72:11 73:18, 19 123:21
**listed**
60:12,20 61:11 62:15 63:3 74:6 76:13
**listen**
39:23
**little**
43:7,10,11, 16 44:12 47:19 95:6 96:5 113:6,9 116:9 117:23 121:25 122:9,14
**lives**
104:16
**living**
109:9
**loan**
53:9,10,16 86:10 129:3
**location**
78:14 104:11 127:3,6
**locations**
83:25
**log**
130:2,5
**logged**
110:2
**logging**
20:22
**logistics**
10:18 84:16
**logs**
102:14
**London**
63:7 100:12 101:8 104:13,14
**long**
13:12 31:11 39:24 82:2 97:19 107:14 111:1 118:24 119:4 120:1
**long-form**
12:9,12 13:6,8,12,15 68:23
**longer**
87:14 109:10
**longhand**
111:24
**look**
16:18 34:3 47:20 55:4 60:21 62:6, 17 82:22 90:5 93:6 95:21 96:4 115:9 128:11
**looked**
6:13,15 45:22,25 46:1 67:19 122:24
**looking**
9:12 16:15 34:10 57:19 79:21 104:1 106:13 122:13
**looks**
34:7
**lot**
18:3 31:13 66:14 67:9 75:21 104:16 110:23
**lots**
23:16 68:15
**loud**
111:13
**low**
31:21

**M**

**M-E-G-A-N**
54:6
**made**
7:25 8:12 18:18 26:7 28:5 38:25 44:5 45:11 49:25 63:23 64:4 65:21 67:20 77:16 78:15 85:2 90:18 107:12 111:3 112:2 120:2,5 131:16
**main**
25:13 73:8, 10 94:8 119:7
**maintained**
8:21 44:3,21
**majority**
70:13
**make**
4:15 5:2 10:17,23 16:20 19:7, 21,24 20:2 22:11 23:5 25:10,14 31:16 34:19 36:17 39:7, 19 40:8 45:2,24 48:3 53:15 69:1, 18 76:10,13 77:24 90:25 100:2 114:17 118:19 119:11 120:12,14 126:6 132:4
**maker**
22:10
**makes**
20:24 21:24 22:7 37:1 39:10
**making**
9:3,5,13 10:20 16:22 23:2 33:25 34:10 37:8 67:12 116:24 130:10,14
**manage**
23:5
**managed**
86:7
**management**
9:10 86:11 88:8,9,16 89:11 122:15
**manager**
9:2,9 36:15 86:1 88:11, 19
**managerial**
85:22
**manages**
9:2
**managing**
94:19
**Manchester**
104:16

**Mar-a-lago**
130:13,17
**mark**
33:9 62:25
**marked**
33:11 55:20
**material**
10:3,22
58:16 61:21
66:22 93:2
97:6 99:4,22
100:20,23
101:16
118:13
128:14,23
129:4,8
**materially**
72:9
**matter**
19:9
**Matthew**
46:15,17
53:7 54:24
64:20 68:11
73:9 75:24
77:21 79:11
80:9 82:11,
18 87:13
91:9 92:8
104:21
105:1,20
106:8,13
107:10
110:23 111:2
112:1 128:21
**Matthew's**
94:7
**Maxine**
55:5 73:12
79:10,24
80:9 92:25
**Mccoll**
106:21 107:1
**Mcgolpin**
69:14 70:4
**Meagan**
82:12
**mean**
7:17 8:14
10:14 11:1
17:17 18:8
21:3,4,21
22:4 23:15
25:13 35:2,
12 36:10
38:15 44:23
56:10 59:1,
19 63:12
64:6 67:19
68:14 69:4
70:16 73:3,
15,25 74:24
77:7 89:24
91:7 94:2,7
101:14
102:18
104:20,21
108:2,10
111:17,22,24
117:7 119:18
131:6
**meaning**
21:13
**means**
110:8
**meant**
46:18 49:10
66:15 94:4
**measure**
80:20
**media**
42:8 43:3
48:11
**meet**
18:19 51:1
126:4
**meeting**
67:8 68:25
69:2,11,12,
16 70:1,8,
12,16 123:25
124:2
**meetings**
64:22 65:7,8
70:2 130:10
**meets**
17:20
**Megan**
53:25 54:4,6
73:9 76:2
80:9 82:18
104:14,22
105:2,20
106:12
**Megan's**
87:13
**member**
83:9 86:9
94:12
**members**
82:23
**memory**
64:10 79:21
92:5 124:1
**mention**
106:21
**mentioned**
9:17 11:10
12:20,21
13:19 15:20
20:3 25:10
40:2 45:23
53:10 63:15,
17 89:19,20
107:7
**met**
36:7 64:16
75:18 76:1,5
91:12
**method**
111:5
**microphone**
48:17
**mind**
19:18 53:15
58:14 59:10
126:7
**minute**
97:19 118:24
120:1
**minutes**
34:17,19
51:1 97:20
119:1,4
120:18
126:17
**Mischaracterizes**
37:6 90:20
**misinterpreted**
20:11
**mispronouncing**
11:22
**missed**
62:21
**missing**
60:22 62:8
**misunderstood**
38:13
**mixing**
113:6
**mixture**
23:19
**moment**
5:19 16:3
42:19 43:23
56:20 62:6
82:2 92:16
96:17 100:7
121:22
123:12
128:11
130:19
**money**
19:6 39:8
67:12
**Monroe**
14:11,12
**month's**
16:4
**months**
66:24 97:9,
13 125:7
130:14,24
**morning**
4:7,9 38:2

**Morris**
88:20,22
**move**
5:13 39:24 109:2
**moving**
12:21 100:24
**multi**
9:24
**multi-stage**
68:20
**music**
108:16 109:4 111:12

**N**

**name**
4:7 11:19 14:15 15:10, 12,13,16 41:12 54:2 70:5 73:17 88:12 124:3 127:5
**named**
27:17
**names**
57:12,13 69:20 72:14 88:21 106:1 113:7
**narration**
104:24
**narrative**
57:19
**nature**
77:25
**necessarily**
107:3
**necessary**
34:15
**need**
5:1,2,3 10:23 15:14 31:20,23 34:19 67:8,9 71:18 72:6 100:3 114:2 120:10,12,13
**needed**
11:9 16:5 54:24 66:10 76:14 85:18 87:14 90:1 110:14,24 118:21 121:8 129:9
**needs**
10:4
**negotiate**
17:11
**negotiating**
17:7
**negotiation**
6:4 31:9
**Neil**
29:15 44:10, 19 52:25 59:7 63:11 73:3 74:2 77:22 82:21 86:1,3 88:10 91:8 92:8 93:18 94:18 105:3 106:15 113:10 120:6 122:12,20
**networks**
101:7
**never**
21:18 25:24, 25 26:2,5 75:18 76:1 91:7,9,10 92:10 94:10 122:2 123:23
**news**
12:11,13,15 13:22 14:9 15:7 22:24 41:13,15 66:8,16,20 67:1 77:3 127:17
**Nick**
7:4,8
**night**
78:24
**Nikki**
105:8,23 106:20
**nine**
66:24 72:18, 21 78:4 104:9
**nod**
69:3
**non-linear**
108:23
**normal**
30:7
**note**
123:20
**notes**
7:24,25 80:14,20 106:2 111:3, 8,24 112:2,3
**November**
14:19 95:22, 25 96:11,15 97:4
**number**
31:8 56:21 65:1 84:9 96:6 101:4 107:11,24 125:22
**numbers**
107:9

**O**

**O'DONNELL**
105:9,23 106:20 107:2
**object**
5:5 14:3,22 15:25 21:1 23:13 24:7, 18 26:11 28:13 29:5, 21 30:4 34:25 37:5 40:6,17 41:18 47:7 50:13 51:20 52:18 58:5,8 64:24 67:4 69:7 77:17 80:18 81:2, 12,18 90:19 92:2 94:16 98:13,21 99:10 103:16 108:5 110:3 113:14,25 116:10 120:19
**objection**
40:23 41:23 57:23 127:19,21
**objections**
22:12 57:2 60:11 61:5, 6,13
**obligated**
5:8
**obligations**
34:14,23
**observing**
4:9
**obtain**
30:12 42:12 55:6
**obviously**
50:7 71:25 79:14 82:12 86:8 89:13, 20 99:23 112:7
**occasionally**
16:21
**occur**
64:9 70:23 78:12 80:5, 12

**occurred**
104:5 130:10
**October**
17:14 18:10 29:16,17 30:2,25 31:1 32:2,16,20 33:23 34:13, 24 35:23 36:2,6 42:10,14,17, 23 43:3 46:8 48:10 49:15 52:25 53:9 74:25 76:12 83:15 84:18 86:5,11 88:15 89:14, 19,21,23 90:2 91:19 93:11,16 95:14,20 97:3 98:8 99:12,18,23 100:2 110:10 116:8,18 117:2,19 118:4 119:9, 17 120:5 128:24 129:4,5
**odd**
119:1
**offered**
123:18,21
**office**
23:12
**Ohio**
78:15 79:4, 6,8 84:9 85:5 93:25 126:25 128:5
**okay**
5:12 6:8,22 7:6 8:5,17 12:18 13:1, 7,11,19 15:9,18 19:5 20:23 21:13, 19 28:3 32:19 33:1,8 34:21 41:13 42:8 46:6,18 47:3 49:12, 14,22 54:10 56:24 58:11 59:2,20 60:5,21 62:1,10,22 64:22 65:10, 20 68:12 69:24 70:11 74:11,17 75:9 76:6,10 90:4 95:5 101:3,23 102:14 106:9 108:8 109:18 110:1 115:14 125:14 126:12 127:13 128:9,18 129:7,15 131:3 132:9
**once**
28:3 66:3 70:20 97:8 99:25 123:12
**one**
4:8 7:21,22 9:15 12:18 20:24 22:25 24:11 27:18 45:24 47:12 48:2,25 49:2,6 50:25 59:22 60:7, 18 62:3 63:25 64:1, 4,12,13,14 65:8 66:20 67:15,19 78:17,21 79:9 83:5 87:9 92:9 94:9,25 96:10 106:24 108:14 113:11 119:4 121:10 123:22 127:16 128:11
**ongoing**
6:3 66:6,7 70:22
**operates**
41:2 105:17
**operation**
122:2
**operations**
40:5
**opposed**
48:6
**Oral**
132:21
**order**
5:21,22 6:1, 2 59:3 95:25 97:6 107:3 120:11 132:19
**organic**
109:6
**organization**
12:14 22:24 40:20,25 41:1,5,12
**organizing**
76:24
**original**
70:23 72:8 93:3 119:20
**other's**
100:19
**outlets**
67:13
**outlined**
64:15
**outside**
39:4 50:23 62:5,13
**outsource**
30:7
**outsourced**
30:2 116:7
**outsourcing**
116:13
**override**
117:3
**oversaw**
37:3
**overseas**
16:22 17:2, 3,4
**oversee**
9:4,15,16 36:16
**overseeing**
16:10 28:10 36:5 73:1,25 127:16 128:4
**oversight**
35:22 87:20, 24 88:2 89:12 119:24
**owe**
36:21
**owned**
32:15
**owner**
33:24 37:19
**owns**
30:15

**P**

**p.m.**
51:3
**page**
23:10 48:4 56:13 57:5, 10,11 58:1,2 60:4,12,13, 25 61:5,7 62:2,11,18 63:2 74:12, 14 76:11,15 77:24 95:19

101:4 108:19 116:23
**paid**
31:1 32:19 53:19 100:3
**Panorama**
9:10 10:19 11:11 15:2 17:12 33:18 99:14 119:3, 4
**Panoramas**
124:18
**paper**
97:10 111:25 112:2
**paperwork**
97:10,24 99:2 100:2 128:24
**paragraph**
33:13 42:18 43:5,19 45:9 48:7,22 49:8 52:8,11,20 63:23 72:18, 21 78:4 81:24 82:3, 7,23 83:6 84:7 90:5 92:13 93:6 95:2,6,8,10 96:21 103:6 104:8,9,19 112:9 114:6, 22 115:6,9, 11,13 117:25 119:15,23 120:4 121:19 128:10,13,19 130:8
**paragraphs**
63:3
**parallel**
119:7
**parameters**
28:18
**parking**
78:23
**part**
7:23 15:1 22:21 27:25 30:8 37:11 46:16 53:20 71:9 72:14 80:16 82:13 93:10 102:16 116:16 118:12 131:6
**participate**
105:5
**participated**
29:2 31:8 60:17 105:15 123:25
**participation**
103:22
**particular**
17:9 20:14, 18 22:4 26:9 27:7 30:13 31:24 40:19 74:21 123:22
**parties**
5:24 27:17 36:24
**partners**
27:11,12 28:23
**partnerships**
112:17
**parts**
73:13
**party**
72:13
**pass**
26:18
**passed**
42:16
**patience**
126:14
**Paul**
99:21 128:22,25
129:2
**pay**
30:9 97:16, 22 99:4,23 129:6
**payable**
95:20
**PBS**
114:13
**pending**
5:21,25
**penultimate**
106:24
**people**
7:19 9:24 10:10,15,19 11:2 19:4 22:23 23:2, 17,19 25:13 50:19 51:11, 22 54:25 55:7 62:5 66:15,19,21, 24 67:13 69:10,15 72:12 73:8, 10 75:21,23 76:11 82:13 83:13 84:10 89:14,25 90:1 91:12 100:3 111:12 113:2 114:15 124:17
**people's**
39:5 67:2
**period**
30:13
**Persian**
19:24
**person**
22:13 51:22 53:15 55:10 69:25 70:3 89:1,16 105:17 106:18,23
**personal**
44:2 63:10, 12 93:22
**personally**
24:1 31:8 45:10
**persons**
57:8
**perspective**
34:22
**pertaining**
129:24
**phase**
58:15
**phone**
5:2 65:2,7 78:14 92:7 122:20
**phonetic**
68:24
**phrase**
20:3,5,6,8 23:11 28:11 38:6 57:15 61:20 85:13 124:14 125:17
**picked**
20:1
**pictures**
48:8
**pitch**
45:25 46:10 49:17 63:7, 16,18,21 64:6,18,19, 21,23 65:3, 14,15,17,22, 24 66:2,4 67:15,25 68:3,6,19 69:6 70:15, 20,23 71:2, 16 72:3,8 77:10,16
**pitcher**
106:5,6

**pitching**
16:21
**place**
18:6 78:7, 13,15 79:1, 19 84:2 109:6
**places**
122:10
**Plaintiff's**
55:15 56:5
**plan**
91:8,9
**planning**
16:14,16 90:15
**platform**
124:10,22
**platforms**
31:2 32:21
**played**
82:13
**please**
8:24 11:21 14:15 15:13 18:17 33:24 38:18 41:10 43:18 50:2 56:20 58:2 60:23 62:11, 23 69:21 74:17 85:20 90:10 92:13, 17 95:16 96:9 97:1 106:2 108:18 112:10 115:10 121:19 122:25 123:13 132:17
**PM**
126:11 132:22
**point**
4:24 5:1 17:24 33:2 38:17 59:7, 12,14,15 109:21 121:12 131:2
**policy**
111:7 124:15
**pond**
4:10 38:3
**pool**
101:7
**populated**
108:25
**portion**
103:9 104:3
**portions**
35:21 45:15 104:4
**position**
13:8
**positioned**
5:14
**positive**
123:20
**possibility**
123:17
**possible**
71:11 81:1,4
**possibly**
10:1 65:7 125:20
**post**
59:23 84:23 108:21
**post-production**
59:18 60:19
**posted**
124:9,18
**potential**
72:12 76:23
**potentially**
71:18,22 77:21
**pounds**
31:6,13 32:22,24 97:21
**practical**
21:13
**practice**
30:7
**precisely**
97:16
**prefer**
27:5,6
**premises**
110:11
**preparation**
7:23 44:9 91:17
**prepare**
6:9 7:13 45:18 63:16, 18
**prepared**
49:22,23
**preparing**
44:9
**present**
5:25 8:10,22 13:25
**presented**
68:4,7 109:22
**presenting**
109:21
**President**
4:11 6:14 66:7 79:15 104:4 121:7 122:1
**President's**
128:15
**presume**
98:11
**presumptively**
70:6
**pretty**
76:3 107:5
**preventing**
122:15
**previous**
101:15
**previously**
105:4 119:19
**primarily**
72:22 73:3 78:6 87:20 114:11
**primary**
40:9,14
**prior**
63:11
**priorities**
122:4
**privilege**
50:20 51:21
**privileged**
50:8,19
**probably**
22:13 39:2 88:13 109:15 112:4
**problem**
94:22 115:19
**problems**
30:18 86:2
**procedure**
124:15
**procedures**
125:1,2
**process**
4:16 10:5 16:2 21:14 26:22 59:16, 17 64:3 68:15,20 87:15,19 97:5 98:6, 12,24 99:24 104:21 107:14 108:18,21 109:5,6,23 111:6 117:15,16 119:6 129:13 131:8,22
**produce**
39:18 55:9

**produced**
55:11 119:5
**producer**
8:11,12,21, 25 9:8,21 10:1,2 11:3, 16 16:10 18:12 19:15 22:7 26:18 30:8 33:18, 25 34:2,7,13 45:21 46:13, 15,17,19 52:12,23 53:6,7 54:1, 14,17 73:1 85:14 103:23 119:10 125:24 127:15 129:2
**producers**
10:7,21 25:15 52:17 53:4 74:7,19 75:6 99:22
**product**
30:11 72:1
**production**
8:18 10:12 11:1,2 16:19 17:2,14,19, 21,24,25 18:8,18,19 26:15 29:10, 11 30:10,14, 23 31:15 32:4,8 34:4, 5,11,14,24 35:2,20 37:9,10,11 38:16 39:14, 18 43:14 45:20 53:14, 17,20,21 54:16 58:13, 15,23 59:17, 23,24 60:19 70:22 75:20, 22 76:2 77:2 80:8,13 82:7,10,11, 24 83:5,6,10 84:23 86:19 87:18 88:10, 18 89:4 90:14,16,23 91:6 92:20 100:22 104:15 107:13 108:21 115:1,3,21, 22 116:14 126:21
**productions**
27:20 28:2 40:4 41:16 101:15 117:16
**profits**
39:7
**program**
9:13 10:4,20 15:2 16:14, 20 17:16 18:2,8,25 19:7,12,20, 22,25 21:24 22:4,8 23:3, 7 30:10,13, 15 31:11,12, 17 32:4,8,18 34:14,17,20, 23 35:2,8 36:15 37:14 46:4 54:1, 14,22 55:1, 4,6,8 59:14 64:4,16 69:18 70:19 71:12 72:16 73:14 79:21 97:7,8,11 100:1 105:24 107:17 110:8,24 116:17 117:10,13 119:12 120:16 122:10 130:14 131:2
**programming**
21:19 122:4
**programs**
9:6 10:23 16:16,22 17:9 18:22 25:14 39:11 123:21 129:14 131:7
**progressing**
90:2
**project**
9:6 10:17 31:14,25 34:3 64:21 74:21,25 97:14 110:6, 8,9 111:18 114:13
**projects**
9:3 111:11, 12
**properly**
11:23
**property**
30:21 32:18 102:11 116:16
**proposed**
71:15
**protect**
125:3
**protective**
5:21,22 6:1
**provided**
6:23,25 128:24 130:3
**provisionally**
5:23
**public**
39:9 67:12 92:22
**publicly**
124:10
**published**
14:25 96:24 122:2
**pull**
33:3 55:23
**pulled**
101:16
**purpose**
84:5,12
**purposes**
5:6
**pursuant**
102:4
**purview**
93:17 94:14
**push**
10:5
**put**
18:5 19:22 26:13 27:4 31:23 33:6 36:22 71:19 108:11 109:3

## Q

**Q3**
8:15
**Q4**
8:15,16,20 11:15 13:24 14:12
**question**
4:19,22,23, 24 5:6,8 14:4,23 16:1 20:7 22:2 23:14 24:8, 19 26:12 28:14 29:6, 22 30:5 35:1,18 37:6 38:5 39:23 40:7,18

41:7,10,19 46:3 47:8 49:4 50:14 51:21 52:19 57:15 58:6 64:25 67:5 69:8 77:18 80:19 81:3, 13,19 89:6 90:20 92:3 93:5 98:14, 22 99:11 102:15 103:17 108:6 113:15 114:1 115:17 116:11 126:13 127:10 132:15

**questioning** 110:16

**questions** 4:18 5:10 32:10 42:20 90:23 91:2 92:21 94:17 126:16,21 128:10 132:3,10

**quick** 103:6

**quite** 12:13 18:3 38:22 71:20 87:17 91:2 111:1

**quoted** 52:20

**R**

**R-A-S-H-I-T** 69:23

**R-O-U-R-K-E** 51:24

**Rachel** 51:14,23

**raised** 61:14

**rallies** 78:17,21

**rally** 78:24 79:2, 11,13,15

**ran** 129:10

**rancher** 79:5

**Rashit** 69:13,22

**rattle** 88:21

**reaching** 76:23

**read** 17:19,23 43:23 56:21 57:13 63:5 66:4 68:9 82:3 90:9 93:10 123:12 124:8 132:19

**reading** 56:23,24

**ready** 43:24 100:8

**real** 74:2

**reason** 5:2 25:23 29:13 119:18 121:17

**reasonable** 64:16 117:11

**reasoning** 122:12

**reasons** 20:15,16,17

**recall** 6:16 8:13 31:5 40:1,2 49:21 50:20 55:7,12 63:19 65:5,6 66:3 67:18, 21 69:20 72:6 78:18 79:19 84:21 90:1 91:15 103:11 107:24 110:19,25 111:10,17 112:1 124:2 125:21,23 126:20

**recalled** 127:11

**recap** 46:6

**recent** 130:18

**recently** 19:18 43:12

**reciprocal** 100:11,19 101:6

**recite** 5:19

**recommending** 26:23

**reconcile** 36:4 97:1

**reconciled** 76:14

**reconstruct** 110:13

**record** 4:22 5:7 82:3 98:1 103:1,3 115:8 132:14

**recorded** 84:22

**records** 44:3,8,20 91:1 92:22

**recruitment** 16:2

**recycled** 112:5

**reduce** 119:13

**refer** 15:14 23:11 42:19 49:7 104:8,9,10, 18

**referenced** 47:4

**references** 48:6

**referred** 7:7 128:14

**referring** 6:17,18 7:2, 3 18:8 22:18 27:24,25 30:24 38:8, 14,18 46:22, 23 47:3,14 48:4 50:17 76:11 82:17 83:10 91:24 100:15 101:11 108:2 114:7,10,25 124:16 129:11

**refers** 48:25 62:12 83:17 95:10 104:13 118:3

**reflect** 4:23

**reflected** 130:8

**reflects** 129:18

**refresh** 79:20 124:1

**regarding** 19:16 89:23 110:17

**region** 22:15

**regular**
44:4,21
**regularize**
100:2
**regularly**
100:23
**reimburses**
53:21
**related**
17:11,16
86:3
**relationship**
26:16 29:12
32:2 37:17
59:8 75:25
79:25 85:21,
22 93:3,20
100:18
114:11,14
**relationships**
114:12
**relevant**
22:14
**rely**
101:20
**remained**
86:9
**remember**
6:14 14:2
15:15 65:1
69:15 87:8
88:12 90:3
110:22
126:24
127:2,5
**remind**
78:20
**remote**
79:9 94:10
121:2 132:21
**remotely**
78:17 79:11
87:12 104:15
106:11
**repeat**
54:2 69:20
106:1
115:16,19
**rephrase**
4:25 7:11
13:24 20:12
48:20 52:20
60:16 63:16
65:25 77:14
85:18 98:7
102:2 113:1,
22 116:5,22
118:8 128:2
**report**
9:10 10:25
11:5,6,10
12:4 53:18
82:19
**reporter**
10:9 11:3
16:25 48:14,
16
**reporter's**
11:20
**reporting**
12:3 73:6
**represent**
96:18
**representatio
n**
85:9
**representatio
ns**
90:17 103:20
**representativ
es**
18:20
**represented**
76:7
**Republican**
72:12
**reputation**
81:7
**request**
77:14 92:22
117:18
**requests**
91:1
**required**
17:21 87:6
**research**
72:21 73:2,7
76:19,21
77:8 78:5,9,
12 80:5,10,
11,16,17,24
82:6 91:13
116:3
**researched**
103:9
**researcher**
10:1 11:3
**researchers**
10:8
**resident**
113:21,23
114:3
**resignation**
14:25
**resigned**
14:19,21
**resolved**
86:4,21,22
87:1
**respect**
130:9 131:14
**respond**
123:19
**response**
51:19 57:2
**Responses**
55:15 56:5
**responsibilit
ies**
8:25 16:9,12
17:6 18:13
25:16
**responsibilit
y**
9:11,12
18:16 19:15
34:12,22
35:23 37:4
61:24 93:19
94:19
**responsible**
9:15 10:22
28:16 73:1
**responsive**
62:2
**rest**
71:7 120:16
**restate**
4:25
**restriction**
122:14
**restroom**
5:3
**result**
16:18 26:25
**retained**
29:11
**retroactively**
47:8
**reveal**
123:7
**review**
6:8,11 42:20
44:3,8,16,20
45:12,18
82:2 92:16
96:17,19
100:7 121:22
129:23
130:2,3
**reviewed**
6:12 45:14
46:5 47:5
49:4,20
63:16,17
91:16 119:25
**reviewing**
58:1
**revised**
125:9
**Rhodri**
15:10,11
**Ric**
105:9,23
106:22,23
**Richard**
13:23 25:17

26:2,4
**Rick**
79:5 84:8,20
**right**
15:21,22 18:11 28:8, 25 32:6 35:17 39:22 44:25 50:2, 25 51:4,5,6 56:20,23 58:24,25 59:13 60:6 61:18 68:3 88:7 91:12 95:15 96:5, 25 100:24 101:23 105:19 106:7 113:5 117:1 118:17 123:9 125:5 127:4, 9 129:20,22, 25 132:13
**rights**
29:11 39:15, 16 43:6 112:15 113:7 116:15,18 118:19 120:8 122:1,14
**risk**
102:22
**Robinson**
99:19
**role**
7:9 8:18,21 14:18 36:25 37:8 40:9 54:12 55:8 68:22 88:23 98:9 115:2, 21 127:15 129:7 131:6
**roles**
8:10 9:16 10:8,11 11:4,5 16:12

83:13
**room**
5:14 7:5 51:11 69:10 70:18 106:10
**Ross**
73:12,17,20 75:10,16 76:4,5,18
**rough**
132:17,18
**Rourke**
51:23
**routinely**
112:6
**Row**
55:10 76:25 78:18,23 79:2,13,15, 25 93:2,4 130:23
**rules**
4:15
**run**
23:16 60:7 99:12 113:2 115:5
**runs**
40:25 110:6
**Russia**
23:3
**Russian**
23:4,5

**S**

**sack**
36:23
**safety**
19:19 20:16 22:24 23:6 27:5
**salary**
53:21
**sales**
95:25

**Samir**
6:19 16:8
**Sarah**
106:21
**Sasha**
7:4 56:1
**sat**
109:16
**satellite**
23:12
**satisfied**
44:14
**satisfy**
66:9 91:11
**saved**
107:22 110:2 112:8
**saves**
107:10
**saying**
47:16 78:25 96:22 116:7 121:5
**says**
33:17 38:24 56:21 70:18 95:21 96:11
**scan**
78:19
**scant**
76:3
**schedule**
9:6 16:15 77:1,2 84:4 88:12 130:1
**scheduling**
9:5 114:16
**school**
21:22
**science**
21:10,11,15
**scope**
32:1 71:15, 16 72:2,8 77:10 94:24
**scratch**
36:17

**screen**
33:3 55:19
**script**
46:1,11 49:18 78:19 104:23,24 106:13 107:9,11,13, 22,23,25 108:1,3,9, 13,17 109:19 111:10,11, 15,16,21,23, 25 112:3 117:11 119:25 121:4
**scripting**
104:2,19 105:6
**scripts**
112:4,7
**searches**
131:16
**second**
12:18 32:12 33:19 46:10 64:4,21 65:15 67:15 68:3,18 69:6 70:15 74:4 77:13,15,22 78:18 82:22 83:16 84:7 85:11 87:13 90:9 93:10 98:19 130:11 131:5 132:14
**seconds**
55:21 103:2
**section**
46:24 48:13
**sections**
119:12 121:9,11
**secure**
72:13
**see**
5:15 20:22,

23 21:4 23:5 33:4,21 37:8,10 42:25 43:8, 15 44:6 47:25 48:20 52:14 57:12, 18 58:7 60:13,21 61:8 62:16 63:7 69:3 72:20,23 74:7 75:4 78:22 82:8, 25 83:20 93:13 95:23 96:2,7,12,15 100:13 101:9 102:5 104:6 106:18 109:10 111:17 112:19 114:8 115:4,23 118:5 122:5, 17 124:12 131:18
**seeing** 76:1
**Select** 40:25 41:4,5 113:3 123:16
**self-contained** 73:15
**sell** 19:13
**send** 26:13,14,21 28:5
**sending** 93:15 94:11
**senior** 54:15,16,19 89:15 98:10
**sense** 37:1 104:23
**senses** 18:15
**sentence** 82:22 83:5, 6,9,16 84:7 90:6 93:10 101:5 102:1 122:13
**separate** 39:1,2,10,11 92:8
**September/october** 125:13
**sequence** 68:17 109:1
**sequentially** 60:18 68:12
**series** 4:17 32:9 57:1,2 91:15 132:2
**served** 11:16
**Service** 19:24 39:9
**serving** 14:18 15:23
**set** 9:7 28:18 55:16 75:19
**sets** 100:21
**setting** 108:17
**seven** 60:5 62:11
**several** 48:22 106:19 107:12 111:2 117:15 121:9 125:20
**Shah** 6:19 12:7 16:8
**share** 68:6 87:9
**shared** 50:12,21
**shining** 5:15
**shops** 46:25
**short** 121:8
**shortened** 114:18 119:5
**shorter** 34:17 46:3 109:10 118:22 119:2
**shot** 93:1 130:18
**show** 30:12 98:20 114:17
**showing** 118:15 122:9
**shown** 19:20,22,24 20:14,18 21:25 22:16 23:7 27:7 44:13,14 118:13 132:8
**sic** 11:15
**side** 4:10 37:9 38:2 51:3 86:7
**sight** 100:22
**sign** 18:5 59:13 117:18 120:20 131:25 132:20
**signed** 17:13,17 117:14 120:1,22,24
**significant** 61:20,24 71:5,19 72:5,17
**significantly** 62:14 71:10
**signoff** 120:14
**similar** 23:11
**simple** 19:9
**single** 114:3
**singular** 46:19
**sir** 5:10 24:10 41:7 52:24 54:2 59:4 81:17 113:18
**sit** 10:15,16
**site** 23:12
**sites** 124:19
**sitting** 7:3 105:20
**skeleton** 74:1
**skilled** 9:24
**skip** 100:11
**slight** 84:17
**slightly** 75:19 99:24 116:12 125:9
**small** 70:4
**smaller** 82:13 83:13
**smoother** 4:16

**software**
110:6,7
**sold**
113:11
116:19
122:11
**solicitor**
35:15
**sort**
4:21 9:24
16:16 35:5
37:16 53:22
55:6 59:15
61:23 64:2
68:14,15,20,
24 69:3,9
70:17 73:14
75:25 87:18
89:16 93:20
94:19,22
97:19 100:16
105:18
106:11
114:13
**sorting**
129:4
**sorts**
22:23
**sounds**
51:4 126:10
**source**
99:22
**sources**
88:3 128:14
**sourcing**
10:22 128:23
**South**
127:12 128:5
**speak**
7:13 51:9,13
70:13 75:16
77:21
**speaking**
7:20 8:17
11:7 22:6
70:20 71:1
86:20 94:13
97:25 101:20
119:3
**special**
77:6
**specialist**
101:21
**specialize**
124:19
**specific**
8:15 17:10
27:15 40:3
50:17 53:15
92:4 93:4
102:15
104:11
124:15
125:11 130:4
**specifically**
44:24 78:11
83:13 99:8
124:14
**specification**
9:7 31:17
35:4
**specifications**
17:20,23
**specifics**
87:8
**speculate**
4:21
**speculation**
24:8
**speech**
104:4 121:7
**speed**
60:7 103:7
**spell**
11:19 14:15
15:13 54:9
**spelled**
15:16
**sphere**
25:25
**spillover**
62:18
**spills**
57:10
**split**
84:2
**spoke**
51:11,14
128:21,22
**spoken**
26:2,5 80:8,
9 113:2
132:7
**sporadic**
70:2
**spreadsheet**
102:9 129:10
**spreadsheets**
122:10
**squaring**
99:2
**staff**
8:7 23:17,20
86:9 94:12
**stage**
39:13 59:22,
23 60:1
**stages**
58:14 59:21
60:17
**stakeholders**
22:23
**Stan**
70:4
**stand**
127:14
**standard**
36:18 119:6
**standards**
36:7 37:21
86:13 125:6,
18
**stands**
70:9
**start**
89:8 96:11,
14 108:22
**started**
8:9 95:9
106:2 125:23
**starting**
12:20 90:6
96:10
**starts**
31:12 56:13
60:25
**state**
42:23 43:5
47:15 78:3
127:17
130:22
**stated**
44:2 46:9,13
49:3 73:20
91:5
**statement**
33:25 63:9,
23 90:12
91:24 92:19
103:13
122:7,22
123:6,14
**statements**
6:12
**states**
23:23 43:22
44:1 45:9
52:11 57:6
63:6 72:21
73:21 75:9
78:7,12 79:1
82:7,23
83:9,17 85:5
93:11 96:7,
18 100:10
101:5 102:1
104:2
112:14,17,23
114:6,7,25
115:19
119:15
121:25
122:3,13
124:8 126:22
128:2,3,5
131:5

**stating**
112:21
**status**
129:11
**stay**
87:14
**staying**
10:17 78:24
**step**
34:15
**stick**
34:11
**sticks**
37:9
**stop**
50:2
**stopped**
14:18
**story**
19:4
**stream**
112:16 131:4
**streamed**
132:4
**street**
94:6
**stricken**
50:9
**structure**
38:22 86:11 89:15
**Stuart**
99:19
**studios**
18:20 19:10 25:22 26:14 27:11,18,19, 23 28:1,2,6, 17 37:24 38:7,16,23 39:1,3,10,17 40:4,15 41:8,15,16 43:7,11,16 114:25 115:1,20,21 121:25
**stuff**
109:3 130:16
**subcontractor**
36:12
**subject**
6:3 37:14,20 53:8 57:6 60:11 61:6, 13 80:2 86:12 119:20
**sublicensed**
43:6,13 116:9
**sublicensing**
43:15
**subparagraph**
95:8
**subparagraphs**
48:23 49:8 95:7
**subsections**
12:13
**subsequent**
64:1 94:9 109:23
**subsequently**
122:23
**substance**
52:1
**substantive**
50:3
**sufficiently**
66:4
**suggestion**
92:10
**suite**
110:11 111:25 119:9
**superiors**
120:7
**supervise**
37:17
**supervision**
36:25
**supervisor**
74:3
**supervisory**
85:22
**suppose**
34:9 36:10
**sure**
6:3 9:5,19 10:17 14:16 15:19 19:21, 25 20:2 21:6 22:11 23:5 32:13 34:11 35:12 36:17 37:8 45:2,4, 16,24 47:21 48:3 53:13 62:17 66:3, 14 68:10 70:7,8 74:10,24 76:10,13 77:24 81:11, 17,21 86:14 92:15 100:3 106:3 108:21 119:11 120:14 130:21 132:16
**surname**
51:15
**swap**
109:2
**sworn**
4:2
**system**
102:24 108:23 122:15

**T**

**T-O-W-E-Y**
54:5,8
**T-U-R-N-E-S-S**
14:16
**tail**
74:14
**take**
5:1 7:16,24 18:2,7 19:12 22:9 42:19 43:22 51:1 53:22 56:20 59:2 62:5,17 68:25 69:2 82:2 90:5 92:16 93:6 96:17 97:12 100:7 102:10,21 121:22 123:12 124:22 125:25 126:3 128:11 132:16,18
**taken**
51:7 66:23 124:20 126:11
**takes**
39:3 109:6
**taking**
72:14
**Talfan**
15:11
**talk**
18:22 23:3 63:3 75:1 89:8
**talked**
82:6 95:5 110:23 128:25
**talking**
11:7 22:5 56:11 76:4
**tangent**
25:6
**tariff**
31:10
**team**
6:25 7:1,15, 16 10:9,10, 16,19,20

11:1,2 16:15 18:19 23:5 49:23 51:12 65:8 69:9 71:7,11 80:8 82:6,7,10, 11,14,17,24 83:5,6,10 87:18 90:14 92:20 94:20 106:11 122:23 124:3,19 126:21

**teams**
9:3,12,14,16 10:7 16:11 76:2 123:15

**technical**
10:11 17:22

**teenager**
21:12

**televised**
66:21

**television**
68:15 101:7

**tell**
8:9 24:1,3 27:13 58:2 62:6,12 78:14 81:6 88:21 92:4 99:12 102:22 115:8 125:2 128:18

**telling**
4:1,7 6:8 12:4 22:14 25:9 29:1 32:14 33:13 37:23 38:12 41:22 43:18 45:6 47:23 48:19 51:9 52:7,22 56:12 58:2 61:17,18 70:20 81:7 85:11 90:5 95:12 103:5 116:6 126:13,20 132:12

**ten**
34:17,19 51:1 81:24 82:7,23 83:6,17 84:7 90:5 104:10 107:15 125:21 126:6

**tend**
10:15

**term**
70:6 99:18

**terms**
6:4 20:2 40:4 44:17 58:20 93:15 106:17 107:23 108:12 109:7,10,12

**territories**
18:23 20:20 44:13 113:10 131:7

**territory**
20:15,18 23:7 27:7

**testified**
4:3 33:23 36:4 126:24 127:2

**testimony**
13:7 30:3 36:1 37:7 49:3 64:5 70:12 90:20 127:14

**thank**
5:11,15 6:6 12:2 33:8 38:19 50:9 51:5 126:10, 13 127:13 131:3 132:12,13

**that'll**
39:24

**there'd**
23:19

**thing**
11:8 48:12 56:11 68:25 69:9 96:18 109:9 120:13 124:9

**things**
9:25 10:18 37:15 44:17 45:11 90:2 114:18,19 124:20 130:3

**think**
12:11,14 13:3 14:5 15:8 16:3,7 18:23 19:17 25:21,23 30:6,7 31:22 39:4 44:16 45:24 46:4 49:9 50:19 52:19 53:25 54:4,9 55:22 57:14 61:22 62:9,20 63:24 64:17, 20 66:14 67:6 69:12, 14,22,25 70:1,3,9,16, 18 71:3,8 72:11,16 73:17 75:18, 24 76:5 78:19,22 79:10,20,24 83:7 84:19, 20,25 86:9 87:11,15 89:5,13,24 94:9 97:25 101:18 106:22 107:9,15,23, 25 109:13 115:5 117:12 122:11,20,23 123:18,20 125:9,12 128:25 130:12

**thinking**
67:7

**third**
83:9 127:3

**Thompson**
84:19

**thought**
64:15 77:23 89:7 106:14 130:13

**thoughts**
106:14

**thousands**
97:21

**threats**
23:1

**three**
7:19 11:2 39:2 43:19 47:13 59:23 60:4 61:7 109:14

**thrown**
112:4

**tick**
68:24

**Tiktok**
130:16

**time**
5:5 8:7 9:15 16:5 53:13 59:16 64:17, 20 66:22 69:13 70:22 72:9,10 84:2 107:10,11 117:12

121:8,18 125:13,17 126:4,5,9,13 127:9 129:17 130:20 132:11
**timeline** 108:25
**times** 104:16 106:19 117:15 124:17
**timing** 114:16
**titles** 13:1
**Tobin** 5:18 6:6 7:3,17 11:19 14:3,22 15:25 20:6 21:1 23:13 24:7,18 26:11 28:13 29:5,21 30:4 33:6 34:25 36:9 37:5 38:4,19 40:6,17,23 41:18,23 44:23 45:2 47:7,17 48:6,14 50:2,9,13 51:4,8,20 52:18 55:21, 25 56:8 57:24 58:5,9 61:13,16 64:24 67:4 69:7 74:12 77:17 80:18 81:2,12,18 89:5 90:19 92:2 94:16 98:13,21 99:10 103:16 108:5 110:3 113:14,25 115:5,8,12 116:10 120:19 122:25 125:25 126:6,10,15, 19 127:22,24 128:1 132:9, 13,18
**today** 4:16 126:14
**today's** 6:9 7:14,23
**told** 42:15 58:7 80:10 90:15 91:13 92:21 98:19 103:20 123:5
**tongue** 15:17
**top** 114:12
**total** 48:23
**totality** 90:23 91:6, 25 103:21
**touch** 124:21
**touched** 37:23
**Towey** 53:25 54:4, 8,19 73:9 74:5,13 76:18 82:12, 18,19 83:2, 11,22 85:4 92:23,24 104:15 106:12,25
**track** 47:17 48:20, 21 56:9
**tracking** 119:10
**trail** 71:9
**training** 35:16
**transmit** 131:4
**transmitted** 132:4
**transposed** 107:4
**travel** 83:25
**traveled** 126:22,25 127:17 128:6
**trials** 66:6,7,9,17, 20
**trick** 21:5
**trim** 120:18
**trip** 83:17,23 84:6,15,23 85:6 87:11 93:25 94:8, 24
**trips** 94:3
**true** 44:2 92:19 97:2 122:7, 19 123:14
**Trump** 33:19 66:7
**Trump's** 79:15 104:4 121:7 122:1
**trust** 99:3
**trusted** 99:3
**try** 4:15 19:12 32:7,12 39:23 84:18 87:10 108:11
**trying** 6:14 14:2 19:17 21:5 45:13 48:3 55:6 57:14, 17,20 74:19 86:17
**turn** 33:12 43:18 56:13 60:3 62:22 63:2,4 72:18 90:4 92:13 93:9 95:16 96:9 100:4 112:9 114:22 121:19
**Turness** 14:14
**turning** 52:7 81:24 95:7 103:5 117:25
**Twenty-five** 123:10
**Twenty-six** 124:5
**two** 10:21 24:12 25:13,15 27:17 36:24 38:9 39:12 47:13 48:13 51:22 56:14, 21 59:22 60:25 62:12 63:24 64:6, 17 65:6 73:8 83:6 87:8,23 88:1 92:9 96:14 99:21 107:4 113:7 116:19 124:24 126:1 130:24

**type**
6:16

## U

**UK**
67:7 118:16, 17 119:7
**ultimate**
116:15
**ultimately**
28:10 29:7 30:11,14 32:17 37:12 68:18 69:5 87:23 102:10,18 105:23 120:17 129:5
**unacceptable**
34:18
**unauthorized**
124:11,15
**underspending**
31:22
**understand**
4:24 14:24 24:22 38:23 40:8,13 41:1 59:20 64:5 74:19 76:6 100:17 129:8
**understanding**
14:17,20 15:23 30:1 32:1 40:3, 12,15 41:8, 21 42:13 57:20 58:12 65:24 66:1, 12 67:16 74:23 76:21 86:18 95:12 107:20 117:2,9 120:10
**understood**
4:23 45:3
**unfair**
53:22
**united**
23:23 73:21 75:9 78:7,12 79:1 83:17 85:5 112:17, 23 114:7 122:3 126:22 131:5
**unlike**
118:23
**unmet**
67:9
**upcoming**
66:6
**update**
91:8
**updated**
125:14,19
**updating**
107:13
**upwards**
31:12 109:15
**USA**
41:13,15

## V

**various**
9:3 20:17 23:2 45:22 83:18 104:25
**vary**
23:8
**VAT**
96:6
**verbal**
111:4
**verbally**
110:22
**verbatim**
82:3
**verification**
88:2
**version**
46:2,3,11 49:19 107:10,22 109:8,24 111:25 112:2 118:3,7,10, 20 119:16, 23,25 120:1, 3,20 121:5, 6,9 125:8,9 132:1
**versions**
107:12,16,18 109:7 110:12 111:9 119:6
**video**
108:16
**Videoconference**
132:21
**view**
17:24 130:20
**viewed**
106:19 117:8 128:23
**viewers**
66:9
**viewing**
109:11,21,23 110:23 121:2
**viewings**
109:15,16 110:1
**views**
109:12
**visibility**
84:4
**visited**
24:2
**vote**
70:13

## W

**W-I-G-H-T-M-A-N**
11:25
**waiting**
89:5
**waiving**
57:7
**want**
9:18 12:19 19:3,20 20:2,11 27:6 37:13 42:3, 19 45:2 47:19 48:15 53:15 57:13 58:9 60:3 67:11 81:4 93:9 114:19 117:9 118:13,24,25 125:3
**wanted**
34:17 65:4 76:10,13 77:20 87:13 91:11 94:8, 23 113:8 114:17 115:9 120:7
**wanting**
87:10
**Washington**
24:2 78:16 79:7 84:10 126:25 128:6
**waste**
67:11
**watch**
66:25
**watched**
121:2,3
**watching**
106:12

**way**
8:8 36:11 38:5 62:23 81:10,16,21 82:16 86:7 108:14 125:22,23
**website**
97:7,18
**week**
5:23,24
**weeks**
97:9,12 99:1 107:15 109:6,7
**Welsh**
15:16
**went**
25:6 64:2,17 78:18 80:14 85:4 86:8 91:15 127:3
**West**
24:12
**whatsoever**
28:9
**whichever**
124:22
**wholly**
124:11,14
**wide**
130:18
**Wightman**
11:14,25 12:2,3,21 22:18,19,21 25:10 27:1 28:5 29:2 68:8,13 87:22 102:19 105:7,22 106:19 107:1
**Wilcox**
7:4,8,18
**Wilcox'**
7:9
**Williamson**
105:19 106:5,25
**Wilson**
84:20
**Wineman**
11:15
**wiring**
36:13
**witness**
4:2 11:24 17:2 21:6 45:4 47:25 52:5 55:18 56:16,18 61:22 74:15 94:18 115:7,14,16 127:20,24
**wonderful**
55:18
**Wong**
51:14,25
**word**
19:11 38:7 58:12 66:13
**words**
37:3 67:2
**work**
10:4 19:6 23:18 32:7,12 36:16,23 42:15 53:14,17 54:24 73:25 75:13 81:4 85:2 108:12,22 112:3 116:14 123:16
**worked**
8:18 54:13 55:5 87:11,17 121:14 129:15
**working**
25:14 73:13,21 75:10,21 77:1 99:1 109:19,21 110:25
**works**
34:7 42:10 74:22 104:15 106:8 117:16
**worldwide**
118:14
**worried**
35:4
**worrisome**
71:10
**wrapped**
126:3
**write**
104:22
**writing**
26:13 106:2
**written**
26:22 64:20 67:20 100:21 101:12 111:8 117:8,12
**wrong**
11:8 18:7 19:11 98:11 106:15 115:6
**wrote**
6:14 64:18,21 65:14,15 111:24

**Y**

**Yas**
69:22
**Yasemin**
69:13,22
**yeah**
7:19,20 8:16 11:1 12:5,23 13:18,21,23 15:19,22 17:9 18:15 20:8,13 22:9,13 23:15 24:17 27:2 28:8,24 32:18,22,25 33:6,15 35:14 38:20 41:25 42:7,12,22 43:1,21,25 44:7 45:1,4 46:1,20 48:8 50:5 51:2 54:7 56:10,18 57:4,12,13 58:21 59:5,25 60:9,14 61:1,4,9,22 62:20 63:12 64:7 65:1 68:8,14 70:14,16,17 72:20 73:22 74:8,15 75:19 76:5,9,16 77:5,7 79:14,18 80:1,4 82:1,5,9 83:1,12,21 85:10,17 86:14,24 87:3,8 88:4,7,18 89:1 90:8,11 91:7 92:15,18,25 93:8,14 94:7,15,18 95:4,15,18,24 96:8,13,16,20 99:20 100:6,9 101:3,10,14,25 102:6 103:12 104:14 107:4,6,22 108:4 111:6,22 112:11,13,20 114:24 115:7,16,24 116:12,20

118:2,6
121:21,24
122:6,18
123:9,11,15
124:7,13,17
125:2,8
126:6,23
127:1,7,9,
10,12,20
128:12,21
129:10,16
130:12
131:20,25

**year**
14:19 125:9,
10

**years**
24:5 92:9
125:20,21,22

**yielded**
70:13

**York**
24:2

**Youtube**
20:21 124:9,
18

**Z**

**zoom**
27:15,16
45:6 65:8

**Zooming**
85:11