UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CV-25894-RKA

PRESIDENT DONALD J. TRUMP, an individual,

Plaintiff,

-vs-

BRITISH BROADCASTING CORPORATION a/k/a BBC, BBC STUDIOS DISTRIBUTION LIMITED, and BBC STUDIOS PRODUCTIONS LIMITED,

Defendants.

---

CONFIDENTIAL VIDEO-RECORDED ZOOM DEPOSITION OF:
REPRESENTATIVE OF BRITISH BROADCASTING CORPORATION
RICHARD BURGESS

DATE TAKEN: May 29, 2026

TIME: 1:32 p.m. - 4:43 p.m.

PLACE: All Parties Appeared Remotely via Zoom

Stenographically Reported Remotely By:

Sharon Ambersley, FPR
Notary Public, State of Florida
U.S. Legal & Support

\- - -

APPEARANCES:

On behalf of the Plaintiff:

ALEJANDRO BRITO, ESQUIRE
IAN CORP, ESQUIRE
JALAINE GARCIA, ESQUIRE
MICHAEL MENA, ESQUIRE
BRITO, PLLC
2121 Ponce De Leon Boulevard
Suite 650
Coral Gables, FL 33134
abrito@britopllc.com
jgarcia@britopllc.com
icorp@britopllc.com

On behalf of the Defendants:

CHARLES D. TOBIN, ESQUIRE
SASHA DUDDING, ESQUIRE
BALLARD SPAHR, LLP
1909 K Street, NW
12th Floor
Washington, D.C. 20006
tobinc@ballardspahr.com

ALSO PRESENT:

NICHOLAS WILCOX, IN-HOUSE COUNSEL

KYLE HANKINS, VIDEOGRAPHER

# I N D E X

WITNESS:

Richard Burgess

Direct Examination By Mr. Brito 5

Cross Examination By Mr. Tobin 100

\- - -

## E X H I B I T S M A R K E D

\- - -

PLAINTIFF'S EXHIBIT 26 Notice of deposition 6
PLAINTIFF'S EXHIBIT 13 Secondment agreement 18
PLAINTIFF'S EXHIBIT 15 Program production agreement
PLAINTIFF'S EXHIBIT 1 Email string 58
PLAINTIFF'S EXHIBIT 2 Email 64
PLAINTIFF'S EXHIBIT 3 Email 66
PLAINTIFF'S EXHIBIT 4 Email 67
PLAINTIFF'S EXHIBIT 5 Emails 67
PLAINTIFF'S EXHIBIT 6 Email 68
PLAINTIFF'S EXHIBIT 7 Email 69
PLAINTIFF'S EXHIBIT 8 Screenshot 69
PLAINTIFF'S EXHIBIT 9 Email 72
PLAINTIFF'S EXHIBIT 10 Email 73
PLAINTIFF'S EXHIBIT 11 Email 76
PLAINTIFF'S EXHIBIT 12 Email 80
PLAINTIFF'S EXHIBIT 14 X post 81
PLAINTIFF'S EXHIBIT 18 Email series 86
PLAINTIFF'S EXHIBIT 19 Email series 88
PLAINTIFF'S EXHIBIT 21 Email series 90
PLAINTIFF'S EXHIBIT 32 Email 98

P R O C E E D I N G S

\- - -

Deposition taken remotely before Sharon Ambersley, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- -

THE VIDEOGRAPHER: Good afternoon. We're now on the video record. Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there is a request to go off the record. This is the video-recorded deposition of Richard Burgess as the corporate representative of British Broadcasting Corporation. Today is Friday the 29th of May 2026. The time is currently 1:33 p.m. Eastern Standard Time.

We're here in the matter of President Donald J. Trump versus British Broadcasting Corporation also known as BBC, BBC Studios Distribution Limited and BBC Studios Productions Limited. At this time will all counsel state their appearances for the record beginning with plaintiff's counsel first, please.

MR. BRITO: Good afternoon. Alejandro Brito and Ian Corp on behalf of the plaintiff.

MR. TOBIN: Hi, this is Chuck Tobin with Sasha Dudding, both with Ballard Spahr, along with Nick Wilcox, in-house counsel on behalf of the British Broadcasting Corporation.

THE COURT REPORTER: Can you raise your right hand, please? Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

Thereupon,

Richard Burgess,

having been first duly sworn, was examined and testified under oath as follows:

DIRECT EXAMINATION

BY MR. BRITO:

Q Good afternoon, Mr. Burgess.
A Good afternoon.
Q Can you hear me okay?
A Yes, I can.
Q Fantastic. Mr. Burgess, my understanding is you gave a deposition in this case on April 24 and my understanding is that you understand the rules of how a deposition works; is that fair?
A Yes, that's fair.
Q Okay. When you testified on April 24th you

did so truthfully and accurately, correct?

A That's correct.

Q You've been designated today as a representative of the BBC on various topics that have been listed on the deposition notice. Are you familiar with that?

A I am, yes.

Q Let me just for ease of reference, let me show you what's been marked as Exhibit 26.

MR. TOBIN: Alex, he also has it in front of him if you're talking about the notice.

MR. BRITO: I am. Thank you very much. I appreciate it.

MR. TOBIN: You bet.

(Plaintiff's Exhibit No. 26 was marked for identification.)

BY MR. BRITO:

Q So Exhibit 26 -- we don't need to put it on the screen since Mr. Burgess has it. If you turn to the last page it has Schedule A and it has eight designated topics. You've been designated to testify on behalf of all eight of those topics for the BBC with certain limitations that we have agreed to amongst the lawyers, correct?

A That's correct.

Q Did you review any documents in preparation for the deposition, sir?
A Yes, I did.
Q What did you review?
A I reviewed the program production agreements between the BBC and October Films, the general terms in terms of agreements between the BBC and the independent producers. I reviewed the commissioning spec documents in relation to this documentary, the compliance form in relation to this documentary. I reviewed documents in relation to the jurisdiction so the email from Adam Bullmore who is the CEO of October Films to me, a sales list from Blue Ant, an email from Little Dot to the BBC and to Blue Ant confirming that they did not sell the film in the USA. That's an email from their senior acquisition manager. There will be a list of content that has been on BritBox from October 24 until April 26 and then a list of content on BBC Select on the same dates. I reviewed corporate documents regarding BBC News USA Inc. I reviewed Division of Corporations in Florida. I have reviewed Department of Revenue documents from Florida. I have reviewed telephone records, telecommunications records, bank account details in relation to BBC News USA Inc. I reviewed the pitch documents in relation to the program. I reviewed

certain emails between the program teams. I reviewed the staff list at the Coral Gables office in Miami. I reviewed the X posts in relation to the documentary. I reviewed the BBC schedule in relation to the documentary in question. I reviewed a Getty images invoice from October Films, a licensing agreement between October Films and Celebro Media, an edit decision list for the program in question and at this time those are what I can remember that I reviewed.

Q Did you review the motion to dismiss that's been filed by the defendants in this court action?

A I did review the motion to dismiss. Yeah.

Q Did you review the declaration that you previously provided in this case?

A Yes, I did.

Q Did you review the deposition transcript of your prior deposition?

A I did, yes.

Q Did you review the declarations and/or the transcripts that were supplied by Mrs. Telling, Cooper and/or Freeman?

A Yes.

Q Did you review answers to interrogatories that BBC supplied?

A Yes.

Q Very well. Who did you speak to if anyone in preparation for the deposition?

A I spoke to the Panorama team who made the documentary and the senior leaders in that team, so the head of current affairs, Joanna Carr; the deputy head of current affairs at the BBC, this is Jim Gray; the executive producer Leo Telling; the editor of Panorama Karen Wightman; and the producer Matthew Hill. I spoke to individuals from Celebro Media so Maxine Hughes and Angelina McCahey. I spoke to the director of BBC news USA Inc. John McPherson. I spoke to corporate secretary at the BBC Jackline Ryland. I spoke to the regional director for USA BBC Kevin Ponniah. I spoke to Paul Alexander who is an archivist for the BBC who works on the program. And those are the people I can remember at this point in time.

Q Very well. When you met with these individuals or spoke to these individuals, did you take any notes of those conversations?

A No.

Q You are the BBC's director of news content, correct?

A That's correct.

Q And since February of 2024 you've been responsible for current affairs?

A That's correct.
Q And the Panorama component of the BBC, that falls within current affairs, does it not?
A That's correct.
Q You also sit on the BBC news board?
A That's correct.
Q Let me ask you about the documentary in question that we are here on. BBC retained final editorial control over that documentary, correct?
A That's correct.
Q And everything that is broadcast on the BBC required final sign off by the BBC, correct?
A That's correct.
Q And that includes editorial sign off?
A That's correct.
Q And that would apply to the documentary as well?
A Yes. That's clearly set out in the general terms that I mentioned previously in relation to independent production companies and the BBC where it's clear that the BBC has final editorial control.
Q Okay. And that outside production company you're referring to as it relates to this particular documentary is October Films; is that fair?
A That's right.

Q October Films does not have the authority to override that ultimate decision making authority of the BBC, correct?

MR. TOBIN: Object to form.

THE WITNESS: As I was referring to before, the terms of use, the general terms, sorry, in relation to independent productions and the BBC it's clear that the BBC retains final editorial control.

BY MR. BRITO:

Q And that final editorial control applies irrespective of where the broadcast is being displayed; is that fair?

MR. TOBIN: Object to form.

THE WITNESS: I don't understand -- I don't understand the question.

BY MR. BRITO:

Q To the extent there's any information that's broadcast by the BBC that contains different versions of that broadcast, irrespective of the version, irrespective of where the BBC material broadcasts, BBC retains the editorial control, correct?

MR. TOBIN: Object to form.

THE WITNESS: I think it's more straightforward if I just reiterate what I said

previously which is that it's really clear within the general terms in terms of independent productions for the BBC, the BBC retains final editorial control. Those terms are also clear that the BBC has UK rights for those programs.

BY MR. BRITO:

Q Okay. Is it your understanding that certain parties were responsible for creating and producing the documentary?

A October Films were responsible for producing the documentary.

Q What about the creation of it?

A Yeah. October Films pitched the documentary to the BBC and it was commissioned by the BBC so, yeah, October Films.

Q And it was produced in London; is that fair?

A That's correct.

Q The producer of the documentary was Matthew Hill, was it not?

A That's correct.

Q He's a BBC employee?

A He is and he was seconded to October Films for this documentary.

Q And that was done through a loan-out agreement, correct?

A Through a standard, yes, secondment agreement.
Q So if I understand the testimony, Mr. Hill who is a BBC employee produced the documentary while embedded at October Films; is that fair?
A Mr. Hill was on secondment to October Films.
Q What's your understanding as to what that means?
A Well, that means he was working for October Films.
Q While also serving as a BBC employee?
A But he was on secondment to October Films from the BBC.
Q Right. And during that period of time he was still a BBC employee is my question?
A Well, he's on secondment. He's -- how to say it? He's on secondment to October Films for -- in order to produce this documentary for October Films.
Q And I appreciate it. There may not be another way for you to answer that question for me and that's fine, but my question is a bit different. What I'm saying is while -- while Mr. Hill was involved in the documentary, he was still a BBC employee; that did not cease to exist, correct?
A He remains a BBC employee now. During the period of the documentary he was on secondment to

October Films.

Q When he was with October Films, was he -- was Mr. Hill being compensated in any way by BBC?

A I understand the October Films paid the BBC.

Q October Films paid the BBC and the BBC then paid Mr. Hill; is that what you're saying?

A I'm not sure of the exact arrangement.

Q Okay. So let me just ask you this conceptually without getting into the details, do you have an understanding as to what Mr. Hill's compensation structure is with the BBC?

A He's paid a salary by the BBC.

Q Is he paid any bonuses?

A Well, he may be, but I'm not aware of that particular --

Q Is he provided any other sort of incentives, insurance or any other type of incentive through the BBC?

A He may be. I'm not aware of it.

Q During the time that Mr. Hill was working with October Films, did any of the compensation that he was entitled to receive from the BBC, was that either terminated, suspended or modified in any way?

A I'm not aware of that.

Q With respect to the documentary there were BBC

personnel who exercised editorial functions over that documentary, correct?

A The executive producer was Neil Breakwell, from October Films, but who was an executive producer on the BBC side, Leo Telling, and also the editor of Panorama Karen Wightman.

Q So we have Ms. Wightman, but what about -- I'm not sure -- I just had the last name so I apologize if I say Mr. or Mrs. Carr, C-A-R-R?

A Mrs. Carr is the head of current affairs, so would not have had a direct role in the making of this documentary.

Q And I'm not limiting it to the creation. I'm speaking about editorial control. Would Ms. Carr have any editorial control over the documentary?

A I think it's simpler to say that Leo was the executive producer and Karen Wightman was the editor of Panorama. Karen Wightman signed off the compliance form.

Q Okay. I appreciate the fact that it may be simpler, but I want to make sure I get an answer to my question as well. Was Ms. Carr, did she possess editorial control over the documentary?

A No. It was Karen Wightman who signed off the compliance form.

Q O'Donnell, O'- D-O-N-N-E-L-L, did that individual have any editorial control over the documentary?

A Nikki O'Donnell is the editorial policy adviser from the BBC. So the BBC has -- it might be easier if I just explained this -- has a department that's all editorial policy and their job is to ensure that the BBC adheres to its obligations around impartiality, fairness, independence and for all long form content. There is an editorial policy advisor assigned to those programs and Nikki O'Donnell was the editorial policy adviser for this program.

Q Did Nikki O'Donnell have editorial control over the program?

A No. She's an advisor.

Q Did she have any specific role with the documentary?

A She was an advisor.

Q Last name Bailey, B-A-I-L-E-Y. Did that person have any involvement specifically with the documentary?

A Rick Bailey is also from editorial policy, but he is a specialist in politics and so when the BBC is doing stuff that is in relation to politics, then Mr. Bailey is consulted normally for his view. Again it

is advice and guidance. I believe he was consulted around the start of this program.

Q And he's a BBC employee?

A He is a BBC employee. Yes.

Q McColl, M-C-O-L-L? [SIC]

A Sarah McColl, yes. She is a duty lawyer.

Q Did she have any involvement specifically with the documentary?

A She was the duty lawyer assigned by the BBC for the documentary.

Q And she's also a BBC employee?

A He's a BBC duty lawyer.

Q And last name Alexander within the archive division, is that individual a BBC employee?

A Alexander, I think. I believe so.

Q And was Mr. Alexander involved with this documentary in any fashion that you're aware of?

A I believe so.

Q In what capacity, sir?

A I think he's an archivist.

Q But explain the -- aside from the fact that he's an archivist and works within the BBC archive division, specifically what involvement, if any, did he have with the documentary?

A I mean, personally wasn't involved day-to-day

with the documentary so I can't give you exact details, but his role is to source archive footage. That's what an archivist does.

Q Ms. Wightman as the editor of Panorama, she reported to Joanna Carr, did she not?

A That's correct.

Q And Joanna Carr reported to Jonathan Munro, M-U-N-R-O?

A That's correct.

Q And I believe you testified, but I'm just trying to make sure I understand the roster. Leo Telling was the executive producer of the documentary, correct?

A That's correct. On the BBC side, yes.

Q I'm going to put up on the screen what we'll mark as Exhibit 13, sir which is the agreement between BBC and October Films, the secondment agreement?

MR. TOBIN: Alex, what exhibit number is this?

MR. BRITO: Thirteen.

MR. TOBIN: Thank you.

(Plaintiff's Exhibit No. 13 was marked for identification.)

BY MR. BRITO:

Q Can you see the screen?

A Yes.

Q Do you recognize this to be the secondment agreement between BBC and October films?

A Yes.

Q Okay. And of we turn to the second page it refers to the BBC as the employer, Matthew Hill as the producer, and that the employer BBC is seconding him to October Films to provide services under this agreement, correct?

A Yes.

Q And if we look at the last page appendix one, it defines those services as the producer of the Panorama Trump documentary, correct?

A Yes.

Q This secondment that existed ran between April 8, 2024 and November 8, 2024; is that accurate?

A And I'll show you page three --

MR. TOBIN: I was going to ask you if you're relying on the document, would you please show us where.

BY MR. BRITO:

Q Sure. Section two says duration. You see that at the top of the screen?

A Yes.

Q And if you look at section three -- section 3.5 says the employer shall continue to pay the

secondee's salary and any allowances. Do you see that?
A Yes.
Q So while Mr. Hill was pursuant to the second secondment agreement working with October Films, he remained on the BBC payroll; fair?
A Yes.
Q And if we look at section 3.6 it reads that the secondee may be required to undertake normal BBC work during the secondment when not with October Films during the secondment period. Do you see that?
A Yes.
Q And that took place during the duration of this secondment agreement, did it not?
A I'm not aware of him undertaking normal BBC work.
Q But BBC and October Films and Mr. Hill had agreed that Mr. Hill may be required to undertake normal BBC work during the duration of this agreement, correct?
A That's what 3.6 says. Yes.
Q And during the term of the secondment agreement, the BBC through Mr. Telling remained as Mr. Hill's manager, correct?
A I'm not sure about that.
Q If you look at 3.7 it identifies that the BBC was required to use reasonable endeavors to ensure that

the secondee notify both the manager of October Films and the manager of BBC if there was any potential conflict of interest. Do you see that?

A Yes.

Q Does this period of time Mr. Telling was the manager of the BBC that Mr. Hill owed certain obligations to expressly pursuant to section 3.7; would you agree?

MR. TOBIN: Object to form. Answer as best you can.

THE WITNESS: Yeah. I think it's clear that the -- as a manager host Neil Breakwell and the manager of BBC Leo Telling.

BY MR. BRITO:

Q My question to you, sir, is under the term of this agreement, the term being from April of 2024 through November of 2024, Mr. Hill owed duties to both October Films and to the BBC and was required to report to two separate managers; would you agree?

MR. TOBIN: Object to form.

THE WITNESS: I think that paragraph is saying if there is any conflict of interest between the host and the employer then, you know, that would need to be informed the manager of the host, Neil Breakwell, and the manager which was October Films,

the manager of the BBC Leo Telling.

BY MR. BRITO:

Q Understood. And I'm not referring simply to that provision of the agreement. My question to you is far more broad question which is that throughout the term of the secondment agreement it -- would you agree that Mr. Hill owed separate obligations to BBC and to October Films?

MR. TOBIN: Object to form.

THE WITNESS: Well, it's clear that he had a manager at the BBC, Leo Telling. It's clear in 3.6. Sorry. The secondee may be required to undertake normal BBC work during the secondment. May be required.

BY MR. BRITO:

Q If I step on your answer, sir, it's not intentional. It's just because there's a little bit of a lag since we're doing this by video and sometimes you're pausing and I don't know if you are done. So the agreement contemplated, did it not, that Mr. Hill would be traveling outside of the United Kingdom for purposes of engaging in host businesses, correct?

MR. TOBIN: Object to form.

THE WITNESS: I know that Mr. Hill did travel outside of the UK in relation of this documentary

if that's the question.

BY MR. BRITO:

Q Where did he travel to?

A The United States.

Q On how many occasions?

A One occasion.

Q Where in the United States?

A To Washington and to Ohio.

Q Anywhere else that you're aware of?

A Not that I'm aware of.

Q Why did he travel to these two locations within the United States?

A He traveled to conduct interviews. He conducted interviews in Washington and he conducted an interview in Ohio with the contributor.

Q From a practical standpoint, would you agree that in relation of this documentary that the BBC supplied a producer which was its own employee while October Films served as the production vehicle?

MR. TOBIN: Object to form.

THE WITNESS: October Films was the independent producer and Matthew Hill was seconded to October Films.

BY MR. BRITO:

Q And the actual producer was Mr. Hill, the

vehicle, the entity that was used to serve as the production entity was October Films. Would you agree with that phrasing?

MR. TOBIN: Object to form.

THE WITNESS: It was October Films production. October Films owned the rights to the film. They licensed the rights, the UK rights to the BBC. They retained the worldwide rights for the documentary which they then licensed to Blue Ant.

BY MR. BRITO:

Q But in relation to the producer, that's an individual, not a company; would you agree?

MR. TOBIN: Object to form.

THE WITNESS: Matthew Hill is an individual. Yes.

BY MR. BRITO:

Q No, I know that Matthew Hill is an individual. What I'm saying is in the context of the terminology that we're utilizing, a producer is an individual, not an entity and in that instance it's Mr. Hill. Would you agree?

A Mr. Hill was the producer on secondment to October Films for this documentary, an October Films production. Yes.

(Plaintiff's Exhibit No. 15 was marked for identification.)
BY MR. BRITO:
Q I'm going to ask you to take a look at a new document for me please, which is Exhibit 15. And that is the program production agreement. Have you ever seen this document before?
A Yes.
Q All right. And this also as an agreement between the BBC and October Films and the subject is Panorama specials 24/25 (Trump). Do you see that?
A I do, yes.
Q If we look at under paragraph one it talks about contract representatives and it list BBC business affairs executive Simon Hughes and BBC's editorial representative as Leo Telling, right?
A Yes.
Q As part of this program production agreement October Films was required to comply with BBC guidelines, was it not?
A Yes.
Q Now I'm going to turn your attention please to page six -- actually, let me go to page five at the very bottom of page five. You have here the commissioning specifications and at the very bottom it says editorial

brief synopsis and that reads: Like it or not, and most Americans don't, it's probably Trump versus Biden again in 2024. Do you see that?

A I do.

Q Do you know who came up with that editorial brief synopsis?

A I don't know who wrote that, but the -- it was a pitch by October Films to the BBC.

Q Now if we go to the next page, page six, there is a section that says editorial compliance considerations. Can you see that on the screen?

A Yes.

Q And it reads potential editorial issues relating to compliance with the BBC editorial guidelines that either will or may foreseeably arise in connection with the program and how these will be addressed following discussions between the producer and the BBC editorial representatives; right?

A Yes.

Q Those editorial guidelines were imposed in this relationship by the BBC on the production on and publication of this documentary, correct?

A The BBC has guidelines in relation to fairness and to impartiality in all of its output, that's correct.

Q And in the section that identifies the specific information, it talks about in April 4, 2024 in appears to be a meeting between Neil Breakwell and Leo Telling. Do you see that?
A I do, yes.
Q Now do you know where that meeting occurred?
A I don't.
Q It then reads that the principles of fairness and due impartiality will apply when reporting on a foreign election. We will be mindful of the effects of our reporting that could be seen in territories where the vote could be affected. We will consult with the BBC's editorial policy advisor for politics Rick Bailey on any potential issues. Did I read that correctly?
A You did.
Q At the time that this program production agreement was being entered into, the BBC knew that it would be reporting on a subject matter that could have an impact on a foreign election, correct?
MR. TOBIN: Object to the form of the question.
THE WITNESS: Well, this section is a standard section around editorial compliance and the BBC's reporting on elections are rigorously enforced guidelines around fairness and impartiality so

that's correct. Yes.

BY MR. BRITO:

Q Okay. You said correct at the end and I just want to make sure you understood my question. At the time that this program production agreement was being entered into, the BBC recognized that this particular documentary would be reporting on a foreign election, correct?

MR. TOBIN: Object to the form of the question.

THE WITNESS: Well, the first sentence is clear. The principles of fairness and impartiality will apply when reporting on a foreign election because obviously this agreement was in relation to the UK rights.

BY MR. BRITO:

Q I get it, but when you said to me just a minute ago that this was standard language, I want to make sure that -- or something to that effect. I'm trying to make sure that I understand your answer and I want to make sure that you're answering my question as opposed to something else that maybe I didn't artfully ask you, so let me repeat myself. We've seen the language on page six. I'm not asking you to answer that in a -- answer my following question in a vacuum. I'm

asking generally speaking, at the time that the BBC was entering into a program production agreement for this particular documentary, it obviously recognized that it would be engaging and reporting on a foreign election, correct?

MR. TOBIN: Object to the form of the question. I'll also object because to my eye that does not appear in any of the topics noted in your schedule. I'm not going to instruct him at this point not to answer the question while it's pending, but we're getting close, Alex. Go ahead and answer the question as best you can.

MR. BRITO: Just to look at categories two and four and I think that those are captured by my question, but again I also don't want to belabor that point further.

MR. TOBIN: I don't agree with that, but we've had our conversation so please go ahead and answer the question pending as --

MR. BRITO: Very well.

MR. TOBIN: -- best you can.

THE WITNESS: The point I was making before is that the BBC has guidelines around reporting of elections those guidelines are around fairness and impartiality.

BY MR. BRITO:

Q Okay. I appreciate that answer. Now I'm going to move on to my question which is at the time that the BBC was entering into this particular program production agreement for this particular documentary, it recognized that it would be reporting on a foreign election, correct?

MR. TOBIN: Same objections. Go ahead and answer.

THE WITNESS: Well, the documentary was about the US forthcoming -- well, the documentary was about following key kind of Trump supporters over the course of the year to understand why Trump still appealed to a large majority of American voters so we call it Trump supporters, so that was the point of the documentary.

BY MR. BRITO:

Q And what we read on the preceding page just a minute ago where it talked about the editorial brief, it specifically said like it or not and most Americans don't, it's probably Trump versus Biden again in 2024; that was in relation to the upcoming election in the United States, correct?

A That's correct.

Q And so at the time that this production

agreement was being entered into, the BBC understood and recognized that it would be reporting on a foreign election, correct?

MR. TOBIN: Object to the form of the question. Go ahead and answer.

THE WITNESS: Well, it's reporting on why American voters might be about to elect Donald Trump for a second time. So it's not actually reporting on the actual election, but it's reporting on the -- on the build up to an election.

BY MR. BRITO:

Q And the BBC recognized at the time that it was entering into this program production agreement that its reporting on this subject matter could have an impact on the election, correct?

MR. TOBIN: Object to the form of the question. I'm going to instruct him not to answer that question because it is not called for within the topics that you drafted and that you clarified when we ask you some questions about it, so it's outside of the scope of this examination today.

MR. BRITO: I vehemently disagree because as I mentioned paragraph two talks about the decision-making process to broadcast the documentary in certain jurisdictions and number

four talks about BBC's intent behind the documentary, both of which are subsumed within the questions that I'm posing to this witness regarding a program production agreement that the BBC is starting -- is trying to hide behind to absolve itself of liability, so it is well within those topics, sir.

MR. TOBIN: Alex, I don't see anywhere where we have tried to absolve ourselves of liability by hiding behind a PPA. I have no idea what you're talking about, but if your foundation is the topics as written in the document, I'm going to stand by my instruction. You want to try and link it up better, we'll see what your next question is, but as it stands he's not going to answer that question.

MR. BRITO: My obligations are not to satisfy your standards, but rather to comply with what the law permits and requires. We've designated the topics. Mr. Burgess to my understanding was here to provide testimony to those topics. I provided you with two topics. To the extent that you are instructing him not to answer a question for something other than a privilege, then I think there will be consequences to that and obviously

we'll take it up with the judge at the appropriate time and if necessary we'll obviously bring Mr. Burgess back for a follow-up deposition, but be that as it may, I'm going to proceed with my examination.

BY MR. BRITO:

Q Mr. Burgess, if you look at the document that's in front of you, it says we will be mindful of the effect of our reporting that could be seen in territories where the vote could be affected. Did I read that correctly?

A Yes.

Q What territories is that in relation to?

A So this is agreement is in relation to the UK rights for the documentary. It's a program production agreement between the BBC and October Films, their licensing agreement that agrees that BBC has the UK rights.

Q Did you understand my question, sir?

A Yes.

Q Okay. Could you provide me with an answer, please?

MR. TOBIN: You want to repeat the question please, Alex. I thought he answered it, but I'd be happy to listen again.

MR. BRITO: Sure. I'd like to hear the answer this time.

BY MR. BRITO:

Q The language the agreement says we will be mindful of the effects of our reporting that could be seen in territories where the vote could be affected. My question to you, sir, is what territories is that in reference to?

MR. TOBIN: And I think he -- well --

THE WITNESS: I can answer the question. I mean, the program production agreement is clear that this is a program being licensed to the BBC for UK rights. The BBC is a UK public broadcaster. It produces programs for the UK public. That is what this agreement is about.

BY MR. BRITO:

Q I didn't ask you what this agreement is about, sir. I'll ask it now for a third time. I'm being very clear and I can understand that you don't want to answer my question, but I need you to, please.

MR. TOBIN: He's trying to answer your question. You can force him to answer it a certain way. If he's comfortable with his answer, he'll repeat his answer. If you ask a different question, he'll respond accordingly.

BY MR. BRITO:
Q What --
MR. TOBIN: Please don't badger him, Alex. You know better than that.
MR. BRITO: Trust me, I know far better when a witness doesn't want to answer a question. Trust me, I've seen this before.
BY MR. BRITO:
Q My question, sir, Mr. Burgess, there's the -- there's the word territories in the sentence that I read to you. Do you see that word?
A Yes.
Q What territories does that reference -- that pertain to in this agreement on behalf of the BBC?
MR. TOBIN: Answer the question.
THE WITNESS: I mean, I can only repeat what I have said previously which is that the agreement is clear. The agreement is an agreement for the UK rights to the documentary which is what the BBC had and that was what the BBC's interest was in this documentary, UK audiences.
BY MR. BRITO:
Q Can you name a single territory, geographic territory that is represented by the language that I have read to you in Exhibit 15?

MR. TOBIN: Object to the form of the question.

THE WITNESS: I don't understand the question.

BY MR. BRITO:

Q Does the United States fall within the description of reporting that could be seen in the territories where the vote could be affected, sir?

A I can only reiterate what I've already said which is what the purpose of the program production agreement is. It's really clear. If you go back to the top, it's really clear. It's around --

Q Is would be --

A It's around the UK rights.

Q It would be --

MR. TOBIN: Let him finish his answer, please.

MR. BRITO: He did. He finished.

BY MR. BRITO:

Q It would be clear if I was asking you --

MR. TOBIN: What you're doing is still talking. He has not finished his answer, Alex. So please stop interrupting and badgering him. If you don't like his answer, you can move on or you can re-ask it. If you think that there is a problem with him, we can take up with the judge later, but please let him finish his answer.

BY MR. BRITO:

Q Go right ahead, Mr. Burgess. Anything else you want to add on to tell me what the purpose of the agreement is which I didn't ask you about?

A I think I've been clear on the purpose of agreement and you can see it at the top of agreement.

Q Got you. You told me that. I'm still -- I still haven't asked you that question so I'm going to ask you the question I do want you to try to answer for me, please. Is the United States one of the territories that's referenced specifically in -- on this page in this section of the agreement that I'm asking you about?

A I can't answer that question. I don't know. I have been really clear about the point of the program production agreement which is around UK audiences.

Q I didn't ask you about audience. I didn't ask you about the purpose of the agreement.

MR. TOBIN: You did ask him about audiences. You asked him which territory and he gave you an answer, UK audiences. If you don't like him adding the word audience on it, that's on you, not on the witness.

BY MR. BRITO:

Q If I add the word audience, I would probably be a little bit more understanding to your speaking

objection, but I didn't say audience. I said territory, a physical geographic territory which I've mentioned now on a couple of occasions and so I'm not talking about an audience I'm talking about a physical territory of physical location. And so my question to you is the United States one of the territories that's referenced in this sentence on page six of this exhibit?

MR. TOBIN: Objection. Go ahead.

THE WITNESS: I can only reiterate what I already said which is that I think it's really clear that this document is around UK audiences or audiences in the UK.

BY MR. BRITO:

Q The language that I'm asking you, sir, says we will be mindful of the effect of our reporting that could be seen in territories where the vote could be affected, correct?

A Yes.

Q I want you to focus on the words seen in the territories. Do you understand the language?

A Yes.

Q Do you have any difficulty understanding what that says?

A No.

Q What territories could the reporting be seen

as it's referenced in this section of this document?

A Well, I know that the documentary wasn't seen in the United States of America, so maybe that answers your question.

Q No. Because this program agreement was entered into before the program was broadcast, correct?

A That's correct.

Q All right. So before it was broadcast there was language inserted into this agreement that said that the BBC and October Films will be mindful of the effects of our reporting that could be seen in territories where the vote could be affected. The territories where the reporting could be seen, does that include the United States as of the time that this agreement was being entered into?

A I'm not sure what they weren't referring to in terms of those territories. I can only be clear about what the point of the agreement is which is UK audiences and people viewing the film in the UK.

Q So you can't sit here -- sitting here today you can't identify a single geographic territory that's covered by the word territories on page six; is that correct?

A I can't specifically in the context of that sentence. That's correct.

Q Okay. It also says that the -- we will be mindful of the effects of our reporting that could be seen it territories, where the vote could be affected. Where could the vote be affected that the BBC needed to be mindful of the effect of its reporting?

A You're asking me the same question I think which is that I can't -- I can't answer what territories are being referred to there. I can only reiterate what the point of the document is which is around a program for UK audiences and UK viewers.

Q And this could have -- I mean, it talks about territories where the vote could be affected. We're talking about the United States presidential election, correct, that's the vote?

A I can't -- I can't say that's definitely the case because it talks about in general terms. If you see the first sentence it says the principles of fairness and impartiality are important for an election.

Q What vote other than the 2024 United States presidential election is being referenced on page six of this section that I've been showing you, sir?

A I think it is reiterating what I have already said that which is that we have clear guidelines around the reporting of all elections under the principles of fairness and impartiality.

Q What election is being referenced that the vote could be affected through this documentary other than the 2024 United States presidential election, sir?

A Just to reiterate what I just said which is that we have guidelines around all elections around the principles of fairness and impartiality and I think that's what this is referring to. It says a foreign election.

Q A foreign election. Which one?

MR. TOBIN: I'm sorry.

THE WITNESS: I just reiterate that it's making the point around our guidelines which are around fairness and impartiality when we were reporting foreign elections.

BY MR. BRITO:

Q Which foreign election --

A Or a foreign.

Q Which foreign election is being reported on under this program production agreement?

MR. TOBIN: It's a different question.

THE WITNESS: Yes. As previously discussed a production program where the BBC was following Trump's key supporters, the Front Row Joes, in order to understand for audiences in the UK why Trump retains such popularity and why he might be

elected for a second time.

BY MR. BRITO:

Q We're talking about the 2024 United States presidential election, correct, sir?

A We're talking about the build up, yes, to the 2024 United States election.

Q Let's turn to page nine of the special terms of this program production agreement. Second sentence reads: Our most proactive step would be to limit where possible the number of flights. We are anticipating to only need a minimum number of flights for this production of an election in a foreign country. We only intend to do one trip from the UK. Do you see that?

A Yes.

Q That one trip was to the United States, correct?

A That's correct.

Q The production of an election in a foreign country in the preceding sentence was in relation to the 2024 United States presidential election, correct?

A I assume so.

Q Why would you assume? What other election could we be talking about under this agreement, sir?

A Yes, I agree.

Q At the bottom of page nine when we got into

creative brief under electoral brief, first sentence reads: The film will use a combination of on-the-ground observational filming of key characters to the campaign. Do you see that?
A Yes.
Q That relates to President Trump's campaign, correct?
A Yes. This is what I was talking about to you about before which is that the film followed what's known as the Front Row Joes. They are ardent supporters of President Trump. For UK audiences, it is instructive to hear from the Front Row Joes to understand, you know, why they going to vote for Trump and why he may be elected for a second time.
Q Now let's go to page ten where we talk about general casting brief. Second sentence: We have already filmed with Trump supporters who are predominantly white. Do you see that?
A Yes.
Q The we have already filmed, was that the BBC or October Films?
A I'm not sure who that refers to. It's an October Films production.
Q And we have already filmed with Trump supporters. Where was that filmed?

A I'm not sure what it refers to.
Q You don't know the location?
A I don't know what that sentence refers to.
Q Well, it says we have already filmed with Trump supporters who are predominantly white. So there was filming that has already taken place with Trump supporters. Can we agree with -- can we agree on that that's what this says?
A That's what it says.
Q Okay. So my question is do you know on behalf the BBC where the filming occurred with those Trump supporters that is referenced on page ten of Exhibit 15?
A I don't know specifically in relation to that sentence. I know that the BBC did film with Trump supporters in South Carolina and in Grand Rapids Michigan.
Q And it says that they filmed with Trump supporters who are predominantly white. Why was that added to this section?
A I believe this is around diversity, so authentic portrayal, diversity, that's what this section is about.
Q It's actually not. It's general casting brief. Below this it has the section for diversity and inclusion as you can see at the bottom of your screen.

So within the general casting brief there's a reference to the fact that the supporters of President Trump who are predominantly white is specifically referenced in this section. Do you know why?

A No. I understand it's a general casting -- sorry, to qualify that. It's a general casting brief so I imagine it's to just to describe the casting of the documentary. You'll see that it says disabled representation will most likely be incidental in nature so it's around cast and representation.

Q So do you or do you not know why the words predominantly white were included in this section?

MR. TOBIN: Objection. Asked and answered. Answer it again.

THE WITNESS: I'll answer again. I don't know specifically why they said predominantly white, but I am looking at the section as you are and as you can it's around the casting of the supporters and the casting of the documentary and you can see there are a number of different ways in which those groups are described.

BY MR. BRITO:

Q Right. And I don't see white or brown or black or yellow as a descriptor here other than somebody elected in the special terms to include that language as

predominantly white. I see that. But I don't see any of the description in the general casting brief section, do you?

MR. TOBIN: Thank you for your testimony, Alex. I object to the form of the question. Is there a question?

MR. BRITO: Yeah. I said do you.

THE WITNESS: Do I see what? Sorry.

BY MR. BRITO:

Q Do you see any description regarding the color of someone's skin within the general casting brief section that would warrant the inclusion of the language that we find about Trump supporters who are predominantly white having been filmed?

MR. TOBIN: Object to the form of the question. Answer as best you can.

THE WITNESS: Well, you can read the casting brief like I can.

BY MR. BRITO:

Q And it doesn't say anything regarding skin color, correct?

A If you'll allow me to read it, please. I think where it says on-air representation what overt representation is are in the cast example e.g. female protagonist, disabled presenters is probably the most

relevant section.

Q Now the BBC has maintained that it did not publish the documentary in the United States including in Florida, correct?

A Correct, it didn't.

Q It did stream the documentary on iPlayer for a full year, correct?

A That is correct. And I'm sure you're familiar with the iPlayer terms of use and they set out clearly what iPlayer is for UK licensed fee payers and geoblocked internationally.

MR. TOBIN: Alex, are you continuing with exhibit or can we take it down?

MR. BRITO: No, no. I'm still using them.

MR. TOBIN: Okay.

BY MR. BRITO:

Q And so if we go to page 12 of the agreement it says geographic location of filming and it has a section for UK filming and that's all blank, correct?

A That's correct.

Q Foreign filming list USA as the country where filming will take place and it says the number of days in each country will be ten to 15. Did I read that correctly?

A That's correct.

Q And was the filming in the United States approximately ten to 15 days?
A Yes. I believe so, yes.
Q If we turn to the next page, page 13 at the very top and it says number of shooting blocks and it says one ten-day shooting block for a UK team plus a remote US local team additional ad hoc days. Do you see that?
A Yes.
Q So there was a UK team that was sent to the United States for purposes of filming, correct?
A That's correct.
Q That team, did it consist of any BBC employees?
A I'm not sure. I think that -- I know that Matthew Hill was in it. He was seconded to October Films. I'm not sure who else was in it to be honest.
Q Okay. And then it says the remote US local team. Do you know who that refers to?
A That refers to Chloe Ross.
Q And who is Chloe Ross in relation to the BBC?
A She is a BBC News USA Inc. producer based in Washington.
Q And I know that this agreement contemplates future activity. My question now is did that actually

take place? Was there a ten-day shooting block that consisted of a UK team, plus the individual from the BBC United States entity as well?

A Yes.

Q Who within the BBC decided to broadcast the documentary only in the UK, sir?

A The BBC only had the rights to broadcast the documentary in the UK as is clear on the agreement that you just showed and on the general terms in terms of independent production company and the BBC.

Q Was there ever any internal discussions within the BBC about distribution of the documentary in the United States?

A The BBC only have the rights -- the UK rights to the documentary.

Q Understood. You mentioned that to me just now. My question is a bit different. Were there any conversations or discussion had within the BBC about distributing the documentary or seeking to try to distribute the documentary in the United States?

A Well, it's clear from that program production agreement that October Films had the international rights and they had licensed those rights to Blue Ant. It's on that agreement that you just showed me that was £27,000 so the answer is no.

Q There weren't -- so I know that the agreement says what it says and that's not what I'm asking you right now. What I'm asking you were there any conversations at any point in time before the agreement, after the agreement, at any point in time within the BBC or with -- between the BBC and anyone else about the BBC's intent, desire, or request to distribute the documentary in the United States?

A No. The BBC is a UK public broadcaster and it had the UK rights to the documentary. October Films had the international rights which they licensed to Blue Ant, so no.

Q Is it your understanding that the international version of the documentary did not contain the edited version of the January 6th speech?

A That's correct. It does not contain the editing in question, yeah, in this case. Yes.

Q Who on behalf of the BBC signed off on that international version?

A That was Leo Telling.

Q Blue Ant approached the BBC, did it not, for -- or actually BBC Select to air the documentary, correct?

A Yes. I believe that's correct. Yes.

Q Is there a contract between October Films and

Blue Ant that you're aware of?

A Yes. There is a distribution acquisition deal which I have seen which I mentioned earlier.

Q And do you know if that document has been produced by the defendants in this case?

A I don't know that.

MR. TOBIN: I'll represent that we have, Alex.

BY MR. BRITO:

Q BBC News USA, I'm going to ask you some questions about that, sir.

A Okay.

Q Is that a subsidiary of BBC, the defendant in this case, correct?

MR. TOBIN: Object to form.

THE WITNESS: It's a separate legal entity with its own directors, own bank accounts, its employees, its own staff. It has its own fiduciary obligations so I think a better description is it's a separate legal entity.

BY MR. BRITO:

Q Okay. It may be a better description from your perspective, but I'm asking you a very specific question. It is a -- is it a subsidiary of the BBC? Yes or no.

A It's a separate legal entity to the BBC so

it's -- it's -- so it's a -- it's a company that is registered in Washington. It's has articles of amendment under the -- incorporated in Washington. It's separate to the BBC. It's a separate legal entity to the BBC.

Q Do you know what a subsidiary is?

A Yes.

Q Is BBC News USA a subsidiary of BBC?

A It's a separate legal entity so --

MR. TOBIN: Let me just interrupt. You can answer his question yes or no.

THE WITNESS: No. It's a separate legal entity.

MR. TOBIN: Sorry, Alex. Trying to help.

BY MR. BRITO:

Q The BBC sends journalists with frequency to Florida to cover news items, does it not?

MR. TOBIN: Object to the form of the question.

THE WITNESS: Does the BBC send journalists frequently to Florida to cover news items? The BBC will send journalists to Florida if there is news that is of interest to UK audiences, yes.

BY MR. BRITO:

Q The BBC has covered events in Florida with

regularity, correct?

MR. TOBIN: Object to the form of the question.

THE WITNESS: I don't think regularity is an accurate description if I'm honest. I think the BBC will cover when there is significant news within Florida.

BY MR. BRITO:

Q Does the BBC have a partnership with PBS?

A Yes, it does.

Q Does the BBC have a partnership with NPR?

A The BBC has a partnership with American Public Media which is kind of a group of radio stations as I understand and NPR is part of that.

Q Does the BBC have a partnership with CBS?

A Yeah. It has a content sharing partnership with CBS, a news gathering partnership.

Q Are you familiar with the BBC.com website?

A Yes.

Q The content on that website originates from BBC's news gathering team, correct?

A It's not solely. It can come from anywhere within the BBC so it's different -- different areas.

Q BBC.com maintains a section called Florida news, correct?

A There are pages on the BBC's website which are tagged pages and there is Florida tag. There is also tag for every state in the United States of America, pretty much every place you can think of and those tags will auto generate pages.
Q And so one of those auto-generated pages is one that is entitled Florida weather, correct?
A So, that's -- you're asking me a separate question. That's there -- are around 40,000 separate weather location pages that the BBC has.
Q One of them being Florida weather?
A That's correct.
Q There's also a page that says Miami news, correct?
A This is the same point I was making before. So there are tags, so stories get tagged with a subject or place and so stories will be tagged with place names. So if you look up Mongolia, there's Liechtenstein, there's Dusseldorf, there's Valencia so I haven't checked with Miami, but I'll take your word for it.
Q Okay. Did the BBC communicate with any individuals or organizations located in Florida in connection with the documentary?
A Not to my knowledge.
Q Did October Films communicate with any

individuals or organization located in Florida in connection with the documentary to your knowledge?

A Not to my knowledge.

Q Did the BBC film any portion of the documentary in Florida?

A No.

Q Did October Films film any portions of the documentary in Florida to your knowledge?

A They didn't, no.

Q Did the BBC know that Mr. Trump resided in Florida at the time that it created and distributed the documentary?

A The BBC didn't distribute the documentary. The BBC had the UK rights to the documentary. October Films had the international rights, just to be clear on that point. The BBC is aware that Donald Trump resides in or has a residence in Florida.

Q Does the BBC regularly solicit interviews within the United States?

MR. TOBIN: Object to the form.

THE WITNESS: The BBC conducts interviews in the United States. Yes.

BY MR. BRITO:

Q Does it film content in the United States with regularity?

MR. TOBIN: Object to form.

THE WITNESS: The BBC has a -- has a bureau in Washington which covers United States news primarily for UK audiences and, yes, they will gather news around the United States.

BY MR. BRITO:

Q Does the BBC derive any revenue either through advertising, licensing or subscription from US customers?

A No. The BBC is a UK public service broadcaster, doesn't -- doesn't derive any commercial income from any of its activities.

Q Who within BBC was responsible for forming the intent behind the documentary?

A Sorry. Can you repeat the question?

Q Who at the BBC was involved in forming the intent behind the documentary?

A Well, the documentary was an October Films production. October Films produced a pitch document for the BBC so it was October Films who had the intent behind the documentary.

Q And who on the BBC had the decision making authority to accept the pitch that was being made by October Films?

A Yes. So ultimately that is Joanna Carr the

head of current affairs and then, I'm sorry, there's a little bit of process here. She then has to have agreement for the commission with a meeting which is called CHIPS, which is that stands for Channels iPlayer Schedules. And so there's a meeting with those individuals and then ultimately a commissioning decision is made around which is and, yeah, so Joanna Carr has the ultimate say.

Q Did the BBC encourage the United States citizens to view the documentary?

A No. The BBC had the UK rights to the documentary so the BBC was solely concerned with UK audiences.

Q So you're not aware of the BBC encouraging anyone in the United States to view the documentary?

A BBC had the UK rights to the documentary so that there was their concern, UK audiences, and that's clear on all the documentation.

Q My question is different, sir. My question is I understand you testified several times about the BBC possessing the rights within the UK. My question is different. Are you testifying that the BBC did not encourage individuals within the United States to watch the documentary?

A The BBC did send the links, I don't know if

this is what you're referring to, links to a handful of the contributors, a Dropbox link I think it was in order to watch the documentary after it had gone out. So that was from -- well, it was Matthew Hill who was obviously seconded to the October Films at the time.

Q And those invitations by Mr. Hill were to individuals within the United States, correct?

A They were contributors who'd been in the film, yeah. I think -- I think all of them were based in the United States. That would be standard practice for any documentary where contributors want to see their contribution for a producer to send a link to view the documentary afterwards.

(Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. BRITO:

Q Let me show you what we'll mark as Exhibit 1, sir. Exhibit one is an email string from Whitney Hayes, Matthew Hill and Rick Wilson and Megan Towey as well. My question to you is Megan Towey, she's an employee of October Films, correct?

A That's right.

Q Whitney Hayes work at the Lincoln Project, correct?

A I believe so, yes. Is it possible to see down

the email chain?

Q If you look at her email address at the very beginning --

A Oh, I see it at the top. Yeah. Forgive me.

Q Not trying to trick you. Just trying to identify --

A Yes, that's it there.

Q And Matthew Hill --

MR. TOBIN: He did ask to see the email chain so in fairness why don't you just scroll through it for a second, please, Alex.

MR. BRITO: I will, but let me just get through the roster. I have no problem showing the witness anything, but I just want to get through the roster so Mr. Burgess understands who I'm asking about and we put context.

MR. TOBIN: Sure. That's fine.

BY MR. BRITO:

Q Matthew Hill is a BBC employee, correct?

A On secondment October Films at this time. Yes.

Q And Rick Wilson, do you know who that is?

A He was a contributor to the film.

Q All right. Let me show you -- I'm going to go to the very end. As you know emails print in reverse

order in terms of chronology. So I'm going to show you the second page. I'll show you the first page because that's where the second email starts and that's where Megan Towey dated October 25th, 2024 to Whitney Hayes at the Lincoln Project. Do you see that?

A Yes.

Q I will represent to you my understanding, Mr. Rick Wilson runs and operates the Lincoln Project here in the United States. And Ms. Towey says, thank you again for all your help in setting up the interview with Rick Wilson and then it spills into the next page. And then Ms. Towey says, as it is difficult to access the BBC iPlayer in the US, we can send you a link to the film after it airs. Just please let us know if you/Rick would like to send -- us to send that along. Do you see that?

A Yes.

Q Okay. It says that it's difficult to access the BBC iPlayer in the US. That's what Ms. Towey is saying, right?

A That's correct. Yeah. It's geoblocked in the United States.

Q But it is possible, is it not?

MR. TOBIN: Object to form.

THE WITNESS: It's geoblocked in the United

States. I'm not -- I think you spoke to Mr. Cooper earlier. He's more an expert in this than I am.

BY MR. BRITO:

Q Okay. We won't have to deal with expertise. We'll just read the next sentence. She writes: If you do want to watch the premiere you would need a VPN to watch in the United States. A few articles on how to access the iPlayer through VPN are, and she provides him with two Internet links. Do you see that?

A Yes.

Q Do you have an understanding as to whether or not if someone were to perform the tasks that Ms. Towey is saying that they would be able to watch the premiere of the documentary in the United States?

A I'm not an expert. What I do know is that the iPlayer terms of use are absolutely clear that it is the UK license fee payer is geoblocked overseas and that the BBC rigorously enforces that.

Q Right. But do you have reason to believe that Ms. Towey story was simply not telling the truth when she wrote to Ms. Hayes where she says if you want to watch the premiere, you need a VPN to watch it in the United States?

A I don't know what Ms. Towey was -- what her motivation was or her insight or her knowledge. I'm

just telling you my knowledge which is that the BBC has really strict guidelines and rules around this which it rigorously enforces which I think Mr. Cooper spoke to you about in the previous deposition.

Q Correct. But do you know sitting here today whether or not if somebody were to perform the tasks set forth in this email they would be able to watch BBC iPlayer in the United States? Do you know one way or the other?

A No, I don't -- I don't know.

Q Okay.

A I think that was Mr. Cooper's evidence.

Q And then if we scroll to the first page we have Mr. Hill responding to that email and he says: Further to Megan's email below, you can download the film here and provide the Dropbox link. Do you see that?

A Yes.

Q And ask if it could be forwarded to --

A Rick.

Q No, I understand who. I get -- I was looking at something else.

A Okay.

Q It obviously states that he could forward it to Rick Wilson and he conveys the thanks for his time,

correct?

A Correct.

Q I can see the word Rick on the page. I appreciate everybody --

A Sorry.

Q I wasn't in the middle of a stroke. I was in the middle of something else. Thank you.

MR. TOBIN: There was pausing for pensiveness there.

MR. BRITO: I'm getting the same comment from you, getting it from my colleague. Everybody's telling me Rick.

MR. TOBIN: Yeah. Yeah. They're pulling the words out of your mouth, Alex.

MR. BRITO: Trying to get me to speed this up. I get it. Understood.

MR. TOBIN: No worries.

BY MR. BRITO:

Q Mr. Rick Wilson that is referenced in the email, do you know where Mr. Wilson resides?

A I'm not sure, but I think it might be Florida.

Q How do you know Florida?

A That somebody told me that.

Q I'm sorry. That he told you or somebody told you?

A Somebody, yeah. I can't recall who. Sorry. But, yes, I have heard that he resides in Florida.

Q And if you look at the top of the page there is a CC and it says -- one of them is to Rick Wilson and then next to it it's essentially redacted. Do you see that?

A Yes.

Q I'm not going to ask you who that is, but I'm going to ask you if you know why that person's name was redacted from this document?

A I don't know.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. BRITO:

Q I'm going to show you what we'll mark as Exhibit 2. And Exhibit 2 is an email from Megan Towey to Steven Fish and a CC to Matthew Hill. Subject line is the BBC documentary airing Monday that relates to the Panorama documentary; would you agree?

A I would, yeah.

Q And I'm showing you the totality of the email. It's a two page, but the second page is just a photograph like we found in the other email.

A Yeah. Yeah.

Q Here the same or same information is being

transmitted by Ms. Towey to Steven Fish about how to gain access to BBC iPlayer by going through a VPN, right?
A Yes.
Q And then below Ms. Towey's name there's some information that's redacted. Do you know why that information was redacted?
A I don't.
Q And the CC somebody next to Mr. Matthew Hill's name is also redacted. Do you know why that individual's email address was removed?
A No, I don't know.
Q Do you know who Steven Fish is?
A I know he was another contributor on the film.
Q In what capacity as far as you know?
A As an expert. I don't know any further than that to be honest.
Q He's a professor at Berkeley University in California?
A Yes.
Q Do you know if he's a political science professor?
A I don't know a lot about Mr. Fish to be honest, but that sounds right.
Q And when you say contributor, was he in the

actual documentary or was he somebody that was an off-camera contributor?

A I think he was in the documentary.

(Plaintiff's Exhibit No. 3 was marked for identification.)

BY MR. BRITO:

Q Let me show you Exhibit 3. And here we have an email from Megan to somebody by the name of Yasmine, Y-A-S-M-I-N-E, Brown. Do you see that?

A Yes.

Q And then there's some followup that transpired that same day. Megan is now sending the same email that we've seen in Exhibits 1 and 2 to Yasmine or Yasmine Brown asking her to pass the information along to Congressman Thompson. Do you see that?

A Yes.

Q And Congressman Thompson is from the State of Mississippi, is she not?

A I'm not sure where Congressman Thompson is from.

Q And the congressman -- is the congressman a contributor to the documentary?

A I believe so.

Q On air or off air?

A On air.

(Plaintiff's Exhibit No. 4 was marked for identification.)

BY MR. BRITO:

Q And with respect to -- let me go to the exhibit and I'll ask you that. Let me show you Exhibit 4. Exhibit 4 is a two-page email from Megan Towey October 25th, 2024 and there's some follow up. She is essentially sending the same email to Mary Hurrel, H-U-R-R-E-L, on behalf of Congressman Huffman -- Jared Huffman, correct?

A Yes.

Q And Congressman Huffman is from the State of California?

A I'm not sure.

Q Was Mr. Huffman a contributor?

A I believe so.

Q On air or off air?

A On air.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. BRITO:

Q Show you Exhibit 5, same series of communications. Ms. Towey is sending this one to Liam Donovan from Bracewell. Is Bracewell a law firm?

A It looks like it. Yes.

Q And why was Bracewell being provided with the method to circumvent any territorial restrictions by the use of a VPN?

MR. TOBIN: Object to form. Answer as best you can.

THE WITNESS: The email was sent to a contributor.

BY MR. TOBIN:

Q Who was the contributor that this was being sent to?

A I'm not sure. I assume it's Mr. Donovan.

Q Was Liam Donovan an on-air or off-air contributor?

A I actually can't recall, but I assume an on-air contributor.

(Plaintiff's Exhibit No. 6 was marked for identification.)

BY MR. BRITO:

Q Let me show you Exhibit 6. Same type of email that we've been looking at. This email is directed to Ashley Parker and Alyssa Vasquez from The Washington Post. Do you see that?

A Yes.

Q Were Ms. Parker or Ms. Vasquez contributors to the documentary?

A Yes. I believe Ashley Parker was.
Q Were they on air or off air?
A On air.
(Plaintiff's Exhibit No. 7 was marked for identification.)
BY MR. BRITO:
Q And let me show you Exhibit 7. And here we have a similar email from Ms. Towey to the Shelby County Ohio Democrats and the email reads: Hello, Chris. Do you see that?
A Yes. Yes.
Q And did somebody from the Shelby County Ohio Democrats contribute towards the documentary?
A Yes. Chris did, I think is his name.
Q Was he an on-air contributor?
A Yes.
(Plaintiff's Exhibit No. 8 was marked for identification.)
BY MR. TOBIN:
Q Let me show you what we'll mark as Exhibit 8. And I will represent to you that this is a screenshot of a page on www.techradar.com going back to the year 2024, which is the -- one of the links that were in the emails that we just went through Exhibits 1 through 7 that Ms. Towey we had suggested that these US citizens

utilize for purposes of gaining access to or getting instruction as to how to gain access to BBC iPlayer was through this techradar.com page. Do you see that?

A Yes.

Q Or do you see what I've handed -- what I've put in front of you?

A Yes. I can see the page. Yes.

Q Had you ever seen this page before?

A No.

Q And if we turn to the second page it says what's the best iPlayer VPN. Number one on the list is NordVPN, correct?

A Yes.

Q Does the BBC have any reason to doubt that its iPlayer was accessible in 2024 through the utilization to the VPN as set forth in Exhibit 8?

MR. TOBIN: Objection to form and it's outside of the scope of this particular witness' deposition. Mr. Cooper was designated exclusively for geoblocking technology and for territorial restrictions. So this witness will not answer any questions regarding the technology of geoblocking like the one you just posed.

MR. BRITO: I'm not asking about technology. I'm asking whether or not the BBC has any reason to

doubt the information contained on Exhibit 8.

MR. TOBIN: An exhibit that he told you he has never seen before. I'm going to stand by my objection and I'll add the objection of foundation and I'll instruct you not to answer the question.

MR. BRITO: All right. We'll move on.

MR. TOBIN: Alex, I don't want to interrupt your flow, but we have been going about an hour and 45. If you're -- I don't know how much you have left, but a comfort break would be appreciated at some point soon.

MR. BRITO: Let's do it now.

MR. TOBIN: Okay. Can we take ten?

MR. BRITO: Yes. Absolutely.

MR. TOBIN: Good.

THE VIDEOGRAPHER: The time is 3:14 p.m. We're off the video record.

(Thereupon, a brief recess was taken.)

THE VIDEOGRAPHER: The time is 3:28 p.m. We're back on the video record.

BY MR. BRITO:

Q Mr. Burgess, I think you mentioned to me earlier that it was October Films who pitched the documentary; is that accurate?

A Yes.

Q It was not Matthew Hill?
A No. It was October Films.
(Plaintiff's Exhibit No. 9 was marked for identification.)
BY MR. BRITO:
Q All right. Let's take a look at Exhibit 9 and here we have an email from Matthew Hill with Leo Telling dated February 5th, 2024 and the subject is skeleton and then there's a document attached that is called Trump Skeleton. Do you see that?
A Yes.
Q And I'm sorry, May 2nd. I may have misspoken. I may have gotten the date in the month inverted. It's May 2nd, 2024 as opposed to February 5th.
A That's correct.
Q And if we turn to the attachment. It's entitled Trump Skeleton and it lays out, you know, some information with respect to what Mr. Hill is proposing to Mr. Telling, correct?
A That's correct.
Q Now it's your testimony that prior to this Trump Skeleton that there was a pitch that preceded this?
A Yeah, that's right.
Q From whom?

A I think from October Films. I believe it was commissioned on October the 14th -- sorry, forgive me -- on February the 14, 2024 so quite a few months before this.

Q By whom?

A October Films. So it will be -- October Films is the best way for me describing it I think.

Q Right. Because you don't know specifically who within October Films; is that fair?

A I would say if I had to give you a name I would say Neil Breakwell.

Q Okay. And is it your understanding that this Trump Skeleton that we're looking at was one of the early versions of what was being contemplated by the BBC that ultimately ended up as the documentary?

MR. TOBIN: Object to form.

THE WITNESS: It looks like. I haven't seen this before if I'm honest, I don't think, but it looks like that way. Yes.

(Plaintiff's Exhibit No. 10 was marked for identification.)

BY MR. BRITO:

Q Now let's take a look at Exhibit 10. And here we have an email from Matthew Hill essentially sending it to himself and the attachment is page three, a Word

document. Do you see that?

A Yes.

Q And then if we turn the document that's attached says wanted for president and then if we go onto to next page it provides some information as well regarding the pitch, correct?

A Yes.

Q And now this precedes your recollection of February 14th there being a pitch from October Films, correct?

A Yes.

Q And then if we scroll there's some photographs and then there's a photograph here on the page you're looking at which at the bottom says -- well, it says protester in prison costume blocks Trump's motorcade following his arraignment in Miami federal court June 2023, correct?

A Yes.

Q Now that was a photograph that the BBC had, correct?

A I don't know the provenance of that photograph. This is a -- this is October Films' pitch is my understanding. I don't know where that photograph is from.

Q What leads you to believe that this is October

Films' pitch and not the BBC's?

A Because October Films was the independent producer that pitched it to a BBC and then it was commissioned by the BBC, so that's what leads me to believe that this is October Films' pitch.

Q Other than your recollection that that's the manner in which it was pitched, what else just about this document leads you to believe that it was created by October Films and not BBC if anything?

MR. TOBIN: No objection. Go ahead.

THE WITNESS: Let me just consider why.

MR. TOBIN: Do you need to review the document?

THE WITNESS: Yeah. I mean, it might be helpful to review the document or at least go further down.

BY MR. BRITO:

Q By all means. Feel free.

A Sure. If you continue down. Yeah. Yeah. Continue. Yeah, continue. Yeah. You can continue. Thank you. You can continue. Yeah. Yeah. Now I believe this is the October Films pitch document. Yeah.

Q Right. And --

A Being commissioned on -- sorry to interrupt you -- subsequently commissioned on February the 14th.

Q Okay. But I understand that it's your understanding that it's October Films', but is there anything about the document that we just walked through with you that supports that conclusion that you're arriving in?

MR. TOBIN: Object to form.

THE WITNESS: It was -- I really have not seen the document before.

BY MR. BRITO:

Q Okay. So there's nothing in the document itself that you can point me to that says I know it's October Films because of this language or any aspect of the document; is that fair?

A I haven't reviewed it in detail so it's hard for me to say, but it's a pitch document which a pitch document will come from an independent producer, so that's why it's clearly from October Films.

Q So a pitch document would not ever come from somebody within the BBC?

A I can't say not ever, but a pitch document to this level would be an independent production pitch. That's my understanding. Yeah.

(Plaintiff's Exhibit No. 11 was marked for identification.)

BY MR. BRITO:

Q Let me show you Exhibit 11. And here's an email from Karen Wightman to Joanna Carr and Jim Gray. So this is an internal BBC communication that is circulating I guess version five of the same Trump pitch and it says updated Trump. Hopefully this addresses your point, thanks Karen; right?

A Yes.

Q And if we turn to the third page it says wanted, President Trump, question mark.

A Yes.

Q And it says 1X60, what does that refer to?

A That has the duration of the documentary. 60 minutes. One times 60 minutes.

Q Panorama BBC One?

A So that's the UK terrestrial channel that it would be broadcast on.

Q TX Wednesday 30th, October 2024?

A That will be the potential transmission date on BBC One.

Q TX stands for transmission?

A Yeah.

Q Okay. And I apologize, let me go back to Exhibit 11 for a second, sir.

A No problem.

Q I'm going to put it back up on the screen for you and I want to direct your attention to what is essentially the sixth page of the document which is designated with a marking of BBC10714. And towards the bottom it makes a reference to Front Row Joes and then in bold it says we have footage of them behind the scenes inside Mar-a-Lago in April after Trump was arrested in New York. Do you see that?

A Yes.

Q And then the next page at the very bottom it says, each revelation from D.C., Florida, New York or Georgia will be analyzed and discussed as it happens by the people who actually decide whether Trump gets back into the White House in November. We spent time with them, climb inside their lives and be with them at key points in the story to capture their reactions and unfolding events.

Did I read that correctly?

A Yes.

Q The characters, at least as they're being pitched, were from Florida or located in Florida; would you agree?

MR. TOBIN: Object to form.

THE WITNESS: No, I would not agree. This refers to the Front Row Joes who as previously

mentioned are a group of committed Trump supporters who the documentary follows. The main one is Rick Frazier who is not based in Florida, he's based in Ohio. I don't think any of the Front Row Joes that were followed were based in Florida.

BY MR. BRITO:

Q It says here we have footage of them behind the scenes inside Mar-a-Lago in April, right?

A That's correct.

Q And Mar-a-Lago is obviously in Florida, correct?

A Yes.

Q And then on the next page where it says each revelation from D.C., Florida, New York or Georgia will be analyzed. Florida was playing a prominent role within the documentary, correct?

A Well, Florida is in the documentary for about three minutes. I don't think that is a prominent role within a 60-minute documentary, so I do not agree with that.

Q It's named as one of the four locations that's going to be analyzed and discussed, correct?

A In the pitch document, yes. Correct.

(Plaintiff's Exhibit No. 12 was marked for identification.)

BY MR. BRITO:
Q Let me show you what we'll mark as -- let's go to 12 for a second. And here Matthew Hill is transmitting to Leo Telling a link relating to a Washington Post article on March the 12th, 2024. Do you see that?
A Yes.
Q And he writes, this is the rally we filmed recently in South Carolina singled out for deconstruction by Washington Post. Do you see that?
A Yes.
Q And then Mr. Telling writes, sounds like my leaving due. Do you see that?
A Yes.
Q Do you know what that refers to?
A I don't.
Q Do you understand that Mr. Hill had actually filmed what's referenced in this Exhibit 12 in South Carolina in the United States?
A I don't know if Mr. Hill was there. I know that that is correct that the BBC -- well, for this documentary October Films probably filmed that in South Carolina. Yes.
Q Was it BBC or October Films that filmed it?
A It would have been -- I'm actually not sure.

I know there was filming in South Carolina for this documentary. The documentary was made by October Films so I assume it's October Films.

(Plaintiff's Exhibit No. 14 was marked for identification.)

BY MR. BRITO:

Q Let's take a look at Exhibit 14. And here we have the BBC Panorama X post regarding the documentary, correct?

A Correct.

Q And it references the fact that it's on BBC iPlayer, right?

A Yes.

Q This post had worldwide reach, did it not?

A Well, it's on X which is a worldwide platform, but it's clearly directed at UK audiences. It talks about on BBC iPlayer which is only available in the UK, on BBC One which is a UK terrestrial time and channel and it refers to a time which is UK time 8:00 p.m.

Q Do you know if X has any ability to geo restrict any post?

A I don't know.

Q Irrespective of whether or not X has any sort of geo restriction, the BBC independently took no steps to prevent someone in the United States from seeing this

post, correct?
A That's correct. This post -- sorry, forgive me. This post could be seen by anybody anywhere around the world.
Q With an instruction of how to view the documentary on the BBC iPlayer, right?
MR. TOBIN: Object to form. Do you want to put the post back up?
MR. BRITO: Yep.
THE WITNESS: I think the post is clear that it's about a program which is on UK television at 8:00 p.m. that night and on the BBC iPlayer which is restricted to UK audiences.
BY MR. BRITO:
Q Right. All I was asking you is it broadcasts the fact that the documentary was being broadcast worldwide and it was giving an indications that it could be seen on BBC iPlayer, right?
A No. It's not saying it could be broadcast worldwide.
Q No, the post. The post, I'm sorry. The X broadcast was worldwide is what I said or what I meant to say.
A Understood. Yeah. As previously mentioned X is available worldwide.

Q Right. Now you had mentioned to me earlier that BBC News USA is a separate entity, correct?
A Yes.
Q And if I understand correctly, there are employees of BBC News USA that work in Coral Gables Florida; is that accurate?
A Yes. In Coral Gables office in Florida, all the employees are employed by BBC News USA Inc. which is based in Washington and the employees there, there are a mixture of employees. They either work for BBC Mundo, which is the BBC's Spanish speaking service aimed at Latin America or they work for BBC Monitoring, which is a service which monitors media and that particular section of staff monitor the media in Latin America as well.
Q And BBC Mundo which is the entity that the staff in Florida perform services for, that's the Spanish language service for BBC World Service, right?
A That's correct.
Q And BBC World Service is a division of the BBC, not a separate legal entity, correct?
A BBC World Service, yeah, it's a part of BBC News. That's right.
Q But not a separate legal entity?
A No. It's partly government funded and it

provides new services around the world in 40 different languages.

Q And BBC Monitoring is also part of the BBC, correct?

A Yes. BBC Monitoring, yeah, is part of BBC World Service. Yeah.

Q So it's fair to conclude, if we do the links in that chain that we just established, that the staff that is based in Florida perform services for certain divisions of BBC itself, correct?

MR. TOBIN: Object to form. Answer as best you can.

THE WITNESS: So the staff that are employed by BBC News USA Inc. and they provide content for BBC Mundo in relation to those staff and BBC Monitoring. Although BBC Monitoring isn't a platform. They just -- they monitor media sources in Latin America.

BY MR. BRITO:

Q Right. But BBC Monitoring and BBC Mundo are divisions within BBC, right?

A They are, yes. Well, they are -- BBC Mundo is a language service as part of the world service, which I think what I explained before and BBC Monitoring is a service which monitors various media sources across the

world. It has different offices around the world and BBC Monitoring is part of the BBC World Service.

Q Okay. So I appreciate the explanation of what they do, but I think the terms of where they fall within the grand scheme of things, both BBC World Service and BBC Mundo are divisions of the BBC, correct?

A Well, the BBC Mundo staff within the Coral Gables office are employed by BBC News USA Inc.

Q Understood. And that's not what I'm asking you. I'm just talking about the fact that those two organizations that we just identified, BBC World Service and BBC Mundo are divisions of the BBC, right?

A Yeah. So I'll just explain it. So yes, BBC World Service is part of BBC News. It's partly government funded. And BBC Mundo is one of its 40 language services.

Q Let me see if I have a chain of reporting accurately depicted. There is a gentleman in the United States by the name of Kevin Ponniah, P-O-N-N-I-A-H?

A Um-hmm. Yes.

Q He reports to Fiona Crack or Fiona Crack? Pardon me.

A That's correct.

Q And Fiona Crack reports to John Munro who we spoke about earlier, correct?

A That's correct. Yes. Jonathan Munro is in an interim position as the head of news.

Q The acting CEO of BBC News?

A That's correct.

Q He sits on the BBC News board with you, correct?

A That's correct.

(Plaintiff's Exhibit No. 18 was marked for identification.)

BY MR. BRITO:

Q Let me show you what we'll mark as Exhibit 18. And Exhibit 18 is a series of emails on March 14, 2024.

A Um-hmm.

Q And I'm going to -- I'm going to start at the very beginning. It'll give you the opportunity to read it as we go and if you need me to show you something, just please let me know. Okay?

A Sure.

Q The second to last page we have an email at the very bottom from Karen Wightman. The one I want to speak to you about is on that same page at 1708 from Neil Breakwell. And it says here just to reiterate what I said yesterday in order to secure global funds, you can pick your global premier date as the 28th. Do you see that?

A Yes.
Q What's the reference to global funds?
A I'm not sure. The October Films obviously had the international rights to this film, so I would imagine it would refer to that, but I'm not 100 percent certain, but I would imagine so.
Q And then if we go to the second page, there's an email at 5:36 p.m. from Karen Wightman and at that time Karen Wightman was a BBC employee, correct?
A Yes. She's the editor of Panorama. Yes.
Q And on the top of the page she says the advantage of working to Monday 28th is that it increases the window for international broadcast ahead of the US election to several days more than if it were set at Thursday the 31st which is crucial as I understood from you at our meeting yesterday. Do you see that?
A Yes.
Q Okay. And so they were targeting a specific time of when to release the documentary, correct?
MR. TOBIN: Object to form.
THE WITNESS: I think what that is referring to is that the documentary, once the election happened, would no longer be relevant because it was all about the build up to the election. So I think they're referring to there -- that's what

they're referring to there.

(Plaintiff's Exhibit No. 19 was marked for identification.)

BY MR. BRITO:

Q Let me show you what we'll mark as Exhibit 19. And here Exhibit 19 is a series of emails --

MR. TOBIN: Could we have that blown up just a tad, please?

MR. BRITO: Oh, yeah. That's real small.

MR. TOBIN: My eyes aren't what they used to be.

MR. BRITO: There's a song about that.

MR. TOBIN: Right.

MR. BRITO: But you're as good today as you ever were, you know.

BY MR. BRITO:

Q The e-mails relate to communications between October Films and the BBC and then ultimately you just have communications between members of the BBC on the first page of Exhibit 19. The last part of my question, is that accurate, these are just communications within BBC members?

A Well, Matthew Hill was obviously seconded to October Films at the time, but we've had that discussion.

MR. TOBIN: And to be fair we're only looking at one screen at the moment so he can only testify about what's on the screen here to your broader question.

BY MR. BRITO:

Q That's -- and you answered the question. If you look at paragraph five and I'll show you the rest if you want me to, but I just want to focus on certain aspects just -- it references paragraph five. It says our main character Rick is interesting. That's Rick Wilson, right?

A No. I think that's Rick Frazier.

Q Rick Frazier. Okay. Fair enough. And then -- he says in the second line says we filmed him inside Mar-a-Lago last April at the very start of criminal proceedings. We've got him at a rally meeting Trump and getting his T-shirt signed last week. If he stays with us, we'll hopefully have him outside the New York City courthouse, a circus like no other. Do you see that?

A Yes.

Q The reference to the fact that we filmed him inside Mar-a-Lago last April that Mr. Hill is stating, that's in reference to work that BBC had done that he's reflecting here in terms of the filming inside

Mar-a-Lago in April of 2023, correct?
A No. That was filmed by Celebro Media and licensed that footage to October Films. Originally it was made for Salem Films, I think a conservative film company, and then at the later date, I can't remember -- I'm not sure what this date is of this email, but at a later date that footage was licensed by the Celebro Media to October Films to use within this documentary and that's the footage that you see within the documentary Rick Frazier to Mar-a-Lago.
Q What relationship if any does Celebro have with the BBC?
A It has no formal relationship with the BBC.
(Plaintiff's Exhibit No. 21 was marked for identification.)
BY MR. BRITO:
Q Let me show you what we'll mark as Exhibit 21, please. And here we have a series of emails. I'll direct you to the bottom the first page is the first email in this string from Megan Towey to Matthew Hill on May 1st, 2024. Do you see that?
A Yes.
Q And then it spills over on to the second page where she says that she had proposed a first draft to the folks that worked with Elizabeth Cheney. Do you see

that?
A Yeah. I haven't seen the email before but yes I can see it. Yeah.
Q Okay. And Elizabeth Cheney is from the State of Wyoming as far as you know?
A I don't know where Ms. Cheney is from.
Q Very well. So we have here in color so that you can see the changes. And just so you know, the changes that are in red were those proposed by Matthew Hill.
A Okay.
Q Okay. And if you look at the top of the screen it says that there are many things, my thoughts in red.
A Understood. Thank you.
Q Sure. And so Mr. Hill makes edits to this email that Ms. Towey was proposing to send to Elizabeth Cheney and they were asking to see if Ms. Cheney would contribute in the form of granting an interview, correct?
A Yes.
Q And the email that Ms. Towey was writing at the very bottom says our film will be broadcast -- well, actually this is Mr. Hill's words. Our film will be broadcast to a global audience of tens of millions a

week away from polling day. Our provisional transition date is the 30th of October. It is shown on a variety of terrestrial and streaming platforms, most notably on BBC Worldwide and Amazon Prime (BBC Select). Do you see that?

A Yes.

Q And then if we scroll to the top of the first page they exchange some information with respect to the changes are good and then Mr. Hill confirms that it's acceptable to send that email to Elizabeth Cheney's, quote, unquote, "people", correct?

A Yes.

Q The global audience of tens of millions that are referenced in that email, that's not related solely to a UK-only audience. Would you agree?

MR. TOBIN: Object to form.

THE WITNESS: Well, it talks about global audience, doesn't it. Yeah.

BY MR. BRITO:

Q Now with respect to the subject matter of the documentary -- you can take that go down. Thank you. The decision by BBC was reached to agree to be involved with this documentary because of the relevance of the subject matter to a US audience, correct?

A No, that's not correct.

Q Did BBC ever conduct any audience research regarding anticipated viewership of the documentary?
A No.
Q Did the BBC either promote or publicize the documentary in any US based media outlets or websites?
A No, it did not.
Q Did it ever enter into any agreements with US based streaming platforms or media companies for distribution?
A No. The BBC didn't have the international rights to this documentary. They are October Films. They licensed them to Blue Ant who in turn sublicensed them to Little Dot who did have the rights to the USA. They never showed the film in the USA. As previously discussed the international version, did not have the edits in question in this case.
MR. BRITO: There's a lot of this in my outline that I've already covered so just bear with me. I'm just trying to be efficient and I'll eliminate things that we've already covered.
MR. TOBIN: You're appreciated, Alex.
MR. BRITO: No problem.
BY MR. BRITO:
Q Now is it the BBC's position that it did not film any of the images that were in the documentary,

those were not filmed in Florida?

A That's correct. The BBC didn't film any of that material.

Q Did any entities associated with or having any direct relationship with the BBC ever film any images that were depicted on the documentary?

MR. TOBIN: In Florida?

BY MR. BRITO:

Q In Florida.

MR. TOBIN: Thank you.

THE WITNESS: The images in Florida are from Getty images which the BBC does have a relationship with, but they were bought by October Films. It's an October Films production. They are from Celebro Media, from social media, so YouTube and TikTok, from US pool and from CBS.

BY MR. BRITO:

Q And those images that were from CBS were based upon the partnership that the BBC has with CBS; is that fair?

MR. TOBIN: Object to form.

THE WITNESS: Well, it's an October Films production, so October Films would have to source them from CBS.

BY MR. BRITO:

Q And I may have asked this of you earlier, but I want to see if I put a fine point on this. Did any BBC personnel or any BBC contracted crew travel to Florida in connection with the documentary at any time?

A No.

Q Did Maxine Hughes ever travel for the documentary?

A Maxine Hughes is part of Celebro Media. So obviously Celebro Media, which was ahead of the documentary even being talked about in April of 2023, she worked for Celebro Media who, I don't think she was involved, but they were the -- they were the company that obtained the Florida material.

Q They obtained the Florida material by virtue of some sort of a contractual arrangement?

A No. Sorry. They were with the Front Row Joes so they filmed with the Front Row Joes and they -- and that's how they got that material.

Q And they provided that information pursuant to a contract?

A They did a licensing deal with October Films. October Films licensed that material of Celebro Media.

Q Before the broadcast of the documentary, who at BBC viewed the documentary for purposes of either

review or approval?

A Leo Telling and Karen Wightman.

Q Anyone else?

A Not to my knowledge.

Q How soon prior to the actual publication date or the broadcast rather did they review the documentary?

A I don't know the exact date. But normally these documentary -- all documentaries tend to be something -- ones around current affairs tend to be quite close to the TX date, the transmission date.

Q So less than a week, would that be a fair conclusion to draw?

A Yeah, normally. Because by their very nature they are programs about current affairs so they need to be up-to-date.

Q And the versions that they were reviewed, were they modified in any way after they were reviewed?

A I am not sure about that. I think there may have been some modifications, but nothing significant.

Q So for all intents and purpose the sum and substance of the broadcast that -- or the documentary that was broadcast was fairly identical to the version that a BBC producer reviewed, correct?

MR. TOBIN: Object to form.

THE WITNESS: The final documentary has, as we

discussed previously, has the editorial sign off from the BBC so they would have seen the final cut as we say.

BY MR. BRITO:

Q And how does the final cut get approval? Is it verbal? In this instance was it verbal or in writing?

A There's a compliance form which is -- was signed by Karen Wightman, the Panorama editor.

Q What I'm referring to, sir, I may not have been clear, in terms of the final cut how is the approval given by BBC executives to the documentary airing?

A I think it's -- well, the final, final thing is signing the compliance form but there is this conversation that goes on in the final stages of an edit say, you know, if you change this, whatever, and then that communication would end with somebody saying -- well, the editor agreeing that it's now signed off.

Q And so that's my question. When there's that final sign off for the final cut by the BBC, is that done orally or in writing?

A Well, I think -- sorry. I think the compliance form is the thing that's in writing so...

Q Right. And I think you identified that that

compliance form is signed by somebody -- I think you said Karen Wightman, right?

A Yes. She's the editor of Panorama.

MR. BRITO: Right. And so that's -- okay. Fair enough. And I think I'm getting close to being done. If I can just take a ten-minute break to confer with my colleagues and I might -- I may be done. I may have a few more follow-up questions for you, sir.

MR. TOBIN: Understood.

THE WITNESS: Thank you.

MR. TOBIN: Ten minutes.

MR. BRITO: Thank you.

THE VIDEOGRAPHER: The time is 4:19 p.m. We're off video record.

(Thereupon, a brief recess was taken.)

THE VIDEOGRAPHER: The time is 4:28 p.m. We're back on the video record.

(Plaintiff's Exhibit No. 32 was marked for identification.)

BY MR. BRITO:

Q Mr. Burgess, let me show you what we'll mark as Exhibit 32. And this is an email as you can see from Karen Wightman that's dated March 8, 2024. Do you see that?

A Yes.
Q Okay. And if an email to Neil Breakwell and specifically what I want to direct your attention to is paragraph number five. And in that email she writes, I realize we came to you in first instance and with a steer toward Trump's trial, but that pitch as we know was not commissioned. Do you see that?
A Yes.
Q The initial pitch to engage in a broadcast or a documentary about President Trump, that originated from BBC according to this language, correct?
A According to that, but I think it originally came from an email from Neil Breakwell to Karen from October Films. I think that reflects a kind of conversation between the BBC and October Films.
Q Right. And she's saying that the BBC came to October Films in the first instance. Do you read it that way?
A I can tell you that's what she's saying. I realize we came to you in the first instance. I don't -- I don't know exactly what she means by that, but my understanding is that it was Neil Breakwell from October Films who came to the BBC originally with the suggestion.
Q Okay. And despite what we're looking at here,

that doesn't change your understanding or the BBC's understanding as to how this documentary was originally pitched?

A Could you show me the date of the email?

Q March 8, 2024.

A Yes. So that's obviously after the -- after the documentary is being commissioned. Yeah. My understanding -- yeah, it doesn't change. I don't understand entirely -- I'm not able to interpret Karen's language and what she means by that. But it is my understanding that the original idea for the documentary came from October Films.

Q Okay. And then she writes after the sentence that I read to you, instead Matt's significantly different vision for the film including material sourced by him was; was as in was commissioned, correct?

A That's correct.

MR. BRITO: All right, sir. I have no further questions. I thank you for your time.

CROSS-EXAMINATION

BY MR. TOBIN:

Q I would like to ask just a few questions, Richard, if I could. The British Broadcasting Corporation, is that the same thing as the Public Service that you were referring to BBC Public Service?

A Yes.
Q Okay. So where is -- and it's also colloquially known as the BBC?
A Yes.
Q Where is the BBC incorporated?
A In London, the UK.
Q Where does the BBC have its principal place of business?
A In London.
Q Are we in it right now?
A Yes.
Q What's the address?
A It's Portland Place, London W1A 1AA.
Q And when you come to work and you report to work as the head of news content for the BBC, this is where you come to work; is that right?
A That's correct.
Q Would you consider the BBC to be at home in the State of Florida?
A No.
Q How do you know that?
A Because the BBC is based in London in the UK and it is a public service broadcaster for UK audiences which is set out in its charter. It has a number of public purposes and they are about serving UK audiences.

Q It's a royal charter?
A Yes.
Q That's granted by the Regent of the United Kingdom to the BBC?
A Well, it's granted by the government, yes. The royals, yes.
Q All right. Do you recall you were asked earlier by Mr. Brito who at the BBC viewed the documentary before it was finalized and approved?
A Yes.
Q I want to make sure that you understood the question because I understood Mr. Brito to ask you about three names, Nikki O'Donnell, Rick Bailey and Sarah McColl earlier in your testimony, earlier in this questioning.
A Yes.
Q Do you have any knowledge as to whether Ms. O'Donnell, Mr. Bailey and Ms. McColl each saw at least a version of the documentary?
A Yeah, forgive me. I don't know about Rick Bailey, but I know that Nikki O'Donnell and Sarah McColl would have seen a version of the documentary.
Q Okay. There were references throughout your testimony through questions from Mr. Brito to BBC Mundo in Florida?

A Yes.
Q Did BBC Mundo provide any services in connection with the making of the documentary at issue in this case?
A No.
Q Did BBC Monitoring, which you also were asked about with reference to Coral Gables, provide any services in connection with the making of the documentary?
A No.
Q Did anyone in the Coral Gables office provide any services in connection with making of the documentary?
A No.
Q How do you know that?
A I reviewed the staff list of the Coral Gables office to ascertain all the people who are -- who worked there and I have spoken to Kevin Ponniah, the regional director in the US who is responsible ultimately for that office and he's confirmed that not none of them worked on the program and he would know.
Q With respect to the footage in the documentary roughly three minutes of the hour-long documentary that depicts activity in around Mar-a-Lago, do you recall Mr. Brito showing you -- I think it was Exhibit 11

showed you a, quote, "we have footage of them from Florida"?

A Yes.

Q Is it your understanding that that means the BBC filmed the footage that was being referenced in a document itself?

A No. The BBC didn't film it. As I've outlined previously it was Celebro Media.

Q And Celebro Media did it -- do it at the behest of the BBC? Was it asked to do it by the BBC?

A No. It was filmed in April 2023 way ahead of this particular documentary being talked about or commissioned. I believe it was done as I mentioned earlier through a company called Salem Films.

Q And how do you know that?

A Because I have spoken to Maxine Hughes and Angelina McCahey from Celebro Media.

Q And this was information they relayed to you?

A Yes.

Q Did you see any documents in connection with that licensing?

A I saw the licensing document from October Films to Celebro Media.

Q With respect to the footage that you just referenced?

A Yeah. It's on Front Row Joes.
Q Mr. Brito asked you about a series of agreements that BBC has with various other media outlets. He referenced a news sharing agreement with CBS. Do you remember that?
A Yes.
Q What is the nature of that news sharing agreement?
A It's what we would describe as a newsgathering sharing agreement. So we share content that has been gathered in by the respective organization.
Q Is it for want of a better term, is it essentially a mutual licensing agreement?
A Yeah. There's no money involved. It's a mutual sharing.
Q You have the rights to dip into each other's archives of material and use it on each respective platform, CBS can use BBC material?
A Yes. Yes. It's restricted news material and it's kind of current material.
Q Okay. And the material that you referenced from the news sharing -- by virtue of that news sharing made its way into the documentary, does CBS film archive material at the request of BBC?
A No.

Q Did it predate that material? Did its creation predate the creation of this document?
A Yes.
Q Is that news sharing agreement restricted to materials that were filmed in the State of Florida?
A No.
Q Is it's restricted to materials filmed in the southeastern United States?
A No.
Q What are the geographic boundaries by -- for that agreement?
A There are no geographic boundaries.
Q So you could take material that they filmed in California?
A Yes, or outside of the US.
Q Or outside the United States. Anywhere in the United States, anywhere outside of the United States?
A Yes.
Q Okay. You referenced a partnership -- you were asked about a partnership with American Public Media that involved NPR and other public radio stations. Do you recall that testimony?
A Yes.
Q What is nature of that partnership?
A They take some world service programming.

Q And they display on their own platform?
A They play it on there.
Q Are those platforms -- I'm sorry, are those materials restricted to use in the State of Florida?
A No.
Q Where does -- under that agreement to your understanding, where does American Public Media and NPR have the right to use that material in the United States?
A Across the United States, my understanding.
Q All right. With respect to the agreement you referenced with PBS --
A Um-hmm.
Q -- do you recall being asked about that by Mr. Brito?
A Yes.
Q What is the nature of that agreement?
A It is an agreement to broadcast some of the outputs on the BBC News channel.
Q Okay. Broadcast some of your output on their platform PBS?
A That's correct.
Q Is it restricted to PBS in Florida?
A No.
Q Where does PBS have the right to use your

materials under that agreement?
A Across the United States of America.
Q Does the BBC UK Public Service entity have any offices in the United States?
A No.
Q Does it have any offices in the Florida?
A No.
Q You referred earlier to the bureau in Washington, D.C., that's the BBC News USA bureau in Washington?
A Correct.
Q Where else does of your knowledge does the BBC News USA have an office?
A In New York, in LA, in San Francisco.
Q And then there's the operation in Florida that houses BBC Mundo and BBC Monitoring?
A That's correct.
Q So the office arrangement for BBC News USA isn't restricted to Florida, is it?
A No.
Q All right. You referred to -- I think you were asked if anybody in BBC News USA contributed in any way to the documentary and you identified Ms. Chloe Ross?
A Yes.

Q Do you remember that?
A Yes.
Q Do you know what Ms. Ross' roles -- Ms. Ross' role was?
A Yes. She was a guest booker and she booked one guest in particular that was Marc Lotter, who was a former Republican communications chief for Donald Trump and that interview was conducted in Washington.
Q Washington D.C.?
A Yes.
Q You mentioned Washington earlier. So there's no confusion, you mean that Washington D.C., not the State of Washington?
A Yes. Yes.
Q And how do you know about Ms. Ross' role?
A I spoke to her.
Q You spoke to her personally?
A Um-hmm. Yes.
Q And do you know for certain that no individuals from the BBC who worked on this documentary or from October Films who worked on this documentary went to Florida during the process of creating the documentary?
A Yes, I do know that. And I know that because I have consulted -- I consulted with the people that

worked on the documentary who also consulted with the risk assessments that were done for all of the filming that was done in the United States documentary and none of that was involved.

Q How many hours would you estimate that you spent preparing for today's deposition?

A Between 15 and 18 hours, something like that.

Q And you listed a number of people that you spoke with?

A Um-hmm.

Q You said you spoke with a dozen people?

A Yes.

Q All right. And you looked at a lot of documents?

A Yes.

Q Any quantification that you could lend to the transcript about the number of documents quantitative?

A About 80. I'm saying 10 for each one of those points.

Q Did you feel that you were adequately prepared today to answer the questions that were posed you?

A Yes.

MR. TOBIN: No further questions.

MR. BRITO: I have no questions. Thank you, sir.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Before going off record, read or waive?

MR. TOBIN: We will read.

THE VIDEOGRAPHER: And ordering the transcript and video for this one as well?

MR. BRITO: Yes, please.

MR. TOBIN: Same here. Are you're going to order a rough?

MR. BRITO: And a rough as well, please.

MR. TOBIN: Yeah. We'll take a rough as well. We're going to read all three of the depositions taken this week, Ms. Ambersley. If you'll send them to me, I'll arrange for the witnesses to review.

THE VIDEOGRAPHER: The time is 4:43 p.m. and we're off video record.

\- - -

(Thereupon, the deposition was concluded and reading and signing was not waived.)

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA)
COUNTY OF ST. LUCIE)

I, Sharon Ambersley, FPR, do hereby certify that I was authorized to and did stenographically report the foregoing video-recorded deposition of Richard Burgess; that a review of the transcript, was requested; and that the foregoing transcript, pages 1 through 115, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 4th day of June 2026, at St. Lucie County, Florida.

Sharon Ambersley, FPR
Notary Public - State of Florida
My Commission: HH511304
My Commission Expires: 07/06/28

CERTIFICATE OF OATH

STATE OF FLORIDA)
COUNTY OF ST. LUCIE )

I, Sharon Ambersley, Florida Professional Reporter, Notary Public, State of Florida, certify that the witness, RICHARD BURGESS, personally appeared before me on the 29th day of May 2026 and was duly sworn.

WITNESS my hand and official seal this 4th day of June 2026.




Sharon Ambersley, FPR
Notary Public - State of Florida
My Commission: HH511304
My Commission Expires: 07/06/28

# E R R A T A   S H E E T

IN RE: PRESIDENT DONALD J. TRUMP VS. BRITISH BROADCASTING CORPORATION A/K/A BBC, ET AL

DEPOSITION OF: RICHARD BURGESS

TAKEN: May 29, 2026

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

PAGE # LINE # CHANGE REASON

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

Please forward the original signed errata sheet to this office so that copies may be distributed to all parties.

Under penalty of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

DATE: ________________________

SIGNATURE OF DEPONENT: ________________________________

DATE: June 4, 2026

TO: CHARLES D. TOBIN, ESQ.
c/o Richard Burgess
1909 K Street, NW
12th Floor
Washington, DC 20006
U.S. Legal Job#: 7148641-001

IN RE: PRESIDENT DONALD J. TRUMP VS. BRITISH BROADCASTING CORPORATION A/K/A BBC, ET AL

IN RE: Dear : Mr. Tobin

This letter is to advise you that the transcript of your client, RICHARD BURGESS, taken in the above-styled case on May 29, 2026, has been completed and is awaiting his/her reading and signing.

Please have him/her contact our office at (754) 201-2346 to make arrangements to read and sign the deposition transcript. Our office hours are 9:00 a.m. to 5:00 p.m., Monday through Friday.

If the transcript is not signed by the witness within 30 days after this letter has been furnished, we will then process the transcript without a signed errata page. If your client wishes to waive their signature, please have him/her sign his name at the bottom of this letter and return it to our office @ U.S. Legal Support, 16825 Northchase Drive, Suite 900, Houston, TX 77060-6004.

Your prompt attention to this matter is appreciated.
Sincerely,

______________________________
Sharon Ambersley

I do hereby waive my signature:

___________________________________
RICHARD BURGESS

cc via transcript: Alejandro Brito, Esq.
Charles D. Tobin, Esq.

file copy