UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

PRESIDENT DONALD J. TRUMP,

Plaintiff,

v.

BRITISH BROADCASTING CORP.,

Defendant.

Case No. 1:25-cv-25894-JTK-EAL

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

**BALLARD SPAHR LLP**
1909 K Street, NW
Washington, DC 20006-1157
Tel: (202) 661-2218
Fax: (202) 661-2299

Charles D. Tobin
Fla. Bar No.: 816345
Maxwell S. Mishkin (*pro hac vice*)
Sasha Dudding (*pro hac vice*)
Yanni Chen (*pro hac vice*)
Richard W. Miller (*pro hac vice*)
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com
cheny@ballardspahr.com
millerrw@ballardspahr.com

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. THE CASE SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER THE BBC ........ 2

A. Plaintiff Cannot Establish General Personal Jurisdiction ........ 2

B. The BBC Is Not Subject to Specific Personal Jurisdiction in Florida ........ 2

1. Plaintiff does not establish that anyone accessed the Documentary in Florida ........ 2

2. Florida's long-arm statute does not subject Defendant to personal jurisdiction ........ 4

3. Exercising personal jurisdiction over the BBC would violate due process ........ 4

i. Plaintiff cannot establish personal jurisdiction under the effects test ........ 5

a. The BBC's extensive measures to prevent non-U.K. access confirm that it did not aim the Documentary at Florida ........ 5

b. Circumventing geoblocking efforts cannot satisfy the effects test ........ 6

c. Reporting near to the U.S. election does not satisfy the effects test in Florida ........ 8

ii. Plaintiff also cannot satisfy the minimum contacts test ........ 11

4. Exercising jurisdiction would offend notions of fair play and substantial justice ........ 12

II. THE FAC FAILS TO STATE A CLAIM ........ 13

A. The FAC Fails to State a Claim for Defamation ........ 13

B. The FAC Fails to State a Claim for a Violation of FDUTPA ........ 15

CONCLUSION....................................................................................................................15

RESPONSE TO PLAINTIFF'S REQUEST FOR EVIDENTIARY HEARING..........................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asahi Metal Industries Co., Ltd. v. Super. Court of California*,
480 U.S. 102 (1987) .......... 12

*Basulto v. Netflix*,
2023 WL 4014741 (S.D. Fla. May 25, 2023) .......... 10, 11

*Bioheart v. Peschong*,
2013 WL 1729278 (S.D. Fla. Apr. 22, 2013) .......... 12

*Bongino v. Daily Beast*,
477 F. Supp. 3d 1310 (S.D. Fla. 2020) .......... 15

*Caribbean Cruise Line v. Better Business Bureau of Palm Beach County*,
169 So. 3d 164 (Fla. 4th DCA 2015) .......... 15

*Carmouche v. Tamborlee Manamgement*,
789 F.3d 1201 (11th Cir. 2015) .......... 2

*Carroll v. Trump*,
663 F. Supp. 3d 380 (S.D.N.Y. 2023) .......... 15

*Carsey-Werner v. BBC*,
2018 WL 1083550 (C.D. Cal. Feb. 23, 2018) .......... 6, 7, 8

*Chaiken v. VV Publishing*,
119 F.3d 1018 (2d Cir. 1997) .......... 12

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......... 2

*Del Valle v. Trivago GMBH*,
56 F.4th 1265 (11th Cir. 2022) .......... 6

*Dunn v. Air Line Pilots Association*,
193 F.3d 1185 (11th Cir. 1999) .......... 14

*Edelstein v. WFTV*,
798 So. 2d 797 (Fla. 4th DCA 2001) .......... 13

*Fielding v. Hubert Burda Media*,
415 F.3d 419 (5th Cir. 2005) .......... 10, 12

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
592 U.S. 351 (2021) .......... 11

*Guarino v. Mandel*,
327 So. 3d 853 (Fla. 4th DCA 2021) ........................................................................7

*Imerys Talc America, Inc. v. Ricketts*,
262 So. 3d 799 (Fla. 4th DCA 2018) ........................................................................7

*Internet Solutions v. Marshall*,
39 So. 3d 1201 (Fla. 2010)........................................................................................2, 3

*Karnas v. Cuban*,
2025 WL 3759241 (S.D. Fla. Dec. 30, 2025) ..........................................................2, 4, 7, 8

*Klayman v. Judicial Watch*,
22 F. Supp. 3d 1240 (S.D. Fla. 2014) .......................................................................15

*Licciardello v. Lovelady*,
544 F.3d 1280 (11th Cir. 2008) ..................................................................................3

*Loomer v. Maher*,
831 F. Supp. 3d 1212 (M.D. Fla. 2026).....................................................................13

*Louis Vuitton Malletier, S.A. v Mosseri*,
736 F.3d 1339 (11th Cir. 2013) ..................................................................................5

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1991)...................................................................................................14

*McCall v. Zotos*,
2023 WL 3946827 (11th Cir. June 12, 2023) ..........................................................3, 5, 11

*Miller v. Gizmodo Media Group*,
383 F. Supp. 3d 1365 (S.D. Fla. 2019) .......................................................................5

*Moore v. Cecil*,
109 F.4th 1352 (11th Cir. 2024) ...........................................................................5, 7, 9, 11

*Moore v. Cecil*,
174 F.4th 862 (11th Cir. 2026) ...................................................................................13

*N.Y. Times v. Sullivan*,
376 U.S. 254 (1964)...................................................................................................14

*Peruyero v. Airbus S.A.S.*,
83 F. Supp. 3d 1283 (S.D. Fla. 2014) .........................................................................6

*ProAmpac Holdings, Inc. v. RCBA Neutraceuticals, LLC*,
388 So. 3d 41 (Fla. 5th DCA 2022).............................................................................4

*Reger v. Barefoot*,
2024 WL 6978055 (S.D. Fla. July 26, 2024)....................4

*Rothschild v. Starbucks*,
2026 WL 717195 (S.D. Fla. Feb. 18, 2026)....................15

*Safex Foundation v. SafeLaunch Ventures*,
694 F. Supp. 3d 1 (D.D.C. 2023)....................7

*Shriteh v. NYP Holdings*,
2026 WL 386705 (M.D. Fla. Feb. 11, 2026)....................13

*Stone v. Shafran*,
641 F. Supp. 3d 1344 (S.D. Fla. 2022)....................3

*Thane International v. Braden*,
2008 WL 11399575 (S.D. Fla. Jan. 22, 2008)....................12

*Thompson v. Trump*,
590 F. Supp. 3d 46 (D.D.C. 2022)....................15

*Triple Up v. Youku Tudou*,
235 F. Supp. 3d 15 (D.D.C. 2017)....................8

*Walden v. Fiore*,
571 U.S. 277 (2014)....................7, 11, 12

**Statutes**

Communications Act 2003, c. 21, § 363 (U.K.)....................5

Fla. Stat. § 48.193....................4

Fla. Stat. § 501.204....................15

## PRELIMINARY STATEMENT

In his Opposition ("Opp.", ECF 170) to the BBC's Motion to Dismiss ("Br.", ECF 133), Plaintiff tries out several attenuated theories, but none support finding jurisdiction in Florida. With each, Plaintiff ignores the facts: the BBC is at home in the U.K., not Florida; the BBC broadcast "*Trump: A Second Chance?*" (the "Documentary") only on its U.K. TV channels and its geofenced streaming service iPlayer for U.K. TV license holders, with no rights to broadcast in the U.S.; the non-party U.S. rights-holder did not broadcast the Documentary; and the version prepared for distribution outside the U.K. did not even contain the January 6 clip. The Court should decline Plaintiff's invitation to ignore the jurisdictional facts and well-established due process law, and instead dismiss his First Amended Complaint ("FAC," ECF 124).

**First**, Plaintiff claims the Court can exercise jurisdiction because a few Floridians *might*—or might not, Plaintiff does not actually know—have used an unauthorized VPN, in violation of the BBC's Terms of Use ("Terms") and evading its U.K.-only geoblocking measures. Plaintiff's theory of jurisdiction-by-circumvention is without precedent and does not withstand scrutiny. To establish jurisdiction, Plaintiff must show that the BBC *purposefully* aimed the Documentary at Florida, not that someone in Florida might have jumped a geofence to watch it. And it is insufficient to point to a single instance where an individual working on the Documentary sent a viewing link to pass along to a Florida resident, where Plaintiff does not even allege that that Florida resident *actually accessed* the Documentary.

**Second**, Plaintiff urges this Court to find jurisdiction because the Documentary discussed a U.S. election and included video that *non-parties* filmed earlier in Florida and later licensed for the Documentary. But jurisdiction must be based only on the BBC's contacts with Florida specifically—not the U.S. generally, or on others' prior work in the state.

**Third**, Plaintiff asks the Court to exercise jurisdiction because he has alleged that the BBC defamed a Florida resident. The law is clear, however, that Plaintiff's own residence cannot be the link between the BBC and the forum state creating personal jurisdiction.

Plaintiff also fails to state a claim as a matter of law. The Opposition further demonstrates that President Trump has not plausibly alleged the disputed edit caused him actual harm, that the BBC published it with actual malice, or that the implication the edit allegedly conveys is a statement of fact rather than a protected expression of opinion. He has also failed to adequately allege a FDUTPA claim. For these reasons as well, the Court should grant the motion to dismiss.

## ARGUMENT

Plaintiff's Opposition only confirms that the Court lacks personal jurisdiction over the BBC, and that the FAC fails to state a claim for defamation or violating FDUTPA.

### I. THE CASE SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER THE BBC.

Plaintiff cannot show a basis for this Court to exercise personal jurisdiction over the BBC.

#### A. Plaintiff Cannot Establish General Personal Jurisdiction.

Plaintiff cannot, and does not, refute that Defendant's place of incorporation and principal place of business are in the U.K. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (cleaned up); FAC ¶ 12; Burgess Decl. ¶ 5 (ECF 133-2). The fact that BBC News Mundo and BBC Monitoring operated out of the Coral Gables office of BBC News USA, Inc.—a separate entity from the BBC—is not the "exceptional" case that establishes general jurisdiction over a foreign defendant. *See Carmouche v. Tamborlee Mgmt.*, 789 F.3d 1201, 1204 (11th Cir. 2015). Contrary to Plaintiff's representations, the undisputed discovery record establishes that none of the Coral Gables staff report into Mr. Burgess's department in London, as they are all employed by BBC News USA, Inc. instead. *See* Opp. Ex. B ("Burgess Tr.") at 84:7-85:8. And none of these employees had any connection to the Documentary. Burgess Decl. ¶ 12.

#### B. The BBC Is Not Subject to Specific Personal Jurisdiction in Florida.

The undisputed discovery record also confirms that the BBC aimed the Documentary only at U.K. viewers, broadcast it only on U.K. TV channels, and streamed it only on iPlayer under legal, contractual, and technical restrictions designed to limit access to the U.K. The BBC did not create, produce, or broadcast the Documentary in Florida. Plaintiff's core argument—that someone may have used VPNs to hack through iPlayer's territorial restrictions—is irrelevant. As another court in this District made clear, "[i]f digital streaming alone sufficed for personal jurisdiction, then a federal court's reach would have no end." *Karnas v. Cuban*, 2025 WL 3759241, at *11 (S.D. Fla. Dec. 30, 2025). That reasoning applies more forcefully here because the BBC took extensive measures to prevent such streaming.

##### *1. Plaintiff does not establish that anyone accessed the Documentary in Florida.*

Plaintiff concedes that access to the Documentary in Florida is required to find personal jurisdiction over the BBC, as that is what Florida's long-arm statute requires. Opp. at 15 ("Under *Internet Solutions*, defamatory material about a Florida resident is 'published' in Florida when it is accessed here."); *Internet Sols. v. Marshall*, 39 So. 3d 1201, 1215 (Fla. 2010) (a third party must

access the posting). But he cannot and does not meet this threshold burden.

Plaintiff's argument hinges on the allegation that Rick Wilson, allegedly a "known Florida resident," received a link to the Documentary. *See* Opp. at 9. But despite six months of jurisdictional discovery, Plaintiff does not show that Mr. Wilson (or anyone else) actually accessed the Documentary in Florida, a necessary condition to personal jurisdiction. *See Internet Sols.*, 39 So. 3d at 1215. *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008), on which Plaintiff relies, predates the Florida Supreme Court's response to a certified question from the Eleventh Circuit in *Internet Solutions*, where the Court specifically held that for long-arm jurisdiction to apply, "the material posted on the website about a Florida resident must not only be *accessible* in Florida, but also be *accessed* in Florida in order to constitute the commission of the tortious act of defamation within Florida under section 48.193(1)(b)." 39 So. 3d at 1203. Plaintiff has never identified *any* person who accessed the Documentary in Florida. Under current law, the Eleventh Circuit makes clear that the plaintiff now must come forward with that evidence to survive a jurisdictional challenge. *See, e.g.*, *McCall v. Zotos*, 2023 WL 3946827, at *3 (11th Cir. June 12, 2023) ("Here, the district court correctly determined that the first prong was satisfied because the review was accessible in Florida and, *according to his declaration, Mr. Godrey accessed the review in Florida*.") (emphasis supplied) (citing the *Internet Solutions* decisions in the Florida Supreme Court and the Eleventh Circuit).

Additionally, *Calder*'s effects test requires the BBC to "have expressly aimed [its] tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Stone v. Shafran*, 641 F. Supp. 3d 1344, 1360 (S.D. Fla. 2022). That did not happen here. Viewing links went to just six U.S.-based participants, which, in addition to Mr. Wilson's assistant, included D.C. "congressional staff" and "a University of California professor." Opp. at 8. Sending one courtesy email "to be forwarded to a named Florida resident," Opp. at 4, among a few courtesy emails to residents of other states, does not make Florida the "focal point" of the Documentary, particularly where Mr. Wilson's contribution was not even filmed in Florida. *See McCall*, 2023 WL 3946827, at *5 (claims "that the review was accessible and accessed in Florida and that [plaintiffs] resided in Florida are not sufficient to confer personal jurisdiction"); Opp. Ex. A ("Telling Tr.") at 78:13-20, 80:12-13; Burgess Tr. at 23:3-15. Moreover, a freelance producer who was contracted to October Films and is not a BBC employee, sent the email. *See* Telling Tr. at 74:4-75:8. Plaintiff does not contend that she was acting for the BBC.

Absent evidence (or even allegation) that this sole alleged Florida resident in fact accessed the Documentary in Florida, Plaintiff has rested his case on a false premise. Consequently, the BBC is not subject to personal jurisdiction in Florida.

***2. Florida's long-arm statute does not subject Defendant to personal jurisdiction.***

In addition to failing the threshold access issue, Plaintiff also cannot show that exercising personal jurisdiction comports with Florida's long-arm statute, as he must. *See* Br. at 4-12.

**First**, as to Fla. Stat. § 48.193(1)(a)(6), for "injury to persons or property within this state," Plaintiff continues to ignore that "[t]he Florida Supreme Court has held that [§ 48.193(1)(a)(6)] applies only when a defendant's out of state actions cause personal injury or damage to physical property in the State of Florida." *Reger v. Barefoot*, 2024 WL 6978055, at *7 (S.D. Fla. July 26, 2024) (quoting *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006)); *ProAmpac Holdings, Inc. v. RCBA Neutraceuticals, LLC*, 388 So. 3d 41, 47-48 (Fla. 5th DCA 2022) (finding allegation of economic harm insufficient and that "there must be allegations of personal bodily-injury or property damage" instead (quoting *Identigene, Inc. v. Goff*, 774 So. 2d 48, 49 (Fla. 2d DCA 2000))); *cf.* Opp. at 19. Yet "reputational" harm is all the Plaintiff here alleges. FAC ¶¶ 10, 129-32, 139.

**Second**, Plaintiff cites only *unrelated* business for claims based on "carrying on a business or business venture in this state" under Fla. Stat. § 48.193(1)(a)(1). The undisputed facts demonstrate that the Coral Gables office had no role in the Documentary; U.S. employees work for BBC News USA, Inc., which did not create or broadcast it; it was not shared via "partnerships distributing BBC content" in the U.S., and it was never on BBC.com. *Compare* Opp. at 18-19, *with* Burgess Decl. ¶¶ 8-12; Freeman Decl. ¶¶ 14-16 (ECF 133-9). The Florida news and weather pages on BBC.com are not unique to Florida; the site has pages for every U.S. state, countries globally, and topics from sports to music. Opp. Ex. S ("BBCSD Tr.") at 72:14-74:1. This "comes nowhere close to establishing 'a direct affiliation, nexus, or substantial connection . . . between the basis for the cause of action and the business activity.'" *Karnas*, 2025 WL 3759241, at *6.

**Third**, Plaintiff cites Fla. Stat. § 48.193(1)(a)(2), which encompasses "[c]ommitting a tortious act within this state." Even crediting, *arguendo*, Plaintiff's defamation allegations, he cannot invoke this provision because he "still fail[s] to overcome the federal due-process standard" to establish jurisdiction, as set forth below. *Karnas*, 2025 WL 3759241, at *7.

***3. Exercising personal jurisdiction over the BBC would violate due process.***

The Court lacks specific personal jurisdiction over the BBC because Plaintiff cannot overcome the due-process standard under the U.S. Constitution. To do so, Plaintiff must establish, among other things, that the defendant "purposefully availed" itself of the privilege of conducting activities within the forum. *See Louis Vuitton Malletier, S.A. v Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). There are two tests for purposeful availment, "the [*Calder*] effects test and the traditional minimum contacts test." *Miller v. Gizmodo Media Grp.*, 383 F. Supp. 3d 1365, 1373 (S.D. Fla. 2019) (citations omitted). Plaintiff cannot satisfy either.

***i. Plaintiff cannot establish personal jurisdiction under the effects test.***

The effects test requires Plaintiff to establish that the Documentary was "directly aimed at the forum"—that Florida "was the focal point." *Moore v. Cecil*, 109 F.4th 1352, 1364 (11th Cir. 2024) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). The facts here demonstrate the opposite. The record shows the BBC aimed the Documentary at the U.K. and took extensive and robust steps to bar non-U.K. access. This case illustrates the rule that "[p]osting information on the internet is not sufficient by itself to subject that person to personal jurisdiction in each State in which the information is accessed." *McCall*, 2023 WL 3946827, at *4 (cleaned up). Plaintiff's arguments—as to a few copies sent to U.S.-based contributors, unauthorized VPN use, and U.S. filming—cannot manufacture a different result.

**a. The BBC's extensive measures to prevent non-U.K. access confirm that it did not aim the Documentary at Florida.**

Plaintiff's VPN argument rests on the unprecedented theory that unless a foreign content provider's geofencing is impenetrable to VPN hacking, it is amenable to jurisdiction everywhere. That is contrary to precedent, which holds that the BBC's extensive and active steps to prevent access from outside of the U.K. establishes its intent to *not* direct the Documentary into a U.S. forum. Here, the BBC's efforts are undisputed. An internet viewer could only access the Documentary through iPlayer. The only people who can legitimately obtain access to iPlayer are U.K. residents who pay an annual license fee. *See* Cooper Decl. ¶¶ 6-7 (ECF 133-5). Before receiving access, users must agree to iPlayer's Terms of Use, which prohibit watching iPlayer from outside the U.K. and prohibit using technological circumvention tools (such as VPNs) to do so. *Id.* ¶¶ 7-11. Anyone accessing iPlayer from outside the U.K., or providing a false address as part of a scheme to do so, has breached their agreement with the Terms. Watching iPlayer without paying the U.K. license fee is a crime under U.K. law. *See* Commc'ns Act 2003, c. 21, § 363 (U.K.).

These measures alone clearly show that the BBC did not aim the Documentary anywhere but the U.K. That is more than enough to defeat Plaintiff's personal jurisdiction argument. *See Carsey-Werner v. BBC*, 2018 WL 1083550, at *6 (C.D. Cal. Feb. 23, 2018) (no personal jurisdiction over the BBC because "[u]nauthorized viewers outside of the United Kingdom do not provide a basis for personal jurisdiction").

Moreover, to help enforce these territorial restrictions on its content, the BBC employs GeoComply, the "gold standard" geoblocking system, to identify attempts to access iPlayer from outside of the U.K. *See* Opp. Ex. J ("Cooper Tr.") at 44:1-5. GeoComply is so well regarded that U.S. online gambling providers use it to ensure compliance with state laws, which require significant diligence considering the legal "risks." *Id.* at 111:16-112:9. GeoComply is also used by other peer companies and other content distributors, including U.K. competitor ITV and Amazon Prime Video, content distribution networks such as Akamai. *Id.* at 44:3-13, 135:1-12.

The BBC's efforts are so meaningful that [redacted] Trying to block viewing outside of the U.K. is the opposite of aiming the Documentary at Florida, and defeats the exercise of personal jurisdiction here. *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1276 (11th Cir. 2022).

**b. Circumventing geoblocking efforts cannot satisfy the effects test.**

Plaintiff constructs a theory of personal jurisdiction that would create near-universal jurisdiction over any global business with an internet presence, even if that business uses gold- and industry-standard technology to identify and block extraterritorial access, and employs contractual and legal safeguards to do the same. Plaintiff's jurisdiction-by-circumvention theory, based on an alleged "34 play-starts" by putative viewers using VPNs does not carry the day.[1]

[redacted] Plaintiff presents the Court with an uncited, incorrect explanation of VPN operation

[1] Plaintiff erroneously argues that he only needs to plead facts that make a "prima facie showing of access by a third party in Florida." Opp. at 15. This, and his description of the burden-shifting framework, *id.* at 2-3, ignore the procedural posture of this case, where Plaintiff has completed jurisdictional discovery and where the BBC has challenged Plaintiff's pleadings with sworn testimony collected as part of that process. *See* Order (ECF 45) (granting Plaintiff an extension of time to file his original opposition to complete jurisdictional discovery); *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1286-87 (S.D. Fla. 2014).

created from whole cloth. Plaintiff contends that after the VPN "presents a United Kingdom egress IP address . . . the BBC's own delivery network streams the file to the device that requested it—here, to devices in Florida." Opp. at 11. The absence of any citation for Plaintiff's assertion is unsurprising because it is flatly incorrect. [redacted]

Plaintiff's inability to refute this fact leaves only one undisputed conclusion: there is no evidence that the BBC ever directed the Documentary to Florida. [redacted] The unilateral contacts of bad actors cannot create personal jurisdiction over the BBC. *See Moore*, 109 F.4th at 1364; *Carsey-Werner*, 2018 WL 1083550, at *6. Thus, "there is no evidence that the defendant[] posted the . . . information hoping to reach the forum state . . . *specifically*." *Karnas*, 2025 WL 3759241, at *8; *cf. Safex Found. v. SafeLaunch Ventures*, 694 F. Supp. 3d 1, 13-15 (D.D.C. 2023) (unauthorized access "only underscore[s] what [defendant's] own policies and practices already suggest – that the company seeks to avoid doing business with U.S. consumers, despite the fact that its website is accessible in the United States"). [redacted] plainly describes "unilateral activity of a third party" falling under *Walden v. Fiore*, which cannot supply personal jurisdiction. 571 U.S. 277, 291 (2014) (cleaned up); *see also Imerys Talc Am., Inc. v. Ricketts*, 262 So. 3d 799, 803 (Fla. 4th DCA 2018) ("'a consumer's unilateral act of bringing the defendant's product into the forum State'" is an insufficient constitutional basis for personal jurisdiction) (quoting *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102, 109 (1987)).[2]

Notably, Plaintiff does not identify a single decision exercising personal jurisdiction over a foreign defendant based on unauthorized internet access. Indeed, another court rejected Plaintiff's precise theory as to BBC's iPlayer, holding that "[u]nauthorized viewers outside of the

---

[2] Plaintiff's nits that the BBC's cite to *Imerys* quotes Supreme Court precedent, Opp. at 18, and that its indirect reference to *Guarino v. Mandel*, 327 So. 3d 853 (Fla. 4th DCA 2021) quotes Florida appellate precedent, Opp. at 17, are beside the point—both approvingly cite controlling standards from precedent that those cases applied, and that would apply here.

United Kingdom do not provide a basis for personal jurisdiction." *Carsey-Werner*, 2018 WL 1083550, at *6; *accord Triple Up v. Youku Tudou*, 235 F. Supp. 3d 15, 25 (D.D.C. 2017) (noting that "affirmative geoblocking efforts should weigh *against* the exercise of personal jurisdiction" and that "equat[ing] a failure to geoblock with purposeful availment" would upend due process), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018). Plaintiff's efforts to distinguish *Carsey-Werner* and *Triple Up* ring hollow because they are based on two emails to the assistant of one alleged Florida resident with no proof that he accessed or watched the Documentary, and alleged unauthorized VPN use in violation of the BBC's Terms. *See* Opp. at 13-14.

Plaintiff also points to unreliable data showing 34 out of 570,000 play-starts, by 10 unique visitors who *may* have been in Florida, along with alleged unauthorized access to German soccer broadcasts (from Germany). *Id.* at 11-12. Assuming for argument's sake that these play-starts were in Florida (which Plaintiff has *not* established), the BBC has already explained why, under any circumstance, this *de minimis* alleged access is insufficient to establish personal jurisdiction. *See* Br. at 8-11; *see also Carsey-Werner*, 2018 WL 1083550, at *6 (unauthorized iPlayer access cannot create jurisdiction). But most importantly, the systems the BBC relies on for geoblocking show *no* U.S. access; they would have blocked users detected to be in the U.S. *See* Cooper Tr. at 39:18-25.[3]

At bottom, Plaintiff offers a theory of personal jurisdiction based on unauthorized third-party access in violation of the BBC's extensive efforts. *See* Opp. at 10-15; *id.* Ex. K. If this were enough, anyone anywhere in the world who posts content online, even if they work as diligently as the BBC does to block U.S. access, could be pulled into court in any state. Such an exercise of jurisdiction does not comport with due process. *Karnas*, 2025 WL 3759241, at *11.

[3] Contrary to Plaintiff's unfounded attacks on Mr. Cooper, there is no inconsistency. *Cf.* Opp. at 11; Lavian Decl. at App'x E. Neither Mr. Cooper nor the BBC has claimed its geoblocking is 100% effective. Rather, what the BBC has claimed—[redacted]—is that the BBC aims to block users outside the U.K. from using iPlayer. *See* Cooper Decl. ¶ 9 (ECF 133-5) ("Where the IP geo-location feature detects unauthorised use outside of the United Kingdom, it prevents access to video content via the iPlayer service."); Cooper Tr. at 31:14-17 ("[W]here we detect someone is from the US, we do not deliver the content to them."); [redacted] That is the opposite of purposeful availment in Florida. Regarding the one document showing 34 attempted play-starts in Florida, as Mr. Cooper testified [redacted], that data is "not reliable" for geolocation. It is used by a different BBC team for audience analytics, not geoblocking; those metrics do not use up-to-date geolocation data; and based on Mr. Cooper's analysis, some of those attempts appeared to be in the U.K. Cooper Tr. at 39:22-41:8, 101:5-103:17.

**c. Reporting near to the U.S. election does not satisfy the effects test in Florida.**

Plaintiff's argument that specific jurisdiction arises in Florida because the Documentary was aimed at a "global, unrestricted U.S. audience," Opp. at 4-8, errs legally and factually. Legally, Plaintiff must show that Florida, not the U.S., "was the focal point of" the film. *Moore*, 109 F.4th at 1364. He has not and cannot. As the facts show, it was aimed at U.K. audiences, not Floridians.

***Commissioning documents.*** Plaintiff argues that these documents show the Documentary was "conceived, timed, and structured around the 2024 U.S. Presidential Election." Opp. at 5. True enough, as this event was newsworthy for U.K. viewers. That the production agreement states the film "*could* be seen in" the U.S. is unremarkable, as are emails noting *possible* international distribution. *See* Opp. Ex. D at 6 (emphasis added); *id.* Exs. G-H. Blue Ant, a non-party that contracted with the Documentary's owner October Films, had the international distribution rights, so any U.S. distribution could not have been via the BBC. Opp. Ex. D at 1. Nor does the record support that international distribution would have been targeted at Florida specifically.

***Pitches.*** While a pitch mentioned "revelation[s] from DC, Florida, New York or Georgia," where Plaintiff was facing trial, on its face this reflects a general plan to track "events/trial verdicts" in each jurisdiction where President Trump faced criminal charges, not to focus the Documentary on Florida. Opp. Ex. F. at 7; *cf.* Opp. at 5. This is evident in the Documentary itself. As to Florida, it shows just one brief clip of a Mar-a-Lago rally, which the BBC licensed from the archive of another company and did not film itself. *See* Telling Decl. Ex. 3. Overall, the Documentary aimed to explain to its "audience in the UK why Trump retains such popularity and why he might be elected for a second time." Burgess Tr. at 41:21-42:1.

***U.S. filming and non-parties' Florida footage.*** Plaintiff mentions the U.K.-based production team's sole, ten-day filming trip to D.C. and Ohio, *see* Opp. at 16, but manufactures "irreconcilable conflict" by suggesting that the BBC could have filmed in Florida. It is undisputed that no one went to Florida for this Documentary. *See* Telling Tr. at 78:13-20, 80:12-13; Burgess Tr. at 23:3-15. Plaintiff also peddles the false claim that the BBC "traveled to Florida to film" at Mar-a-Lago, Opp. at 16, yet it is also undisputed that the Mar-a-Lago footage in the Documentary was not filmed by the BBC but was licensed from third parties or was publicly available, and was filmed, by others, before the Documentary was even commissioned. *See id.* at 96:21-102:25, 130:7-131:2; Telling Decl. ¶¶ 12-14 & Exs. 1-2. Plaintiff cannot even state a legitimate basis for his contention that the BBC filmed in Florida. *See* Pl.'s Interrog. Resps. at 77-78 ¶ 3 (ECF 57-2)

(failing to identify any concrete basis for this contention beyond the footage and images themselves).[4] Notwithstanding those facts, the clip ran just three minutes out of the hour-long film that featured a number of gatherings elsewhere, and it is not the edit Plaintiff's suit challenges. This cannot satisfy the effects test. *See, e.g.*, *Fielding v. Hubert Burda Media*, 415 F.3d 419, 426-27 (5th Cir. 2005) (test not met where "references to [forum] were merely collateral to the focus of the article").

***Air date.*** Plaintiff's arguments about the BBC's plan to air the Documentary ahead of the U.S. election are also misplaced. *Cf.* Opp. at 5. That is when *Panorama*'s U.K. viewers would find a documentary previewing the 2024 U.S. election newsworthy. *See* Burgess Tr. at 87:21-88:1. This shows no Florida-specific aiming, just basic principles of news and current affairs programming.

***Non-party distribution.*** Plaintiff's note that the "international rights ran from October Films to Blue Ant to Little Dot Studios" further undermines his jurisdictional claims. Opp. at 7. The BBC itself *never* had the international distribution rights; only U.K. distribution rights. *See* Burgess Tr. at 24:5-9; Opp. Ex. D at 1. Moreover, even after October Films licensed the rights, Little Dot never aired the Documentary in the U.S., and the international version that October Films licensed to Blue Ant, which Blue Ant then licensed to Little Dot, *did not even contain the edit at issue*. *See* Telling Decl. ¶¶ 21, 24. Critically, this licensing chain shows *no* aiming by the BBC at *Florida*. *See Basulto v. Netflix*, 2023 WL 4014741, at *13 (S.D. Fla. May 25, 2023) (no jurisdiction where non-party "had the exclusive discretion on when/where to publish the Film in the United States," "(which would include Florida – along with 49 other states)").

Plaintiff's continued insistence on claiming jurisdiction through the alleged activity (or lack thereof) of the now-dismissed BBC Studios defendants is even more confounding. *Cf.* Opp. at 7. His claim that the BBC's "commercial arm was actively shopping this film into the United States" is flatly wrong under the undisputed facts. *Id.* Although its streaming platform BBC Select was "approached" by Blue Ant, a non-party with the film's international distribution rights, to ask if it would be interested in airing the film, *id.*, the outcome is undisputed: BBC Select "didn't acquire the documentary," and certainly did not air it in Florida. BBCSD Tr. at 40:4; *id.* at 25:15-26:25 ("[T]here is no record of that program having been acquired[.]"); Freeman Decl. ¶¶ 9-10

---

[4] Plaintiff's fixation on the Getty Images license date for Mar-a-Lago footage is confusing; the undisputed point is that the BBC did not film it. Opp. at 16; Telling Tr. at 95:12-98:5 (explaining licenses are commonly signed after broadcast, so the producer only pays for footage it uses).

(BBC Studios did not "ha[ve] any role in the creation or production of," or "had the contractual rights to, and therefore did not, distribute" the film). Plaintiff does not even claim that this "approach" occurred in Florida, nor could he. *Cf.* BBCSD Tr. at 18:19-24 (BBC Select "operate[s] out of" New York). As "unilateral activity of a third party" cannot create jurisdiction, *Walden*, 571 U.S. at 291, Blue Ant's outreach is irrelevant. Neither BBC, the sole defendant, nor BBC Studios reached into Florida.

***X post.*** The BBC's sole social media post about the Documentary also was not aimed at Florida. Even Plaintiff refers to it, diffusely, as "international-facing." Opp. at 6. In fact, it was aimed at the U.K.: the post provided the *U.K.* airtime for *Panorama* on the BBC's *U.K.* TV channel or *U.K.* streaming service, which would, if it detected a user was not in the U.K., block the content from being viewed. *See* Opp. Ex. I. Again, the possibility that someone in Florida breached the BBC's geofencing does not show the BBC aimed *at Florida*, but the opposite. *Cf. Moore*, 109 F.4th at 1364 (no jurisdiction given "no evidence that the four tweets in question were directed at Alabama . . . as opposed to his followers or a national audience").

The precedent, the facts, and simple logic do not support Plaintiff's arguments that the BBC is subject to jurisdiction here because it contracted a U.K. company's U.K.-based team to make a film about the U.S. election, broadcast it in the U.K., but allegedly defamed one Florida resident. *See McCall*, 2023 WL 3946827, at *4-5 ("The mere fact that [defendant] knew that the plaintiffs resided in Florida is not sufficient to show that Florida was targeted as the focal point of the statements."); *Basulto*, 2023 WL 4014741, at *13 (that foreign defendants "produced a film which a Florida resident claims was defamatory. . . is insufficient"). The effects test is not met.

***ii. Plaintiff also cannot satisfy the minimum contacts test.***

Plaintiff barely attempts to satisfy the second test for purposeful availment, nor could he. "The contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (internal marks omitted). Unauthorized VPN use (if any) and other stray, isolated contacts cannot satisfy that standard. Plaintiff's claim that some Florida bad actors might have watched the Documentary unauthorizedly using a VPN also fails the minimum contacts test because, here too, due process means that a defendant's "relationship [with the forum state] must arise out of contacts that the defendant *himself* creates." *Walden*, 571 U.S. at 284 (emphasis in original) (internal marks omitted). Contrary to Plaintiff's false representations, *see supra* Section I.B.3.i.b, it is "precisely

the sort of unilateral activity of a third party that cannot satisfy the requirement of contact with the forum State." *Walden*, 571 U.S. at 291 (cleaned up).

Plaintiff's attempted distinction between this case, in which the BBC "transmitted the challenged work to a named resident of the forum," and the "circulation-volume" minimum contacts cases, holding that isolated transactions cannot create jurisdiction, makes no sense. Opp. at 14. In those cases, the defendant affirmatively sent a product into the forum state in question, yet the courts found jurisdiction lacking. *See, e.g.*, *Fielding*, 415 F.3d at 427 (noting copies "were purposefully sent to readers in Texas" yet declining personal jurisdiction); *Chaiken v. VV Publ'g*, 119 F.3d 1018, 1029 (2d Cir. 1997) (defendant did not "expressly aim" its actions at Massachusetts despite affirmatively sending four copies of its publication there because it had "no reason to think that the 'brunt of the harm' would be felt there," not because defendant hadn't purposefully placed the publication in Massachusetts); *Thane Int'l v. Braden*, 2008 WL 11399575, at *5, 8 (S.D. Fla. Jan. 22, 2008) (no personal jurisdiction for shipping its products to Florida, even where defendant "regularly communicated by telephone and email" to Florida resident and traveled to Florida).

Further undercutting Plaintiff's misconstruction is the established record that, again, shows no targeting of Florida. As noted above, viewing links were sent to six participants based across the U.S. as a standard journalistic courtesy of sharing a final product with those who contributed to it. *See supra* Section I.B.1. This cannot be said to "target" Florida. If it did, Plaintiff's distinction between what he calls the "circulation-volume" cases and this matter would collapse for a second reason. In each of those cases, the publications and products were sent to the forum state among other jurisdictions—the dispositive question instead was whether the forum state was the focal point of the defendant's actions and harm suffered. *See, e.g.*, *Chaiken*, 119 F.3d at 1029. That is on all fours with the fact pattern in this case and precludes a finding of jurisdiction.

***4. Exercising jurisdiction would offend notions of fair play and substantial justice.***

Asserting jurisdiction here despite the lack of connection between the U.K. Defendant and Florida would also offend notions of fair play and substantial justice. *See* Br. at 11-12; *Asahi Metal*, 480 U.S. at 114 (emphasizing "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system"); *Bioheart v. Peschong*, 2013 WL 1729278, at *5 (S.D. Fla. Apr. 22, 2013). Plaintiff's response repeatedly and improperly conflates general U.S. contacts with Documentary-related Florida contacts. Opp. at 19-20. None of it is sufficient. Again, the Coral Gables office of non-party BBC News USA, Inc. had no role in the Documentary; U.S. employees work for BBC

News USA, Inc., which did not create or broadcast the Documentary; the BBC did not distribute it via "U.S. broadcaster partnerships" or to "U.S. subscribers"; and "logs" showing that ten Florida visitors *may* have unauthorizedly viewed the Documentary cannot justify haling the BBC into a Florida court. *Id.*; *see* Burgess Decl. ¶¶ 8-12; Freeman Decl. ¶¶ 14-16. Under this Circuit's due process test, the BBC is not subject to jurisdiction in Florida, and the FAC should be dismissed.

## II. THE FAC FAILS TO STATE A CLAIM.

In addition to its jurisdictional failures, Plaintiff's FAC fails to state any claim for defamation or under FDUTPA and his Opposition does not disabuse from that deficiency.

### A. The FAC Fails to State a Claim for Defamation.

In moving to dismiss, the BBC identified three separate and independent reasons why Plaintiff failed to state a claim for defamation. Plaintiff's Opposition has not rebutted any of them.

<u>**First**</u>, Plaintiff refuses to accept that under *Edelstein v. WFTV*, he is required to "plead and prove actual injury" because he is suing a media defendant, and makes no effort to do so. 798 So. 2d 797, 798 (Fla. 4th DCA 2001) (per curiam) (requiring plaintiff suing a media defendant to plead and prove actual injury where he has alleged defamation per se); *Loomer v. Maher*, 831 F. Supp. 3d 1212, 1222 (M.D. Fla. 2026) (citing *Edelstein*'s holding that plaintiffs suing media defendants must plead actual injury "*even in cases of defamation per se*") (emphasis added); *Shriteh v. NYP Holdings*, 2026 WL 386705, at *3 n.4 (M.D. Fla. Feb. 11, 2026) ("Because Plaintiff sues media defendants, he must allege actual malice and damages for his libel per se claim to survive.").

<u>**Second**</u>, Plaintiff continues to misapprehend what the Supreme Court and the Eleventh Circuit require to plausibly allege actual malice. For one, Plaintiff erroneously claims actual malice can be inferred because the BBC's Chair issued an apology, *see* Opp. at 25, but the apology for an edit that "unintentionally created the impression of a single, continuous section of [Plaintiff's] speech" contradicts actual malice, *see id.* Because actual malice in a defamation-by-implication claim like this one requires Plaintiff to both plead and prove that that defendant "intended" to convey the allegedly false and defamatory meaning, *see Moore v. Cecil*, 174 F.4th 862, 883 (11th Cir. 2026), the apology for "unintentionally creat[ing] the impression" fails to support actual malice. Plaintiff also mischaracterizes the apology—he argues that the Chair "conceded" that "the edit created a false impression, and that the impression was that President Trump called for violence," and that he therefore admitted actual malice, falsity, and defamatory meaning. Opp. at 25. But Plaintiff conveniently misquotes the text he cites: the Chair instead apologized for the

"mistaken" impression that Plaintiff "made a *direct* call for violent action." FAC Ex. K (emphasis added). Plaintiff's argument warps the Chair's words and does not provide evidence that the BBC understood the Documentary to convey the message that Plaintiff now imputes.

For another, Plaintiff suggests that edit was, by definition, a knowing falsehood because "[o]ne cannot accidentally falsely assemble a sentence the speaker never spoke from a transcript one already possesses." Opp. at 24. That argument ignores the central holding in *Masson v. New Yorker Magazine*, where the Supreme Court concluded that "a deliberate alteration of the words uttered by a plaintiff does *not* equate with knowledge of falsity for purposes of . . . *Sullivan* and *Gertz* . . . unless the alteration results in a material change in the meaning conveyed by the statement." 501 U.S. 496, 517 (1991) (emphasis added) (citations omitted). The mere fact that the edit occurred does not plausibly allege actual malice.

Plaintiff's arguments about the 2022 *Newsnight* episode and the 2021 article also remain unavailing. *Cf.* Opp. at 24. Again, allegations as to these BBC staff who did *not* make the Documentary are legally irrelevant. Because actual malice "ha[s] to be brought home to the persons in [the] organization having responsibility for the publication," Plaintiff fails to plead any facts to support an argument that the Documentary's creators had any knowledge of those previous works. *N.Y. Times v. Sullivan*, 376 U.S. 254, 287 (1964); *cf.* FAC ¶¶ 65-85, 99-106, 115-118.

And finally, Plaintiff continues to falsely insist that he has alleged actual malice by baldly pleading that BBC's "leadership bore [him] ill will," Opp. at 24 (cleaned up), even though the Eleventh Circuit has been crystal clear that "[i]ll-will . . . plays no role in determining whether a defendant acted with 'actual malice.'" *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999). Plaintiff thus fails to plausibly allege actual malice, as he must.

**<u>Third</u>**, Plaintiff misses the forest for the trees on the question of whether the edit conveys a statement of fact or an expression of opinion. The BBC has argued that, to the extent the edit can be interpreted to convey the implication that Plaintiff fomented the violence on January 6, that implication is an expression of opinion on a matter of public concern, entitled to the fiercest protections of the First Amendment. The BBC has also argued that the Documentary reflects the editorial opinion of the effect of the speech on its listeners. Plaintiff responds with the non sequitur that it is "a binary question of historical fact" whether he "spoke the continuous sentence that the Documentary attributed to him." Opp. at 28. But whether the implication that Plaintiff alleges the edit conveys—that Plaintiff fomented violence on January 6—is too subjective to be proven true

or false. Because this issue is subjective, it is not actionable as fact. So too is the issue of whether the speech's audience understood it as an instruction to riot. Plaintiff ignores the holding of another District Court, in an action against President Trump and January 6 Capitol riot participants, that it is plausible to interpret his January 6 speech and its aftermath as the President's incitement of the day's events. *Thompson v. Trump*, 590 F. Supp. 3d 46, 115 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). Individuals facing charges related to their attack on the Capitol have said just that. *See Carroll v. Trump*, 663 F. Supp. 3d 380, 381 (S.D.N.Y. 2023) ("[S]ome individuals charged with crimes in connection with the January 6, 202[1] events at the United States Capitol have argued that their actions were attributable to what the individuals perceived, rightly or wrongly, as incitement by Mr. Trump."); *see also* Br. at 17-18 n.11.

### B. The FAC Fails to State a Claim for a Violation of FDUTPA.

Plaintiff's argument that his FDUTPA claim survives under Florida's single-action rule fails at the outset, because that claim is also premised on the BBC's alleged "deliberate dissemination of the false, defamatory, and malicious statements about President Trump." FAC ¶ 158. As Plaintiff accepts, it fails "'[i]f the defamation count fails.'" Opp. at 29 (quoting *Bongino v. Daily Beast*, 477 F. Supp. 3d 1310, 1320 (S.D. Fla. 2020)). But he errs in claiming that is the "only" effect of the single-action rule. *Id.* The law is consistent that "a plaintiff may not proceed on multiple counts for . . . the same defamatory publication." *Klayman v. Jud. Watch*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014).

Moreover, the Documentary is not "trade or commerce" under FDUTPA because it is not purely "commercial speech." *Bongino*, 477 F. Supp. 3d at 1321 (citation omitted); *see* Fla. Stat. § 501.204(1); *cf.* Opp. at 29. Plaintiff's cited case is not to the contrary, as it involved commerce: a company's accreditation methods. *Caribbean Cruise Line v. Better Bus. Bureau of Palm Beach Cnty.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015) (cited in Opp. at 29). Here, Plaintiff targets a Documentary "about the 2024 United States Presidential Election," Opp. at 98—clearly not "solely" "economic interest[s]." *Bongino*, 477 F. Supp. 3d at 1321; *cf. Rothschild v. Starbucks*, 2026 WL 717195, at *4 (S.D. Fla. Feb. 18, 2026) (news article not "trade or commerce"), *R.&R. adopted*, 2026 WL 714494 (Mar. 13, 2026). The FDUTPA claim fails on this ground as well.

## CONCLUSION

For each and all of the foregoing reasons and those set forth in its opening brief, Defendant respectfully requests that the Court dismiss the FAC with prejudice.

**RESPONSE TO PLAINTIFF'S REQUEST FOR EVIDENTIARY HEARING**

The Court should deny Plaintiff's request for an evidentiary hearing. *Cf.* Opp. at 31. There is no genuine dispute of any material jurisdictional fact. *See, e.g.*, *Bernardele v. Bonorino*, 608 F. Supp. 2d 1313, 1321 (S.D. Fla. 2009) (disputed facts "must be sufficiently material to warrant . . . an evidentiary hearing"). Witnesses sat for dozens of hours of depositions, their testimony is in the record, and the record facts cited in both parties' briefing are undisputed. If the Court determines oral argument would help its review, that would be sufficient to address any questions the Court may have.

Dated: September 15, 2026

Respectfully submitted,

**BALLARD SPAHR LLP**
1909 K Street, NW
Washington, DC 20006-1157
Tel: (202) 661-2218
Fax: (202) 661-2299

By: */s/Charles D. Tobin*
Charles D. Tobin
Fla. Bar No.: 816345
Maxwell S. Mishkin (*pro hac vice*)
Sasha Dudding (*pro hac vice*)
Yanni Chen (*pro hac vice*)
Richard W. Miller (*pro hac vice*)
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com
cheny@ballardspahr.com
millerrw@ballardspahr.com

*Attorneys for Defendant*