**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:25-cv-25894-KUNTZ**

**PRESIDENT DONALD J. TRUMP**,
an individual,

Plaintiff,

v.

**BRITISH BROADCASTING CORP.**,

Defendant.
_______________________________________/

**ORDER GRANTING IN PART AND DENYING**
**IN PART DEFENDANT'S MOTION TO DISMISS**

**THIS CAUSE** is before the Court on Defendant British Broadcasting Corporation's Motion to Dismiss [ECF No. 133]. In his amended complaint, President Trump brings a claim for defamation and a claim under the Florida Deceptive and Unfair Trade Practices Act. In its motion to dismiss, BBC argues that the Court lacks personal jurisdiction and that President Trump fails to state a claim.

This may seem familiar. But factually, this case differs from other cases that may look similar in name. *See, e.g.*, *Trump v. Dow Jones & Co., Inc.*, No. 1:25-CV-23232, 2026 WL 3270869 (S.D. Fla. Oct. 31, 2026); *Trump v. Cable News Network, Inc.*, 684 F. Supp. 3d 1269, 1270 (S.D. Fla. 2023), aff'd, No. 23-14044, 2025 WL 3213203 (11th Cir. Nov. 18, 2025).

In *CNN*, Judge Singhal concluded that "the complained of statements are opinion, not factually false statements, and therefore are not actionable." *Cable News Network*, 684 F. Supp. 3d at 1274. In *Dow Jones*, Judge Gayles dismissed President Trump's claims that the Wall Street Journal failed to adequately investigate claims it reported. *Dow Jones & Co., Inc.*, 2026 WL 3270869, at *9.[1]

Those cases involved a news entity reporting on a story. Here, the news entity created the story. BBC admitted as much by confirming it had edited a video to make it appear as though President Trump made a statement he never made. And it acknowledged it chose to release the video in a documentary only a week before the 2024 Presidential Election, at the time it would have the most impact. To make sure it was seen in Florida, BBC even emailed U.S. and Florida based commenters with instructions to on how to view the documentary.

Whether President Trump can prove these claims and establish he sustained damages at summary judgment or trial is left for another day. For now, after careful review, and being otherwise fully advised, BBC's Motion to Dismiss is granted in part and denied in part.

## <u>BACKGROUND</u>

The Plaintiff in this case is President Donald J. Trump, a citizen of the United States and Florida. [FAC, ¶11]. The Defendant is British Broadcasting Corporation, also known as BBC, a British corporation with its principal place of business in London. *Id.* ¶12.

---

[1] A petition for writ of certiorari in the *CNN* case remains pending at the Supreme Court, and an appeal in the *Dow Jones* case is pending at the Eleventh Circuit.

On October 28, 2024, one week before the 2024 Presidential Election, BBC broadcast a documentary titled "Trump: A Second Chance." *Id.* ¶1. In the Documentary, a twelve-second segment portrayed President Trump giving a speech to his supporters on January 6, 2021:

> We're going to walk down to the Capitol and I'll be there with you. And we fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore.

*Id.* ¶3. This two sentence, twelve-second segment, represents the core of Trump's complaint. However, the issue with the statement is that Trump never said it. The above statement is actually two parts of a speech spliced together. Instead, the first remarks that Trump made were:

> Now it is up to Congress to confront this egregious assault on our democracy. And after this, we're going to walk down and I'll be there with you. We're going to walk down, we're going to walk down. Anyone you want but I think right here, we're going to walk down to the Capitol and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them

*Id.* ¶4. Nearly fifty-five minutes later, Trump continued:

> [B]ut I said 'Something's wrong here, Something's really wrong, can't have happened.' And we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore.

*Id.* Additionally, less than a minute later, Trump told his supporters to peacefully walk to the Capitol, stating:

> I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard

*Id.* ¶5.

It is those two statements, edited and spliced together, that form the alleged defamatory twelve-second segment that aired in the Documentary. BBC admits Trump never made the statements as aired. The Chairman of BBC apologized to Trump, stating that the BBC "editing unintentionally created the impression of a single continuous section of your speech, rather than excerpts from different points in the speech." [FAC, Ex. K]. This, the BBC chairman stated, "gave the mistaken impression that you had made a direct call for violent action. That was an editorial error and it should not have happened."

After the statement aired, Trump filed this lawsuit and later, the amended complaint at issue.

**ANALYSIS**

BBC moved to dismiss Trump's first amended complaint. [ECF No. 133]. BBC raises two distinct bases for dismissal. First, BBC argues the Court lacks personal jurisdiction over it. Second, BBC argues the complaint fails to state a claim for defamation.

Under Florida law, before a court addresses whether specific jurisdiction exists under the state's long arm-statute, the court must determine "whether the allegations of the complaint state a cause of action." *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (citations omitted). So, before determining whether specific jurisdiction is proper, the Court must address whether the complaint states a cause of action for defamation per se and/or under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a plaintiff must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

While detailed factual allegations are not required, a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss. *Id*. When considering a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all of the plaintiff's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts may also consider evidence outside the complaint if the evidence is incorporated by reference into the complaint. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). To do so, the evidence must be "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Id.*

## I. <u>**Defamation Per Se Claim**</u>

Trump brings a claim for defamation per se in Count I. Trump alleges that BBC made "false, deceptive, malicious, and defamatory statements and depictions

about [Trump]" which were done "intentionally, with actual malice, and without privilege." [ECF No. 1, ¶ 135]. BBC argues that Count I should be dismissed because Trump has not pled actual harm or malice, is unable to plead actual harm, and that the documentary contains protected expressions of opinion. [ECF No. 133, at 24-28].

For his defamation claim, Trump must plausibly allege "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official …; (4) actual damages; and (5) the statement was defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018).[2] True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment. *Id.* (citing *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714-15, 717 (11th Cir. 1985). Additionally, under Florida law, where a statement suggests that someone has committed a dishonest or illegal act, that statement may be defamatory per se. *See Corsi v. Newsmax Media Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla 2021); *Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539, 1541-42 (M.D. Fla. 1993).

---

[2] When applying state defamation law to public figures, the First Amendment imposes additional limitations. *Coral Ridge Ministries Media, Inc. v. Amazon.com Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021). First, the alleged defamatory statement must be "sufficiently factual to be susceptible of being proved true or false." *Id.* (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)). Second, the statement must be actually false. *Milkovich*, 497 U.S. at 16. And third, the public figure plaintiff must prove that the defendant made the alleged defamatory statement with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 245, 279-80 (1964) ("with knowledge that it was false or with reckless disregard of whether it was false or not.").

BBC raises several attacks against Trump's defamation claim. First, that Trump "has not pleaded, and will not be able to prove, actual harm." [ECF No. 133, at 24]. Second, that the "[c]omplaint fails to plausibly plead actual malice. *Id.* at 25. And finally, that the "Documentary contains protected expressions of opinion." *Id.* at 28. Any one of these arguments, if successful, would independently defeat Trump's defamation claim. The Court addresses each argument individually.

**A. <u>Actual Harm</u>**

BBC contends that not only has Trump failed to plead actual harm, but that he will be unable to prove any harm at all. [ECF No. 133, at 24]. It argues that Trump cannot prove the Documentary caused any cognizable harm. *Id.* With respect to damages in defamation per se actions, Florida law eliminates presumed damages for defamation per se actions against media defendants. *See Mid-Florida Television Corp. v. Boyles*, 67 So. 2d 282 (Fla. 1985). So, it follows that Trump is required to sufficiently plead actual damages.

The linchpin for Trump's claim of actual harm is the reputational harm he allegedly suffered because of BBC's portrayal in the Documentary. *See* [FAC, ¶131]. Still, BBC frames this claim as a vague and conclusory assertion that Trump suffered some injury to his personal reputation. [ECF No. 133, at 24].

BBC correctly asserts that Florida requires defamation plaintiffs to plead and prove actual damages, and challenged defamatory statements must be the "but for" cause of plaintiff's alleged injuries. BBC cites a Florida Circuit Court case to support its position. *Zimmerman v. Allen*, 12-CA-6178, 2014 WL 3731999, at *9

(Fla. Cir. Ct. June 30, 2014). However, *Zimmerman* is distinguishable given the material differences between the alleged statements in *Zimmerman* versus those at issue here. In *Zimmerman,* the court found that the plaintiff was "unable to demonstrate that the editing choices at issue resulted in a materially false change in the meaning of what was actually said[.]" *Id.* at *9. In another case cited by BBC, *Harrington v. Veritext, LLC*, the court found the plaintiff did not plausibly allege actual damages because plaintiff failed to identify the "precise statements he alleges are defamatory." 24-CV-22787, 2025 WL 1591614, at *21 (S.D. Fla. May 1, 2025).

The same cannot be said for this case. Here, Trump properly alleges that BBC spliced and edited together a twelve-second segment that resulted in reputational harm based off "deceptive and defamatory distortion." [FAC, ¶128-133]. On its face, a twelve-second clip seems insignificant, but in the context of the complaint, these twelve seconds are the result of splicing two segments that are separated by nearly fifty-five minutes in the speech from which the segment is sourced. [FAC, ¶62]. Rather, this twelve-second segment is the precise sort of statement that separates this case from *Zimmerman* and *Harrington.*

Finally, BBC intentionally distributed the Documentary to reach a target audience within a week of a major election. Whether Trump can prove the Documentary caused reputational harm is not at issue right now. What is at issue is what has been pleaded in the complaint. Accepting the allegations in the complaint as true, the Court finds Trump plausibly pled damages where Trump alleges a

defamatory documentary released toward the election caused reputational harm. It would be difficult for the Court to accept a different framing without completely negating the significance and fragility of political elections.

A plaintiff need only plead actual damages, which Trump has done here. At this time, Trump need not prove these damages, only plausibly allege them. Proving them is for a later inquiry. So, accepting the factual allegations in the complaint as true, the Court finds that Trump has sufficiently pleaded actual damages.

**B. <u>Actual Malice</u>**

BBC next argues that the Complaint fails to plausibly plead actual malice. [ECF No. 133, at 25]. When the plaintiff is a public figure, the plaintiff must show that the defamatory statement was made with "actual malice – that is with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Actual malice is a subjective test, meaning Trump must show that BBC "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Project Veritas v. CNN, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024). Therefore, to survive a motion to dismiss, Trump must sufficiently plead "facts giving rise to a reasonable inference that the defendant[] published the story knowing that it was false or with reckless disregard for whether it was false or not." *Dershowitz v. CNN, Inc.*, 541 F. Supp. 3d 1354, 1366 (S.D. Fla 2021) (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016)).

The Court acknowledges several recent criticisms levied against *Sullivan*. *See McKee v. Crosby,* 587 U.S. 1172 (2019) (Thomas, J., concurring in denial of certiorari); *see also Berisha v. Lawson*, 141 S. Ct. 2424 (2021) (Thomas, J., dissenting from denial of certiorari). It cannot be said that *Sullivan* is grounded in the original meaning of the Constitution, at least not in any meaningful sense. *See McKee*, 586 U.S. at 1173 ("If the Constitution does not require public figures to satisfy an actual-malice standard … then neither should we.").

Nor is *Sullivan* grounded in the history and tradition of the common law. *Id.* at 1176-77. Common law libel at the time the First and Fourteenth Amendments were ratified did not require public figures to satisfy any kind of heightened liability standard as a condition of recovering damages. *Id.* In fact, historically the common law deemed libels against public figures to be more serious and injurious than ordinary libels. *Id.* at 1177 (citing 3 William Blackstone, Commentaries *124) ("Words also tending to scandalize a magistrate, or person in a public trust, are reputed more highly injurious than when spoken of a private man").

It is logical then, that a public figure like the President of the United States should not be subjected to a heightened standard *non-existent* at the time of the Founding. Under *Sullivan*, the chief executive of the world's most powerful country could be subject to false and injurious statements without a remedy if he fails to satisfy a judge made standard that bears "no relation to the text, history or structure of the Constitution[.]" *See Tah v. Glob. Witness Publ'g, Inc.,* 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J. dissenting).

Regardless, *Sullivan* remains good law and inferior courts are bound by vertical precedent. Furthermore, it is the responsibility of inferior courts to respect that binding authority. District courts are not asked to expound on what the law should be. Rather, District courts are asked to resolve cases and controversies presented to them by applying the law available to them. This case is no different.

### ***i. Ill-will, improper motive, or personal animosity***

First, BBC argues that Trump cannot "create an actionable statement or implication by citing one clip but ignoring the rest of the documentary." [ECF No. 133, at 26]. BBC asserts that there is no actual malice because courts consider "challenged statements in context of the full publication"[3] and the Documentary contains "extensive coverage of [Trump] supporters and balanced coverage of [Trump's] path to reelection." *Id.* Nonetheless, BBC contends that whether the Documentary is "overwhelmingly negative" is irrelevant at this time because "an intention to portray a public figure in a negative light, even when motivated by ill will … is not sufficient to show actual malice[.]" [ECF No. 133, at 26]; *Don King Prods. v. Walt Disney*, 40 So. 3d 40, 44-46 (Fla. 4th DCA 2010).

For purposes of the defamation test, ill-will is different from actual malice. *Id.* at 44. An intention to portray a public figure in a negative light, even when motivated by ill-will or evil intent, is not sufficient to show actual malice unless the publisher intended to inflict harm through knowing or reckless falsehood. *Id.* at 45.

---

[3] *See e.g.*, *Berisha v. Lawson*, 973 F.3d 1304, 1315-16 (11th Cir. 2020); *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999).

However, ill-will or motive, when combined with other evidence, may be taken into account for actual malice. *Id.* at 44 (citing *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668 (1989)).

It is worth noting that the Eleventh Circuit has held that "[i]ll-will, improper motive or personal animosity plays no role in determining whether a defendant acted with actual malice." *Veritas*, 121 F.4th at 1283 (quoting *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999)). However, this appears to conflict with the Supreme Court in *Connaughton*, where the Court explained "it cannot be said that [circumstantial] evidence concerning motive … never bears any relation to the actual malice inquiry." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668 (1989). This district has identified the same dilemma in another proceeding. *See Block v. Matesic*, 789 F. Supp. 1131, 1171-72 (S.D. Fla. 2025) (Altman, J.) ("*Veritas* and *Dunn* may be in tension with *Connaughton*").

Where *Veritas* simply quotes and reincorporates the Eleventh Circuit's footnote in *Dunn*, the Eleventh Circuit in *Dunn* relies on the Supreme Court to formulate its position that ill-will plays no role in determining actual malice. *See Dunn*, 193 F.3d at 1198 n.17. A cursory glance at the footnote shows that the court is citing to *Masson v. New Yorker* for support, quoting "[a]ctual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from site or ill will." 501 U.S. 496, 510 (1991). It is unclear the extent to which the Eleventh Circuit interprets this to mean that ill-will or motive plays *no role* in the sense that it may never be raised in an actual malice

inquiry. The Supreme Court in *Masser* was merely clarifying that the legal term "actual malice" should not be confused with how the term "malice" is understood in common parlance.[4] And nothing in *Masser* indicates the Supreme Court intended to overturn the position established in *Connaughton*, that much is known.

To be clear, this Court does not assert the Eleventh Circuit's decisions in *Veritas* and *Dunn* defy existing Supreme Court precedent. Rather, the Court construes the Eleventh Circuit's interpretation as one that is compatible with existing Supreme Court precedent in *Connaughton*. Put another way, "ill-will, improper motive or personal animosity" play no role in determining whether a defendant acted with "actual malice" insofar as that is not the proper inquiry. The proper inquiry for actual malice is whether BBC "actually entertained serious doubts as to the veracity of the published account or was highly aware that the account was probably false." *See e.g.*, *Veritas*, 121 F.4th at 1283. Therefore, "[t]he existence of actual malice may be shown [through] any competent evidence, either direct or circumstantial[.]" *Block*, 789 F. Supp. at 1166 (quoting *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979)).

It follows that Trump may plausibly allege actual malice through factual allegations of circumstantial evidence, such as ill-will, improper motive, or personal

[4] The Supreme Court's discussion around the meaning of "actual malice" arose in the context of how the phrase is to be interpreted with regards to jury instructions. *Masson*, 501 U.S. 496 at 511 ("In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity.")

animosity, when such circumstantial evidence is probative of BBC's state of mind regarding their knowledge of falsity or reckless disregard for the truth.

Here, Trump alleges that BBC has a history of unfair or improper coverage toward him. In addition to the Documentary itself, Trump highlights the Prescott Memorandum, a 2022 BBC Newsnight episode, and the "2024 BBC News Shooting Hoax." [FAC, ¶¶63-85]. As an important reminder, the state of mind required for actual malice must be "brought home" to the person in the BBC's organization responsible for the publication of the Documentary. *Sullivan*, 376 U.S. at 287. This principle is relevant as it relates to the 2022 Newsnight episode and the 2024 "Shooting Hoax." Again, Trump has not alleged that either of these incidents involved the creator(s) of the Documentary. That said, these incidents are not merely portrayal in a negative light, but examples of BBC playing fast and loose with the factual accuracy of their media content. With respect to the Newsnight episode, the BBC seemingly did not care about the falsity of the portrayal until the later Documentary became an issue. *See* [FAC, at 18 & n.25]. Such examples can be said to be probative of BBC's state of mind as it pertains to recklessness in light of BBC's non-action toward false statements about Trump.

Thus, Trump paints a picture that demonstrates the BBC has a record of allowing the publication of false statements in their portrayal of Trump. BBC asks the Court to put on blinders and treat the Panorama team as if they were blocked off from the rest of the organization, ignorant of everything else going on at BBC. At this procedural stage, the Court simply cannot ignore the circumstantial evidence

presented. To do so would make it extremely difficult to ever prove a defendant's subjective state of mind in any defamation case. *See Trump Media & Technology Grp. Corp. v. WP Company LLC*, 838 F. Supp. 3d 1213, 1219 (M.D. Fla. 2026).

#### ***ii. BBC's editing and Chairman apology***

Trump alleged that BBC's editing of the speech was an "intentional and malicious effort to falsely and deceptively portray President Trump as having called for violence." [FAC, ¶61]. In support, Trump alleges that it "would have been impossible for BBC's journalists and producers to splice together two distinct parts of the [s]peech from nearly fifty-five minutes apart *unless* they were acting intentionally." *Id.* ¶62. On its face, the editing may independently establish the plausibility of actual malice. BBC tries to frame this editing as ordinary editing done to condense a seventy-minute-long speech into twelve seconds. But the Court is not persuaded.

Editing is often required. However, given the time disparity between the two statements, the distance itself tends toward a plausible inference that BBC knew or should have known that the segment they were creating would not and could not have been a truthful statement. This was not trimming around the edges but creating something different than what was stated in the speech. BBC also had the entire speech available to them for nearly three years by the time of the Documentary. *See Pete v. Cooper*, 812 F. Supp. 1251, 1266 (S.D. Fla. 2025) (finding the pleading standard was satisfied where plaintiff alleged, *inter alia,* that readily available information contradicted defendant's statement).

In addition to the editing itself, BBC's Chairman issued an apology:

> "The way the speech was edited in the documentary gave a misleading impression of what you said. The editing unintentionally created the impression of a single continuous section of your speech, rather than excerpts from different points in the speech. This gave the mistaken impression that you had made a direct call for violent action. That was an editorial error and it should not have happened."

[FAC, Ex. K].

However, the BBC now appears to disagree with the apology issued by the Chairman. BBC's Chairman admitted that the documentary gave a misleading and mistaken impression that Trump made a direct call for violent action. Strangely enough, BBC strays from that position in the Motion to Dismiss, referring to statements made by January 6 defendants as evidence that the speech may be interpreted as a call to violent action. [ECF No. 133, at 26]. But BBC's own Chairman acknowledged the editing was misleading in his letter to Trump. *See* [FAC, Ex. K].

Regarding misleading impressions, the quote that BBC relies on from the open letter to the U.K. Parliament has been used out of context. *Id.* In that letter, the Chairman states, "the *EGSC also heard from BBC News that* the purpose of editing the clip, was to convey the message of the speech made by President Trump so that Panorama's audience could better understand how it had been received by President Trump's supporters and what was happening on the ground at that time." [FAC Ex. K, at 3 & n.7] (emphasis added). BBC omits the first portion of the sentence in an effort to assign the words directly to the Chairman himself. That was not the reality. The words were a statement that the EGSC had heard and then

relayed to the Chairman. Put another way, the Chairman himself never admitted that was the purpose for editing the clip, hence why such a statement is notably absent from his letter to Trump.

Nonetheless, if that were the goal of the portrayal, then playing the speech in its original form should achieve those ends. After all, if the goal is to convey a feeling that existed at the time of the speech, why not relay the speech in the exact manner as it was originally given? BBC provides no answer to that question.

Even if we accept BBC's framing, this argument does not favor BBC. Accepting BBC's framing would mean BBC *intentionally* edited the clip to convey a message not found in the speech itself, but a message found in the crowd on January 6. But the Documentary's audience is not on the ground on January 6, they are interpreting the speech as a viewer. Accepting BBC's argument would be to accept that BBC edited the clip to convey to the audience Trump issued a call for violence rather than what message would be conveyed in its original form. This would contradict the Chairman's statement that the impression given - that Trump made a direct call to violence - was unintentional.

### ***iii. <u>Departure from reasonable journalistic standards</u>***

As a final matter on the issue of actual malice, Trump alleges that BBC strayed from accepted standards of journalistic integrity. [FAC, ¶66]. Such a claim on its own would not amount to actual malice, since actual malice requires "more than a departure from reasonable journalistic standards." *Michel*, 816 F.3d at 703.

A failure to investigate, standing on its own, does not indicate the presence of actual malice. *Id.* (citing *Connaughton*, 491 U.S. at 692). To show actual malice, there must be some showing that the BBC purposefully avoided further investigation with the intent to avoid the truth. *Id.*

BBC first argues that allegations BBC failed to contact Trump for comment before publishing are insufficient to establish actual malice. [ECF No. 133, at 27]. On this point, the Court agrees.

BBC then argues that allegations that BBC omitted portions of Trump's speech are also insufficient to establish actual malice. *Id.* Alterations of quotes that "materially alter" the meaning of Trump's statements could support a finding of actual malice. *See Moore*, 174 F.4th at 886. In *Moore*, the court found no actual malice where plaintiff's claims did not turn on the alteration of direct quotes from news reports. *Id.* The facts here differ significantly. BBC did not just alter the quote but created a new quote by splicing two statements together and passing them off as a single continuous sentence. To the extent that there was no material alteration to the meaning of Trump's speech, that simply cannot be the case. The Chairman's letter makes it very clear that BBC acknowledges there was a material change of meaning when they edited the speech to create a single continuous segment that did not exist. *See* [FAC, Ex. K].

BBC then argues that the apology "militates against a finding of actual malice." [ECF No. 133, at 28]; *see Nelson Auto Ctr. v. Multimedia Holdings*, 951 F.3d 952, 959 (8th Cir. 2020). "[R]eadiness to print a retraction weighs against

'malice.'" *Id.* (quoting *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987). If *Nelson* applies, the Court first turns to the true origin of the quoted language, *Hoffman v. Washington Post Co.*, 433 F. Supp. 600 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978).

In *Hoffman*, the court stated that "it is significant and tends to negate any inference of actual malice on the part of the [defendant] that it published a retraction … *in the next day's edition* of The Washington Post." *Id.* (emphasis added). That makes sense. In the 1970s, next day retraction was likely the fastest correction that could be issued for a printed publication. Today, retractions can be issued near instantaneously for online publications thanks to the internet. The Court acknowledges that media entities, like The Washington Post, or BBC, are not perfect, and make mistakes. However, it cannot be said that a retraction the next day is in the same ballpark as a retraction over a year later, and only after being threatened with legal action. The temporal distance here makes the retraction a weak indicator as to BBC's state of mind at the time of publication.

Further weakening BBC's argument, BBC was aware that such editing created a false impression as early as 2022. *See* [FAC, ¶¶71-78]. Former Acting White House Chief of Staff Mick Mulvaney, in relation to the 2022 Newsnight episode, stated on-air: "Your video actually spliced together the presentation. … [Y]our video makes it look like those two things came together." *Id.* ¶78. As BBC's own Clive Coleman stated "[t]he first lesson … you're taught as a broadcast journalist is that you do not joint two bits of footage together from different times in

a way that will make the audience think that it is one piece of footage." *Id.* ¶79. Considering these facts, BBC's ultimate retraction in 2025 reads less like a readiness to retract, and more like a reluctance to retract.

The Court acknowledges that events from 2022 do not directly bear on the state of mind at the time of publication. But neither does a retraction over a year after publication. Hence why courts are often reliant on circumstantial evidence when making state of mind determinations. *See Trump Media & Technology Group Corp.* 838 F. Supp. 3d at 1219. Still, Trump's allegations regarding BBC's departure from journalistic standards are more than enough to plausibly alleged more than mere negligence. *Masson*, 501 U.S. 496 at 510 ("Mere negligence does not suffice.")

### *iv.* ***Trump has sufficiently pleaded actual malice***

Of course, all of this does not prove BBC acted with actual malice. But it does make it plausible. And Trump need only allege facts sufficient to give rise to a reasonable inference that the BBC edited and published the Documentary "with knowledge that it was false or with reckless disregard of whether it was false or not." *Michel*, 816 F.3d 686 at 702. Trump has done so here.

Trump has plausibly alleged a comprehensive framework of actual malice by alleging the context in which the speech was edited along with a long list of circumstantial evidence to support a showing of actual malice with respect to the edit. Trump's claims extend beyond negligence and plead a claim of recklessness. That is more than enough to satisfy the notice-pleading standard. *See Pete*, 812 F. Supp. at 1266.

### C. Protected Expressions of Opinion

BBC's final argument against Trump's defamation claim is that the Documentary contains protected expressions of opinion. [ECF No. 133, at 28]. BBC argues that the edited segment conveys an opinion of what the audience understood Trump to say. *Id.* Additionally, BBC states that "[e]ven if the Documentary is reasonably interpreted to report that [Trump] encouraged the crowd to violently storm the Capitol … that is an opinion on a matter of public concern[.]" *Id.*

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Trump v. CNN, Inc.*, No. 23-14044, 2025 WL 3213203, at *1 (11th Cir. Nov. 18, 2025) (citations omitted). As Trump correctly points out, a spliced segment that creates a sentence that Trump never spoke represents the exact kind of false statement of fact that courts hold as the *sine qua non* for recovery in defamation. Whether the audience "reasonably interpreted"[5] the segment to convey that Trump called for violence is irrelevant.[6] So the alleged defamatory statement is not a protected expression of opinion.

[5] The Court notes, again, that BBC's Chairman admitted the segment was misleading. [FAC, Ex. K]. It is puzzlingly to the Court that BBC continues down this path by implicitly alleging that the speech called for violence, in direct contradiction of the Chairman's own words.

[6] BBC's own words use "Documentary" in place of the twelve-second segment. BBC routinely conflates the two things. The Documentary can have protected expressions of opinion, but what is relevant to our inquiry is the spliced segment. That is what is the subject of the litigation, the Documentary being the vessel for the alleged false statement.

## II. FDUTPA Claim

In addition to the defamation claim, Trump brings a second claim, Count II, under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). [FAC, ¶¶147-163]. BBC argues that the claim fails under the single-action rule and that Trump cannot show FDUTPA applies here. [ECF No. 133, at 29].

Under Florida law, a single publication sustains a single cause of action. *Bongino v. Daily Beast Company, LLC*, 477 F. Supp. 3d 1310, 1320 (S.D. Fla. 2020). Therefore, "[i]f the defamation count fails, the other counts based on the same publication must fail as well." *Id.* Because the Court finds Trump's defamation claims are sufficient, the single-action rule is inapplicable.

BBC's second argument that the FDUTPA does not apply because FDUTPA is limited to acts "in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The statute defines this as "the advertising, soliciting, providing, offering, or distributing" of goods, services, property, "or any other article, commodity, or thing of value." Fla. Stat. §§ 501.203(8).

BBC correctly identifies that the Eleventh Circuit has held "magazines and newspapers often have commercial purposes, but those purposes do not convert the individual articles within these editorial sources into commercial speech." *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017). Both advertising and subscriptions are typical features of newspapers, whether online or in-print. *Id.* at 952. Even if BBC has commercial purposes, that does not convert the Documentary into commercial speech. *See id.* So, Trump's FDUTPA claim is dismissed.

## III. Personal Jurisdiction

BBC asks the court to dismiss this case for a lack of personal jurisdiction on two bases. First, that BBC is not at home in Florida and therefore, not subject to general personal jurisdiction in Florida. Second, that the Court does not have specific personal jurisdiction. The Court must consider two questions in resolving personal jurisdiction: (1) whether personal jurisdiction exists over the nonresident defendant under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1139, 1350 (11th Cir. 2013) (citing *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004).

Put simply, for the first prong, the exercise of jurisdiction must be appropriate under the forum state's long-arm statute. *See Moore v. Cecil*, 109 F.4th 1352, 1362 (11th Cir. 2024). For the second prong, the defendant must have sufficient minimum contacts with the forum state, and the exercise of jurisdiction must not offend traditional notions of fair play and justice. *See id.*

## IV. General Jurisdiction

Florida's long-arm statute allows general jurisdiction over "[a] defendant who is engaged in substantial and not isolated activity within this state[.]" Fla. Stat. § 48.193(2). The reach of Section 48.193(2) "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment."

*Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (quoting *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010). So, to determine whether a court has general jurisdiction under Section 48.193(2), the Court "need only determine whether the [ ] court's exercise of jurisdiction over [defendant] would exceed constitutional bounds." *Id.*

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations" without offending due process "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation omitted). Corporations are usually "at home" at their place of incorporation and at their principal place of business. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (citation omitted).

Trump acknowledges that BBC is a "British corporation … with its principal place of business in London, England." *Id.* ¶12. Nevertheless, Trump argues that BBC is engaged in "substantial and not isolated business activities in Florida … [and] in this district[,]" by publishing media content available to individuals in Florida and by having a subsidiary located in Florida. [ECF No. 124, ¶¶14-18]. So, to establish general jurisdiction, Trump would have to alleged that BBC's activities in this forum present an "exceptional case" rendering it "at home" in Florida. *See Grimm v. Imagine Nation Company, Inc.*, 2023 WL 12023157, at *3 (S.D. Fla. Dec. 21, 2023) (citing *Daimler AG v. Baumann*, 571 U.S. 117, 139 n.19 (2014)).

The lone exceptional case is that of *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952) where a Philippines mining company temporarily moved to Ohio during the Japanese occupation of the Philippines in World War II. The Supreme Court later explained that in *Perkins*, "Ohio was he corporation's principal, if temporary, place of business[.]" *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779 n.11 (1984). In that context, '[g]iven the wartime circumstances, Ohio could be considered a surrogate for the place of incorporation or head office[.]" *Daimler AG*, 571 U.S. 117, 152 n.8 (Sotomayor, J., concurring).

Having explained the applicability of the exception to the rule in *Perkins*, the Court looks at Trump's assertion that BBC's Florida subsidiary establishes general jurisdiction in this case. The Supreme Court's decision in *Daimler* is guiding here. In that case, the Court held that California courts could not exercise general jurisdiction over a German company with a wholly-owned subsidiary that did business in California even if the subsidiary's contacts were "imputable" to the parent. 571 U.S. at 136. The Supreme Court rejected this view that a foreign corporation should be subject to general jurisdiction whenever they have an in-state subsidiary. *Id.*

Finally, regarding BBC's alleged "substantial and not isolated business activities," the inquiry is whether BBC's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear*, 564 U.S. at 919. The Eleventh Circuit has held that maintaining a website accessible from Florida and, *inter alia*, advertising in publications

circulated in the United States, is insufficient to be considered "continuous and systematic." *See Fraser v. Smith*, 594 F.3d 842, 844-47 (11th Cir. 2010).

So the Court finds that BBC's affiliations with the state do not rise to the appropriate level of continuous and systematic. If BBC's Florida activities, which amount to a subsidiary office and media content accessible from Florida, were sufficient to exercise general jurisdiction, then the same reach would be extended in virtually every state in which BBC has an office and whose residents have internet access. *See Daimler*, 571 U.S. at 139.

Therefore, the Court finds that BBC is not "at home" in Florida and as a result, not subject to general personal jurisdiction.

## V. <u>Specific Jurisdiction Under Florida's Long Arm Statute</u>

### A. <u>Fla. Stat. § 48.193(1)(a)(6)</u>

The "causing injury" provision of Florida's long-arm statute allows courts to establish personal jurisdiction when a defendant either "engaged in solicitation or service activities within this state" or that "[p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use." Fla. Stat. § 48.193(1)(a)(6)(a)-(b); *Reger v. Barefoot*, No. 9:24-CV-80396-WPD, 2024 WL 6978055, at *7 (S.D. Fla. July 26, 2024) (citations omitted). Critically, this provision applies only if the alleged acts cause "injury to persons or property," meaning the plaintiff must allege "personal injury or physical property damage." *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So. 2d 992, 994 (Fla. 1987).

BBC argues in their motion to dismiss that the Court lacks jurisdiction under Fla. Stat. 48.193(1)(a)(6) because Trump fails to allege any personal injury or physical property damage. [ECF No. 133, at 4]. Trump brings two claims: Count I, a defamation per se claim; and Count II, a Florida Deceptive and Unfair Trade Practices act claim, neither of which alleges personal injury or physical property damage. *See* [ECF No. 124, ¶¶134-163]. Thus, BBC is correct that Trump's claims do not allege any personal injury or physical property harm and the Court lacks jurisdiction under Section 48.193(1)(a)(6). *See Leon v. Continental AG*, 301 F. Supp. 3d 1203 (S.D. Fla. 2017) (finding lack of jurisdiction because plaintiff did not claim they suffered any personal injury or physical property damage.)

**B. <u>Fla. Stat. § 48.193(1)(a)(1)</u>**

The "arising from" provision of Florida's long-arm statute allows courts to establish personal jurisdiction over "any cause of action arising from…[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Fla. Stat. § 48.193(1)(a)(1); *Karnas v. Cuban*, 22-cv-22538, 2025 WL 3759241, at *5 (S.D. Fla Dec. 30, 2025). "In order to establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000).

Florida courts have interpreted specific jurisdiction under Florida Statute § 48.193(1)(a)(1) to require "connexity," or "a causal connection between the

defendant's activities in Florida and the plaintiff's cause of action." *Doe (V.H.) v. Hyatt Hotels Corp.*, No. 23-13503, 2024 WL 3859882, at *1 (11th Cir. Aug. 19, 2024) (quoting *Canale v.* Rubin, 20 So. 3d 463, 466 (Fla. 2d DCA 2009)). Connexity requires a "direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity." *Id.* (quoting *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 82 (Fla. 1st DCA 1994) (citation omitted)).

Here, BBC is incorporated and headquartered in the United Kingdom. [ECF No. 124, ¶12]. While BBC does have a subsidiary Florida office, that office was not involved in the filming, editing, or production of the documentary in question. [ECF No. 36-1, ¶¶13-15]. Nor did BBC have the rights to broadcast, stream, or distribute the documentary in the United States, including through any of its partnerships with U.S. broadcasters. *Id.* ¶¶16-18. Whatever business contacts the BBC had with the forum state, they were unrelated to the documentary since the Florida affiliates played no role in the creation of the documentary. Because BBC's Florida connections are not directly related to Trump's cause of action, the Court lacks jurisdiction under Section 48.193(1)(a)(1). *See Doe (V.H.)*, 2025 WL 3759241, at *2 (finding a lack of jurisdiction because the connections to Florida were not causally connected to the cause of action, despite the presence of defendant's owned subsidiary in Florida).

**C. <u>Fla. Stat. § 48.193(1)(a)(2)</u>**

While Trump seemingly concedes the jurisdictional arguments under 48.193(1)(a)(1), 48.193(1)(a)(6), and 48.193(2) by not raising them in his response, Trump takes a firm stance that the Court should exercise jurisdiction under 48.193(1)(a)(2). In fact, Trump's entire jurisdictional argument appears to rest on whether specific jurisdiction exists under 48.193(1)(a)(2).

As a reminder, the exercise of jurisdiction must be appropriate under the forum state's long-arm statute. *See Moore*, 109 F.4th at 1362. The "tortious act" provision of Florida's long arm statute provides that a defendant is subject to personal jurisdiction in Florida "for any cause of action arising from … [c]omitting a tortious act within [Florida]." Fla. Stat. § 48.193(1)(a)(2). So, for Trump to establish jurisdiction under this provision, he must show that the defamation claims arose from BBC committing "a tortious act within" Florida. *See Louis Vuitton*, 736 at 1353.

The Eleventh Circuit has held that Florida's long-arm statute permits jurisdiction over a nonresident defendant who commits a tort outside the state that causes injury inside the state. *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). It follows that even if the BCC edited and broadcast the documentary in the United Kingdom, the Florida long-arm statute is satisfied if the alleged defamation in the documentary caused injury in Florida. *See id.* (finding the Florida long-arm statute satisfied in a trademark infringement case where the website was created in Tennessee but the injury occurred in Florida).

In the interest of clarity, the Court acknowledges that *Lovelady* did not hold that accessibility of a website alone is sufficient to satisfy the long-arm statute. *See PeopleShare, LLC v. Vogler*, 601 F. Supp. 3d 1276, 1282-83 (S.D. Fla. 2022); *Louis Vuitton*, 736 F.3d at 1354. Accessibility was sufficient in *Lovelady* and in *Louis Vuitton* because it was accompanied by the fact that the plaintiff was located in Florida, thus sustaining an injury in Florida. *Id.*

Because the Court accepts that Trump was a resident of Florida at the time of the alleged injury, the inquiry turns to whether the defamatory material was accessible in Florida. In their effort to contest whether Due Process was satisfied, BBC seemingly concedes that the documentary was accessible in Florida. [ECF No. 133, at 11]. The Court need not address whether this establishes any intent to target Florida. That is reserved for later analysis. For purposes of the long-arm statute, the Court need only find that the Documentary was accessible. *See Louis Vuitton*, 736 F.3d at 1354.

In Florida, out of state defendants may be subject to personal jurisdiction for defamatory materials posted on the defendant's website. *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214-15 (Fla. 2010). The Florida Supreme Court has stated that when allegedly defamatory material is posted on the internet about a Florida resident, "the poster has directed the communication about a Florida resident to readers worldwide, including potential readers within Florida." *Id.* And when that posting is accessed by a third party in Florida, "the material has been

'published' in Florida and the poster has communicated the material 'into' Florida, thereby committing the tortious act of defamation within Florida."

## VI. <u>The Due Process Clause</u>

"Even accepting *arguendo*" that Florida's long-arm statute applies, BBC argues that Due Process is not satisfied because Trump cannot show purposeful availment on behalf of BBC. *See* [ECF No. 133, at 14-15].

In specific jurisdiction cases, to determine whether jurisdiction over a non-resident defendant comports with due process, courts look at "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355.

As for the first prong, the Court focuses on the "causal relationship between the defendant, the forum, and the litigation." *Del Valle v. Trivago GmbH*, 56 F.4th 1265, 1275 (11th Cir. 2022). And specific jurisdiction need not attach only when the defendant's forum conduct directly gave rise to the plaintiff's claim. *Id.* Here, we can say that there is some relation between the forum and BBC's conduct since BBC emailed a link of the documentary to a Florida resident. Also, the subject of the documentary is a Florida resident, and some filming was done in Florida. Thus, the first prong is readily met.

Turning to the second prong, concerning purposeful availment, courts generally apply two tests: the effects test and the minimum contacts test. *Id.* at 1276. Trump argues that Due Process is satisfied here via the *Calder* effects test. This test "requires a showing that the defendant (1) committed an intentional tort, (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Moore*, 109 F.4th at 1362. The parties mainly dispute whether any alleged intentional tort was directly *aimed* at the forum.

BBC argues that Trump cannot show that "BBC purposefully aimed the Documentary at Florida[.]" [ECF No. 133, at 14]. BBC asserts the following: (1) "the BBC did not broadcast the Documentary in the U.S."; (2) "the BBC took active steps to prevent viewers outside the U.K. from streaming BBC content"; (3) "[t]he allegation that the BBC streamed the Documentary 34 times to Florida is incorrect, irrelevant, and insufficient to establish personal jurisdiction"; and (4) "[t]hird-party producers cannot create personal jurisdiction over the BBC." *Id.* at 14-20.

### A. ***Calder* Effects Test**

"Stated in its broadest construction, the effects test requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.28 (11th Cir. 2009).

Internet-based activities, such as online streaming as is the case here, present a unique context for addressing personal jurisdiction under *Calder*. *See Moore*, 109 F.4th at 1363. In determining whether the allegedly defamatory Documentary was directly aimed at the forum, the court "must look to the defendant's focus, purpose, and/or intent in posting the information." *Ibid.* (citations omitted). "Thus, where the out-of-state defendant deliberately directs his posting at the plaintiff or at an audience in the forum state, then the 'directly aimed at the forum' prong of the *Calder* effects test is satisfied." *Ibid.* (citation omitted). But where there is no evidence that BBC posted the Documentary hoping to reach the forum state or an audience in the forum state, then the effects test is not satisfied. *See ibid.*

Here, Trump alleged the Documentary was available and accessible to residents of Florida, the Documentary was accessed by residents of Florida, and that BBC intentionally distributed the Documentary in the United States and in Florida. [FAC, ¶¶20-49].

"Under the 'effects test,' a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum" if the intentional conduct directly impacts a Florida resident. *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1159 (S.D. Fla 2017) (quoting *Louis Vuitton*, 736 F.3d at 1356). The tort must be: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendants should have anticipated would be suffered in the forum state." *Id.*

In *Gubarev*, the defendant published an article and dossier with allegedly defamatory statements about the plaintiffs, one of which was a Florida resident. *Id.* The court held that defendants "knew it would be viewed around the world, and given the international scope of its contents, should have anticipated that the effects of the publication might be felt … where [p]laintiffs are located." *Id.*

Here, BBC stated that the BBC would be "mindful of the effects of our report that could be seen in territories where the vote could be affected." [FAC, Ex. A]. Additionally, BBC acknowledged that "due to the subject matter," the Documentary "need[ed] to [be] broadcast ahead of the US election on 5th November 2024." *Id.* BBC affirmatively decided to film, edit, produce, and stream the Documentary while contemplating not only an international audience, but an American audience. Explicitly, Trump alleges BBC sent links to Americans with instructions on how to watch, including a link sent directly to a Florida resident. [FAC, Exs. E-G]. Implicitly, the subject matter of the Documentary involves then-candidate Trump, a Florida resident, with filming and interviews done in the United States. *See generally* [FAC, ¶31]. BBC aired the Documentary about a resident of Florida running as a Presidential candidate, one week from the election. BBC cannot then "claim surprise at being haled into court in the Southern District of Florida." *See Gubarev*, 253 F. Supp. 3d at 1159.

This case is distinguished from *Karnas*, cited above, in that *Karnas* had no specific targeting. In *Karnas*, at issue were marketing promotions directed to a generic, national audience of NBA fans. *See Karnas*, 2025 WL 3759241, at *8. Here,

specificity can be found in that Trump is a Florida resident, the Documentary was directed into the forum state via electronic communication, and the forum state was placed at issue in the Documentary itself.

For BBC to then argue that they never targeted the U.S. presents an unworkable standard. Accepting BBC's argument, a foreign litigant would be able to publish false statements directed at a presidential candidate and never be haled into court in the United States, much less Florida. The Documentary was not streamed at random. The Documentary's broadcast was tailored to have a close nexus with the 2024 election. Viewing the Documentary in a vacuum ignores this context which is the very basis for why this Documentary was even contemplated in the first place. To then turn and argue that the courts of the United States are without jurisdiction, the Court is unpersuaded.

Therefore, Trump has sufficiently alleged purposeful availment under the *Calder* "effects test."

B. **Minimum Contacts**

The other test courts apply is the traditional minimum contacts test. Under the minimum contacts test, the Court assesses whether BBC's contacts with the forum state are: (1) related to the plaintiff's cause of action; (2) involve some act by which BBC purposefully availed itself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum. *Louis Vuitton*, 736 F.3d at 1357. The Court must "identify all contacts between a nonresident defendant and a forum state and ask whether,

individually or collectively, those contacts satisfy these criteria." *Id.* (citation omitted).

Video streaming presents unique jurisdictional questions by combining different aspects of both internet commerce and traditional publications. In the context of internet postings, the Eleventh Circuit has held that "[p]osting information on the internet is not sufficient by itself to subject that person to personal jurisdiction in each State in which the information is accessed." *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *4 (11th Cir. Jun. 12, 2023) (cleaned up). Otherwise, online posters would be subject to personal jurisdiction in every state. *Id.* Thus, "[s]omething more than posting [online] and accessibility" from the forum is required. *Id.*

Therefore, purposeful availment requires that "the defendant must have had contacts with the forum that were his own choice and not random, isolated, or fortuitous," and "those contacts must show that the defendant deliberately reached out beyond its home." *LM Media, LLC v. Ello Ent. Grp., LLC*, 25-cv-60261, 2026 WL 2066165, at *10 (S.D. Fla. Jul. 17, 2026) (quoting *SkyHop Techs, Inc. v. Narra,* 58 F.4th 1211, 1230 (11th Cir. 2023)).

Here, Trump alleges that BBC has sufficient minimum contacts with Florida through VPN access in Florida, intentional distribution of the Documentary through various channels, close nexus between the subject matter and the forum state, filming done in Florida, and an email link sent to a Florida resident. [FAC, ¶¶20-51]. BBC argues that they did not broadcast the Documentary in the U.S. and

took active steps to prevent viewers outside the U.K. from streaming, that the Documentary was not streamed through VPN, and that third-party producers cannot create personal jurisdiction over BBC. [ECF No. 133, at 15-20].

Considering all these facts, the Court finds that BBC has extensive contacts with the state of Florida. First, some connection exists between BBC and Florida by virtue of Trump being the primary subject of the Documentary. BBC also identified Florida as an area of focus during the creation of the Documentary. [FAC; Ex. B, at 20]. Second, BBC directly sent a link to Rick Wilson, Florida resident, providing him with the Documentary. [FAC, ¶¶38-41]. It wasn't just the one link that BBC sent. BBC actively contemplated a global audience, to include an American audience, not just through unauthorized access, but through BBC directing a Documentary about Americans toward Americans broadcast in a window tailored toward the 2024 elections. [FAC, ¶¶36-41].

And regarding the allegations of unauthorized access in the United States, this is heavily disputed, as to both whether it was accessed in Florida and the extent of such access. While BBC did make efforts to prevent access in the U.S. the extent to which those preventive measures succeeded is disputed. But Trump pleads specific instances of so called "unauthorized access" that did not result from independent actors, but the result of directed assistance by BBC. Put another way, Trump alleges contacts that BBC themselves created the link to the forum state by circumventing the protective measures. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014). It seems contradictory that BBC would argue they prevented access while

actively assisting American citizens to circumvent the preventative measures. [FAC; Exs. E-G]. Because of this, it should be foreseeable to BBC that the Documentary would be viewed outside the U.K.

Accordingly, Trump has alleged extensive contacts tying BBC to the State of Florida. BBC tries to frame this as an operation entirely disconnected from Florida. That cannot be the case. Trump is a Florida resident, and the Documentary is almost entirely about Trump. Portions were filmed in Florida and BBC identified Florida as an important part of the Documentary. Therefore, "it seems disingenuous" for BBC to argue that they "could not have anticipated being haled into court in Florida." *Compare Gubarev*, 253 F. Supp. at 1161 (holding, in part, that defendant was subject to jurisdiction in Florida because they engaged in newsgathering efforts in Florida and regularly published articles concerning Florida-centric topics), *with LM Media*, 2026 WL 2066165, at *10 (holding defendant is not subject to jurisdiction since the sole jurisdictional hook that the plaintiff relies on is the availability of the content in the district.)

### C. <u>**Fair Play and Substantial Justice**</u>

Finally, the Court's exercise of personal jurisdiction over BBC must comport with notions of fair play and substantial justice. *See International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). The Court must consider the following facts: (1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, and (4) the judicial system's interest in resolving the dispute. *Lovelady*, 544 F.3d at 1288.

First, the burden on the defendant is minimal. BBC is a global organization with an office in Florida. Next, Trump has an interest in obtaining convenient and effective relief given the nature of the dispute and his residence in Florida. Finally, it goes without saying this forum and judicial system have a strong interest in adjudicating a defamation dispute and protecting one of its residents from harm resulting from such defamatory statements. *See Gubarev*, 253 F. Supp. 3d at 1162.

Absent compelling evidence of other considerations that would render jurisdiction in the forum unfair, the Court finds that exercising personal jurisdiction over BBC does not render jurisdiction in the forum unfair. *See Sun Trust Bank v. Sun Int'l Hotels, LTD.*, 184 F. Supp. 2d 1246, 1272 (S.D. Fla. 2001) (citing *Burger King v. Rudzewics*, 471 U.S. 462, 477 (1985)).

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that BBC's Motion to Dismiss [ECF No. 133] is granted in part and denied in part:

1. The Motion to Dismiss Count I of the First Amended Complaint is **DENIED**

2. The Motion to Dismiss Count II of the First Amended Complaint is **GRANTED**.

3. Defendant shall file an answer to Count I of the First Amended Complaint on or before December 1, 2026.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 10th day of November, 2026.

JEFFREY T. KUNTZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record